**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

THERESA D. THOMAS, ET AL                    CIVIL ACTION NO. 65-11314

VERSUS                                       JUDGE ELIZABETH ERNY FOOTE

ST. MARTIN PARISH SCHOOL BOARD,
ET AL

**MEMORANDUM ORDER**

**I.      Introduction**

Pending before the Court are two Motions to Dismiss filed by the School Board of

St. Martin Parish (the "Board").  [Record Documents 36 and 46]. The Board argues that

Plaintiffs are barred from taking any further action in this case because a final judgment

was entered by the Court on December 20, 1974 dismissing this suit.  The Board's

motions to dismiss place the Court in the unique position of interpreting one of its own

orders issued almost forty years ago.  For the reasons stated below, the Court finds that

the December 20, 1974 Decree did not dismiss this litigation and therefore **DENIES** the

Board's two motions to dismiss [Record Documents 36 and 46].

**II.     Statement of the Question to be Decided**

This Memorandum Order does not address the constitutional status of the St.

Martin Parish School System.  The Court expresses no opinion today on St. Martin

Parish School System's compliance with the requirements of the Equal Protection Clause

of the United States Constitution. The Court today decides only a narrow threshold issue that must be addressed before the question of the Board's compliance with the mandate of the United States Constitution may be considered.  That issue is whether Judge Putnam's December 20, 1974 Decree was a final judgment dismissing this suit. If the 1974 Decree dismissed this suit, then there is nothing more for this Court to decide.  The Plaintiffs could file another suit to right any segregation wrongs, but the Plaintiffs would bear the burden to prove intentional discrimination by the Board in a new action. If the 1974 Decree did not dismiss this suit, then the St. Martin Parish School Board remains under the supervision of this Court and the burden of proof remains with the Board.

III.    **Factual and Procedural Background**

    A.    **A Brief Summary of the Litigation Leading to the Pending Motions**

In 1965, Plaintiffs filed suit against the Board, alleging that the St. Martin Parish School System was being operated in a racially segregated manner in violation of the Equal Protection Clause of the United States Constitution.  [Record Document 1, p.1]. On December 20, 1974, after nine years of litigation, this Court issued a Decree declaring that the Board had operated a "unitary" school system for three years, dissolving all existing "regulatory injunctions," permanently enjoining the Board from operating a segregated school system, placing the case on the inactive docket, and retaining jurisdiction for two years.  [Record Document 25-10, pp.2-4].  In 2009, Chief Judge James discovered that this case still remained on the inactive docket and

assigned it to Judge Doherty. [Record Document 2].

Judge Doherty issued a Minute Entry on April 20, 2010 stating that it appeared that the Court had been divested of jurisdiction on December 21, 1976.  [Record Document 4, p.2].  The Court, however, invited the parties to oppose this reading of the Docket.  Id.  On May 5, 2010, both Counsel for the United States of America and Counsel for Plaintiffs filed responses to the Court's Minute Entry, arguing that the Court had not yet dismissed the case and therefore that the case remained alive.  [Record Documents 5 and 9].  The Court held a status conference in open court on June 29, 2010 at which time the Court ordered the parties to search their files to find any non-privileged documents relevant to the question of whether the case had been dismissed in 1974 and to provide those documents to opposing counsel and the Court in order to supplement the incomplete paper docket.  [Record Document 22].  All of the documents the parties identified as relevant were filed in the record on February 7, 2011.  [Record Document 25].

The case was assigned to Judge Elizabeth Foote on January 27, 2011.  On September 14, 2011, the Board moved to dismiss the suit, arguing that further litigation of the desegregation claims brought in 1965 is barred by the doctrine of res judicata. [Record Document 36].  On November 16, 2011, after the Court set out a schedule for the parties to brief this question, the Board filed a more detailed motion to dismiss on substantially the same grounds as their previous motion.  [Record Document 46].  The Court heard oral argument on these motions on April 19, 2012.

It bears repeating that the Court's resolution of the issue raised by these motions does not reach the ultimate question of whether the St. Martin Parish School Board is currently in compliance with the requirements of the Constitution.  Today the Court only decides the threshold issue of whether this Court was divested of jurisdiction over this suit more than thirty years ago.  Keeping the limited nature of this question in mind, the Court will now give a more detailed history of this litigation.

**B.    The 1965 and 1969 Desegregation Decrees**

In 1965, Plaintiffs filed suit against the School Board of St. Martin Parish ("the Board"), alleging that the school system was being operated on a racially segregated basis in violation of the Equal Protection Clause of the United States Constitution. [Record Document 1, p.1].  In the same year, the parties agreed that a "freedom of choice" plan would govern student assignments.  [Record Document 25-1, pp.1-2].  In 1969, however, the Fifth Circuit, following the Supreme Court's decision in Green v. Sch. Bd. of New Kent Cnty., 391 U.S. 430 (1968), held that the freedom of choice plan operating in St. Martin Parish and a number of other parishes within the Western District of Louisiana did not satisfy the obligations imposed by the Constitution.  Hall v. St. Helena Parish Sch. Bd., 417 F.2d 801, 809 (5th Cir. 1969).  After the parties failed to agree upon an appropriate new plan, the Court approved the plan submitted by the Board and ordered that it be implemented for kindergarten through eighth grade starting in September 1969 and for grades nine through twelve starting in the fall of 1970.  [Record Document 25-3, pp. 14-24].  The plan called for setting up school

attendance zones, pairing schools, desegregating faculty and other staff such that the

racial composition of staff of a school in no way indicated that the school was intended

for one race of students, creating a majority-minority transfer policy, and filing periodic

reports with the Court.  Id.  Commenting on the new plan, the Court stated:

> The St. Martin parish School Board has adopted an affirmative and positive
> approach to the problem of dismantling the dual school system in this parish. Its
> good faith and intelligent planning is manifest throughout the record.

_____...

> The school desegregation plan originally proposed by the defendants, identified
> and attached hererto, with the modifications hereinafter set forth, conforms with
> the requirements imposed upon the defendants by the Fourteenth Amendment
> to the Constitution of the United States and is designed to, and will, disestablish
> the defendant's dual system of schools based on race.

