UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

THERESA D. THOMAS, et al.,          *
        *Plaintiffs*                *
                                    *
UNITED STATES OF AMERICA,           *
        *Plaintiff-Intervenor*      *        CIVIL ACTION NO. 6:65-cv-11314
                                    *
vs.                                 *
                                    *
ST. MARTIN PARISH SCHOOL            *        JUDGE ELIZABETH E. FOOTE
DISTRICT, et al.,                   *
        *Defendants*                *
                                    *

*****************************************************************************

## CONSENT ORDER
## REGARDING STUDENT ASSIGNMENT

i

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    OVERVIEW AND GENERAL REQUIREMENTS ............................................. 2

III.   PROCEDURAL HISTORY.................................................................................. 2

IV.   FACTS ................................................................................................................. 3

V.    LEGAL STANDARDS ........................................................................................ 5

VI.   AGREED REMEDIAL MEASURES REGARDING STUDENT ASSIGNMENT.......... 6

   A.   The Desegregation Standard ...................................................................... 6

   B.   Attendance Zones and Modifications.......................................................... 8

       1.  High Schools................................................................................... 8
       2.  Breaux Bridge and Parks ............................................................... 8
       3.  St. Martinville and Catahoula ..................................................... 11
       4.  Cecilia ......................................................................................... 12

   C.   Majority-to-Minority Transfers................................................................ 15

       1.  General.......................................................................................... 15
       2.  Applications, Qualifications, and Effect...................................... 16
       3.  Transportation .............................................................................. 17
       4.  Capacity ....................................................................................... 17
       5.  Marketing ..................................................................................... 17

   D.   Transition Assistance for Majority-to-Minority Transfers and Students Reassigned As A Result of Attendance Zone Changes ....................................................... 19

   E.   Implementation Safeguards to Ensure Equitable Classroom/Within-School Student Assignment ........................................................................................... 19

VII.  MONITORING, REPORTING, AND OVERSIGHT ...................................... 20

   A.   November 15 and March 15 Reports ........................................................ 20

   B.   June 30 Report........................................................................................... 21

VIII. MODIFICATIONS ........................................................................................... 21

IX.   OBJECTIONS................................................................................................... 21

X.      TERMINATION OF JUDICIAL SUPERVISION..........................................................22

XI.     EFFECT OF PRIOR ORDERS .................................................................................23

XII.    APPENDIX NO. 1 ....................................................................................................26

XIII.   APPENDIX NO. 2 ....................................................................................................27

## I.   INTRODUCTION

Plaintiffs, Tracie Borel and Genevieve Dartez, and Plaintiff-Intervenor, United States of America ("United States"), (collectively, "Plaintiff Parties") and Defendant, St. Martin Parish School Board (the "District"), respectfully submit this Consent Order Regarding Student Assignment, which clarifies the remaining issues regarding the District's fulfillment of its affirmative desegregation obligations in the area of student assignment.  The parties agree that entry of this Consent Order, without further litigation, is in the public interest and, if fully and appropriately implemented, will facilitate both the District's fulfillment of its affirmative desegregation obligations in the area of student assignment and the termination of judicial supervision regarding student assignment.

Relying on the parties' representations and the expert reports and testimony, the Court finds that this Consent Order is a good faith effort towards desegregation.  However, the mere fulfillment of the terms of the Consent Order shall not bind the Court to make a finding of unitary status.  Upon motion by a party at the appropriate time, the Court will make a factual and legal determination as to whether the vestiges of segregation have been eliminated to the extent practicable or whether further relief is necessary.  This reservation by the Court is necessary because the impact of some of the Consent Order's provisions will not be known until they are put into effect, such as the change of attendance zone boundaries and the increased encouragement and facilitation of majority-to-minority ("M-to-M") transfers.[1]

This Court has reviewed the terms of this Consent Order and concludes that entry of the Consent Order is consistent with the Fourteenth Amendment to the United States Constitution and other applicable federal law, and that such entry will further the orderly desegregation of the District.

---

[1]     *Green v. Sch. Bd. of New Kent Cnty.*, 391 U.S. 430, 439 (1968) ("[W]hatever plan is adopted will require evaluation in practice, and the court should retain jurisdiction until it is clear that state-imposed segregation has been completely removed.").

Accordingly, it is hereby ORDERED, ADJUDGED, AND DECREED as follows:

## II.   OVERVIEW AND GENERAL REQUIREMENTS

This Consent Order reflects the District's obligations under Title IV of the Civil Rights Act of 1964, 42 U.S.C. § 2000c *et seq.*, to provide educational programs and services without discriminating on the basis of race and in a manner that does not perpetuate or further the racial segregation of students.

The parties agree to the terms of this Consent Order to resolve the Plaintiff Parties' outstanding concerns regarding student assignment.  The parties anticipate that full compliance with this Consent Order will help support a finding that the District has complied with both the letter and spirit of the orders governing student assignment, and that the vestiges of past discrimination in the area of student assignment have been eliminated to the extent practicable. *See Freeman v. Pitts*, 503 U.S. 467, 485 (1992).

This Consent Order shall at all times be binding upon the District, including the successor members of the District's school board and successor District superintendents.

## III.   PROCEDURAL HISTORY

On August 17, 1965, Private Plaintiffs sued the District, alleging that the District operated a racially segregated school district in violation of the Fourteenth Amendment to the United States Constitution. *Thomas v. St. Martin Parish Sch. Bd.*, 245 F. Supp. 601, 601 (W.D. La. 1965).  On May 28, 1969, the United States Court of Appeals for the Fifth Circuit, following the Supreme Court's decision in *Green v. School Board of New Kent County*, 391 U.S. 430 (1968), invalidated the District's "freedom of choice" desegregation plan in *Hall v. St. Helena School Board*, 417 F.2d 801 (5th Cir. 1969).