> Id. at 16, 20.

The Court adopted the new plan and "permanently enjoined the defendants... from

discriminating on the basis of race or color in the operation of their parish school

system." Id. at 20.

### C.    Litigation from 1969 to 1974

From 1970 to 1974 the school board submitted the periodic reports required by

the 1969 Decree and the Court actively oversaw the running of the school district,

monitored compliance with the 1969 plan, and amended the desegregation plan.  On

May 16, 1970, the Court approved a construction plan for a new school building and the

new attendance zones for students in grades nine through twelve.  [Record Document

25-4, pp.54-55].  On December 8, 1971, the Court amended the 1969 decree to add

reporting requirements and faculty and staff assignment requirements.  [Record Document 25-5, p.54].  On February 7, 1972, the Court conducted a hearing on a motion for approval of sites for school construction.  [Record Document 25-6, p.57]. Finding that "neither the construction nor the location of either [school] will tend to re-establish a dual school system" the Court approved the proposed sites.  Id.  The Court also ordered the Board to file by May 1, 1972 an updated plan for the operation of the school system incorporating both the changes made since the approval of the 1969 plan and any future planned changes.  Id. at 58.  On October 5, 1973, the Court issued an order declining to rule on a pending motion for declaratory relief by the Board.  The motion was prompted by a recent injunction issued by a state district court that conflicted with the busing portion of the desegregation order in place.  [Record Document 25-7, p.11].  The Court declined to rule on the motion until after it had addressed a related issue in another case.  Id.

**D.     Events Precipitating the Unitariness Finding**

On December 12, 1973, Judge Putnam ordered counsel to meet and report to the Court within forty-five days regarding whether there was any trend towards "re-establishment of a dual public school system in the parish of St. Martin, Louisiana, and whether or not said school system is otherwise in compliance with the orders of this Court."  Id. at 15.  The reconstructed docket does not include any response to this order.  On July 10, 1974, in response to a motion by the Board for approval of new school attendance zones, the Court ordered the Board to forward a copy of their

pending motion and the "manual developed by the Board... containing criteria for judging the qualifications of faculty and staff in said school system, objective criteria for employing new faculty members..., and otherwise defining the duties and responsibilities of the Board's staff, administrative personnel, faculty members and other employees" to opposing Counsel.  Id. at 36-37.  The Court then stated that "two years have elapsed since the final decree in this matter without further litigation" and ordered the parties to brief the following issues:

> a) Whether or not the St. Martin Parish School Board is properly before the Court as defendant in the main action.
>
> b) Whether or not the objective criteria stated in the Policy Manual adopted by the Board for the hiring and promotion of faculty and staff members meet the requirements therefor developed by the jurisprudence...
>
> c) Whether or not this school system has achieved a unitary status, has maintained such status for a period of two years, and the decree of this Court should be dissolved at this time.
>
> d) Any objections plaintiff-respondent in the rule now before us or the Department of Justice as amicus curiae may have to the zone changes proposed at this time...
>
> Id. at 37-38.

The Court stated that once all the briefing was in, a hearing would be set "for all parties to show cause why the St. Martin Parish School System should not be declared unitary and non-discriminatory and the injunctions of this Court previously issued by the Court dissolved." Id. at 38.  The Court set a hearing for August 21, 1974.  Id. at 40.

Plaintiffs moved to continue the hearing and to extend the briefing deadlines, arguing that resetting the hearing for later in the year would allow this matter to be

heard at the same time as other similar matters.  Id. at 42-44.  Plaintiffs also informed the Court that they had no objection to the Board's proposed re-definition of attendance zones.  Id. at 45.  The Defendants also moved to continue the hearing.  Id. at 50.  On August 15, 1974, the Court continued the hearing without date and extended the briefing schedule.  [Record Document 25-9, pp.2-3].  There is no indication in the reconstructed docket that the hearing was ever reset.

A detailed examination of the briefs submitted by each party in response to the Court's order provides context for the December 20, 1974 Decree at issue in the motion before the Court.  The bulk of Plaintiffs' brief addressed the first question posed by the Court, i.e., whether the Board is properly before the Court as a defendant.  Id. at 5-16.  Plaintiffs briefly consented to acceptance of the objective hiring and firing criteria contained in the Board's manual.  Id. at 16-17.  Regarding the Court's unitary status inquiry, Plaintiffs cited Wright v. Board of Public Instruction, 445 F.2d 1397 (5th Cir. 1971) and Lemon v. Bossier Parish Sch. Bd., 446 F.2d 911 (5th Cir. 1971) for the proposition that "the relevant time period in connection with the Court's inquiry is three, not two, years."  Id. at 17.  Plaintiffs also recommended either: 1) "placing the case on the inactive docket, subject to reopening for cause by either party..." as "this method permits notification to the Administrative Office that the matter is effectively closed... while indicating the continuing responsibility of the Court should unanticipated problems arise;" or 2) "the case might also be dismissed, subject to the right of either party to reopen upon good cause shown and without prepayment of costs and subject further to

the obligation of sending copies of the HEW reports to counsel." Id. at 17-18.

The United States' brief similarly focused on the issue of whether the Board was properly before the Court as a Defendant. Id. at 21-26.  The Government also did not object to the Board's new objective hiring criteria, although it did recommend that "defendants be required to keep all documents, forms and reports utilyzing [sic] the Board's criteria for an appropriate period of time, e.g. three to five years, in order to allow a determination, if it should become necessary to do so, as to whether the criteria have been followed and what their affects have been." Id. at 27.  Turning to the question of whether the school district should be released from supervision, the Government stated:

> Although the Court intimated in its Order of July 12, 1974, that the school system's maintenance of a unitary status "for a period of two years" would qualify it for discharge from the Court's active supervision, it appears to be the standard in the Fifth Circuit for district courts to retain jurisdiction of school desegregation cases "for at least three years following the achievement of a unitary school system." Lee v. Macon Cnty. Board of Educ., 5th Cir. 1972, 455 F.2d 978 (Oxford City and Calhoun County Boards of Education); Youngblood v. Board of Public Instruction of Bay Cnty., 5th Cir. 1971, 448 F.2d 770; and Steele v. Board of Public Instruction of Leon Cnty., Florida, 5th Cir. 1971, 448 F.2d 767.