On August 8, 1969, the Court approved the District's new desegregation plan as modified (the "1969 Desegregation Decree"), which, *inter alia*, authorized M-to-M transfers and established five neighborhood-based attendance zones – St. Martinville, Parks, Breaux Bridge,

Cecilia, and Catahoula. ECF No. 25-3 at 20-24. *See* ECF No. 25-3 at 9, 12; ECF No. 25-4 at 45-46.   On December 20, 1974, the Court entered a decree purporting to dissolve the 1969 Desegregation Decree (the "1974 Desegregation Decree").  *See* ECF No. 25-10 at 2-4.  On April 20, 2010, this Court issued a Minute Entry stating that "it appeared that the Court had been divested of jurisdiction on December 21, 1976" and "invited the parties to oppose this reading of the Docket." Mem. Order, *Thomas v. St. Martin Parish Sch. Bd.*, No. 65-11314, ECF No. 58 at 3 (W.D. La. July 12, 2012).

After briefing by the parties, on July 12, 2012, the Court held that this case remained open because the 1974 Desegregation Decree had not dissolved the 1969 Desegregation Decree or terminated the case.  Mem. Order, *Thomas v. St. Martin Parish Sch. Bd.*, No. 65-11314, ECF No. 58 at 31 (W.D. La. July 12, 2012).   On June 24, 2014, the Court of Appeals for the Fifth Circuit affirmed the District Court's July 12, 2012 decision.  *Thomas v. Sch. Bd. St. Martin Parish*, 756 F.3d 380, 387 (5th Cir. 2014).

On January 19, 2016, the Court conducted a hearing as to the terms of this Consent Order and received evidence in the form of testimony and reports of experts presented by the Board and the Plaintiffs.   On January 20, 2016, the Court toured several of the schools that would be impacted by this Consent Order.  Upon review of the evidence received and in consideration of the consent of the parties, the Court finds that the Consent Order should be approved, as follows.

## IV.   FACTS

The District's current student assignment plan assigns students by geographically designated attendance zones to a total of sixteen (16) schools, with all but Stephensville being in feeder patterns within four (4) attendance zones as follows:

| Breaux Bridge Zone | Parks Zone | St. Martinville Zone | Cecilia Zone |
|---|---|---|---|
| Breaux Bridge High (9-12) | | St. Martinville High (9-12) | Cecilia High (9-12) |
| Breaux Bridge Junior (6-8) | Parks Middle (5-8)[2] | St. Martinville Junior (6-8) | Cecilia Middle (6-8) |
| Breaux Bridge Elem. (3-5) | Parks Primary (PK-4) | St. Martinville Primary (3-5) | Teche Elementary (3-5) |
| Breaux Bridge Primary (PK-2) | | Early Learning Center (PK-2) | Cecilia Primary (PK-2) |
| | | Catahoula Elementary (PK-8) | |

Stephensville Elementary School serves grades PK-8 with students in grades 9-12 attending Morgan City High School in neighboring St. Mary Parish.

During the 1968-1969 school year, 56% of the students in the District were White, while 44% were Black.  ECF No. 25-3 at 9-11.  That year, all of the students, faculty, and staff at Catahoula Elementary were White.  ECF No. 25-3 at 9, 11-12.  Catahoula was a White school during *de jure* segregation and has continued to be a virtually all-White school ever since.  ECF No. 25-3 at 14-18; ECF No. 150 at 5.

Currently, the District serves approximately 8,422 students in grades PK-12, of whom about 51% are White and 46% are Black.  Pursuant to current District policy, all students must attend school in the attendance zone where they reside unless they qualify for and are granted a valid transfer to another attendance zone.[3]  The District's official October 1, 2015 report shows the racial makeup of the student enrollment at each school based on the "actual enrollment" as of that date.  The actual enrollment figures account for all students attending the school, including those students who live in the residential attendance zone and those who have transferred into that zone.[4]

Based on the October 1, 2015 actual enrollment data, the racial makeup of the student enrollments by school and grade level are:

---

[2]     The students who are assigned to the Parks attendance zone for grades PK-8 currently move to either Breaux Bridge or St. Martinville for high school according to a geographical zone for those grades.

[3]     Exhibit 2 (Student Transfer and Residency Policies).

[4]     Exhibit 3 (Student Enrollment as of October 1, 2015).

**Table 1: Actual Enrollment as of Oct. 1, 2015**
*deviations from the +/-15% desegregation standard described
below in Section VI.A are highlighted in yellow and in italics*