> Id. at 28.

The Government also stated that an outstanding transportation issue precluded the immediate end of Court supervision of the school system.  Id.  After receiving the Government's brief, the Plaintiffs amended their own brief to add that the allegedly outstanding transportation issue precluded a declaration of unitary status and that "in this case and in the Vermillion Parish suit, any order of dismissal should require the

preservation of documents and information relating to faculty as suggested in the response of the United States." Id. at 32.

For its part, the Board allocated space in their brief to each of the Court's questions in the same ratio as the Plaintiffs and the Government.  Regarding the faculty hiring and firing standards, the Board argued that the reservation of the right to challenge those standards in the future is "a reservation of a right always maintained... [and that there] is no need to judicially reserve such a right which is inherently a remedy of all citizens of the United States assertable by them at any time." Id. at 43. Regarding dismissal of the case, the Board noted that both the Government and Defendants appeared to agree that the Board was in "full compliance with both the letter and spirit of the desegregation decree...." Id. at 44.  Finally, the Board argued that:

> [a]ll prior vestiges of the dual system are gone. There is no need for this court to retain jurisdiction. Should the circumstances change (and indeed they will not) these same plaintiffs or others aggrieved have easy access and are accorded preferential docket treatment in a summary proceedings [sic] to litigate the matter.

> Id. at 44.

The Board's brief was the final response to the Court's prior Order.

### E.    The December 20, 1974 Decree

On December 20, 1974, the Court issued a decree stating that the parties had waived formal hearing and submitted all questions on the basis of the record, affidavits and briefs.  [Record Document 25-10, p.2].  The Court ruled that the Board was

properly before the Court as a defendant and that the employment policies of the Board

may be continued in operation.  Id.  Regarding the question of whether or not the

school system had achieved "unitary status," the Court stated the following:

> It is apparent from the record in this case, including the detailed plan for the
> operation of the St. Martin Parish public schools, and we so find and accordingly
> decree that the above named defendants have previously achieved a unitary
> school system and have operated as such for a period in excess of three (3)
> years prior to this date; accordingly all detailed regulatory injunctions theretofore
> entered by this Court against said defendants are hereby dissolved.

> Id. at 2-3.

The Court then "permanently enjoined" the Board from operating a dual public school

system and from taking any discriminatory actions.  Id. at 3.  The Court did not,

however, immediately dismiss the case.  Rather, the Court retained jurisdiction for two

years:

> This Court retains jurisdiction of this cause for a period of two years from this
> date.  The matter shall be placed on the inactive docket of this Court, subject to
> being reopened on proper application by any party made within said period, or
> on the Court's own motion should it appear that further proceedings are
> necessary.

> Id. at 4.

"To insure compliance with the permanent injunction above set forth," the Court

ordered the Board to: 1) file a "Hinds County" report in both 1975 and 1976; and 2)

comply with all regulations of the "Department of Health, Education and Welfare or any

other department or agency of the United States Government for the purpose of

qualifying for and receiving financial assistance in the future operation of said school

system, to the same extent as is provided by law for school systems not subject to

judicial decree, as contemplated by Title VI of the Civil Rights Act of 1964, as amended, and other federal laws, including the Emergency School Aid Act, Title VII of the Education Amendments of 1972, 20 U.S.C.A. § 1605 (a)(1)(A)." Id. at 3.  The Court also reserved the right of all parties to raise any issue relating to the hiring or firing of faculty and staff "on the merits within the two year period...." Id. at 2.

### F.    Events after the December 20, 1974 Decree

The 1975 report was filed as ordered.  Id. at 6-16.  The 1976 report ordered by the Court, however, cannot be found anywhere in the reconstructed docket.  In the process of searching their files for documents relevant to the question before the Court, the parties produced two additional post-1974 documents.  On December 9, 1975, Judge Putnam wrote a letter to Mr. Leon Roy, First Assistant District Attorney in the Sixteenth Judicial District and Counsel for the Board, in which he stated that in reviewing the 1975 report he noticed that the enrollment had increased at a school that for geographic and demographic reasons was allowed to remain all white under the desegregation decree.  Id. at 20.  Judge Putnam stated the following:

> I call your attention to the fact that the Board is still under our original injunction not to construct or otherwise enlarge existing facilities, except in such a manner as will promote the desegregation process. I suggest that any further increases in enrollment at these two schools be scrutinized carefully and that no further additions be made at either facility without taking it up with attorneys for plaintiffs.

Id. at 20.

Similarly, in a April 20, 1978 letter addressed to Mr. Knowles M. Tucker, District Attorney for the Sixteenth Judicial District, Judge Putnam states the following:

You will note that Iberia Parish and St. Martin Parish have been declared unitary, the injunction against them made permanent and the cases ordered placed on the inactive files. In each decree the Court makes reference to the final desegregation plan filed by the school board in those parishes which they are to implement and to continue in operation. Iberia Parish seems to have been ordered to make annual reports to the Court in accordance with Hinds County in order to establish that there is no resegregation taking place. On the other hand, St. Martin Parish was ordered to make these reports for two years following the date of the final decree in that case.

There is no doubt that each of these three school boards are under an injunctive decree from this Court ordering them to implement the desegregation plans approved by them and by the Court.

...

There is no doubt that if the school board in any one of these cases should violate the injunction directed to them of failed [sic] to implement the plan of desegregation which we approved they would be subject to contempt of court and other penalties. Perhaps this letter itself will suffice for your purposes.

Id. at 27-28.

The docket does not show any subsequent activity until December 9, 2008, when the

"Paper Docket Sheet of filings through 5/6/1976" was filed electronically by the Clerk of

Court.  [Record Document 1].