| School (Grades Served) | White | Black | Other | Total |
|---|---|---|---|---|
| *Breaux Bridge Primary (PK-2)* | 196 (34%) | *382 (66%)* | 5 (1%) | 583 |
| *Breaux Bridge Elementary (3-5)* | 137 (31%) | *294 (67%)* | 5 (1%) | 436 |
| *Catahoula Elementary (PK-8)* | 216 (92%) | *16 (7%)* | 4 (2%) | 236 |
| *Early Learning Center (PK-1)* | 118 (30%) | *268 (67%)* | 12 (3%) | 398 |
| *Parks Primary (PK-4)* | 398 (72%) | *142 (26%)* | 12 (2%) | 552 |
| Cecilia Primary (PK-2) | 488 (62%) | 258 (33%) | 42 (5%) | 788 |
| *St. Martinville Primary (2-5)* | 159 (26%) | *431 (71%)* | 18 (3%) | 608 |
| *Stephensville Elementary (PK-8)* | 129 (97%) | *2 (1.5%)* | 2 (1.5%) | 133 |
| Teche Elementary (3-5) | 347 (67%) | 187 (34%) | 25 (5%) | 559 |
| *Elementary School Totals* | *2188 (51%)* | *1980 (46%)* | *125 (3%)* | *4293* |
| | | | | |
| *Breaux Bridge Junior High (6-8)* | 100 (29%) | *239 (70%)* | 5 (2%) | 344 |
| *Cecilia Junior High (6-8)* | 366 (65%) | *168 (30%)* | 32 (6%) | 566 |
| Parks Middle (5-8) | 240 (62%) | 139 (36%) | 6 (2%) | 385 |
| *St. Martinville Junior High (6-8)* | 103 (26%) | *280 (70%)* | 17 (4%) | 400 |
| *Middle School Totals* | *809 (48%)* | *826 (49 %)* | *60 (4%)* | *1695* |
| | | | | |
| Breaux Bridge Senior High (9-12) | 451 (54%) | 361 (43%) | 24 (3%) | 836 |
| Cecilia Senior High (9-12) | 498 (62%) | 271 (34%) | 29 (4 %) | 798 |
| St. Martinville Senior High (9-12) | 305 (40%) | 445 (58%) | 20 (3%) | 770 |
| *High School Totals* | *1254 (52%)* | *1077 (45%)* | *73 (3%)* | *2404* |
| | | | | |
| Juvenile Continuing Education Program (K-12) | 18 (60%) | 9 (30%) | 3 (10%) | 30 |
| *Other School Totals* | *18 (60%)* | *9 (30%)* | *3 (10%)* | *30* |
| | | | | |
| **TOTAL:** | *4269 (51%)* | *3892 (46%)* | *261 (3%)* | *8422* |

## V.   LEGAL STANDARDS

The ultimate goal of every desegregation case, including this one, is the elimination of the vestiges of past segregation in all aspects of school operations to the extent practicable and, ultimately, a declaration that the school district has achieved unitary status.[5]   Federal court supervision of a local school system is intended to remedy the constitutional violation and, after unitary status has been achieved, to return control of the school system to the locally elected school board.[6]

The United States Supreme Court has described six areas of operation that must be free

---

[5]      503 U.S. 467, 489 (1992).
[6]      *Id.* at 489.

from racial discrimination before full unitary status can be achieved: (1) student assignment; (2) faculty assignment; (3) staff assignment; (4) extracurricular activities; (5) facilities; and (6) transportation.[7] Each of these "*Green* factors" may be considered individually, and a school district may achieve partial unitary status as to these factors one at a time such that federal judicial supervision is relinquished incrementally.[8] In order to secure a declaration of unitary status as to any one (or more) of the *Green* factors, the District must demonstrate, as to each specific factor, that it has complied in good faith with the desegregation decree for a reasonable period of time and that the vestiges of past discrimination have been eliminated to the extent practicable.[9] For each area of operation, if the facts reveal (a) no continued racial discrimination, (b) that the District has made good faith efforts to comply with the desegregation decree, and (c) that the District has made affirmative efforts to eliminate the vestiges of the prior discrimination, this Court may declare that factor unitary but retain continuing jurisdiction over the remaining factors until such time as unitary status is achieved in the remaining areas.[10]

## VI.   AGREED REMEDIAL MEASURES REGARDING STUDENT ASSIGNMENT

### A.   The Desegregation Standard

The Supreme Court has stated that the "fundamental" inquiry and "critical beginning point" in assessing a school district's compliance with a desegregation decree is determining whether its schools remain racially identifiable.[11] Courts rely on multiple factors, including student enrollment and faculty and staff assignment, to determine whether a school is racially identifiable.[12] Racial identifiability often focuses on calculating the extent to which a school's student enrollment by race deviates from the district-wide student enrollment by race for the

---

[7]     *Green*, 391 U.S. at 435.
[8]     *Freeman*, 503 U.S. at 489-91. A court may also consider other ancillary factors. *Id.* at 492.
[9]     *Bd. of Educ. v. Dowell*, 498 U.S. 237, 249-50 (1991). *See also Flax v. Potts*, 915 F.2d 155, 158 (5th Cir. 1990); *Monteilth v. St. Landry Pub. Sch. Bd.*, 848 F.2d 625, 629 (5th Cir. 1988).
[10]    *Freeman*, 503 U.S. at 490-91.
[11]    *Freeman*, 503 U.S. at 474.
[12]    *United States v. West Carroll Parish Sch. Dist.*, 477 F. Supp. 2d 759, 763 (W.D. La. 2007).

comparable grade levels, *e.g.*, elementary, junior high, and high schools.[13]  The parties agree and the Court finds that a plus or minus fifteen percent (+/-15) variance from Black enrollment is clearly within accepted standards for this purpose and provides a reasonable starting point in this case for moving toward a unitary status determination.[14]

For the 2015-2016 school year, the district-wide percentage of Black students is 46%. The actual enrollment percentage of Black elementary students is 46%; therefore, elementary schools that comply with the +/-15% desegregation standard have an actual Black enrollment of 31-61%; the actual enrollment percentage of Black middle school students is 49%; therefore, middle schools that comply with the +/-15% desegregation standard have an actual Black enrollment of 34-64%; the actual enrollment percentage of Black high school students is 45%; therefore, high schools that comply with the +/-15% desegregation standard have an actual enrollment of 30-60% Black.