## IV.    The Law

### A.    The Procedural Posture of the Board's Motions to Dismiss

The present motions are before the Court in an unorthodox procedural posture.

Although the Court and parties have referred to the question before the Court as one of

jurisdiction, the Board's motions to dismiss do not actually question the Court's subject

matter or personal jurisdiction.  Rather, the motions rely on the doctrine of res judicata.

Specifically, the Board argues that any further litigation in this suit, such as Plaintiff's

Motion to Substitute Named Plaintiffs [Record Document 18], is barred by the doctrine

of res judicata.[1]  The doctrine of res judicata is generally reserved for the situation

where a second action involving the same cause of action as the first action is filed after

a final judgment on the merits of the first action.  Nilsen v. City of Moss Point, Miss.,

710 F.2d 556, 559 (5th Cir. 1983) (en banc).  In the instant suit Plaintiffs have not filed

a separate action.   The thrust of the Board's argument in their motions to dismiss—that

the December 20, 1974 Decree was a final judgment dismissing this action—is,

however, central to the question of whether the Court has subject matter jurisdiction

over this action.

       The Court has an ongoing obligation to ensure that it possesses subject matter

jurisdiction, and it may raise the issue of subject matter jurisdiction sua sponte at any

time.  Fed. R. Civ. P. 12(h)(3); MCG, Inc. v. Great Western Energy Co., 896 F.2d 170,

173 (5th Cir. 1990).  It is well-settled that a notice of appeal filed after entry of a final

judgment on the merits divests the district court of jurisdiction over the portion of a suit

resolved by the final judgment.  Griggs v. Provident Consumer Discount Co., 459 U.S.

56, 58 (1982) ("Even before 1979, it was generally understood that a federal district

court and a federal court of appeals should not attempt to assert jurisdiction over a case

simultaneously. The filing of a notice of appeal is an event of jurisdictional

significance—it confers jurisdiction on the court of appeals and divests the district court

---

[1] Plaintiff's Motion to Substitute Named Plaintiffs was denied for administrative
reasons.  [Record Document 26].

of its control over those aspects of the case involved in the appeal.").  No notice of appeal was filed in this case, however.  The Court has found only one case, an unpublished opinion of the Sixth Circuit, addressing the nature of the district court's subject matter jurisdiction after entry of a final judgment when no notice of appeal is filed.  In Clarke v. Mindis Metals, Inc. the court held that the district court retained subject matter jurisdiction to entertain an award of attorneys fees after entry of final judgment but before filing of a notice of appeal and before the deadline for filing a motion for relief from judgment.  99 F.3d 1138, 1996 WL 616677 at *6 (6th Cir. 1996). The court noted that neither 28 U.S.C. § 1291, which grants the appellate court jurisdiction to entertain an appeal once a district court has entered a final judgment on the merits, nor Federal Rule of Civil Procedure 58, which governs entry of final judgments, circumscribe the subject matter jurisdiction of district courts.  Id at *4.  The court held the following:

> [i]t cannot seriously be maintained, however, that a district court perpetually retains complete jurisdiction over a case it has decided unless and until an appeal is taken... [f]iling a notice of appeal can terminate the district court's jurisdiction sooner, but in the absence of an intervening appeal, once a district court has disposed of all claims against all parties pursuant to Rule 54(b), a district court retains jurisdiction over a case until the time for filing motions for a new trial or motions for relief from the judgment or order under Fed. R. Civ. P. 59 & 60(b) has elapsed.

> Id. at 5.

This Court is also of the opinion that the interests of litigants and the judiciary in finality require that the Court's subject matter jurisdiction over a suit terminate at some point after entry of a final judgment dismissing the suit.

While Clarke is not binding precedent, the Court is persuaded that in the event no notice of appeal is filed, a court loses subject matter jurisdiction over the portion of the suit adjudicated in the final judgment at least by the time the deadlines for filing motions under Rules 59 and 60 have run.[2]  Therefore, if the December 20, 1974 Decree was indeed a final judgment dismissing the suit, then the Court lacks subject matter jurisdiction to do anything further in this action.

Other courts in this Circuit have held that dismissal of a desegregation suit divests the district court of subject matter jurisdiction, reasoning that the limited nature of federal judicial power requires that the Court's subject matter jurisdiction over a desegregation suit terminate when the constitutional violation has been found to have been remedied and the case is dismissed.  See e.g., U.S. v. Texas Educ. Agency, 671 F.Supp 484, 486 (W.D. Tex. July 24, 1987) aff'd Overton, 834 F.2d 1171 (5th Cir. 1988) ("A district court has jurisdiction to order further relief in a desegregation case only when the case has not yet been dismissed.") (citing Lee, 584 F.2d at 82, Pickens v. Okolona Mun. Separate Sch. Dist., 594 F.2d 433, 436 (5th Cir. 1979), Pate v. Dade Cnty. Sch. Bd., 599 F.2d 501, 504 (5th Cir. 1979)).  This reasoning further supports the conclusion that the question before the court is best characterized as one of subject matter jurisdiction.  Accordingly, the Court will treat the arguments presented by both

---

[2]Since more than forty years have passed since the December 20, 1974 Decree, the Court need not decide when exactly its subject matter jurisdiction would have terminated in the event the December 20, 1974 was in fact a final judgment dismissing the suit.  Suffice it to say that the Court's subject matter jurisdiction would have long ago expired.

parties regarding the effect of the December 20, 1974 Decree as arguments addressing

whether the Court continues to have subject matter jurisdiction over this action.[3]

### B.    Supreme Court Jurisprudence

In 1954 the Supreme Court held racial discrimination in public education

unconstitutional.  Brown v. Board of Educ. Of Topeka (Brown I), 347 U.S. 483 (1954).