In subsequent school years, compliance with the +/-15% desegregation standard will be based on district-wide actual enrollment of Black students by grade level (elementary, middle, and high school) for the preceding school year as reported to the Court on June 30 of the respective year.  Utilizing the +/-15% standard to assess the District's desegregation efforts, the October 1, 2015 actual enrollment figures (which include valid transfers) reveal that 10 schools are racially identifiable: Breaux Bridge Primary, Breaux Bridge Elementary, Breaux Bridge Junior High, Cecilia Junior High, the Early Learning Center, St. Martinville Primary, St. Martinville Junior High, Catahoula Elementary, Parks Primary, and Stephensville Elementary.

While "[c]onstructing a unitary school system does not require a racial balance in all of the schools,"[15] "[t]he district judge or school authorities should make every effort to achieve the

---

[13]     *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 25 (1971); *see also Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 269 F.3d 305, 319 (4th Cir. 2001).

[14]     *Belk*, 269 F.3d at 319.

[15]     *Ross v. Houston Indep. Sch. Dist.*, 699 F.2d 218, 228-29 (5th Cir. 1983).

greatest possible degree of actual desegregation."[16]  The parties agree and the Court finds that the

remedial measures set forth below are designed to eliminate the vestiges of the prior

discrimination and to address the Plaintiff Parties' concerns regarding the District's operations in

the area of student assignment.  The parties agree and the Court finds, subject to the reservations

stated in Section I above, that the relief detailed below will address such concerns and, if fully

and properly implemented over a reasonable period of time, is designed to result in the

achievement of unitary status and dismissal of the case in the area of student assignment.

### B.      Attendance Zones and Modifications

The parties agree and the Court finds that, in light of the presently known facts,

circumstances, and residential patterns at issue, the zone line modifications are practicable zone

line adjustments that further desegregation.

#### 1.   High Schools

All of the high school attendance zones shall remain the same under this Consent Order.[17]

#### 2.   Breaux Bridge and Parks

Beginning with the 2016-2017 school year, the District will alter the student assignment

plan for the Breaux Bridge and Parks PK-8 attendance zones so that the Breaux Bridge

attendance zone line will extend south along the east bank of the Bayou Teche to a point at the

intersection of Poydras Highway and Jordan Drive, as more fully described in the geographical

description of "Area C" attached as Exhibit 4 and as identified in the map attached as Exhibit 5,

both of which are incorporated into this Consent Order as if fully set forth herein.

At present, Breaux Bridge Primary is 66% Black, Breaux Bridge Elementary is 67%

Black, and Breaux Bridge Junior High is 70% Black.[18]  Each of the three Breaux Bridge schools

---

[16]      *Swann*, 402 U.S. at 26.  *See Dowell*, 498 U.S. at 250 (requiring a court assessing whether a school district
has achieved unitary status to consider "whether the vestiges of de jure segregation had been eliminated as far as
practicable.").
[17]      *See* Exhibit 1.
[18]      *See* Table 1.

that serve grades PK-8 are between five (5) and six (6) points above the +/-15% desegregation standard for the Black enrollment and are racially identifiable as Black.[19]  Parks Primary (26% Black) falls below the +/-15% desegregation standard by five (5) percentage points for the Black enrollment.[20]  Parks Middle is within the +/-15% desegregation standard.[21]

As shown in Table 2 below, the reassignment of the 221 students (183 White, 36 Black, and 2 other) in Area C from the Parks zone to the Breaux Bridge zone would result in all three of the Breaux Bridge schools that serve grades PK-8 coming within the +/-15% desegregation standard.  Under the modified attendance zone plan, Parks Middle would remain within the +/-15% desegregation standard, and Parks Primary would come within two (2) percentage points of the +/-15% desegregation standard.  The parties anticipate that the agreed upon remedial measures regarding M-to-M transfers will bring Parks Primary into compliance with the +/-15% desegregation standard prior to the end of the Consent Order's monitoring period.

---

[19]     *Id.*
[20]     *Id.*
[21]     *Id.*

**Table 2: Current vs. Projected Actual Enrollment**
**- Breaux Bridge and Parks Schools Affected by Zone Changes –**
(The columns entitled "+/-" show the number of percentage points by which the Black ("B")
enrollment deviates from the overall racial makeup of the respective grade level)

| SCHOOL | CURRENT ACTUAL ENROLLMENT | | | +/- | PROJECTED ACTUAL ENROLLMENT[22] | | | +/- |
|---|---|---|---|---|---|---|---|---|
| | White % [#] | Black % [#] | Other % [#] | | White % [#] | Black % [#] | Other % [#] | |
| **Breaux Bridge Primary** | 34% [196] | 66% [382] | 1% [5] | *+20B* | 40% [271] | 59% [398] | 1% [6] | +13B |
| **Breaux Bridge Elem.** | 31% [137] | 67% [294] | 1% [5] | *+21B* | 39% [203] | 59% [307] | 1% [5] | +13B |
| **Breaux Bridge Junior** | 29% [100] | 70% [239] | 2% [5] | *+21B* | 36% [142] | 63% [246] | 1% [5] | +14B |
| **Parks Middle** | 62% [240] | 36% [139] | 2% [6] | -12B | 57% [174] | 42% [128] | 1% [4] | -5B |
| **Parks Primary** | 72% [398] | 26% [142] | 2% [12] | *-20B* | 69% [281] | 29% [117] | 2% [7] | *-17B* |

*Deviations outside of the +/-15% desegregation standard described in Section VI.A. are highlighted in pink and in italics.