The Court did not, however, decide the appropriate remedy in 1954, confining itself to

ordering additional briefing.  Id. at 495-6.  Taking up the remedy issue in 1955, the

Court decided that remanding the cases before it to the lower courts who originally

heard them was the best choice considering the complexity of the issues involved in

desegregating diverse school systems.  Brown v. Board of Educ. Of Topeka (Brown II),

349 U.S. 755, 756 (1955).  The Court ordered the lower courts to use their equitable

powers to fashion decrees that would require segregated school systems to transition to

desegregated school systems.  Id.  The Court explained that "[t]raditionally, equity has

been characterized by a practical flexibility in shaping its remedies and by a facility for

adjusting and reconciling public and private needs.  These cases call for the exercise of

these traditional attributes of equity power."  Id.  The Court further ordered that

"[d]uring this period of transition, the courts will retain jurisdiction of these cases." Id.

The Court did not, however, specify exactly when or how jurisdiction over

desegregation cases was to be terminated.

The Supreme Court did not tackle this issue until 1991, when in Bd. Of Educ. Of

---

[3]Both parties had ample notice that the Court was raising the issue of its subject
matter jurisdiction. [Record Documents 4, 10, 22, 28, 39].

Ok. City Public Sch. v. Dowell it held that desegregation injunctions cannot operate in perpetuity.  498 U.S. 237, 247-48 (1991).[4]  The Court held that federalism concerns implicit in Brown's holding that Courts only retain jurisdiction during the transition to a nonracial system of public education require a different standard for dissolving a desegregation injunction than the standard enunciated in U.S. v. Swift, 286 U.S. 106 (1932).  The Court rejected the holding of the lower court that a desegregation injunction could not be lifted or modified absent a showing of "grievous wrong evoked by new and unforseen conditions."  Id. at 246 (citing Swift, 286 U.S. at 119).  As the power of a federal court to remedy a constitutional violation only extends as far as the constitutional violation itself, a federal-court decree can last only so long as it is aimed at eliminating a condition that violates the Constitution or flows from a constitutional violation.  Id. at 247 (citing Milliken v. Bradley, 433 U.S. 267 (1977)).  Citing the limited nature of federal judicial power, the Dowell Court held that in assessing whether to dissolve a desegregation injunction district courts must determine whether: 1) the

_____

[4]In order to rule on the Board's motion, the Court must determine whether the Court's December 20, 1974 Decree was a final judgment on the merits. The jurisprudence governing the termination of desegregation suits has developed substantially since the 1974 Decree was entered.  The Court is thus faced with the initial question of what law governs the Court's interpretation of the 1974 order.  In cases involving interpretation of a unitary status finding, the Fifth Circuit has relied on cases decided subsequent to the finding of unitary status.  Accordingly, the Court will adopt the same approach and apply the jurisprudence as it currently exists to the question of whether the Dec. 20, 1974 Decree dismissed the suit.  Monteihl v. St. Landry Parish Sch. Bd., 848 F.2d 625, 629 (5th 1988) (citing U.S. v. St. Lawrence Cnty. Sch. Dist., 799 F.2d 1031, 1034 (5th Cir. 1986) to support its ruling that a 1971 district court decree declaring a school system unitary did not dismiss the case because it also retained jurisdiction for a number of years, and retention of jurisdiction would be anomalous with dismissal.).

school board has complied in good faith with the desegregation decree since it was entered; and 2) whether the vestiges of past discrimination have been eliminated to the extent practicable.  Id. at 249-50 (1991).  In determining "whether the vestiges of past discrimination have been eliminated to the extent practicable," the Court restated the holding in Green that "the District Court should look not only at student assignments, but to every facet of school operations—faculty, staff, transportation, extra-curricular activities and facilities."  Id. at 250 (internal citations and quotation marks omitted).[5]

The Dowell Court was also faced with the question of whether the failure of plaintiffs to appeal a 1977 order finding the system "unitary" prevented them from now challenging the 1987 order dissolving the desegregation injunction.  Id. at 244-45.  The Court held that the 1977 finding that the school district was "unitary" was "too ambiguous to bar respondents from challenging later action by the Board."  Id. at 245.  The Court noted that lower courts have been inconsistent in their use of the term unitary, sometimes using it to refer to school districts that have completely remedied all vestiges of past discrimination, and sometimes using it to designate a school district

---

[5]In 1968 the Supreme Court held in Green v. Cnty. Sch. Bd. Of New Kent Cnty., Va. that the adoption of a freedom of choice plan, i.e., a plan allowing students at presently segregated schools to opt to attend other schools within the district, by a school board does not automatically fulfill their constitutional obligation to desegregate. 391 U.S. 430, 440-41 (1968).  The Court held that the district courts must assess the effectiveness of each proposed plan on a case-by-case basis by considering whether the board is acting in good faith and whether the proposed plan has "real prospects for dismantling the state-imposed dual system at the earliest practicable date."  Id. at 439 (internal quotation marks omitted).  The Court further held that the question of whether a school system remained segregated was to be answered by looking to "every facet of school operations—faculty, staff, transportation, extracurricular activities and facilities." Id. at 435.

"that has currently desegregated student assignments, whether or not that status is solely the result of a court-imposed desegregation plan." Id.  The Court discouraged placing too much weight on the terms "dual" and "unitary" when parsing district court orders, noting that neither term is found in the Constitution.  Id.  Most importantly, the Court established a clear-statement requirement for interpreting district court orders alleged to have terminated desegregation litigation: "In Pasadena City Bd. Of Educ. v. Spangler, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.25. 599 (1976), we held that a school board is entitled to a rather precise statement of its obligations under a desegregation decree.  If such a decree is to be terminated or dissolved, respondents as well as the school board are entitled to a like statement from the court." Id. at 246.  Dowell thus imposes an obligation on a district court seeking to dismiss a school desegregation suit to carefully craft the judgment dismissing the suit.