---

[22]     Projected actual enrollment was calculated by subtracting the number of students in the current residency figures (*see* Appendix No. 1) from the number of students in the projected residency numbers (*see* Appendix No. 2) then adding that number of students to the actual enrollment numbers. For example, based on June 2015 residency, were all students attending their zoned school, Parks Primary would have had 384 white students. Given the rezoning done by this Consent Order, were all students to attend their zoned school, Parks Primary would be projected to have 267 white students. Thus, since 267-384 = -117, 117 white students are projected to be reassigned from Parks Primary to another school given rezoning. Since (per Table 1 above) there were 398 white students enrolled at Parks Primary as of October 1, 2015, to calculate the projected actual enrollment, the 117 white students projected to leave Parks Primary would be subtracted from 398. Since 398-117 = 281, the projected actual enrollment of white students at Parks Primary given the implementation of this plan (without taking into consideration additional student transfers) is 281. A projection using actual enrollment is used rather than a projection involving residency because this Consent Order encourages transfers; residency figures alone will not reflect transfers.

### 3.  St. Martinville and Catahoula

Beginning with the 2016-2017 school year, the student assignment plan for the St. Martinville and Catahoula attendance zones will be modified, as follows:

Grades PK-1          The student assignment plan will not be modified for grades PK-1 (i.e., all students residing in the current St. Martinville attendance zone, as shown in Exhibit 6 by bolded red line, will attend the Early Learning Center for grades PK-1 while all students residing in the current Catahoula attendance zone, as shown in Exhibit 6, will attend Catahoula Elementary for grades PK-1).

Grades 2-5           All students residing in the modified attendance zone (as described in Exhibit 4 and as depicted in Exhibit 6 by color shading) will attend Catahoula Elementary for grades 2-5.

Grades 6-8           All students who reside in the modified attendance zone will attend St. Martinville Junior High School for grades 6-8.

The Court notes that, for the purposes of this Consent Order and in a spirit of compromise, the parties have agreed not to take into account the racial makeup of grades PK-1 at the Early Learning Center and Catahoula Elementary for the purposes of determining the District's compliance with the +/-15% desegregation standard.  In determining whether the District has achieved unitary status, however, the Court will not necessarily be bound by the parties' agreement.  Regardless of the parties' agreement regarding grades PK-1 at Catahoula Elementary and the Early Learning Center, the District shall not take any action that will hinder desegregation of these schools and shall promote their desegregation via the M-to-M program.

Per Table 3 below, St. Martinville Primary is ten (10) percentage points and St. Martinville Junior High is six (6) percentage points above the +/-15% desegregation standard for the Black enrollment.  Both St. Martinville Primary (grades 2-5) and St. Martinville Junior High (grades 6-8) are racially identifiable as Black.  Catahoula Elementary (grades PK-8) is twenty-four (24) percentage points below the desegregation standard for the Black enrollment.  Under the modified attendance zone plan, St. Martinville Junior High would come within the +/-15%

11

desegregation standard.  St. Martinville Primary would be nine (9) points above the +/-15%

desegregation standard.  Catahoula would be nine (9) percentage points below the +/-15%

desegregation standard for the Black enrollment.  The parties anticipate that the agreed upon

remedial measures regarding M-to-M transfers detailed in Section C below will bring St.

Martinville Primary and grades 2-5 at Catahoula Elementary into compliance with the +/-15%

desegregation standard prior to the end of the Consent Order's monitoring period.

**Table 3: Current vs. Projected Actual Enrollment**
**- Catahoula and St. Martinville 2-8 Schools Affected by Zone Changes –**
(The columns entitled "+/-" show the number of percentage points by which the Black ("B")
enrollment deviates from the overall racial makeup of the respective grade level)

| SCHOOL | CURRENT ACTUAL ENROLLMENT | | | +/- | PROJECTED ACTUAL ENROLLMENT[23] | | | +/- |
|---|---|---|---|---|---|---|---|---|
| | White % [ # ] | Black % [ # ] | Other % [ # ] | | White % [ # ] | Black % [ # ] | Other % [ # ] | |
| St. Martinville Primary | 26% [159] | 71% [431] | 3% [18] | *+25B* | 26% [151] | 70% [401] | 3% [18] | *+24B* |
| St. Martinville Jr. High | 26% [103] | 70% [280] | 4% [17] | +21B | 36% [168] | 60% [281] | 4% [20] | +11B |
| Catahoula Elem. | 92% [216] PK-8 | 7% [16] PK-8 | 2% [4] PK-8 | -39B | 77% [158] PK-5 | 22% [45] PK-5 | 1% [1] PK-5 | *-24B* |

*Deviations outside of the +/-15% desegregation standard described in Section VI.A are highlighted in pink and in italics.

### 4.  Cecilia

This Order does not modify the Cecilia PK-8 attendance zone.  Presently, Cecilia Primary

and Teche Elementary are within the within the +/-15% desegregation standard.  The Cecilia

Junior High School enrollment figures fall outside the acceptable +/-15% desegregation standard

by standard by four (4) percentage points for the Black enrollment, thus the parties agree and the

---

23  *See* note 22, supra, for an explanation of how projected actual enrollment was calculated.

Court finds that the District will employ remedial measures as described below in Section VI.C. Further, the District shall not take any action that will hinder desegregation of the Cecilia zone.

### 5. Stephensville Elementary

Although the Stephensville Elementary enrollment figures fall outside the acceptable +/-15% desegregation standard, the parties agree and the Court finds that the Stephensville Elementary attendance zone is geographically isolated such that no further practicable measure can be utilized to further desegregation. Therefore, the Stephensville Elementary zone shall not be a consideration in the analysis for achieving unitary status in the area of student assignment. However, the District shall not take any action that will hinder desegregation of the Stephensville zone.

### 6. Residency Verification

Because the above projections are based, in part, on the residency enrollment (*see* footnote 22), the parties agree and the Court finds that the District shall strictly implement its residency verification policy and transfer policy,[24] which shall be revised to be consistent with this Consent Order.