### C.    5th Circuit Jurisprudence

While the Supreme Court declined to lay down rules governing the termination of desegregation litigation until 1991, the Fifth Circuit developed such rules in the interim. In 1971, the Fifth Circuit held in Youngblood v. Bd. of Public Instruction of Bay Cnty. that the district court must retain jurisdiction over desegregation suits for at least three years in order to ensure that the school board does not attempt to resegregate the school system.  448 F.2d 770 (1971).  At the end of three years, the district court must give plaintiffs notice and the opportunity for a hearing where they would be able to argue for why the suit should not be dismissed.  Id.  Only then could the suit be

dismissed.  Id.  While the terse opinion in Youngblood does not specify exactly when the three-year period of retained jurisdiction should begin, the Youngblood Court was reviewing a district court's sua sponte declaration that a school system was "desegregated and unitary in nature," which suggests that district courts must retain jurisdiction for three years after declaring the system unitary.  Id.  Subsequent cases confirm that the three year period should run from the time the school district is declared "unitary."[6]  During the 1970s the Youngblood procedure for dismissing desegregation suits was enforced strictly by the Fifth Circuit.  See e.g. U.S. v. Lawrence Cnty. Sch. Dist., 799 F.2d 1031, 1038 (5th Cir. 1986) ("It is not reasonable to believe that a panel of this court would have declared the Lawrence County School District finally and fully unitary without following these procedures when the court was, during that period of time, requiring district judges to adhere assiduously to the notice and hearing requirements."); see also Monteihl, 451 F.2d at 1248-49.

   In a number of other cases the Fifth Circuit has been tasked with determining

---

   [6] See. e.g. Monteihl v. St. Landry Parish Sch. Bd., 451 F.2d 1248-49 (5th Cit. 1972) (requiring district court to retain jurisdiction for three years to ensure that no "deliberate action by the school authorities or some other agency of the State has affected the unitary status of this system so that further intervention by the district court is required."); see also Flax v. Potts, 915 F.2d 155, 158 (5th Cir. 1990) ("A district court in this circuit must not dismiss a school desegregation case until at least three years after it has declared the system unitary."), U.S. v. Overton, 834 F.2d 1171, 1175 (5th Cir. 1987) ("In Youngblood we required the district court to retain jurisdiction over a school desegregation case for three years after the court had declared the system unitary and dismissed the case."), Tasby v. Moses, 265 F.Supp.2d 757, 763-64 (N.D. Tex. 2003) (Sanders, J.)("A District Court is required to retain jurisdiction over a school district for three years after finding it to be unitary, during which time the district is to submit annual reports to the Court...").

the effect of a district court's unitary status finding.  In <u>Overton v. Price</u>, the Fifth Circuit

held that once a school district has been found to have attained unitary status, in the

sense of having remedied to the extent practicable the vestiges of past discrimination,

the district is then "free of judicial superintendence."  834 F.2d 1171, 1174 (5th Cir.

1987).  The court then explained the consequences of a declaration of unitary status:

> Attaining unitary status, however means that a school board is free to act
> without federal supervision so long as the board does not purposefully
> discriminate; only intentional discrimination violates the Constitution. As we have
> said, a school district is released from the consequences of its past misdeeds
> when it eliminates the vestiges of a segregated system and achieves a true
> unitary system.
>
> We also are unconvinced that the end of judicial superintendence that
> accompanies unitary status means only that a superintending injunction and a
> pending suit are absent; rather, we are convinced that it must also be
> accompanied by a release of a unitary district from the burden of proving that its
> decisions are free of segregative purpose.
>
> <u>Id.</u> at 1175.

It follows that a declaration by a district court that a school system is "unitary"

unaccompanied by the relinquishment of jurisdiction cannot be a finding that the school

district has eliminated the "vestiges of a segregated system."[7]  The Fifth Circuit has so

held in <u>Monteilh v. St. Landry Parish Sch. Bd.</u>, a case involving a district court judgment

dismissing a desegregation suit on the grounds that a finding of unitary status more

than a decade ago ended the case.  848 F.2d 625 (5th Cir. 1988).  The <u>Monteilh</u> court

held that the district court erred in dismissing the suit on the grounds that the suit had

---

[7]The Supreme Court subsequently embraced the principle that once the district
court finds that a school board has remedied its past constitutional wrongs normal Equal
Protection Clause doctrine applies.  <u>Dowell</u>, 498 U.S. at 250-51.

already been dismissed when the school system was previously declared "unitary." 848 F.2d at 629.  In interpreting the unitariness finding, the court reasoned that if the lower court's finding of unitariness in 1971 had indeed dismissed the suit, "the retention of jurisdiction would have been anomalous."  848 F.2d at 629 (citing U. S. v. Lawrence Cnty. Sch. District, 799 F.2d 1031, 1038 (5th Cir. 1986)).

## V.    Analysis

In Dowell the Supreme Court held that plaintiffs in school desegregation suits are entitled to a "rather precise statement" if a desegregation decree "is to be terminated or dissolved." 498 U.S. 237, 246 (1991).  In reading the December 20, 1974 Decree, the core question is therefore whether the decree is a "rather precise" statement that the suit is dismissed.  Id.  To determine whether the Decree is sufficiently precise, the Court will first examine the language of the decree in the light of the requirements imposed by the Fifth Circuit on district courts seeking to dismiss a desegregation suit. The Court will next discuss the significance of the retention of jurisdiction in the 1974 Decree.  Finally, the Court will turn to what light, if any, the contents of the reconstructed docket sheds on the meaning of the Decree.

### A.    Non-Compliance with the Youngblood Procedure

The Fifth Circuit has made clear that the Youngblood dismissal procedures exist because of the significant consequences that follow from dismissal of a desegregation suit.  Lawrence Cnty. Sch. Dist., 799 F.2d at 1037 ("because the potential consequences of a judicial declaration that a school system has become unitary are significant, this

court has required district courts to follow certain procedures before declaring a school

system unitary").  An order dismissing a desegregation suit is significant because once

the court has found that the effects of past segregation have been sufficiently

remedied, the burden reverts to the plaintiffs to prove that the school board

intentionally discriminated on the basis of race in the event resegregation is later

alleged.  Dowell, 498 U.S. at 251 ("A school district which has been released from an

injunction imposing a desegregation plan no longer requires court authorization for the

promulgation of policies and rules regulating matters such as assignment of students

and the like, but it of course remains subject to the mandate of the Equal Protection

Clause of the Fourteenth Amendment."); Overton, 834 F.2d 1175 ("Attaining unitary

status, however, means that a school board is free to act without federal supervision so

long as the board does not purposefully discriminate; only intentional discrimination

violates the Constitution.").  Given the long periods of inactivity that characterize

lengthy desegregation suits, it makes sense that plaintiffs are entitled to a clear

statement from the Court that their suit has been dismissed before they are subjected

to the serious consequences that flow from dismissal.  Wendy Parker, The Future of

School Desegregation, 94 Nw. U. L. Rev. 1157, 1207 (2000) (arguing from empirical

evidence that a substantial number of school desegregation suits are "inactive" though

court orders remain outstanding).