Accordingly, within 60 days of entry of the Consent Order, the District shall provide the Plaintiff Parties with a proposed revision of the residency verification and transfer policy. The Plaintiff Parties shall have 30 days following receipt of the proposed revised policy to provide the District with comments regarding the proposed revision. The parties shall meet and confer (either via telephone, videoconference, or in person) as necessary to reach agreement as to these policies. If the parties are unable to reach agreement regarding the revision within 120 days of entry of the Consent Order, any party may move the Court to resolve the dispute.

---

[24] Exhibit 2 (Student Transfer and Residency Policies).

Until such time that the District is declared unitary as to student assignment and this case is dismissed as to student assignment, the above procedure shall be used to address any subsequent modification to the District's residency verification and student transfer policies.

## 7.  Notice

Within two (2) weeks of the entry of this Consent Order, the District will communicate information about the attendance zone modifications directly to all parents/guardians through at least two media (e.g., hard copy letters by mail, robocalls, email, newspaper, website, etc.).  In communicating with parents/guardians, the District will include efforts designed to reach parents/guardians who face barriers to receiving information, including lack of digital access.

The District shall provide documentation to the Plaintiff Parties for review and comment one week prior to the implementation of the notice process.

## 8.  Capacity

The District shall ensure that adequate space and capacity are made available for all students at each of the schools affected by the zone changes described above.

Until such time that the District is declared unitary as to student assignment and this case is dismissed as to student assignment, the District shall provide the Plaintiff Parties with notice of any proposed changes to the functional capacity of any of the District's schools for any reason (*e.g.*, any increases or decreases in the number of classrooms or the classroom capacities).  The Plaintiff Parties shall have 14 calendar days following receipt of the proposed changes to provide the District with objections regarding the proposed changes.  To the extent that the Plaintiff Parties do raise objections, the parties shall meet and confer (either via telephone, videoconference, or in person) as necessary to reach agreement as to these changes.  If the parties are unable to reach agreement regarding a proposed change, any party may move the Court to resolve the dispute.

14

In the event of extreme emergencies (*e.g.*, hurricanes, fire, natural disasters, or other acts of *force majeure*), the District may implement changes to functional capacity without the preapproval of the Plaintiff Parties; *provided* that the District shall notify the Plaintiff Parties no later than 14 days following the implementation of the changes to functional capacities.

### C.    Majority-to-Minority Transfers

#### 1.  General

The District shall encourage[25] and permit a student in Kindergarten through 12th grade zoned to a school where the student's race, as specified in the District's student information system, is in the majority to attend another school where the student's race is in the minority ("Majority-to-Minority" or "M-to-M" transfers).

Although the parties agree that the District shall employ the use of the M-to-M transfer program to enhance desegregation at all schools, the parties agree and the Court finds that the primary goal of the remedial measures related to M-to-M transfers is to bring St. Martinville Primary, Catahoula Elementary for grades 2-5, Parks Primary, and Cecilia Junior High within the +/-15% desegregation standard.  The District shall actively and affirmatively advertise, market, promote, and otherwise seek to encourage students and parents/guardians to use M-to-M transfers in a manner that fosters the desegregation of those four (4) schools prior to the end of the Consent Order's monitoring period.  To that end, the District shall promote M-to-M transfers between the St. Martinville zone and the Parks or Catahoula zones and between the Breaux Bridge zones and the Cecilia or Parks zones in a manner that furthers the goal of meeting the +/-15% desegregation standard.  Nevertheless, the District shall not discourage any M-to-M transfers regardless of whether those transfers would directly affect the targeted schools.

---

[25]    Consistent with Section VI.C.5 below.

Prior to March 15, 2019, the parties agree to work in good-faith to agree to a legally

adequate student transfer policy to continue the promotion of desegregative student transfers

after the end of the Consent Order.[26]

### 2. Applications, Qualifications, and Effect

All students, except those M-to-M transfer students who began attending grades PK-5 at

Catahoula Elementary during the 2015-2016 school year, must apply for M-to-M transfers for

the 2016-2017 school year by the end of the business day on May 1, 2016 (the application period

will open, at the latest, upon entry of this Consent Order).  In subsequent years, the application

period will open on the first school day of the Spring semester and close by the end of the

business day on May 1 preceding the school year for which the M-to-M transfer would first be

applicable (e.g., applications for M-to-M transfers that would be effective as of the 2016-2017

school year would be due on May 1, 2016).  In the event this Consent Order is entered less than

two (2) weeks before May 1, 2016, the District shall extend the application date for 2016 to two

(2) weeks after the entry of the Consent Order.

A student whose race is in the majority at the grade-appropriate school in his zone of

residence will have a valid M-to-M transfer request if he requests to be transferred to a grade-

appropriate school where his race is in the minority.  Any student who meets this criterion and

submits a timely application shall be granted an M-to-M transfer.

The receiving school shall become the home school for all purposes for the M-to-M

transfer student until the student completes all grade levels at the particular school (i.e., a student

granted a M-to-M transfer need not reapply each year to ensure continued enrollment at the

receiving school).[27]  However, once the M-to-M transfer student completes all grade levels at the

---

[26]   *See Freeman*, 503 U.S. at 498.

[27]   For example, if a student who resides in the St. Martinville attendance zone is granted an M-to-M transfer
to Parks Primary, that student would attend Parks Primary until she or he completed the highest grade offered at

receiving school, the student must apply for a new M-to-M transfer if the student desires to

continue his/her education at the next school in that feeder pattern.[28]  The District will

communicate this information to parents using the methods set forth in Section VI.C.5. of this

Consent Order.