The Fifth Circuit has previously found non-compliance with the Youngblood

procedure during the early years of desegregation in the Fifth Circuit to be evidence

that the court did not dismiss a desegregation suit.  Lawrence Cnty. Sch. Dist., 799 F.2d at 1038. To be sure, in Lawrence Cnty. Sch. Dist. the question was whether the appellate court, rather than a district court, dismissed a desegregation suit.  Still, in the instant case both the Plaintiffs and the Government reminded the Court of the proper procedure to be employed in dismissing a desegregation suit, defusing the argument that the Fifth Circuit was more mindful of the Youngblood procedure than this Court was in 1974.  Indeed, the Government cited Youngblood directly in its brief to this Court.  [Record Document 25-9, p. 28].  The Court declines to assume that Judge Putnam was unaware of the proper method of dismissing a desegregation suit when it issued the December 20, 1974 Decree.

Though the Decree contains provisions that resemble the Youngblood procedure—such as the retention of jurisdiction after finding the school district unitary and the use of the three-year time-period—it does not follow the procedure properly.  If the Court intended to apply the Youngblood procedure "retoactively" by finding that the district had been unitary for three years and giving the Plaintiffs notice and an opportunity to object to dismissal of the suit in 1974, it is unclear why the Court then retained jurisdiction for two additional years.  See Lawrence Cnty. Sch. District, 799 F.2d at 1037 ("Before relinquishing jurisdiction, the court must give notice to the plaintiffs that it will hold a hearing to consider whether the school system should be declared unitary... if no cause is shown at a hearing held for this purpose, the case may

be dismissed, not merely declared inactive.").[8]  If the Court intended to apply the typical

Youngblood procedure and retain jurisdiction after finding that the district was unitary,

it is unclear why jurisdiction was only retained for two additional years and Plaintiffs

were not given notice or an opportunity to contest dismissal of the case at the end of

the two years.  In short, the fact that the Court did not follow the Youngblood

procedure suggests that Court did not dismiss the suit in either 1974 or 1976.

### B.    Retention of Jurisdiction

The retention of jurisdiction is also inconsistent with an order dismissing the

suit.[9]  The Court explicitly retained jurisdiction over the case for two years after the

December 20, 1974 Decree.  The Court also "permanently enjoined [the Board] from

operating a dual public school system in the Parish of St. Martin, and from adopting any

regulatory policies [or] practices... which are discriminatory as to any members of the

student population, faculty or staff, or any of its employees...."  [Record Document 25-

10, p. 3].  The Court further ordered that reports be filed for two years to assist the

---

[8]It is also far from certain that the Youngblood procedure even could be applied "retroactively" in this manner.  See Lawrence Cnty. Sch Dist., 799 F.2d at 1037 ("It should go without saying that a system does not become unitary merely upon entry of a court order intended to transform it into a unitary system.").

[9] Monteilh, 848 F.2d at 629 ("[if] the district court had found St. Landry to be unitary... the retention of jurisdiction would have been anomalous") (citation omitted); Lawrence Cnty. Sch. Dist., 799 F.2d at 1038 ("If the court had decided that the vestiges of segregation had been completely erased, the retention of jurisdiction would have been anomalous"); Overton, 834 F.2d at 1174 ("The assertion that a district court retains superintendence of a school district by the terms of a consent decree entered in a lawsuit later dismissed cannot be reconciled with the declaration that the district has achieved unitary status and is free of judicial superintendence.").

Court in monitoring compliance with the injunction.  Id.  That the Court intended to monitor compliance with the permanent injunction indicates that the injunction was not simply an injunction to "follow the law."  The fact that the Court used the same "permanent injunction" language when it approved the Board's plan in 1969 further shows that this injunction was not merely an exhortation to go forth and sin no more. [Record Document 25-3, p.20].  Both the issuance of a permanent injunction and the retention of jurisdiction for two years are inconsistent with a finding that the Board has completely discharged its constitutional duty and a release of the Board from federal supervision.

### C.    Evidence Extrinsic to the Decree

As stated above, the ambiguity apparent on the face of the decree, the Court's decision not to follow the Youngblood procedures, and the retention of the jurisdiction are sufficient to compel the Court to conclude that the Decree does not dismiss the suit. However, in the interest of completeness, the Court has examined the docket entries surrounding the December 20, 1974 decree to determine whether they clarify its meaning.  Neither the motion practice leading up to the Decree, nor the Court's letters after the Decree shed any light on the meaning of the Decree itself.

Taking the events leading up to the Decree first, the question of whether the St. Martin Parish School System had achieved unitary status was raised first by the Court sua sponte on December 12, 1973.  At that time, the Court ordered Counsel to meet and report regarding whether there is any trend towards "re-establishment of a dual

public school system...." [Record Document 25-7, p.15].  The motion practice culminating in the December 20, 1974 Decree was also initiated by the Court.  On July 10, 1973, the Court ordered the parties to brief the question of "whether or not this school system has achieved a unitary status, has maintained such status for a period of two years, and the decree of this Court should be dissolved at this time."  Id. at 37-38.