### 3. Transportation

The District will provide all students granted M-to-M transfers with free transportation to

and from school.[29]

To the extent that the District provides any student in the District with free transportation

to and/or from events held outside of regular school hours (e.g. after-school extracurricular

activities, a celebratory breakfast), the District shall extend the same courtesy to students granted

M-to-M transfers.  The District will communicate this information to parents using the methods

set forth in Section VI.C.5. of this Consent Order.

### 4. Capacity

The District will ensure that a space is made available at the school to which a student

granted an M-to-M transfer desires to move and the lack of capacity at the receiving school shall

not be justification for denying any M-to-M request.[30]  The District will communicate this

information to parents using the methods set forth in Section VI.C.5. of this Consent Order.

### 5. Marketing

No later than November 15 of each school year, the District will broadly disseminate and

publicize information about M-to-M transfers for the following school year through the means

---

Parks Primary (the fourth grade) without ever needing to reapply for an M-to-M transfer to Parks Primary.

[28]   Continuing the example from above, if a student who resides in the St. Martinville attendance zone had
transferred as an M-to-M transfer student to Parks Primary and, after the completion of fourth grade, the student
wanted to continue on to Parks Middle, then that student would be required to apply for an M-to-M transfer to Parks
Middle by May 1 of the year preceding the school year in which the student wishes to enter Parks Middle.

[29]   *See Swann*, 402 U.S. at 26-27 ("In order to be effective, [a M-to-M] transfer arrangement must grant the
transferring student free transportation and space must be made available in the school to which he desires to
move.").

[30]   *See id.*

described in this section.  Within two (2) weeks of the entry of this Consent Order, the District shall ensure that these steps are in process for marketing for the 2016 application period.

The District will communicate information about the M-to-M program including the provision of free transportation and application process directly to parents/guardians who have children eligible to participate in the M-to-M program through at least two media sources (e.g., hard copy letters by mail, robocalls, emails, newspaper, website, etc.), at least one time per week during the application period noted in Section VI.C.2.  In communicating with parents/guardians, the District will include efforts designed to reach parents/guardians who face barriers to receiving information, including lack of digital access.

The District will:  (a) post communications about the M-to-M process on the District website, (b) provide communications to community groups, such as the parent-teacher association and local community centers, and (c) distribute communications through local media, such as television, radio and newspapers.

The District will hold parent/guardian information sessions open to all parents/guardians at each high school in the evenings or on weekends prior to the start of the M-to-M application period.  The District may combine M-to-M program information sessions with other information sessions, such as information sessions regarding magnet programs and career courses.

Communication will include an explanation of the M-to-M policy, the District's commitment to providing free transportation, the application process, the opening and closing dates for requesting an M-to-M transfer and the District phone number to call for additional information and assistance.

The District will create an online information portal, available, at a minimum, through the District student information system or publicly through the District's website, to provide prospective M-to-M transfer students and parents/guardians information about the M-to-M program.  Information provided through the information portal will include:  (a) the policies and

procedures governing the M-to-M program; (b) a summary explanation of the application process and timeline; (c) information regarding the enrollment demographics of each school; (d) information regarding "projected" pick-up and drop-off points and approximate pick-up and drop-off times; (e) the online M-to-M application; and (f) the District phone number to call for additional information and assistance.

### D. Transition Assistance for Majority-to-Minority Transfers and Students Reassigned As A Result of Attendance Zone Changes

Within forty-five (45) days of the entry of this Consent Order, the District shall develop and provide to the Plaintiff Parties for review, comment, and approval an administrative procedure which addresses student transfer transition assistance to be provided to any student and/or parent who is affected by the student attendance zone changes described herein or who is granted an M-to-M transfer in the District. The District will implement the administrative procedure beginning with the 2016-2017 school year.

### E. Implementation Safeguards to Ensure Equitable Classroom/Within-School Student Assignment

Consistent with and in addition to the measures set forth in Section IV.C.2.a. of the Consent Order Regarding Quality of Education, by the beginning of the 2016-2017 school year, the District shall:

1. Review its student assignment policies, procedures, and practices, and revise them to eliminate and prevent racially identifiable assignments to classes and programs to the extent practicable.

2. Develop and maintain policies, procedures, and practices for within-school student assignment in grades PK-5 that adequately reflect and take into account multiple criteria relevant to student need and likelihood of benefitting from classes and programs by ensuring that results on standardized tests alone do not determine assignment to classes and/or eligibility to participate in programs. That is, student motivation and student grades should temper the impact

19

of standardized test results on access to desired courses or programs (e.g., the gifted and talented program or any offering that utilizes ability grouping).

      3.    Within 60 days of entry of the Consent Order, the District shall provide the Plaintiff Parties with the proposed revised policies and/or procedures developed pursuant to Sections VI.E.1. and VI.E.2. The Plaintiff Parties shall have 30 days following receipt of proposed revised policies and/or procedures to provide the District with comments regarding those proposed revised policies and/or procedures. The parties shall meet and confer (either via telephone, videoconference, or in person) as necessary to reach agreement as to these policies. If the parties are unable to reach agreement regarding a proposed revised policy or procedure, any party may move the Court to resolve the dispute.

      4.    Until such time that the District is declared unitary as to student assignment and this case is dismissed as to student assignment, the above procedure shall be used to address classroom and within-school student assignment polices and/or procedures.

## VII.   MONITORING, REPORTING, AND OVERSIGHT

      The District shall file and submit to the Court, and to counsel of record for all parties, reports pursuant to this Consent Order until such time as the District is declared unitary. The District shall submit these reports on the first business day after each November 15, March 15, and June 30, with the first report due on March 15, 2016. Each report shall include a key for all codes or abbreviations used therein.

### A.   November 15 and March 15 Reports

      Each November 15 and March 15 report must include the following information:

      1.    A chart indicating the total number and percentage of students, by grade level and race, enrolled in each school and district-wide in the District.

      2.    For each class in each school:  (a) the number of students by race and grade level; (b) the name and race of the faculty member(s) assigned to the classroom; (c) whether any

20

students in the class are grouped or assigned by race, ability, achievement, language needs, or another basis; (d) the subject of the class; and (e) whether the class is an elective or a non-elective course.

### B.     June 30 Report

All reports shall include the following information for the time period since the last report was submitted (except that the June 30, 2016 report shall include the requested information since the start of the second semester of the 2015-2016 school year):

1.     A complete description of all specific efforts, if any, the District has taken to encourage students to engage in M-to-M transfers.  To the extent that these efforts involved the dissemination or posting of written notices, the District shall provide copies of such notices.

2.     A list of students who applied for an M-to-M transfer since the last report was filed (except that the June 30, 2016 report shall include the requested information since the start of the second semester of the 2015-2016 school year) that identifies each applicant by race, home school, receiving school, and, if denied, the reason for denial, to be filed under seal.

## VIII.   MODIFICATIONS

Until such time that the District is declared unitary as to student assignment and this case is dismissed as to student assignment, the District must obtain the Court's approval of all modifications to the attendance zones, grade structures (e.g., modifying an elementary school that used to serve grades PK-4 so that it will serve grades PK-5 instead), and educational programs at each of the District schools (e.g., the establishment or modification of a magnet program).

## IX.   OBJECTIONS

Specific written objections by the Plaintiff Parties to the March 15th, June 30th, and November 15th reports, including objections related to the District's compliance with the +/-15% desegregation standard, shall be submitted within forty-five (45) calendar days of receipt of each

report or such objections will be deemed waived and a presumption of compliance for the preceding reporting period will be applied. The parties will meet and confer (either via telephone, videoconference, or in person) about each objection within fourteen (14) business days of service of the objection. In good faith, the District will consider proposals from the Plaintiff Parties to address their objections regarding the District's compliance with the Consent Order. In the event that the parties reach an impasse as to either (a) whether an objection has merit or (b) how to remedy any concerns raised in an objection, then any party may move the Court to resolve the dispute so long as the motion is made within forty-five (45) calendar days of the meet and confer.

## X.   TERMINATION OF JUDICIAL SUPERVISION

The parties agree that full compliance with the foregoing Consent Order will support a finding that the District has complied with both the letter and the spirit of the orders governing this matter as they pertain to student assignment and that the vestiges of segregation in the area of student assignment have been eliminated to the extent practicable.[31] Forty-five (45) calendar days subsequent to the District filing a complete June 30, 2019 report, the District may move for unitary status and dismissal on student assignment and/or the Plaintiffs Parties may move for further relief or to enforce the Consent Order on student assignment. The applicable provisions of the Federal Rules of Civil Procedure and the Local Rules of this Court will apply to any such motions. In the absence of a motion in opposition to unitary status, a motion to enforce the Consent Order, or a motion for further relief by the Plaintiff Parties, and subject to this Court's ruling that the District is in compliance with this Consent Order, Title IV of the Civil Rights Act of 1964, and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, then the Court may declare the District unitary with respect to student assignment and dismiss this case as to student assignment.

---

[31]     *See Freeman*, 503 U.S. at 485.

## XI.   EFFECT OF PRIOR ORDERS

All prior orders not inconsistent herewith remain in full force and effect.

HEREBY ORDERED, ADJUDGED, AND DECREED, this the 21st day of

January, 2016.

_____

**UNITED STATES DISTRICT JUDGE**

**APPROVED REGARDING FORM AND CONTENT:**

**For Plaintiffs:**

/s/ Deuel Ross
Deuel Ross
Monique N. Lin-Luse
Angel S. Harris (La. Bar No. 32867)
NAACP LEGAL DEFENSE
& EDUCATIONAL FUND, INC.
40 Rector Street, 5th Fl.
New York, NY 10006
(212) 965-2200
(212) 226-7592 Fax
dross@naacpldf.org
mlinluse@naacpldf.org
aharris@naacpldf.org

/s/ Gideon T. Carter, III
Gideon T. Carter, III
Bar Roll Number 14136
Post Office Box 80264
Baton Rouge, LA 70898-0264
(225) 214-1546
(225) 926-2299 Fax
gideon.carter@lawyer4u.com


**For Plaintiff-Intervenor, UNITED STATES OF AMERICA**

VANITA GUPTA
Principal Deputy Assistant Attorney General

/s/ Christopher S. Awad
ANURIMA BHARGAVA
FRANZ R. MARSHALL
CHRISTOPHER S. AWAD
MICHAELE N. TURNAGE YOUNG
Educational Opportunities Section
U.S. Dept. of Justice, Civil Rights Division
950 Pennsylvania Avenue, NW, PHB 4300
Washington, D.C. 20530

24

**For Defendant, ST. MARTIN PARISH SCHOOL BOARD**

I. Jackson Burson, Jr. #3703
P.O. Box 985
Eunice, Louisiana 70535
Phone: (337) 457-1227
Fax: (337) 457-8860
E-mail: jackburson@bursonlaw.net

**HAMMONDS, SILLS, ADKINS & GUICE**
2431 S. Acadian Thruway, Suite 600
Baton Rouge, LA 70808
Telephone (225) 923-3462
Facsimile (225) 923-0315

/s/ Pamela Wescovich Dill
Robert L. Hammonds
Louisiana Bar No. 6484
Pamela Wescovich Dill
Louisiana Bar No. 31703
Courtney T. Joiner
Louisiana Bar No. 32878