The briefing does not clarify the effect of the Court's Decree.  The parties presented the Court with many different options regarding next stage of litigation, none of which the Court adopted in its entirety and none of which, with the possible exception of the Board's position, took a clear stance on whether the case should be dismissed or not.  Both the United States and Plaintiffs reminded the Court that the Youngblood procedure of the Fifth Circuit requires the Court to retain jurisdiction of the case for at least three years following the achievement of a unitary school system. [Record Document 25-9, pp. 17, 28 (citing Youngblood, 448 F.2d 770; Lee v. Macon Cnty. Bd. of Educ., 455 F.2d 978 (5th Cir. 1972), and Steele v. Bd. of Public Instruction of Leon Cnty., Fl., 448 F.2d 767 (5th Cir. 1971))].  Plaintiffs also argued that if the Court ended active supervision of the school system it should nevertheless allow the Plaintiffs to continue to access the Court without filing a new suit.  Id. at 17-18.  Both Plaintiffs and the United States requested that Defendants be ordered to keep all documents relating to the Board's new faculty and staff hiring criteria for "an appropriate period of time, e.g. three to five years, in order to allow a determination, if it should become necessary to do so, as to whether the criteria have been followed and what their affects

[sic] have been." <u>Id.</u> at 27.

It is unclear whether Plaintiffs and the United States envisaged that such a future determination would occur in the same suit or in a separate suit.  The Board argued that the Court should dismiss the case immediately; but it then hedged this clear position, stating that "[s]hould the circumstances change (and indeed they will not) these same plaintiffs or others aggrieved have easy access and are accorded preferential docket treatment in a summary proceedings [sic] to litigate the matter." <u>Id.</u> at 44.  While the Board clearly sought immediate dismissal of the suit and the Plaintiffs and the Government urged the Court to retain jurisdiction for at least three additional years, it is unclear whether the "summary proceedings" contemplated by the Board, the "right of either party to reopen upon good cause shown" contemplated by the Plaintiffs, or the future determination regarding faculty hiring and firing procedures contemplated by the Government would be part of the same suit.[10]  While the briefing of the parties arguably sheds light on some aspects of the December 20, 1974 Decree—perhaps explaining why the Court found that the district had operated on a unitary basis for three rather than two years—it does not resolve the ambiguity present on the face of

---

[10] It would not be surprising if in 1974 the parties were not as concerned as they are now regarding whether the suit was at risk of being dismissed by the Court because in 1974 the serious consequences of dismissal were not as clear as they are today. <u>Washington v. Davis</u>, 426 U.S. 229 (1976), <u>Arlington Heights v. Metropolitan Housing Development Co.</u>, 429 U.S. 252 (1977), and <u>Dowell</u> 498 U.S. 237 (1991), the cases collectively holding that once federal supervision over a school system ends Plaintiffs must prove intentional discrimination in order to obtain relief from re-segregation, were all decided after 1974.

the Decree.[11]

The 1976 and 1978 letters further complicate the task of reading the December 20, 1974 Decree.  The 1976 letter from the Court appears to assume that the 1969 Desegregation Decree is still in effect, thereby contradicting the provision of the December 20, 1974 Decree that dissolved "all regulatory injunctions":

> I call your attention to the fact that the Board is still under our original injunction not to construct or otherwise enlarge existing facilities, except in such a manner as will promote the desegregation process. I suggest that any further increases in enrollment at these two schools be scrutinized carefully and that no further additions be made at either facility without taking it up with attorneys for plaintiffs.

> [Record Document 25-10, p. 20].

Even more problematic is the 1978 letter, written by the Court two years after the Court's jurisdiction should have terminated under the Board's theory, which asserts that St. Martin Parish is still under the 1969 Decree:

> There is no doubt that each of these three school boards are under an injunctive decree from this Court ordering them to implement the desegregation plans approved by them and by the Court.

> ...

> There is no doubt that if the school board in any one of these cases should violate the injunction directed to them of failed [sic] to implement the plan of desegregation which we approved they would be subject to contempt of court and other penalties. Perhaps this letter itself will suffice for your purposes.

> Id. at 27-28.

---

[11] It is of course possible that some missing document clarifies the parties' positions regarding dismissal of the suit, but given the present state of the record forty-years after the parties briefed this issue, the Court must confess that it finds the parties' earlier positions ambiguous.

The legal effect of these letters is unclear. The 1976 letter was delivered to all Counsel. The 1978 letter, however, appears to have only been addressed to Counsel for the Board.  Still, assuming for the sake of argument that these letters may be properly used to help uncover the meaning of the December 20, 1974 Decree, they do nothing of the sort. They further complicate the situation by suggesting that the 1969 Decree was still in effect and that the Court was actively supervising the case after December 20, 1976. Regardless, the retention of jurisdiction, the ambiguity apparent on the face of the Decree, and fact that the Court did not follow the <u>Youngblood</u> procedure compel the conclusion that the Decree is not sufficiently precise to constitute a final judgment finding that the School Board has remedied the vestiges of past segregation to the extent practical.  Accordingly, this suit remains alive.

This analysis is consistent with the recent decision of another court in this district interpreting an identical order issued by Judge Putnam on December 20, 1974 in the Vermillion Parish desegregation suit.  <u>Celestain v. Vermilion Parish Sch. Bd.</u>, No. 6:66-cv-11908, [Record Document 3] (W.D. La. July 9, 2009) (Haik, J.).  In <u>Celestain</u>, the Court held in 2009 that the Vermillion Parish School Board had fulfilled its constitutional obligation to eliminate the vestiges of past discrimination to the extent practicable and was entitled to a declaration of unitary status.  <u>Id.</u>  The Court, thus, both implicitly and explicitly recognized that the December 20, 1974 Vermillion Parish Decree, which is identical to the St. Martin Parish Decree and issued on the same date, did not dismiss the Vermillion Parish suit.  <u>Id.</u> at 2 ("Since December 20, 1974, the District had

operated under the auspices of the permanent injunction established by the Decree.")

## VI.    Conclusion

For the reasons stated above, the December 20, 1974 Decree was not a final judgment dismissing this suit.  The Court retains subject matter jurisdiction over this litigation.  The Board's motions to dismiss [Record Documents 36 and 46] are therefore **DENIED**. July 12, 2012.

ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE