**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**LAFAYETTE DIVISION**

| | |
|---|---|
| THERESA D. THOMAS, ET AL. | CIVIL ACTION NO. 65-11314 |
| VERSUS | JUDGE ELIZABETH E. FOOTE |
| SCHOOL BOARD ST. MARTIN PARISH | |

## Table of Contents

MEMORANDUM RULING.................................................................................4
  I.   Background .............................................................................................5
    A.  Procedural History .............................................................................5
    B.  The Superseding Consent Order ......................................................7
    C.  Areas of Supervision Previously Declared Unitary ...........................8
    D.  The Pending Motions ........................................................................8
    E.  The Hearing ....................................................................................10
  II.  Legal Standards ...................................................................................11
    A.  Achieving Unitary Status ...............................................................11
    B.  Interpretation of a Consent Order .................................................12
    C.  Requirements for Further Relief .....................................................13
  III.  Unitary Status—Student Assignment ..................................................14
    A.  Background......................................................................................14
    B.  Requirements of the Superseding Consent Order ..........................16
       1.  Attendance Zone Modifications .................................................17
       2.  Majority-to-Minority Transfers....................................................18
       3.  The STEM Program....................................................................20
    C.  Facts ...............................................................................................20
       1.  Student Demographics...............................................................20
       2.  The District's Actions—Zone Changes.......................................24
       3.  The District's Actions—Majority-to-Minority Transfers ...............24

4. The District's Actions—Implementing a STEM Program ............................29

5. The District's Post-Unitary Status Plans .................................................35

6. Expert Testimony ...............................................................................36

    i. Michael Hefner ...........................................................................36

    ii. Dr. Erica Frankenberg ...............................................................39

D. The District is Not Entitled to Unitary Status ....................................43

IV. Further Relief—Student Assignment......................................................49

  A. The Requested Relief ...............................................................................49

  B. Facts .........................................................................................................50

    1. Testimony of Dr. Erica Frankenberg—Closing Catahoula and Implementing a Magnet Program......................................................51

    2. Testimony of Dr. Erica Frankenberg—Optional Attendance Zones..............53

    3. Testimony of Michael Hefner ...............................................................54

    4. Dr. Frankenberg's Response to Mr. Hefner .............................................61

    5. Other Evidence .....................................................................................62

  C. Further Relief ...........................................................................................66

V. Unitary Status—Faculty Assignment......................................................71

  A. Requirements of the Superseding Consent Order ...........................71

  B. Facts .........................................................................................................72

    1. Demographics .......................................................................................72

    2. The District's Actions—Employment Procedures ......................................75

    3. The District's Actions—Recruitment Plan...................................................76

    4. Expert Testimony .................................................................................80

  C. The District is Not Entitled to Unitary Status ....................................82

VI. Further Relief—Faculty Assignment.......................................................87

  A. Requested Relief......................................................................................87

  B. Facts .........................................................................................................88

    1. Teacher Retention .................................................................................88

    2. Dr. Frankenberg's Recommendation—Teacher Retention..........................91

    3. Dr. Frankenberg's Recommendation—Stephensville Elementary ...............92

    4. Other Recommendations........................................................................93

  C. Further Relief ...........................................................................................95

VII. Unitary Status—Quality of Education—Discipline.................................97

  A. Requirements of the Superseding Consent Order ...........................97

B. Facts ........................................................................................ 101

    1. The Data .......................................................................... 101

    2. The District's Actions—Positive Behavior Intervention Supports .............. 106

    3. The District's Actions—Monitoring ........................................... 109

    4. The District's Actions—Training .............................................. 110

    5. The District's Actions—Discipline Plan ....................................... 111

    6. The District's Actions—Other Strategies ..................................... 113

    7. Expert Testimony ............................................................... 114

    8. District Faculty and Staff Opinions .......................................... 119

C. The District is Not Entitled to Unitary Status ............................... 121

VIII. Further Relief—Quality of Education—Discipline ................................. 130

  A. Relief Requested ................................................................. 130

  B. Expert Recommendations .......................................................... 131

  C. Further Relief .................................................................. 133

IX. Unitary Status—Quality of Education—Academics ................................ 135

  A. Requirements of the Superseding Consent Order ............................. 135

  B. Facts ........................................................................... 138

    1. Data—Graduation Pathways ................................................... 138

    2. The District's Actions—Graduation Pathways ................................ 141

    3. Data—Graduation Rates ....................................................... 144

    4. Data—In-Grade Retention Rates .............................................. 146

    5. The District's Actions—Graduation Rates and In-Grade Retention ........... 147

    6. Expert Testimony ............................................................. 148

  C. The Board is Entitled to Unitary Status as to Graduation Rates and In-Grade Retention ........................................................................ 152

  D. The Board is Not Entitled to Unitary Status as to Graduation Pathways ........... 154

X. Further Relief—Quality of Education—Graduation Pathways ........................ 156

  A. Requested Relief ................................................................. 156

  B. Expert Recommendation ........................................................... 157

  C. Further Relief .................................................................. 157

XI. Conclusion ........................................................................ 158

## **MEMORANDUM RULING**

Before the Court are two motions for unitary status filed by Defendant, the St. Martin Parish School Board ("Board" or "District"), in this school desegregation case. Record Documents 338 and 365. The pending motions seek unitary status in the remaining areas under Court supervision pursuant to the Superseding Consent Order—student assignment, faculty assignment, and quality of education. The Private Plaintiffs, Tracie Borel and Genevive Dartez on behalf of the Plaintiff class ("Plaintiffs"), oppose the motions regarding each area of supervision. Record Documents 285, 374-1, and 378. Plaintiffs have also filed motions for further relief related to all areas of supervision. Record Documents 342 and 374. Plaintiff-Intervenor, the United States, (with Plaintiffs, the "Plaintiff-Parties") opposed the District's motion for unitary status as to student assignment and as to certain aspects of quality of education. Record Document 373.

The Court held a hearing from March 22, 2021 to March 26, 2021 in which it heard testimony related to all motions. Record Documents 394, 395, 396, 397, and 398. The Court heard additional evidence on April 16, 2021. Record Document 407. After carefully considering the briefs filed in this matter and testimony from all witnesses and for the reasons stated herein, Defendant's motion for unitary status as to student assignment [Record Document 365] is **DENIED**. Plaintiffs' motion for further relief as to student assignment [Record Document 374] is **GRANTED**. Defendant's motion for unitary status as to faculty assignment [Record Document 338] is **DENIED**. Plaintiffs' motion for further relief as to faculty assignment [Record Document 342] is **GRANTED**. Defendant's motion for unitary status as to quality of education [Record Document 365] is **GRANTED in part**

and **DENIED in part**. Plaintiffs' motion for further relief as to quality of education [Record Document 374] is **GRANTED in part** and **DENIED in part**.

## I. Background

### A. Procedural History

The Fifth Circuit Court of Appeals and this Court have previously given a detailed procedural history of this case, and the Court therefore provides only a brief overview at this time. *See Thomas v. St. Martin Par. Sch. Bd.*, 879 F. Supp. 2d 535 (W.D. La. 2012), and *Thomas ex rel. D.M.T. v. Sch. Bd. St. Martin Par.*, 756 F.3d 380 (5th Cir. 2014). The St. Martin Parish School District is located in south Louisiana. The District, serving approximately 7,400 students and employing approximately 480 faculty in the 2020-2021 school year, primarily has its schools in the towns of St. Martinville, Catahoula, Parks, Breaux Bridge, and Cecilia, Louisiana.

In 1965, Judge Richard Putnam of the Western District of Louisiana ruled that the District was continuing to operate racially segregated schools in disregard of the law and ordered that the District desegregate its schools. *Thomas v. St. Martin Par. Sch. Bd.*, 245 F. Supp. 601 (W.D. La. 1965). In 1969, the Judge Putnam adopted a desegregation plan which required the District to "take affirmative action to disestablish all school segregation and to eliminate the effects of the dual school system." Record Document 25-3 at 20. Among other things, the plan required the District to establish new attendance zones, pair schools, permit desegregative transfers, and adopt nondiscriminatory employment policies. Record Document 25-3 at 20-23. It also required that all educational programs be conducted without regard to race and required that the District provide remedial

educational programs to assist students who previously attended segregated schools. *Id.* In 1974, the case was placed on the court's inactive docket. Record Document 25-10 at 2-4.

In 2009, the Chief Judge of the Western District of Louisiana determined that the case was not closed and assigned the case to Judge Rebecca Doherty who asked the parties to brief whether the Court retained jurisdiction in the matter. Record Documents 2, 4, 10, and 39. The case was then reassigned to the undersigned. Record Document 24. In 2012, the Court ruled that it had jurisdiction over the matter, and the Fifth Circuit affirmed. *Thomas v. St. Martin Par. Sch. Bd.*, 879 F. Supp. 2d 535 (W.D. La. 2012), and *Thomas ex rel. D.M.T. v. Sch. Bd. St. Martin Par.*, 756 F.3d 380 (5th Cir. 2014).

Upon remand from the Fifth Circuit, the case returned to active litigation. The parties began evaluating whether the District was unitary in the areas of operation known as the "*Green* factors." *Green v. Cnty. Sch. Bd. of New Kent Cnty.*, 391 U.S. 430 (1968). The *Green* factors are: (1) student assignment; (2) faculty assignment; (3) staff assignment; (4) extracurricular activities; (5) facilities; and (6) transportation. *Id.* at 435. In addition to that, the parties considered ancillary factors such as "the quality of education." *Freeman v. Pitts*, 503 U.S. 467, 473 (1992); *Bd. of Educ. of Oklahoma City Pub. Sch. v. Dowell*, 498 U.S. 237, 245 (1991); *Tasby v. Estes*, 643 F.2d 1103, 1107 (5th Cir. 1981). Between October 2015 and February 2016, the Court entered a series of consent orders governing student assignment, faculty assignment, staff assignment,

facilities, transportation, and quality of education, including discipline and academic achievement.[1] Record Documents 166, 178, 193, and 194.

## B. The Superseding Consent Order

In November 2016, the Court adopted the now-operative Superseding Consent Order which consolidated all of the consent orders adopted in 2015 and 2016 and included several additional provisions.[2] Record Document 211. In May 2017, the Court amended the Superseding Consent Order as to student assignment to approve the District's plan to implement a Science, Technology, Engineering and Math ("STEM") Program in the St. Martinville Attendance Zone to assist with the District's efforts to desegregate those schools. Record Document 222.

The Superseding Consent Order lays out a general requirement that the Board is prohibited from:

> [Operating a] dual public school system which segregates students on the basis of race and from adopting any racially discriminatory regulatory policies or practices, or performing any acts in the areas of student assignment, facilities, faculty assignment, staff assignment, transportation, and/or quality of education which is adverse to its desegregation obligations under federal law.

---

[1] The parties agreed in November 2015 that the District met the standards for unitary status in the area of extracurricular activities. Record Document 154-1. Therefore, the Court did not enter a consent decree imposing substantive obligations on the District in this area and instead issued a judgment granting the District partial unitary status as to extracurricular activities in December 2015. Record Document 157.

[2] The Consent Orders adopted in 2015 in 2016 are:
    1) Facilities, Faculty Assignment and Staff Assignment: December 28, 2015 (Record Document 166)
    2) Student Assignment: January 25, 2016 (Record Document 178)
    3) Quality of Education: February 3, 2016 (Record Document 193)
    4) Transportation: February 4, 2016 (Record Document 194)

Record Document 211 at 4. The attachments to the Superseding Consent Order detail specific obligations relevant to each area of supervision. Record Documents 211-1, 211-2, 211-3, and 211-4. The parties agreed that:

> [F]ull compliance with the order(s) herein, including the consent order(s) set forth in Attachments A, B, C, and D, will support a finding that the District has complied with both the letter and the spirit of the orders governing this matter as they pertain to the vestiges of segregation in the District and that the vestiges of segregation have been eliminated to the extent practicable.

Record Document 211 at 7.

### C. Areas of Supervision Previously Declared Unitary

The District has operated under the Superseding Consent Order since the 2016-2017 school year. Starting in August 2019, the Court began granting the District unitary status in some areas of operation included in the Superseding Consent Order. Record Documents 281, 282 and 381. To date, the District has achieved unitary status in the areas of transportation, staff assignment, facilities, and extracurricular activities. Record Documents 157, 281, 282 and 381. Thus, the only remaining areas of Court supervision are student assignment, faculty assignment, and quality of education. Record Documents 211, 211-1, 211-2, 211-4 and 222.

### D. The Pending Motions

The motions now before the Court seek unitary status in all remaining areas of supervision—student assignment, faculty assignment, and quality of education, which includes academic achievement and discipline. Record Documents 338 and 365. If the motions are granted, the District would achieve full unitary status and judicial supervision over the District would cease. Plaintiffs and the United States oppose the motions for

unitary status—Plaintiffs in each area and the United States in the areas of student assignment and quality of education (discipline). Record Documents 285, 373, and 374-1. Plaintiffs have also moved for further relief in all areas. Record Documents 342 and 374.

The District supports its motions by detailing the steps it has taken to comply with the pertinent consent orders and highlighting the success it has had in achieving the goals set in each area. Even when the District has failed to fully meet each goal in the Superseding Consent Order, it argues that it has nevertheless complied in good faith with the governing consent orders and has, to the extent practicable, eliminated the vestiges of prior de jure segregation in each remaining area of supervision.

Plaintiffs and the United States do not argue that the District has failed to comply with the Superseding Consent Order in all respects, instead raising specific objections to the Court granting unitary status. For example, the Plaintiff-Parties focus their objections to unitary status in the area of student assignment around the District's failure to meet the desegregation standard in one attendance zone and around the alleged failures in how the District implemented and advertised a STEM program and its majority-to-minority ("M-to-M") transfer program. *See e.g.*, Record Document 374-1 at 5-13. Consequently, the Court ordered the parties to focus the evidence at the hearing on these issues. Likewise, this opinion will focus on the objections and generally will not detail the

numerous ways the District has otherwise fully and satisfactorily complied with the governing consent orders.[3]

## E. The Hearing

The Court held a hearing regarding the pending motions for unitary status from March 22, 2021 to March 26, 2021. Record Documents 394, 395, 396, 397, and 398. The Court heard additional testimony on April 16, 2021. Record Document 407.

In the area of student assignment, the Court heard testimony from Plaintiffs' expert Dr. Erica Frankenberg, Catahoula Elementary principal Tiffany Francis, St. Martinville Primary principal Lisa Sylvester, Superintendent Allen Blanchard, Child Welfare and Attendance Officer Fred Wiltz, Director of Curriculum and Instruction Dr. Gail Dalcourt, and Defendant's expert Michael Hefner.

In the area of faculty assignment, the Court heard testimony from Plaintiffs' expert Dr. Erica Frankenberg, Plaintiffs' expert William Cooper, Supervisor of Human Capital Anthony Polotzola, Catahoula Elementary principal Tiffany Francis, St. Martinville Primary principal Lisa Sylvester, Superintendent Allen Blanchard, Breaux Bridge High teachers Chana Jordan and Joy Trahan, and former Breaux Bridge Primary teacher Melissa Narcisse.

In the area of quality of education (academic achievement), the Court heard testimony from Plaintiffs' expert Dr. Robert Balfanz, St. Martinville Senior High principal

---

[3] For example, the Superseding Consent Order imposed multiple reporting requirements on the District. The parties stipulated that the Board has complied with these requirements, Record Document 393 at ¶s 11-12, and the Court will not address this requirement when addressing whether the District is entitled to unitary status.

Kevin Dugas, Superintendent Allen Blanchard, and Director of Curriculum and Instruction Dr. Gail Dalcourt.

In the area of quality of education (discipline), the Court heard testimony from Plaintiffs' expert Dr. Anne Gregory, Catahoula Elementary principal Tiffany Francis, Superintendent Allen Blanchard, and Child Welfare and Attendance Officer Fred Wiltz.

## II.  Legal Standards

### A.  Achieving Unitary Status

The ultimate goal in every desegregation case is to eliminate from each area of school operations the vestiges of past segregation to the extent practicable and, thus, achieve full unitary status. *Freeman*, 503 U.S. at 489. Because federal court supervision of a local school system is intended to be a temporary measure only, a court must return control of a school district to its school board as soon as unitary status has been achieved. *Id.* at 489; *Thomas*, 756 F.3d at 387 (citing *Dowell*, 498 U.S. at 248).

To obtain unitary status, a school board must prove as to each specific *Green* factor that it has acted in good faith for a reasonable period of time and that the vestiges of past discrimination have been eliminated to the extent practicable. *Anderson v. Sch. Bd. of Madison Cnty.*, 517 F.3d 292, 297 (5th Cir. 2008). Good faith requires showing both past good-faith compliance and an ongoing commitment to integration. *Freeman*, 503 U.S. at 498-99. A good-faith commitment to the future operation of the school system can be shown through "specific policies, decisions, and courses of action that extend into the future." *Dowell v. Bd. of Educ. of the Oklahoma City Pub. Schs.*, 8 F.3d 1501, 1513 (10th Cir. 1993) (citations omitted). The Fifth Circuit has held that a period of three years

without circumstances adverse to desegregation is adequate to show a reasonable period of time acting in good faith. *Dowell*, 498 U.S. at 248; *see also Flax v. Potts*, 915 F.2d 155, 158 (5th Cir. 1990); *Monteilh v. St. Landry Par. Sch. Bd.*, 848 F.2d 625, 629 (5th Cir. 1988). "A school district has eliminated the vestiges of past discrimination to the extent practicable when it has made 'every reasonable effort . . . to eradicate segregation and its insidious residue.' " *United States v. Fletcher ex rel. Fletcher*, 805 F.3d 596, 601 (5th Cir. 2015) (quoting *Anderson*, 517 F.3d at 298).

### B. Interpretation of a Consent Order

With respect to interpreting consent decrees, it is well established that "consent decrees are contractual in nature, so parties may fairly expect such orders to be enforced as both a contract and a judicial decree." *Moore v. Tangipahoa Par. Sch. Bd.*, 864 F.3d 401, 407 (5th Cir. 2017) (citing *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004)). As explained by the Supreme Court:

> A consent decree "embodies an agreement of the parties" and is also "an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees."

*Frew*, 540 U.S. at 437 (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 378 (1992)). As recently explained by the Fifth Circuit, "[t]he 'voluntary nature of a consent decree is its most fundamental characteristic'; 'it is the agreement of the parties, rather than the force of the law upon which the complaint was originally based, that creates the obligations embodied in a consent decree.' " *Smith v. Sch. Bd. of Concordia Par.*, 906 F.3d 327, 334 (5th Cir. 2018) (citing *Loc. No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 521-22 (1986)).

Importantly, "the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *United States v. Armour & Co.*, 402 U.S. 673, 682 (1971). In desegregation cases, "[t]he scope of [a] consent decree, and the scope of th[e] case, is limited to eliminating the vestiges of *de jure* segregation in [the] [p]arish." *Smith*, 906 F.3d at 336. Further, "[b]ecause of [a consent decree's] hybrid nature, the Fifth Circuit has held, in numerous contexts, that in interpreting a consent decree, the Court should apply basic rules of contract interpretation and construction, while also keeping in mind that the decree functions as an enforceable judicial order." *Chisom v. Jindal*, 890 F. Supp. 2d 696, 712 (E.D. La. 2012) (collecting cases); *see also Frew v. Janek*, 780 F.3d 320, 327 (5th Cir. 2015). These general rules of consent order/decree interpretation are also in line with Supreme Court and Fifth Circuit precedent that make clear that a school board "is entitled to a rather precise statement of its obligations under a desegregation decree." *Thomas*, 756 F.3d at 386 (quoting *Dowell*, 498 U.S. at 246).

### C. Requirements for Further Relief

A consent order "require[s] evaluation in practice, and the court should retain jurisdiction until it is clear that state-imposed segregation has been completely removed." Record Document 211 at 7 n.2 (quoting *Green*, 391 U.S. at 439). As such, a court has the "broad" authority to deny unitary status and order further relief, "for breadth and flexibility are inherent in equitable remedies." *Cowan v. Cleveland Sch. Dist.*, 748 F.3d 233, 239 (5th Cir. 2014) (citations omitted). To order further relief, a district court does "not need to find that [a school district] violated the Constitution, only that it violated the

consent decree." *Smith*, 906 F.3d at 335. It is not necessary that a plaintiff prove that a school district is discriminating in the areas where it seeks unitary status, "as would be required to establish the right to relief *ab initio.*" *United States v. Lawrence Cnty. Sch. Dist.*, 799 F.2d 1031, 1043 (5th Cir. 1986). Actions by a school board that have a discriminatory effect or that frustrate a consent order's goals are sufficient to demonstrate an ongoing constitutional violation, regardless of a school board's intent. *Id.* at 1044; *see also Cowan*, 748 F.3d at 238. This is because the "failure to sufficiently satisfy" the continuing duty of a district to eradicate the vestiges of discrimination "continues the constitutional violation." *Lawrence Cnty. Sch. Dist.*, 799 F.2d at 1044.

## III. Unitary Status—Student Assignment

### A. Background

The St. Martin Parish School District has sixteen schools serving students in grades pre-Kindergarten ("pre-K") to 12. Of these sixteen schools, Stephensville Elementary ("Stephensville"), which serves grades pre-K to 8, is located in a geographically isolated area of the District and students attending Stephensville matriculate to a high school outside the District. Record Document 211-1 at 8; 3/24/21 Rough Tr. 156:18-157:3 (Frankenberg). All of the other schools are located in four attendance zones within the District—Breaux Bridge Zone, Cecilia Zone, Parks Zone, and St. Martinville Zone. Record Document 211-1 at 8-10; 3/24/21 Rough Tr. 156:13-157:25 (Frankenberg). In the Breaux Bridge Zone and the Cecilia Zone, there is only one public school serving each grade level from pre-K to 12. Record Document 211-1 at 8. In the Parks Zone, there is only one

school for each grade level pre-K to 8, and students matriculate to either Breaux Bridge High or St. Martinville High for grades 9 to 12. Record Document 211-1 at 8.

This is not so in the St. Martinville Zone, however. Prior to entry of the Superseding Consent Order, the St. Martinville Zone offered grades pre-K to 8 at Catahoula Elementary ("Catahoula"). Record Document 211-1 at 8. It also offered these grades at St. Martinville Junior High (grades 6 to 8), St. Martinville Primary ("SMP") (grades 2 to 5), and the Early Learning Center ("ELC") (grades pre-K to 1). *Id.* Because all students at ELC matriculate to SMP for grades 2 to 5, ELC and SMP are essentially a single school located on two campuses. 3/24/21 Rough Tr. 158:1-15, 159:13-19 (Frankenberg). All students in the St. Martinville Zone attend St. Martinville High for grades 9 to 12. Record Document 211-1 at 8.  As discussed below, grades 6 to 8 in the St. Martinville Zone are now only offered at St. Martinville Junior High; Catahoula no longer serves grades 6 to 8. *See infra* Sections III.B.1, III.C.2. Thus, the St. Martinville Zone now has two schools serving students in grades pre-K to 5, and one school option serving students in grades 6 to 12.

| Breaux Bridge Zone | Parks Zone | St. Martinville Zone | Cecilia Zone |
|---|---|---|---|
| Breaux Bridge High (9-12) | | St. Martinville High (9-12) | Cecilia High (9-12) |
| Breaux Bridge Junior (6-8) | Parks Middle (5-8) | St. Martinville Junior (6-8) | Cecilia Middle (6-8) |
| Breaux Bridge Elem. (3-5) | Parks Primary (PK-4) | St. Martinville Primary (2-5) | Teche Elementary (3-5) |
| Breaux Bridge Primary (PK-2) | | Early Learning Center (PK-1) | Cecilia Primary (PK-2) |
| | | Catahoula Elementary (Previously PK-8, Now PK-5) | |

The District built Catahoula as a one-race white school during the era of de jure segregation in a one-race white town to segregate the white students from Black students. Record Document 211-1 at 8; 3/26/21 Rough Tr. 31:16-32:5 (Blanchard).

Catahoula is located about 11.3 miles from SMP and 12 miles from ELC. 3/25/21 Rough Tr.131:2-14 (Hefner). The campuses of ELC and SMP are located 1.3 miles apart. *See* Google Maps, https://goo.gl/maps/Ct3tFhguLF6VFnSm8.

## B. Requirements of the Superseding Consent Order

The consent order entered in regard to student assignment ("Student Assignment Consent Order") was intended to ensure that the District "provide[s] educational programs and services without discriminating on the basis of race and in a manner that does not perpetuate or further the racial segregation of students." Record Document 211-1 at 6. It adopts a plus or minus fifteen percentage point (+/- 15%) variance from Black student enrollment as the standard by which the desegregation efforts are measured. *Id.* at 11. In other words, the percentage of Black or white students enrolled in a particular school in the District should not exceed +/- 15% of the District-wide actual enrollment of Black students for that particular grade band (elementary, middle, and high school).[4] *Id.* Compliance with the +/- 15% standard is to be judged by looking at District-wide actual enrollment of Black students by grade band for the preceding school year as reported to the Court on June 30 of the respective year. *Id.* Any school falling outside the +/- 15% standard is considered a racially identifiable school. *Id.*

At the time the Student Assignment Consent Order was entered into during the 2015-2016 school year, ten schools in the District were racially identifiable. *Id.* at 9. The

---

[4] For example, for the 2015-2016 school year, the actual enrollment percentage of Black elementary students was 46%. Record Document 211-1 at 11. Thus, an elementary school within the District was in compliance with the +/- 15% standard if its actual Black student enrollment was between 31% and 61%. *Id.*

parties and the Court agreed to multiple measures that, "if fully and properly implemented over a reasonable period of time," were designed to "result in the achievement of unitary status and dismissal of the case in the area of student assignment." *Id.* at 12. However, the Student Assignment Consent Order also states that "the mere fulfillment of the terms of the Consent Order shall not bind the Court to make a finding of unitary status." *Id.* at 5. The measures adopted in the Student Assignment Consent Order can be broken down into two broad categories—attendance zone modifications and M-to-M transfers. Later, the parties agreed to an additional measure, a STEM program, which was intended to incentivize more M-to-M transfers of students into the St. Martinville Zone, especially to SMP. Record Document 222.

## 1. Attendance Zone Modifications

The Student Assignment Consent Order required the District to implement several attendance zone modifications beginning in the 2016-2017 school year. *Id.* at 12-17. Boundaries for students in grades pre-K to 8 in the Breaux Bridge and Parks Zones were slightly modified. *Id.* at 12. Most pertinent to the instant ruling are the zone changes in the St. Martinville Zone. They were as follows:

Grades Pre-K-1[5]    The student assignment plan was not modified. All students residing in the then-existing ELC attendance area would continue attending ELC for grades pre-K to 1, and all students residing in the current Catahoula attendance would continue attending Catahoula for pre-K to 1. *Id.* at 15.

---

[5] The parties agreed "not to take into account the racial makeup of grades pre-K to 1 at the Early Learning Center and Catahoula Elementary for the purposes of determining the District's compliance with the +/- 15% desegregation standard." Record Document 211-1 at 15. However, the Court is not bound by this agreement and may consider grades Kindergarten and 1. *Id.*

| | |
|---|---|
| Grades 2-5 | The attendance zone boundary for students in grades 2 to 5 attending either SMP or Catahoula was modified such that more Black students were assigned to Catahoula for grades 2 to 5. *Id.* at 15. |
| Grades 6-8 | All students in grades 6 to 8 were zoned to attend St. Martinville Junior High and would no longer attend Catahoula. *Id.* at 15. |

Attendance zones for the high schools remained unchanged by the Student Assignment Consent Order. *Id.* at 12. The Cecilia pre-K to 8 Attendance Zone was also unchanged. *Id.* at 17. Finally, the Stephensville Attendance Zone was not changed, despite the school falling outside the +/- 15% desegregation standard, because the Zone is geographically isolated from the rest of the District.[6] *Id.* at 17.

### 2. Majority-to-Minority Transfers

The Student Assignment Consent Order also requires that the District "encourage and permit" students in Kindergarten ("K") through grade 12 to engage in M-to-M transfers from the school in which they are zoned to another school in the District. *Id.* at 19. To be eligible, the student must be in the majority race at his or her zoned school and transfer to a school where the student is in the minority. *Id.* The "primary goal" of this program was to "bring St. Martinville Primary, Catahoula Elementary for grades 2-5, Parks Primary, and Cecilia Junior High within the +/- 15% desegregation standard." *Id.* To that end, the Student Assignment Consent Order requires the District to "actively and

---

[6] Because Stephensville Elementary is so isolated from the rest of the District, the parties and the Court agreed that this school would not be considered when determining whether the District has achieved unitary status in the area of student assignment. Record Document 211-1 at 17.

affirmatively advertise, market, promote, and otherwise seek to encourage students and parents/guardians to use M-to-M" at the aforementioned schools. *Id.*

These marketing requirements include: (1) notifications to parents by at least two media sources (e.g., letters by mail, robocalls, email, newspapers, website, etc.) at least once per week during the application period, making sure to design the efforts to reach parents or guardians facing barriers to receiving information (like lack of digital access); (2) posting information about the program on the District website, sharing information with community groups, and disseminating information through local media; (3) holding informational sessions open to all at each high school on evenings or weekends before the application period opened and; (4) including in all communication efforts information regarding the free transportation provided, the application process, application deadlines, and a phone number to call for further information or assistance. *Id.* at 21-23.

The District was required to implement an application period and to grant the applications of any students meeting the criteria for an M-to-M transfer. *Id.* at 20. Once a student transferred, the receiving school was to "become the home school" until the student completed all grades at the receiving school, meaning the student need not re-apply for the program each year. *Id.* A student would have to reapply to continue to the M-to-M transfer at the school housing the next grade level. *Id.* at 21. The District was required to provide free transportation to and from school for all students granted an M-to-M transfer. *Id.*

Finally, the parties agreed that before March 15, 2019, they would "work in good-faith to agree to a legally adequate student transfer policy to continue the promotion of desegregative student transfers after the end of the Consent Order." *Id.* at 20.

### 3. The STEM Program

In an effort to increase the use of M-to-M transfers into the St. Martinville schools, especially SMP, the parties supplemented the Student Assignment Consent Order to include a STEM program in the St. Martinville Zone.[7] Record Document 222. The program was to begin at SMP in the 2017-2018 school year and expand to St. Martinville Junior High and St. Martinville Senior High in subsequent years. *Id.* at 1. The STEM program approved by the Court includes action steps such as conducting an advertising campaign, holding parent meetings, and hosting a summer STEM academy for the first two summers of the program. *Id.* at 8-10.

### C. Facts

### 1. Student Demographics

As of October 2020, the District enrolls 7,409 students at sixteen schools. Record Document 409-1 at 3. Of its students, 49.9% are white and 46.1% are Black. *Id.* With the aforementioned policies in place, all but four of the schools under consideration[8] in

---

[7] The STEM program was not implemented at Catahoula, despite the fact that it is part of the St. Martinville Zone, because a primary goal of the STEM program was to incentivize students at Catahoula to transfer to SMP.

[8] As previously noted, the parties and the Court agreed that student assignment at Stephensville would not be considered in determining whether the District has achieved unitary status, though Stephensville does remain an identifiably white school. Record Documents 211-1 at 17 and 409-1.

the District now have enrollment which falls within the +/- 15% desegregation standard, and therefore, are in compliance with the Student Assignment Consent Order goals. Record Document 409-1 at 3; 3/25/21 Rough Tr. 89:23-90:17 (Hefner). The schools with enrollment falling outside the standard are Cecilia High, Catahoula, SMP, and ELC.

| School | 2020-2021 | | | | | | |
|---|---|---|---|---|---|---|---|
| | White | W% | Other | O% | Black | B% | +/- |
| **Elementary (PRE-K-5) Totals*** | 1,773 | 49.9% | 152 | 4.3% | 1,631 | 45.9% | — |
| Breaux Bridge Elementary | 152 | 40.3% | 16 | 4.2% | 209 | 55.4% | +9.6% |
| Breaux Bridge Primary | 218 | 39.3% | 23 | 4.1% | 314 | 56.6% | +10.7% |
| Cecilia Primary | 407 | 61.5% | 36 | 5.4% | 219 | 33.1% | -12.8% |
| Parks Primary | 217 | 57.7% | 6 | 1.6% | 153 | 40.7% | -5.2% |
| Early Learning Center (PRE-K-1) | 102 | 30.6% | 11 | 3.3% | 220 | 66.1% | +20.2% |
| St. Martinville Primary | 122 | 27.7% | 11 | 2.5% | 308 | 69.8% | +24.0% |
| Teche Elementary | 346 | 61.2% | 41 | 7.3% | 178 | 31.5% | -14.4% |
| Stephensville Elementary | 113 | 96.6% | 4 | 3.4% | 0 | 0.0% | — |
| Catahoula Elementary (PRE-K-5) | 96 | 73.8% | 4 | 3.1% | 30 | 23.1% | -22.8% |
| Catahoula Elementary (2-5) | 61 | 75.3% | 3 | 3.7% | 17 | 21.0% | -24.9% |
| | | | | | | | |
| **Middle School (6-8) Totals** | 869 | 48.7% | 57 | 3.2% | 859 | 48.1% | — |
| Breaux Bridge Junior High | 189 | 41.0% | 12 | 2.6% | 260 | 56.4% | +8.3% |
| Cecilia Junior High | 366 | 60.1% | 25 | 4.1% | 218 | 35.8% | -12.3% |
| Parks Middle | 170 | 54.7% | 8 | 2.6% | 133 | 42.8% | -5.4% |
| St. Martinville Junior High | 144 | 35.6% | 12 | 3.0% | 248 | 61.4% | +13.3% |
| | | | | | | | |
| **High School (9-12) Totals** | 1,052 | 50.9% | 87 | 4.2% | 929 | 44.9% | — |
| Breaux Bridge High | 363 | 48.9% | 22 | 3.0% | 357 | 48.1% | +3.2% |
| Cecilia High | 452 | 64.8% | 39 | 5.6% | 206 | 29.6% | -15.4% |
| St. Martinville Senior High | 237 | 37.7% | 26 | 4.1% | 366 | 58.2% | +13.3% |

| | 2020-2021 | | | | | | |
|---|---|---|---|---|---|---|---|
| | White | W% | Other | O% | Black | B% | Total |
| **DISTRICT-WIDE TOTAL:** | 3,694 | 49.9% | 296 | 4.0% | 3,419 | 46.1% | 7,409 |

Record Document 409-1 at 3. Cecilia High was within the +/- 15% standard for each relevant school year until the 2019-2020 school year. *Id.* Since that time, it has been only a fraction of a percentage point outside the goal—by -.1% in 2019-2020 and -.4% in 2020-21. *Id.*

In contrast to Cecilia High's modest deviation from the desegregation goal, all three of the schools serving elementary students in the St. Martinville Zone have consistently remained substantially outside of the +/- 15% standard. Record Document 409-1. Rezoning increased Catahoula's Black student enrollment from 6.8% in fall 2015 to 23.1% in fall 2020.[9] *Id.* In the 2020-2021 school year, Black students comprise 46.1% of elementary school students in the District and white students comprise 49.9% of elementary school students in the District. *Id.* at 3. Thus, even with Black students comprising 23.1% of the Catahoula student body for the 2020-2021 school year, Catahoula's student body is 22.8 percentage points more white than the overall elementary-level student population when considering grades pre-K to 5 and 24.9 percentage points more white than the overall elementary-level student population when considering only grades 2 to 5. *Id.* Since the 2016-2017 school year, Catahoula has ranged from being a high of 33.5 percentage points more white than the overall

---

[9] The increase has not been linear—Black student enrollment at Catahoula has fluctuated over the years of supervision, largely driven by declines in Catahoula's white population, not increases in the Black student population. 3/24/21 Rough Tr. 174:4-14 (Frankenberg). When the zone changes went into effect in the 2016-2017 school year, the pre-K to 5 Black student enrollment at Catahoula increased from 6.8% to 18%. Record Document 409-1 at 1. In the 2017-2018 and 2018-2019 school years, the pre-K to 5 Black student enrollment at Catahoula decreased to a low of 12.2%. *Id.* at 2. The Black pre-K to 5 student enrollment then increased to 17.5% for the 2019-2020 school year and again increased to 23.1% in the 2020-2021 school year. *Id.* at 3.

elementary-level student population to a low of 22.8 percentage points more white than the overall elementary-level student population. *Id.* at 1-3. Thus, the school has remained identifiably white throughout the relevant time period.

For the 2020-2021 school year, Black students comprise 69.8% of the student body at SMP, which is 24 percentage points more Black than the overall elementary-level school enrollment. Record Document 400-9 at 3. Black students comprise 66.1% of students at ELC, which is 20.2 percentage points higher than the District-wide Black elementary-level enrollment. *Id.* These rates have remained relatively stable since the 2016-2017 school year, with SMP ranging from a low of 22.2 percentage points more Black than the overall elementary-level population in the District to a high of 24 percentage points more Black than the overall elementary-level population and ELC ranging from a low of 20.2 percentage points more Black than the overall elementary-level population to a high of 25.4 percentage points more Black than the overall elementary-level population in the District. *Id.*

In sum, the District has successfully eliminated the racial identifiability at all schools serving grades 6 to 8. At the high school grade band, two high schools, Breaux Bridge High and St. Martinville Senior High have met the +/- 15% goal for the last five years, and Cecilia High, for the last two years, has been only fractions of a percentage point outside the goal. This data demonstrates that students matriculating though the Board's high schools are attending schools that have been fully desegregated with only one slightly outside the goal. However, because of the ongoing racial identifiability of ELC and SMP, approximately one-third of Black elementary students in the District remain in

racially identifiable schools. Record Document 409-1 at 3; 3/24/21 Rough Tr. 169:17-21 (Frankenberg).

### 2. The District's Actions—Zone Changes

Per the Student Assignment Consent Order, the Board was required to implement several attendance zone changes. The District fully implemented these changes and has adopted a policy requiring students to attend the schools in the geographic zone in which they live unless they qualify for and are granted a transfer to another school. Record Document 400-25 at 8; 3/26/21 Rough Tr. 23:3-8 (Blanchard). These transfers include transfers under the M-to-M program implemented to aid desegregation efforts, transfers allowing the children of District employees to attend the school at which their parent is assigned, transfers for the health or safety of a child, and extraordinary hardship transfers. Record Document 400-25 at 10-13. The District verifies that students live in the zone in which they attend school. 3/26/21 Rough Tr. 27:11-25 (Blanchard).

### 3. The District's Actions—Majority-to-Minority Transfers

The District also implemented an M-to-M transfer program as required by the Student Assignment Consent Order.[10] Record Document 400-24. Fred Wiltz, the Supervisor of Child Welfare and Attendance for the District, is in charge of overseeing and implementing the program. 3/25/21 Rough Tr. 203:15-16 (Wiltz); 3/26/21 Rough Tr. 30:12-15 (Blanchard). Wiltz has a master's degree in administration and supervision and

---

[10] The District was operating an M-to-M program prior to entry of the Student Assignment Consent Order. 3/25/21 Rough Tr. 209:24-210:4 (Wiltz). The Court only makes findings as to the program as it existed from the 2016-2017 school year and beyond.

has been the Supervisor of Child Welfare and Attendance for approximately nine years. 3/25/21 Rough Tr. 201:1-4 (Wiltz). Prior to this, he held a variety of positions in the District ranging from sixth-grade teacher at Breaux Bridge Elementary to principal of St. Martinville Junior High. *Id.* at 201:7-13. Wiltz was a forthcoming witness and knowledgeable about his job and the larger St. Martin Parish community, where he lives and sends his child to school. *Id.* at 227:12-21.

For the M-to-M program, Wiltz accepts applications for transfers for the next school year beginning in October or November each year and continues accepting applications until approximately May 1 of the next year. *Id.* at 205:19-21. The application period closes in May for all students currently enrolled in the District so the District can evaluate and meet its staffing needs for the next school year. *Id.* at 205:23-206:11. To apply, parents must print an application from the District website or pick up an application from District's central office or one of the schools. Record Document 400-25 at 8-9; 3/25/21 Rough Tr. 252:16-18 (Wiltz). A parent must then fill out that application and have it notarized.[11] *Id.* at 252:2-3, 253:6-8. The notary requirement is not included in the Student Assignment Consent Order or the Board's Policies Related to Student Assignment. Record Document 400-25 at 8-13; 3/25/21 Rough Tr. 226:5-227:3, 254:19-255:9 (Wiltz);  3/26/21 Rough Tr. 28:13-29:14 (Blanchard). *Id.* The District has arranged for local notaries to offer a special reduced rate to parents and no applications have been denied for not being notarized. 3/25/21 Rough Tr. 253:10-20 (Wiltz). The reduced rates and waivers are an

---

[11] Because of the COVID-19 pandemic, the notary requirement was waived altogether for applications submitted for the 2020-2021 school year. 3/25/21 Rough Tr. 253:6-9 (Wiltz).

informal practice instituted by Wiltz. The completed application must be returned to Wiltz or to the child's current school. *Id.* at 252:24-253:1. Parents may also return the application by scanning, emailing, or texting a picture of the application to Wiltz. *Id.* at 253:1-5.

Each May, Wiltz processes the applications for transfers for the next school year by looking at the racial demographics of each school to determine the eligibility of each applicant. *Id.* at 206:14-23. If a student is in the minority at his or her current school, Wiltz will deny the M-to-M transfer request. *Id.* at 206:24-207:5. If a student qualifies for a transfer, he always approves the transfer. *Id.* at 206:19-23. Once approved, the accepting school becomes the child's "home" school and the student can continue attending that school until he or she completes all grades offered at that school. *Id.* at 205:9-12; Record Document 400-24 at 3. A student must re-apply for an M-to-M transfer in order to matriculate into the same school that the transfer school feeds into. *Id.* Students receive free transportation to the accepting school. 3/25/21 Rough Tr. 222:14-21 (Wiltz).

Wiltz explained how the District publicizes the program.[12] All advertising is done during the time period that the applications are accepted. *Id.* at 235:1-18. The District does not advertise the program between May and September each year. *Id.* Wiltz testified that during the 2015-2016 school year, the District held open houses, but stopped because they were not yielding results. *Id.* at 238:12-21. Currently, the District has no

---

[12] Reports including summaries of efforts taken each year can be found at Record Documents 400-28-400-33.

regular tour program for parents to become familiar with the M-to-M program or see schools where their children may be eligible to transfer. *Id.* at 239:1-13. The District has not trained its principals in effective methods of encouraging parents to use M-to-M transfers. *Id.* at 251:9-15; 3/23/21 Rough Tr. 225:21-24 (Sylvester).

During the application period, the District utilizes its "Jcall" system[13] to call all families in the District monthly or bimonthly. 3/25/21 Rough Tr. 242:23-243:2 (Wiltz). The same message is used for all families in the District; messages are not tailored to different attendance zones and messages contain no explanation of schools to which a family may be eligible to transfer. *Id.* at 242:17-244:20. The District also posts about the program on the District website, on social media, and in the local newspapers. *Id.* at 208:10-12. Wiltz has posted fliers about the program in his personal church, but has not worked with other churches in the Parish or with entities like local libraries to advertise the program. *Id.* at 250:1-7. Like with Jcalls, these advertisements contain information about the availability of the program, mechanics of applying, and who to contact for more information. *Id.* at 242:6-9. The advertisements do not contain information about the different programs each school offers. *Id.* at 242:10-18. The advertisements do not contain a notice of the reduced-price notary services or notice that the requirement may be waived if notarization is a financial hardship. *Id.* at 253:21-254:17.

Wiltz stated that while he began his marketing efforts by focusing on schools where M-to-M transfers were most needed to effect change in the racial makeup of the schools,

---

[13] The Jcall system is the District's automated messaging system. 3/25/21 Rough Tr. 224:11-12 (Wiltz).

he no longer focuses his efforts explicitly on shifting the racial makeup of schools. *Id.* at 251:1-6. Overall, Wiltz testified that he does not monitor how many parents are reached regarding the M-to-M program each year. *Id.* at 246:13-248:13. Instead, he judges success by how many applications are received. *Id.* at 247:19-25.

The District has had some success through these efforts. For example, it more than doubled the number of new M-to-M transfers between the 2016-2017 school year and the 2019-2020 school year.

| New Majority to Minority Transfer Numbers by Year[14] | | | | |
| --- | --- | --- | --- | --- |
| 2016-2017 | 2017-2018 | 2018-2109 | 2019-2020 | 2020-2021[15] |
| 34 | 72 | 73 | 79 | 65 |

Record Documents 400-28 at 1-2, 400-29 at 3-5, 400-30 at 4-9, 400-31 at 2-4, 400-32 at 2-4, and 400-33 at 1. Largely as a result of the M-to-M transfer of fifty-five to sixty-five Black students from the St. Martinville Zone to the Parks Zone, the M-to-M transfer program successfully brought the Parks Zone into compliance with the desegregation standard. 3/24/21 Rough Tr. 188:14-20 (Frankenberg); 3/26/21 Rough Tr. 49:11-50:2 (Blanchard).

However, the program has not been successful in the St. Martinville Zone. 3/26/21 Rough Tr. 46:10-14 (Blanchard); 3/24/21 Rough Tr. 176:20-22 (Frankenberg). Superintendent Blanchard testified that since entry of the Student Assignment Consent

---

[14] This chart shows how many new M-to-M transfers were granted each year. It does not reflect the total number of students attending schools on M-to-M each year. This number could be estimated by adding the new transfers to those granted in the prior years.

[15] The number of transfers for the 2020-2021 school year was likely impacted by the COVID-19 pandemic.

Order, there has only been a "handful" of white students—"four or five over the years but that's about it"—that used the M-to-M program. 3/26/21 Rough Tr. 46:12-15 (Blanchard). Tiffany Francis, principal of Catahoula, testified that in the four years that she had been principal, only one white student had used the M-to-M program to transfer from Catahoula to SMP, and only two Black students had used the M-to-M program to transfer from SMP to Catahoula. 3/23/21 Rough Tr. 167:17-168:2 (Francis). Lisa Sylvester, principal of SMP, testified that in the two years she had been principal, she thought there "may have been a couple" of students using the M-to-M options between Catahoula and SMP, but that she guessed it was "less than five." 3/23/21 Rough Tr. 223:7-20, 224:12-16 (Sylvester). No white students transferred from Catahoula to SMP in the 2020-2021 school year. *Id.* at 224:9-11.

### 4. The District's Actions—Implementing a STEM Program

In an effort to increase the use of M-to-M transfers in the St. Martinville Zone, the Board implemented a STEM program in the St. Martinville Zone in fall 2017. Record Document 222. Dr. Gail Dalcourt, the Director of Curriculum and Instruction for the District, testified about the development and implementation of the program. Dr. Dalcourt has a bachelor's degree in science education, a master's degree in secondary education, and a doctorate in educational leadership. 3/25/21 Rough Tr. 258:3-8 (Dalcourt). She has been the Director of Curriculum since 2006, and held other positions within the District starting in 1988. *Id.* at 258:15-24. Dr. Dalcourt demonstrated expertise in STEM programing, but was unable to provide detailed information about how the District implemented and publicized the STEM program as a desegregation tool.

SMP principal Lisa Sylvester also testified about the STEM program at SMP. Sylvester has worked at SMP since fall 2018, first as the assistant principal and for the last two years as the principal. 3/23/21 Rough Tr. 221:10-18 (Sylvester). She has no background in STEM or in magnet programs generally. *Id.* at 226:23-227:3. Ms. Sylvester was a cooperative witness, but demonstrated a lack of knowledge in areas such as the content of SMP's STEM program and how the STEM program is incorporated throughout the school.

Dr. Dalcourt testified that the District selected a STEM themed magnet program after informally hearing from parents in the area that they preferred a STEM program over other potential themes, like zydeco music. 3/25/21 Rough Tr. 270:4-15 (Dalcourt). The District did not conduct any surveys of parents regarding what programs they were interested in prior to implementing the program, nor did it involve parents in designing the STEM program. *Id.* at 271:5-10.

The District's STEM program is only available at ELC, SMP, St. Martinville Junior High, and St. Martinville High.[16] *Id.* at 262:11-17. It begins for students at ELC where the District has purchased special STEM curriculum which is used to supplement the general science curriculum taught throughout the District.[17] *Id.* at 274:17-275-5. The

_____

[16] The Court's recitation of facts omits information about how the STEM program is implemented in the junior high and high school because how the program is implemented at those schools is of little relevance to how the program functions as a magnet program at the elementary level.

[17] As an example, Dr. Dalcourt explained that for students in the STEM program, a science lesson about erosion may include an activity like having students build a dam and asking them to design it such that it could hold a certain amount of water or prevent other materials from getting through. 3/25/21 Rough Tr. 275:5-14 (Dalcourt).

supplemental curriculum is also used at SMP. *Id.* Students at ELC and SMP receive approximately forty-five minutes of time in a STEM lab each week. 3/23/21 Rough Tr. 227:10-17 (Sylvester). This lab consists of lessons in coding or using Lego toys to do robotics. *Id.* at 228:12-229:10.

At SMP, there is an after-school STEM club in which students can participate. *Id.* at 233:17-20. The club meets after school several times per week and the District provides transportation for participating students. *Id.* at 234:17-21. Sylvester estimated that the club had approximately fifty-five students participating in grades 3 through 5. *Id.* at 234:9-16. Of those students, approximately 90% are Black and 10% are white, compared to the school enrollment being approximately 70% Black and 28% white. *Id.* at 235:11-14; Record Document 409-1 at 3. This indicates that the STEM club is not contributing to desegregation at SMP.

When the District first implemented the STEM program, Dr. Dalcourt, Superintendent Blanchard, and school principals were tasked with promoting the program as a tool to promote M-to-M transfers. 3/26/21 Rough Tr. 58:11-59:9 (Blanchard). As part of the initial promotions, the District sent letters to parents, made Jcalls, advertised in the newspaper, and organized meetings about the STEM program in schools such as Teche Elementary, Cecilia Primary, Parks Primary, Catahoula, and SMP. 3/25/21 Rough Tr. 265:4-16 (Dalcourt); 3/26/21 Rough Tr. 51:17-25 (Blanchard). At the meetings, the SMP principal at the time had a presentation about the program, a sample of robots the students would work with, teachers from the program present to discuss what they would be teaching, and students present to demonstrate what they were doing in class. 3/26/21

Rough Tr. 51:19-52:6 (Blanchard). The next year, the District did not hold those meetings, but did hold an open house at SMP. *Id.* at 52:14-17; 3/23/21 Rough Tr. 169:24-170:5 (Francis). Open houses have not continued in subsequent years. 3/26/21 Rough Tr. 172:2-10 (Blanchard).

The District also operated a STEM summer program at SMP when it began the STEM program. In the first summer, the program had high participation by a racially diverse group of students, and parents had positive feedback about the program. *Id.* at 52:14-53:5. By the time the program ended, however, it was past the deadline for families to utilize the M-to-M program to have their students attend SMP that school year. *Id.* at 54:20-24. In the second summer, the District informed parents that students attending the summer program would be required to use the M-to-M program to enroll their children in SMP for the school year after the summer program. *Id.* at 55:1-10. Interest in the summer program then dropped. *Id.*

After the second summer, in the spring of 2018, the District organized field trips for students at other elementary schools to visit SMP to see the STEM program in hopes that students would express interest in attending to their parents. 3/25/21 Rough Tr. 288:14-18 (Dalcourt); 3/23/21 Rough Tr. 170:24-171:1 (Francis); 3/26/1 Rough Tr. 57:2-10 (Blanchard). Students from Catahoula spent a longer time at SMP seeing the program. 3/26/21 Rough Tr. 57:20-24 (Blanchard).

After the initial advertising efforts organized by the District, officials such as Dr. Dalcourt ceded responsibility for promoting the M-to-M program as a desegregation tool. 3/25/21 Rough Tr. 266:25-267:9 (Dalcourt). Superintendent Blanchard is now the District

official in charge of recruitment to the STEM program to facilitate M-to-M transfers, but the responsibilities have largely been left to school principals, who have received no training in promoting the program. 3/26/21 Rough Tr. 59:6-17 (Blanchard); 3/25/21 Rough Tr. 267:10-13 (Dalcourt); 3/23/21 Rough Tr. 225:21-226:2 (Sylvester). The principal of Catahoula, Tiffany Francis, testified that she tells parents about the STEM program and the M-to-M transfer program at least once per year at meetings scheduled for other purposes. 3/23/21 Rough Tr. 172:4-19 (Francis). However, she has no brochures or other tangible information at Catahoula that she can give to parents who express interest in the STEM program. *Id.* at 173:10-17. Francis has not hosted events or tours at Catahoula to encourage families to use the M-to-M transfer program to attend Catahoula. *Id.* at 173:25-174:6.

Lisa Sylvester, the SMP principal since fall 2018, testified that in her time as principal, the District has not hosted any events, tours, or information sessions at SMP intended to recruit white families to use the M-to-M program to transfer into SMP. 3/23/21 Rough Tr. 224:24-225:20 (Sylvester). Notably, when directly asked multiple times what makes the STEM program at SMP unique, Ms. Sylvester failed to mention the incorporation of any supplemental curriculum into science classes at the school. 3/23/21 Rough Tr. 232:10-233:20 (Sylvester). This oversight or lack of knowledge demonstrates the lack of training for principals tasked with talking to families about the program.

As previously detailed, these efforts were not successful. Since fall 2016, one white student has used the M-to-M program to transfer from Catahoula to SMP and two Black students have used the M-to-M program to transfer from SMP to Catahoula. 3/23/21

Rough Tr. 167:2-10 (Francis). Since the STEM Academy began in fall 2017, less than five white students have transferred from Catahoula (or elsewhere) into SMP or ELC. 3/23/21 Rough Tr. 222:17-223:19 (Sylvester); 3/23/21 Rough Tr. 166:23-167:21 (Francis); 3/24/21 Rough Tr. 175:6-13 (Frankenberg). The District does not track whether a student is using an M-to-M transfer to take advantage of the STEM program. 3/25/21 Rough Tr. 240:16-22 (Wiltz).

Superintendent Blanchard opined that the STEM program was not successful at drawing students to SMP for a variety of reasons. First, for students in locations such as Cecilia, the twenty-mile distance between the two schools is too far. 3/26/21 Rough Tr. 64:10-19 (Blanchard). Second, while Parks Primary is closer to SMP, Parks Primary has an "A" accountability rating and SMP has a "C" rating, so parents would rather their students attend Parks Primary. *Id.* at 65:20-66:4. Third, Superintendent Blanchard opined that even though Catahoula is also a "C" rated school, the school is popular in the community and therefore Catahoula families are not willing to send their children to SMP. *Id.* at 66:5-20. Finally, he explained that the St. Martinville community has "controversy" that may make parents hesitant to send their children there. *Id.* at 67:6-20. For example, he stated that in the last year, gun violence near ELC has resulted in the school being locked down multiple times. *Id.* at 68:7-17.

The District has made only de minimis efforts to formally evaluate why the STEM program is not successfully attracting families to St. Martinville schools, though. The District conducted a survey regarding the program for the first time in the spring or fall of 2019. 3/26/21 Rough Tr. 61:10-62:1, 169:13-19 (Blanchard). The survey was intended

to determine whether there was a different type of program—like music, fine arts, or Montessori—that would receive more interest from families in the District. *Id.* at 61:10-21. The survey was sent to families at all schools qualifying to use the M-to-M program to attend one of the schools in St. Martinville. *Id.* at 62:2-5. Even using Jcalls reminding parents to respond to the survey, the response rate was under 25%. *Id.* at 62:5-15. The District has not considered modifications to the STEM program or considered developing a different magnet program. *Id.* at 171:11-23.

### 5. The District's Post-Unitary Status Plans

The District Superintendent of Schools since September 2018, Allen Blanchard, testified at the hearing. 3/26/21 Rough Tr. 19:16-19 (Blanchard). Superintendent Blanchard has an undergraduate degree from the University of Southwestern Louisiana (now called the University of Louisiana Lafayette), a Master of Arts in supervision, a certification in administration, and a certification to be a superintendent. *Id.* at 11:17-12:3. Prior to becoming the Superintendent, Blanchard worked as a math teacher at Breaux Bridge High School, assistant principal and principal at Cecilia Junior High, elementary supervisor for the District, and Director of Operations and Human Capital for the District. *Id.* at 12:9-22. Superintendent Blanchard, a white man, has lived in St. Martin Parish his entire life. *Id.* at 11:9-10, 13:2-4. Superintendent Blanchard demonstrated a deep knowledge of the operations of the District. He was a candid and forthright witness who would admit facts unfavorable to the District's position during his testimony.

Superintendent Blanchard testified that the District plans to keep the current attendance zone changes after being declared unitary. 3/26/21 Rough Tr. 180:8-12

(Blanchard). The District will also allow those students currently using the M-to-M program to remain in their transfer school until they complete the highest grade offered at that school. *Id.* at 175:8-15. Nevertheless, he was also candid with the Court in admitting that, because the District is no longer obligated to after being declared unitary, the District does not plan to provide those students with transportation to the accepting school beginning the school year after the District is declared unitary. *Id.* at 172:17-173:17.

The District has not modeled what its demographics would be without the M-to-M transfers, and it has not considered proposals such as geography-based transfers between the Parks and St. Martinville Zones. *Id.* at 175:25-176:8. Superintendent Blanchard admitted that the District has no other plans to maintain the levels of desegregation the District has achieved after being declared unitary. *Id.* at 176:4-16.

### 6. Expert Testimony

#### i. Michael Hefner

In the area of student assignment, both parties presented expert testimony. The District's expert, Michael Hefner, was tendered as an expert in census data, mapping, demographics, and the effectiveness of the District's M-to-M transfers and STEM program as desegregative tools. 3/25/21 Rough Tr. 78:1-9 (Hefner). He earned a bachelor's degree in business administration from the University of Southwestern Louisiana in 1978 and an online juris doctorate from Concord Law School in 2008. *Id.* at 73:23-25, 78:10-17; Record Document 400-26 at 9-17. He has been retained as an expert by school districts in numerous school desegregation cases in the State of Louisiana, including

Evangeline Parish, Bossier Parish, DeSoto Parish, and St. Mary Parish. Record Document 400-26 at 9-10. The Department of Justice has retained Mr. Hefner as an expert in two school desegregation cases in Louisiana where his student assignment plans were utilized and the districts were later declared unitary. *Id.* at 10. Mr. Hefner was a member of the school board in Lafayette Parish, which neighbors St. Martin Parish, from 1990 to 2010. Record Document 400-26 at 16.

In 2015, Mr. Hefner was involved in drafting the attendance plan adopted by the Court in the Student Assignment Consent Order that went into effect for the 2016-2017 school year. 3/25/21 Rough Tr. 79:7-21, 80:21-81:6 (Hefner). In 2020, he was asked to review the effects of the rezoning and M-to-M transfer program. Mr. Hefner explained that in 2015, the residency demographics of ten schools in the District fell outside the +/- 15% standard.[18] *Id.* at 85:15-87:8. By October 2019, rezoning and M-to-M transfers brought the actual enrollment at six of the ten schools into compliance. *Id.* at 89:23-90:6.

He admitted that the rezoning and M-to-M transfers were not successful in bringing ELC, SMP, or Catahoula within the +/- 15% standard. *Id.* at 92:5-11. However, Mr. Hefner

---

[18] Mr. Hefner's opinion relied on three main categories of data: actual student enrollment data, residency demographic data, and Census population data. Actual enrollment data refers to the number of students actually attending a school. Per the Student Assignment Consent Order, this data is used to determine whether a school is in compliance with the +/- 15% standard. Record Document 211-1 at 10-11. Residency demographic data tracks the residency of students attending any school in the District. 3/25/21 Rough Tr. 83:23-84:1, 87:1-9, 141:1-20 (Hefner). The residency demographics for a particular school reveal the number and race of students zoned to that school based on students' home address, but does not necessarily correlate to the number of students actually enrolled at a particular school because students can use transfers, like M-to-M transfers, to attend a school they are not zoned to attend. Census population data looks at the overall population, not just school age children or students enrolled in the District. 3/25/21 Rough Tr. 98:1-22 (Hefner).

highlighted that there had been improvement in the diversity of the enrollment at two of the three schools. *Id.* at 92:17-21. The Black student enrollment at Catahoula increased by 11 percentage points between 2015 and 2019—going from approximately 7% (16 students) in October 2015 to 17.5% (24 students) in October 2019. *Id.* at 92:22-93:2; Record Documents 400-26 at 3 and 409-1. Similarly, Mr. Hefner reviewed trends for SMP and ELC. 3/25/21 Rough Tr. 95:13-17 (Hefner). At ELC, the Black student enrollment increased 3 percentage points, from 67% (268 students) in October 2015 to 70.4% (250 students) in October 2019. Record Documents 400-26 at 3 and 409-1. At SMP, the Black student enrollment decreased by 2 percentage points, from 70.9% (431 students) in October 2015 to 68.8% (331 students) in October 2019. *Id.*

Mr. Hefner attributed the changes in the Catahoula area to rezoning and to changes in the racial demographics of the population in the area. 3/25/21 Rough Tr. 97:7-98:9 (Hefner). For example, between 2010 and 2017, the Black population increased by an average of 5.1% in two Census tracts assigned to Catahoula based on Census data estimates. *Id.* at 97:24-98:9.

| Catahoula Area Changes in Population by Race Census 2010 to 2017 Estimated | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Census Tract | Population 2010 | Population 2017 Est. | White 2010 | White 2017 Est. | 2010 White % | 2017 White % | Change White % 2017-2010 | Black 2010 | 2010 Black % | Black 2017 Est. | 2017 Black % | Change Black % 2017-2010 |
| 201 | 5116 | 5352 | 4803 | 4735 | 93.9% | 88.5% | -5.4% | 219 | 4.3% | 578 | 10.8% | 6.5% |
| 208 | 2974 | 3042 | 1795 | 1705 | 60.4% | 56.0% | -4.3% | 1094 | 36.8% | 1213 | 39.9% | 3.1% |
| | 8090 | 8394 | 6598 | 6440 | 81.6% | 76.7% | -4.8% | 1313 | 16.2% | 1791 | 21.3% | 5.1% |

U.S. Census Bureau Population Counts, Compilation by GPDS, LLC

Record Document 400-26 at 4. He observed similar population trends in the St. Martinville area—the white resident's share of the population in St. Martinville grew between 2010 and 2017. 3/25/21 Rough Tr. 100:13-101:1 (Hefner). In two tracts assigned to ELC and

SMP, the Black share of the population decreased an average of 3.4% between 2010 and

2017. Record Document 400-26 at 5.

| | | | | | | | Change White % | | 2010 Black | Black 2017 | 2017 Black | Change Black % |
| Census Tract | Population 2010 | Population 2017 Est. | White 2010 | White 2017 Est. | 2010 White % | 2017 White % | 2017-2010 | Black 2010 | % | Est. | % | 2017-2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 209 | 1923 | 1834 | 958 | 1047 | 49.8% | 57.1% | 7.3% | 910 | 47.3% | 779 | 42.5% | -4.8% |
| 206 | 5752 | 6325 | 2467 | 2565 | 42.9% | 40.6% | -2.3% | 3115 | 54.2% | 3220 | 50.9% | -3.2% |
| | 7675 | 8159 | 3425 | 3612 | 44.6% | 44.3% | -0.4% | 4025 | 52.4% | 3999 | 49.0% | -3.4% |

St. Martinville Area
Changes in Population by Race Census 2010 to 2017 Estimated

U.S. Census Bureau Population Counts, Compilation by GPDS, LLC

*Id.*

## ii.    Dr. Erica Frankenberg

Plaintiffs' expert Dr. Erica Frankenberg also testified. Dr. Frankenberg is a tenured

professor at Pennsylvania State University in the College of Education where she is also

appointed to the demography faculty, an affiliate faculty member at Pennsylvania State

University School of Law, and directs the Center for Education Civil Rights. Record

Document 400-7 at 1; 3/24/21 Rough Tr. 150:10-18 (Frankenberg). She received a

doctorate in educational policy from Harvard University, a masters from Harvard

University, and an undergraduate degree from Dartmouth College where she wrote a

thesis focusing on school desegregation in Mobile, Alabama. Record Document 400-7 at

1; 3/24/21 Rough Tr. 150:1-17 (Frankenberg). Dr. Frankenberg's work focuses on

integration and racial equality within schools, which encompasses both student and

faculty assignment. *Id.* at 151:23-152:4. She has written extensively about both and has

worked with school districts around the country regarding desegregation plans. *Id.* at

152:5-153:3. Dr. Frankenberg has been retained as an expert in legal cases before. *Id.*

at 153:1, 155:18-24. She has worked with Magnet Schools of America. *Id.* at 154:12-20.

Dr. Frankenberg was well-qualified in the fields of student assignment, faculty assignment, and racial inequality in K to 12 schools. *Id.* at 155:7-14. She testified persuasively regarding student assignment in the District and best practices in school desegregation generally. According to Dr. Frankenberg, the St. Martinville Zone presently demonstrates several hallmarks of a once-segregated school district. *Id.* at 166:20-167:18. First, there is more than one elementary school serving the same grades within the Zone. *Id.* at 168:3-8. Second, at those schools, the racial makeup of the students and faculty is persistently racially identifiable. *Id.* at 168:1-3. In this case, she observed that Catahoula, a historically white school, has persistently remained an identifiably white school and SMP has persistently remained an identifiably Black school.[19] *Id.* at 168:21-169:4; Record Document 409-1.

She expressed concern that nearly one-third of Black elementary students continue to attend identifiably Black schools because literature in school desegregation has long found that the benefits of integration are especially pronounced when integration occurs at a younger age. *Id.* at 165:3-15, 169:23-170:8. She explained that the benefits of integration accrue to both white and Black children, but for Black children, attending desegregated schools can lead to higher graduation rates, a higher likelihood of attending college, and a higher likelihood of gaining employment in a better paying field. *Id.* at 165:18-166:16.

---

[19] In her testimony, Dr. Frankenberg adopted the Student Assignment Consent Order's definition that a variance of greater than +/- 15% in the racial makeup of a school from the racial makeup of that grade band in the District as a whole constitutes a "racially identifiable" school. 3/24/21 Rough Tr. 159:25-160:18 (Frankenberg).

Dr. Frankenberg also reviewed data related to the M-to-M transfer program and the STEM program and concluded that the M-to-M and STEM programs, as implemented, were ineffective desegregation tools in the St. Martinville Zone based on the fact that there was very little change in the racial composition at SMP and little evidence of white students using M-to-M to transfer to SMP. *Id.* at 174:25-175:5, 176:7-22. She opined that the District failed to market those programs in a way best suited to making them successful. She explained that a good marketing program will provide families with knowledge about the mechanics of using a transfer and, crucially, information about what is offered at the accepting school such that a family might find that school desirable. *Id.* at 178:16-179:14. Partnership with local community organizations, such as Black churches, libraries, and doctors' offices is important to get the entire community to embrace desegregation solutions. *Id.* at 181:18-25.

For the STEM program, she observed a lack of District support in advertising. *Id.* at 180:17-20. She explained that leaving too much control of the program and its advertisement in the hands of the individual school principals may diminish a transfer program's success because the principals are often reluctant to encourage students to leave their school for another. *Id.* at 180:10-17. Additionally, she observed that the District had failed to make a sustained advertising effort over time. *Id.* at 179:25-180:3. This ongoing push is key to the success of a program because parents' and students' interest in a program may change each year. *Id.* at 181:3-18. Dr. Frankenberg lauded the District for its idea to create a STEM summer academy at SMP, but she noted that after the successful first summer, there was very little effort to inform parents about the

program—the summer program and the field trips for *students* did little to inform *parents* about the program, which is especially important when working with elementary students because parents have more input into school choice for students that age. *Id.* at 179:18-180:10.

In addition to marketing failures, Dr. Frankenberg observed that the STEM program, as currently implemented, is unlikely to be successful as a true "magnet" program because it is not unique enough from what is offered at other schools in the District. *Id.* at 182:25-183:6. She explained that a successful magnet program is often one where it is apparent from entering the building that the school is doing something different than other schools in the district. *Id.* at 184:6-8. Ideally, a magnet program would incorporate its theme throughout the school and there would be elements incorporated into what all teachers do. *Id.* at 184:9-185:1. It also requires extensive training for teachers and principals at the school. *Id.* at 184:14-185:9. Dr. Frankenberg concluded that the STEM program at SMP did not have these characteristics—the program was not robust enough and she would not call it a "magnet" program as implemented.[20] *Id.* at 185:10-86:12.

_____

[20] Dr. Frankenberg based her opinion on District reports about the M-to-M program and STEM program, her visit to SMP and Catahoula, and her discussions with principals at both schools. 3/24/21 Rough Tr. 175:14-24 (Frankenberg). She also heard testimony at the hearing from SMP principal, Lisa Sylvester, about the program at SMP. *Id.* at 183:23-25. From this, Dr. Frankenberg expressed that her understanding of the program was that students attended a robotics lab weekly and that there was a STEM club. *Id.* at 183:25-184:2. Dr. Frankenberg did not address the fact that Dr. Dalcourt testified that STEM was incorporated into the science curriculum taught at the school. This does not change how the Court weighs Dr. Frankenberg's opinion, however, because the Court does not find that the testimony regarding supplemental curriculum in the classroom is

**D. The District is Not Entitled to Unitary Status**

To achieve unitary status in the area of student assignment, a school system is not required to have "a racial balance in all of the schools." *Ross v. Hous. Indep. Sch. Dist.*, 699 F.2d 218, 227-28 (5th Cir. 1983); *Cowan*, 748 F.3d at 238. The Supreme Court has held that "[a]s the *de jure* violation becomes more remote in time and [ ] demographic changes intervene, it becomes less likely that a current racial imbalance in a school district is a vestige of the prior *de jure* system." *Freeman*, 503 U.S. at 496. Furthermore, "[t]he causal link between current conditions and the prior violation is even more attenuated if the school district has demonstrated its good faith." *Id.* Yet, "[t]he retention of all-black or virtually all-black schools within a dual system is nonetheless unacceptable where reasonable alternatives may be implemented." *Cowan,* 748 F.3d at 239 (quoting *Valley v. Rapides Par. Sch. Bd.*, 702 F.2d 1221, 1226 (5th Cir. 1983)).

In this case, the District has failed to achieve unitary status for several reasons. First, the District has failed to eliminate the vestiges of prior *de jure* segregation to the extent practicable. As demonstrated by the data above, the District has failed to achieve the desegregation goals in multiple elementary schools in the St. Martinville Zone. *See supra* Section III.C.1. While as a general rule "[r]acial balance is not to be achieved for its own sake," it should be "pursued when racial imbalance has been caused by a constitutional violation." *Freeman*, 503 U.S. at 494 (citing *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 31-32 (1971)).

---

sufficient to make the school immediately identifiable as a magnet school as described by Dr. Frankenberg.

Here, the racial imbalance that remains in the St. Martinville Zone is a product of the previous constitutional violation; the white racial identifiability of Catahoula results directly from the fact that the District intentionally built the school in a white town for white students. *Lawrence Cnty.*, 799 F.2d at 1044 ("Patently, during the *de jure* segregation era schools were built to accommodate students by race in areas where population was predominantly of a single race, and as a reasonably inferable result, parents who thereafter selected a place to live chose to reside near the racially segregated neighborhood schools."). Likewise, the extent of the Black racial identifiability of SMP and ELC is a result of the fact that the District continues to operate Catahoula. *Keyes v. Sch. Dist. No. 1, Denver, Colo.*, 413 U.S. 189, 208 (1973) ("[I]ntentionally segregative school board actions in a meaningful portion of a school system, as in this case, creates a presumption that other segregated schooling within the system is not adventitious.").

Importantly, this remaining segregation is not a product of demographic *changes*. In *Flax v. Potts*, the Fifth Circuit examined a district court's determination that the Fort Worth, Texas school district had achieved unitary status in student assignment when fourteen of the district's ninety-eight schools had student populations that were more than 80% Black. *Flax v. Potts*, 915 F.2d 155, 160-61 (5th Cir. 1990). The district court in that case found that the district's efforts were successful and concluded that any remaining racial imbalance was not the result of past or present segregation, but rather a result of changes in residential housing patterns. *Id.* at 161. The record before the Fifth Circuit showed that the population of Forth Worth had decreased by approximately 10,000 between 1970 and 1980, the population of Tarrant County increased by 20%

during the same time period, and the school district lost approximately 33,000 white students between 1968 and 1984. *Id.* Based on this, the Fifth Circuit concluded that "[b]ecause those changes occurred during the life of the desegregation plan, they are reactions to that plan—to the extent that they are not reactions to other social and economic factors." *Id.* at 161-62. Therefore, the school district was "not now required to take further steps to counter the effects of what may amount to 'white slight' to its plan." *Id.* at 162.

The evidence before this Court is not comparable to *Flax*. While Catahoula has had fluctuations in the number of white students enrolled during the period of supervision and the overall enrollment of the school has fallen, this fluctuation is not similar to that which occurred in *Flax*. In fact, the cause of schools in the St. Martinville Zone remaining racially identifiable is that the demographics *have not* meaningfully changed during the period of Court supervision.[21]

This makes St. Martin Parish more akin to the situation in *Cowan v. Cleveland School District*. *Cowan*, 748 F.3d at 238-39. In *Cowan*, the Fifth Circuit stated that:

> The retention of single-race schools may be particularly unacceptable where, as here, the district is relatively small, the schools at issue are a single junior high school and a single high school, which have never been meaningfully desegregated and which are located less than a mile and a half away from the only other junior high and high school in the district,

---

[21] The Court acknowledges that the District's expert, Michael Hefner, testified that there have been demographic changes in the St. Martinville Zone between 2010 and 2017. *See supra* Section III.B.6.i. However, that only further supports the Court's point. Even crediting Mr. Hefner's testimony regarding demographic changes, the simple fact remains that these changes have not resulted in a single elementary school in the St. Martinville Zone coming close to having a student population within the +/- 15% standard.

and where the original purpose of this configuration of schools was to segregate the races.

*Cowan*, 748 F.3d at 238-39. Like in *Cowan*, St. Martin Parish is a relatively small school district, only two elementary schools[22] are at issue, those schools have never been meaningfully desegregated, and the original purpose of the configuration of elementary schools in the St. Martinville Zone was to segregate races. The elementary schools in the St. Martinville Zone are approximately twelve miles apart,  which is undoubtedly further apart than the schools at issue in *Cowan*, but the District is already transporting older students in Catahoula to the schools located in St. Martinville without issue. Thus, the ongoing vestige of *de jure* segregation in the St. Martinville Zone is not one that is excusable due to demographic change and is best comparable to type of ongoing segregation the Fifth Circuit described as "particularly unacceptable" in *Cowan*.

Second, the District is not entitled to unitary status because it has failed to show that it complied with the Student Assignment Consent Order in good faith. As required by the Student Assignment Consent Order, the District began advertising its M-to-M program. The advertisements did little more than inform parents that M-to-M transfers were an option. The District also imposed barriers, like the notarization requirement, that were not required by the Consent Order.[23] Nevertheless, in some attendance zones, like

---

[22] As previously noted, ELC and SMP are essentially one elementary school located on two campuses. Therefore the "two" schools at issue are 1) Catahoula and 2) ELC and SMP.

[23] The District objects to the Court considering the notary requirement because Plaintiffs never objected to this practice in the years the District was operating under the Student Assignment Consent Order. Record Document 406 at 18-19. It notes that the Student Assignment Consent Order contains a waiver provision stating that if the Plaintiff-Parties fail to raise an objection within 45 days, the objection is "deemed waived and a

the Parks Zone, the District's advertisements were sufficient to attract numerous students to transfer and have the program achieve its goals. In the St. Martinville Zone, though, this was not the case.

To the District's credit, after recognizing that its efforts were not yielding results in the St. Martinville Zone, it decided to implement a STEM program there. However, the District failed to support and advertise this program in such a way that it was likely to be an effective desegregation tool. The District implemented the STEM program without surveying families about their interest in the STEM theme and did not evaluate whether another magnet theme might be more successful. The fact that there have been so few transfers into SMP since implementation of the program and the fact that the STEM club at SMP is more racially isolated than the overall enrollment of the school suggests that the theme may not be one that interests families, or at least not enough that the theme functions as an effective desegregation tool.

The District also failed to implement the STEM program in a way that meaningfully differentiates SMP from other schools in the District. Unfortunately, after the District saw little success in attracting families to the STEM program in the first two years, it effectively

_____

presumption of compliance for the proceeding reporting period will be applied." *Id.* at 18 (quoting Record Document 211-1 at 25-26). Therefore, it argues, the Plaintiff-Parties waived this issue by failing to raise it before the hearing on the motion for unitary status. *Id.* Plaintiffs contend that the numerous oral and written objections lodged by the Plaintiff-Parties during the period of supervision were sufficient to preserve their objections in the area of student assignment. Record Document 404 at 44. In any event, the Court does not rely on the notary requirement alone as evidence that the District has failed to carry its burden of showing good-faith compliance and the failure to object, standing alone, is "insufficient to satisfy [the District's] burden of proving [its] good faith compliance." *United States v. Mississippi*, No. 70-4706, 2014 WL 11290897 at * 3 (S.D. Miss. Apr. 30, 2014).

gave up on promoting the program as a desegregative tool and largely has not advertised the program since 2018. For example, the District has not provided the Catahoula or the SMP principals with the training, knowledge, or recruitment materials necessary to promote the STEM program, it has not held any recent open houses for parents to see SMP, and it has not included information about the STEM program on the M-to-M section of its website so parents interested in M-to-M can see the programmatic offerings at SMP.

Third, the District is not entitled to unitary status because it has not demonstrated a good-faith ongoing commitment to integration. While the District intends to allow those students currently using an M-to-M transfer to continue attending the transfer school until they complete the highest grade offered at the school, the District intends to stop providing free transportation to those students because it is no longer obligated to. Further, the District has failed to so much as consider permissible options to maintain the current levels of desegregation after it is declared unitary.[24] This is important for two reasons. First, the Student Assignment Consent Order expressly requires that the parties work together to "agree to a legally adequate student transfer policy to continue the promotion of desegregative student transfers at the end of the consent order." Record Document 211-1 at 16. No new transfer policy or other method of promoting desegregative student transfers has been even considered by the District. Thus, the

---

[24] The Court recognizes that the District will not be permitted to continue the M-to-M program after it is declared unitary. *See Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1,* 551 U.S. 701, 710-11 (2007). This does not preclude the District from *considering* whether there are options that would be permissible. *See, e.g. Lewis v. Ascension Par. Sch. Bd.,* 806 F.3d 344, 357-58 (5th Cir. 2015); *Spurlock v. Fox,* 716 F.3d 383, 385, 402-03 (6th Cir. 2013).

District's failure to consider whether there are legally permissible options is a violation of the terms of the Consent Order. Second, M-to-M transfers are responsible for desegregating the Parks Zone. Hence, it follows that without a plan to allow some form of transfers to continue after the District is unitary, the Parks Zone will re-segregate within a few years as those students currently using the M-to-M transfer age out of their school or voluntarily stop using the transfer because transportation is no longer available.

For these reasons, the Court concludes that the District has not achieved unitary status in the area of student assignment and Defendant's motion for unitary status [Record Document 365] is **DENIED**. The Court must next consider whether further relief in the area of student assignment is warranted.

## IV. Further Relief—Student Assignment

### A. The Requested Relief

Plaintiffs moved for further relief to eliminate the vestiges of the prior *de jure* segregation in the St. Martinville Zone. Record Document 374. They urge the Court to order that the District close Catahoula and have those students attend ELC and SMP in St. Martinville instead. Record Document 404. They propose that the Court order the District to implement a more robust magnet program at ELC and SMP in conjunction with closing Catahoula. *Id.* Finally, they request that the Court order the District to "pilot a race-neutral desegregative transfer program between the Parks Zone and the St. Martinville Zone and provide participants with free transportation." Record Document 404 at 54. The United States joins in Plaintiffs' request that the Court close Catahoula. Record Document 401. It does not advocate for an order that the District implement a magnet

program or for an order that the District pilot a race-neutral desegregative transfer program. *Id.*

The District opposes all proposals. It contends that Catahoula is naturally desegregating as the racial makeup of the population in the area changes. Record Document 403. At most, the District argues that attendance boundaries for Catahoula, ELC, and SMP could be redrawn a second time to assist the desegregation efforts. *Id.* at 3-7.

## B. Facts

The Court heard testimony from two experts regarding the proposals. Plaintiffs' expert, Dr. Erica Frankenberg, recommended that the District close Catahoula and send those students to ELC and SMP. She also recommended that the District implement a robust magnet program in the St. Martinville Zone and that the District consider a geography based optional or flexible attendance zone between the Parks Zone and the St. Martinville Zone.

Defendant's expert, Michael Hefner, opined in February 2020 that the District could redraw attendance boundaries between SMP and Catahoula to further desegregation at Catahoula. In October 2020, he modified his opinion and no longer recommends any changes to the attendance zones because he believes that Catahoula is naturally desegregating by virtue of population changes in the Catahoula and St. Martinville areas. Representatives from the District, SMP, and Catahoula also testified about the impact closing Catahoula could have on the community and about how the District might accommodate students currently attending Catahoula if the school were to close.

### 1. Testimony of Dr. Erica Frankenberg—Closing Catahoula and Implementing a Magnet Program

Dr. Frankenberg recommended that the best way to eliminate the ongoing vestiges of *de jure* segregation in the St. Martinville Zone is to 1) close Catahoula and have those students attend SMP and ELC and 2) more robustly implement a magnet program at ELC and SMP. 3/24/21 Rough Tr. 186:15-19 (Frankenberg). Dr. Frankenberg discussed details about each recommendation individually and the cumulative effect of adopting both recommendations together.

The Court turns first to the recommendation that the District close Catahoula. Ultimately, Dr. Frankenberg explained that the efforts to date had been ineffective at desegregating any of the elementary schools in the St. Martinville Zone. *Id.* at 189:11-22. She concluded that having two options for each elementary grade in the Zone will make it difficult to desegregate the schools, especially SMP and ELC. *Id.* at 189:19-22. Therefore, she recommended closing Catahoula and rezoning those students to attend SMP and ELC. *Id.* at 189:11-22. She noted that when the District moved all grade 6 to 8 students in the St. Martinville Zone to St. Martinville Junior High ("SMJH") instead of having students in those grades attend both SMJH and Catahoula, SMJH was no longer racially identifiable. *Id.* at 189:23-190:5; Record Document 409-1. In other words, having all students in the St. Martinville Zone attend grades 6 to 8 at SMJH successfully integrated the middle schools in the Zone.

Dr. Frankenberg admitted that closing Catahoula would not certainly result in SMP and ELC ceasing to be racially identifiable schools. For example, she estimated that if every student currently enrolled at Catahoula instead attended ELC or SMP, ELC would

increase from 322 students to 382 students and go from having a student enrollment that is 20.2 percentage points more Black than the racial makeup of elementary students in the District to an enrollment that is 15 percentage points more Black. Record Documents 409-1 at 3 and 400-22; 3/24/21 Rough Tr. 190:25-191:2 (Frankenberg). At SMP, the student population would increase from 430 students to 522 students, and the school would go from having a student enrollment that is 23.1 percentage points more Black than the racial makeup of all elementary students enrolled in the District to an enrollment that is 16.4 percentage points more Black. Record Documents 409-1 at 3 and 400-22; 3/24/21 Rough Tr. 191:4-6 (Frankenberg).

**Projected SMP/ELC - Student Enrollment (Based on Joint Ex. 1)**

| Total Elementary Schools (3,565 students) | White | Black | Other | +/- |
|---|---|---|---|---|
| | 49.9% (1,773) | 45.9% (1,631) | 4.3% (152) | |
| Early Learning Center (382) | 35.9% (137) | 61% (233) | 3.1% (12) | + 15 B |
| St. Martinville Primary (522) | 35.1% (183) | 62.3% (325) | 2.7% (14) | + 16.4 B |

Record Document 400-22. Nevertheless, she opined that this improvement was better than the alternative of allowing higher levels of segregation to continue, especially given that the segregation was occurring among elementary students and the benefit of desegregations accrues most acutely to younger students. 3/24/21 Rough Tr. 164:20-165:15, 263:3-11 (Frankenberg).

That closing Catahoula would not result in ELC and SMP coming within the +/- 15% desegregation standard is one of the reasons that Dr. Frankenberg also recommended that the District implement a stronger magnet program at ELC and SMP.

Dr. Frankenberg testified that a more robust magnet program could have two main benefits. First, it could attract additional white students to SMP, thus assisting with desegregation efforts and bringing SMP within the +/- 15% range. *Id.* at 200:17-23. Second, a successful magnet program could help bring the St. Martinville and Catahoula communities together should Catahoula be closed. *Id.*

Dr. Frankenberg made numerous suggestions regarding what the District would need to include in a successful magnet program. *Id.* at 203:4-209:23. For example, she recommended that the District ensure that all students at the school have access to the program, that there be no admission criteria to the magnet school, that the District have incremental annual desegregation goals for the school, that the District apply for federal funding for the program, that the District take a centralized approach to advertising the magnet program, that the District continue offering free transportation for students transferring into the school, that the District identify a theme that interests both white and Black families, that staff and faculty at the school be diverse and trained in working with diverse families, and that the District consider offering enrollment to some out-of-District students. *Id.* Dr. Frankenberg made no recommendation as to what magnet school theme may be successful in the District. Instead, she recommended that the District take steps to determine what themes interested parents in the District. *Id.* at 207:25-208:12.

## 2. Testimony of Dr. Erica Frankenberg—Optional Attendance Zones

Dr. Frankenberg testified regarding a proposal to create an optional attendance zone between the St. Martinville and Parks Zones. 3/24/21 Rough Tr. 186:22-187:14

(Frankenberg). She explained that this plan can be implemented in one of two ways. *Id.* at 215:3-4. First, the District could designate a geographic area between the St. Martinville and Parks Zones where families would choose which school their children attend. *Id.* at 215:4-6. Alternatively, the District could assign each student to a default school and allow students living in certain areas to have priority for a transfer with free transportation to the other Zone. *Id.* at 215:6-11.

Dr. Frankenberg opined that the optional attendance zone was a method available to maintain the desegregation at schools like Parks Primary even after the District is declared unitary. *Id.* at 187:3-11. She explained that this type of plan has the added benefit of reducing the burden of transporting students because all transfers would come from a smaller geographic area. *Id.* at 215:14-19. Further, if Black students in the optional attendance zone took the opportunity to attend Parks Primary instead of SMP, this would create additional space for white students who wanted to take advantage of the magnet program at SMP. *Id.* at 187:8-14. Hence, the optional attendance zone could have the added benefit of assisting desegregation efforts at SMP.

### 3. Testimony of Michael Hefner

The Court also heard testimony from the District's expert Michael Hefner. Compared to Dr. Frankenberg's testimony, Mr. Hefner's testimony regarding potential further relief was less helpful to the Court. His qualifications are limited to maps and demographic data. He has no formal training in education policy. At times, his testimony

was argumentative and conclusionary.[25]  The data Mr. Hefner presented was not always directly responsive to the issues under consideration by the Court. When he was questioned regarding his methodology, he became defensive. Thus, his opinions regarding the best options to desegregate the St. Martinville Zone were less persuasive than Dr. Frankenberg's.

As previously detailed, in February 2020 Mr. Hefner reviewed Census demographic data in the St. Martinville Zone and observed that an increasing share of the Catahoula population was Black and an increasing share of St. Martinville's population was white. *See supra* Section III.C.6.i. Nevertheless, in February 2020 Mr. Hefner suggested a change in zoning between SMP and Catahoula to assist desegregation efforts at Catahoula. Record Document 400-26 at 7; 3/25/21 Rough Tr. 117:5-15 (Hefner). The proposed plan would move the border between SMP and Catahoula by approximately two miles such that more Black students currently attending SMP would instead attend Catahoula. 3/25/21 Rough Tr. 113:1-10, 118:14-22 (Hefner). Based on residential data, Mr. Hefner estimated that this boundary change would result in more Black students being zoned to attend Catahoula, thereby increasing the percentage of Black students in grades pre-K to 5 at Catahoula to approximately 37%. *Id.* at 118:18-22.; Record

---

[25] For example, Mr. Hefner opined that closing schools in a small community can be "traumatic" and began to discuss the history of Catahoula dating back to the 1920s. 3/25/21 Rough Tr. 157:15-23 (Hefner). When Plaintiffs' counsel objected that Mr. Hefner is not qualified to testify about the history of the District, Mr. Hefner responded directly to Plaintiffs' counsel that this information was in his report and subsequently apologized to the Court because he "gets a little passionate about these things." *Id.* at 157:24-158:17.

Document 400-26 at 8. Stated differently, he predicted that this zone change would result in Catahoula coming within the +/- 15% desegregation standard.

Crucially, the 37% estimate was based on the residential data for the Catahoula area; it was not based on actual enrollment data, which is the data used to judge desegregation efforts per the Student Assignment Consent Order. 3/25/21 Rough Tr. 175:25-176:3 (Hefner); Record Documents 211-1 at 11 and 400-26 at 8. Mr. Hefner explained that because there is not a high number of M-to-M transfers between SMP and Catahoula, enrollment data would not likely differ from estimates based on residential data. 3/25/21 Rough Tr. 131:20-132:12, 176:9-17, 181:10-21 (Hefner). However, when Mr. Hefner's calculations using residential data for the 2020-2021 school year were compared with the actual enrollment at Catahoula for the same year, the data was off by about 14%.[26] *Id.* at 178:19-179:14. Thus, the Court cannot conclude from Mr. Hefner's residential data that the actual enrollment at Catahoula would certainly come within the +/- 15% standard if the zone modifications were implemented.

---

[26] Mr. Hefner calculated that 150 students in grades pre-K to 5 were zoned to attend Catahoula as of October 1, 2020 with the current zoning in effect. Record Document 400-27; 3/25/21 Rough Tr. 177:2-4 (Hefner). The actual enrollment at Catahoula for students in grades pre-k to 5 for 2020-2021 school year was only 130—96 white students, 4 "other" race students, and 30 Black students. Record Document 400-9 at 3; 3/25/21 Rough Tr. 177:5-178:13 (Hefner). Mr. Hefner provided no explanation for this discrepancy, and the Court heard no other evidence which would explain where the twenty students zoned to Catahoula per Mr. Hefner's residential demographic data attend school. For example, testimony at the hearing clearly established that those twenty elementary students are not using an M-to-M transfer to attend ELC or SMP and there was no testimony about a sizeable number of students from Catahoula using the M-to-M transfer program to attend a different elementary school in the District.

Even if the zone changes would result in Catahoula's enrollment coming within the standard, Mr. Hefner did not foresee that the zone changes would make any meaningful changes to the racial makeup of ELC and SMP because the change in student attendance would not be large enough given that ELC and SMP have more students enrolled. 3/25/21 Rough Tr. 119:9-23, 123:8-12, 124:8-11 (Hefner). Additionally, he explained that the SMP attendance area was demographically isolated and redrawing boundary lines to include additional neighborhoods around the school would not have a meaningful impact on the racial makeup of the school because the neighborhoods which could be included in a changed zone are themselves racially diverse. *Id.* at 153:14-154:15. Adding those neighborhoods would therefore do little to affect the ratio of Black and white student enrollment at SMP. *Id.*

In October 2020, though, Mr. Hefner altered his recommendation. *Id.* at 134:3-6. He justified this change in opinion by explaining that in February 2020, his review of the residential demographic data revealed that there may be a "flattening" in the demographic changes he observed in Catahoula. *Id.* at 134:8-13, 140:7-21. In October 2020 he received updated student data which he used to recalculate the residential demographics in the District. *Id.* at 140:10-15. From that residential demographic data, he concluded that his concerns about flattening residential demographic trends in Catahoula were unfounded, and the Catahoula attendance area would likely continue desegregating naturally without further intervention. *Id.* at 134:12-18, 140:15-25. He therefore altered his opinion to recommend that no additional zone changes are needed to bring the school into compliance, though he did admit that the trends should be

monitored. *Id.* at 183:15-22. He opined that Catahoula's increasing Black population "in the coming years" "should" be "getting it closer" to being within the +/- 15% standard. *Id.* at 134:18-21.

Mr. Hefner presented numerous drawbacks to Dr. Frankenberg's recommendation that the District close Catahoula. First, he noted that even if Catahoula was closed and every student currently at Catahoula instead attended ELC and SMP, those schools would still fall outside the +/- 15% desegregation standard and, therefore, remain identifiably Black schools. *Id.* at 126:17-20. Second, he cast doubt on the expectation that every student currently at Catahoula would indeed attend ELC or SMP were Catahoula to close. Mr. Hefner observed that between October 2015 and October 2019, enrollment at Catahoula decreased from 236 students to 137 students, however his observations did not distinguish what amount of that decrease was due to grades 6 to 8 being removed from the school and what portion of the decrease was due to other factors. *Id.* at 94:1-6, 171:15-173:2. Thus, the Court cannot rely on this data as clear support for the proposition that Catahoula students will exit the District instead of transferring to ELC or SMP. During this same time period, enrollment at ELC decreased from 398 students to 358 students, and enrollment at SMP decreased from 608 students to 481 students. *Id.* at 94:10-20. This decrease in enrollment at ELC and SMP was not caused by the reassignment of any grades.

| St. Martin Parish Schools Enrollment Demographic Changes SY2015 to SY2019 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| School | October 1, 2015 | | | October 1, 2019 | | | Change SY2015-SY2019 | | |
| | Enrollment | White% | Black % | Enrollment | White% | Black % | Enrollment | White% | Black % |
| Catahoula ES | 236 (PK-8) | 92% | 7% | 137(PK-5) | 78.8% | 17.5% | -99 | -13% | 11% |
| ELC PK-1 | 398 | 30% | 67% | 358 | 27.1% | 70.4% | -40 | -3% | 3% |
| St. Martinville Primary 2-5 | 608 | 26% | 71% | 481 | 28.1% | 68.8% | -127 | 2% | -2% |
| Enrollment Data from St. Martin Parish School Board, Compilation by GPDS, LLC | | | | | | | | |

Record Document 400-26 at 3. He then reviewed the change in percentages of students living in the Catahoula and St. Martinville areas who were enrolled in private schools between 2010 and 2017. 3/25/21 Rough Tr. 103:4-9 (Hefner).

| St. Martinville Area Changes in K-12 School Enrollments 2010 Census to 2017 Estimated | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Census Tract | Enrolled in School K-12 2017 | K-12 % Public 2017 | K-12 % Private 2017 | Enrolled in School K-12 2010 | K-12 % Public 2010 | K-12 % Private 2010 | Change K-12 Enrollment 2017-2010 | Change Public % 2017-2010 | Change Private % 2017-2010 |
| 209 | 360 | 62.20% | 37.80% | 296 | 81.8% | 18.2% | 64 | -19.60% | 19.6% |
| 206 | 1821 | 81.70% | 18.30% | 1045 | 86.8% | 13.2% | 776 | -5.10% | 5.1% |

| Catahoula Area Changes in K-12 School Enrollments 2010 Census to 2017 Estimated | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Census Tract | Enrolled in School K-12 2017 | K-12 % Public 2017 | K-12 % Private 2017 | Enrolled in School K-12 2010 | K-12 % Public 2010 | K-12 % Private 2010 | Change K-12 Enrollment 2017-2010 | Change Public % 2017-2010 | Change Private % 2017-2010 |
| 201 | 781 | 60.10% | 39.90% | 1215 | 88.6% | 11.4% | -434 | -28.50% | 28.5% |
| 208 | 462 | 82.90% | 17.10% | 712 | 84.1% | 15.9% | -250 | -1.20% | 1.2% |
| U.S. Census Bureau 2010 Census, ACS 2017 5 Year Avg. File S1401. Compilation by GPDS, LLC | | | | | | | | | |

Record Document 400-26 at 6. He explained that between 2010 and 2017, one area of the ELC and SMP attendance area saw a nearly 20% increase in students leaving public school and enrolling in private school while one area in the Catahoula attendance area

had a nearly 30% increase in students attending private school.[27] *Id.*; 3/25/21 Rough Tr. 103:16-104:17, 109:19-110:5 (Hefner).

Third, he noted that the distance between ELC and Catahoula is approximately 12 miles and the distance between Catahoula and SMP is approximately 11.3 miles. 3/25/21 Rough Tr. 131:2-14 (Hefner). However, he also admitted that one of the biggest private schools in the area, St. Bernard parochial school, is 16 miles from Catahoula. *Id.* at 191:17-192:8. This is significant because Mr. Hefner suggested that this school is one that students from Catahoula may choose to attend if they did not want to attend ELC or SMP. *Id.* at 104:20-105:7, 106:21-107:3.

Ultimately, Mr. Hefner opined that closing Catahoula was unnecessary as a desegregation tool given that the school was naturally desegregating over time. *Id.* at 153:9-13. The basis for this opinion is weak. He reached that conclusion by looking at a snapshot of Census data *population percentages* by race of people living in the Catahoula and St. Martinville areas from 2010 to 2017 and from *residential demographic data*. Neither of these data points necessarily correlate to the actual student enrollment at a school, which is the data used for purposes of the Student Assignment Consent Order +/- 15% desegregation standard. 3/25/21 Rough Tr. 179:24-180:1 (Hefner). In fact, in this case, Mr. Hefner's 2020-2021 school year residential demographic data for the

___

[27] Mr. Hefner stated that the "normal" rate of change in students going from public school to private school is between 1% and 3%. 3/25/21 Rough Tr. 106:1-10. While Mr. Hefner had no evidence of why students were choosing private school at such a high rate, he speculated that it may be due to uncertainty regarding whether Catahoula would remain open. *Id.* at 106:15-21. If parents are uncertain about Catahoula's future and know they do not intend to send their child to SMP should Catahoula close, they may choose to preemptively enroll their children in a private school. *Id.* at 106:21-107:3.

Catahoula attendance area was not close to Catahoula's actual enrollment. *See supra* p. 56 and note 26. Thus, the Court concludes that Mr. Hefner's assumptions are based on unreliable data. Finally, even taking his data as accurate and accepting his methodology, Mr. Hefner gave no estimate of *when* any schools might come into compliance with the +/- 15% *actual enrollment* standard naturally.

### 4. Dr. Frankenberg's Response to Mr. Hefner

Dr. Frankenberg had the opportunity to respond to Mr. Hefner's criticisms of her proposal to close Catahoula. 3/24/21 Rough Tr. 195:5-17 (Frankenberg). She did not share Mr. Hefner's concerns regarding the fact that students would be required to travel from Catahoula to ELC or SMP. First, she noted that older students in Catahoula are already making this trip. *Id.* at 195:20-23. Second, some students from Catahoula are already transported to Parks Primary one day per week for the talented and gifted program.[28] *Id.* at 195:24-196:2. Third, she explained that in her experience, students often enjoy riding a bus to school—they can travel with older siblings, it is a time to socialize, and it can enhance desegregation efforts. *Id.* at 195:23-24; 3/25/21 Rough Tr. 8:14-9:4 (Frankenberg).

Dr. Frankenberg did not support rezoning instead of closing Catahoula. 3/24/21 Rough Tr. 198:22-199:10 (Frankenberg). Based on her review of the data, adjusting the Catahoula attendance boundaries to include areas with more Black students would not accomplish desegregation in the St. Martinville Zone as a whole, even if it did desegregate

---

[28] The District is not transporting these students during the pandemic, instead having the teacher running the program travel to each school. 3/26/21 Rough Tr. 38:15-18 (Blanchard).

Catahoula. *Id.* She explained that merely increasing the diversity of Catahoula would do little to desegregate SMP and ELC, which means approximately one-third of Black elementary students in the District would remain in segregated schools. *Id.* at 199:8-18. She did not think that the redrawn attendance boundaries combined with the STEM program as currently implemented could attract enough white students to SMP and ELC to desegregate those schools. *Id.* at 199:23-200:12.

Dr. Frankenberg also spoke about the possibility that the Catahoula school building could be turned into a charter school if it was no longer in use as a public school and presented ways to minimize that risk. *Id.* at 196:14-197:22. First, she noted that in her experience, any potential charter school would fall under the Court's oversight if it was opened while the District was still operating under the Superseding Consent Order. *Id.* at 196:15-22. Second, she emphasized that how the District goes about closing Catahoula would be of the utmost importance. *Id.* at 196:23-197:5. The District would need to focus on finding ways to bring the two communities together like, for example, reassigning Catahoula teachers to SMP and ELC so children see familiar faces at their new school. *Id.* at 197:1-4. Third, the District could repurpose Catahoula's building to something like a community center, affordable housing, or use it to house programs that are not associated with a particular school like vocational programs, adult basic education, or after-school childcare. *Id.* at 197:5-198:9.

### 5. Other Evidence

Catahoula Principal Tiffany Francis testified about Catahoula Elementary. Francis has been the principal of Catahoula since fall 2016. 3/23/21 Rough Tr. 157:9-12 (Francis).

Francis, a Black woman, opined that Catahoula's history as a white school has contributed to why Black parents are not requesting transfers into the school. *Id.* at 169:3-6. As the principal, she has felt welcomed by the students, staff, and broader community. *Id.* at 180:8-181:6. She thinks the school is an inclusive and welcoming environment for Black students, though she makes an effort to ensure Black families feel welcomed, as parents are often hesitant at first because of the history of racial tension between St. Martinville and Catahoula. *Id.* at 181:7-15, 182:4-11, 215:24-25. Superintendent Blanchard has not received complaints from Black parents whose children were moved to Catahoula by modifications to attendance zones. 3/26/21 Rough Tr. 32:20-22 (Blanchard).

When Francis began as principal in fall 2016, Catahoula had 178 students enrolled.[29] 3/23/21 Rough Tr. 157:12-15 (Francis). Since then, the number of students enrolled has continued to decline each year, with only 137 students enrolled in the 2019-2020 school year and approximately 135[30] students enrolled in the 2020-2021 school year. *Id.* at 157:16-158:7. This number is not expected to meaningfully increase in the near future. *Id.* at 158:8-10.

Catahoula has the capacity to serve 300 students. *Id.* at 163:4-6. Thus, with only 130 students enrolled, all classrooms are not utilized for traditional classroom purposes. *Id.* at 163:15-20. The school nevertheless makes use of every classroom in the building

---

[29] This number is the enrollment at Catahoula after grades 6 to 8 were relocated to St. Martinville Junior High and after the expanded Catahoula attendance zone went into effect. 3/23/21 Rough Tr. 159:15-162:16 (Francis).

[30] Francis testified that the school had "about" 135 students at the time of the hearing. 3/23/21 Rough Tr. 158:7 (Francis). Based on the parties stipulated data, Catahoula had 130 students enrolled for the 2020-2021 school year. Record Document 409-1 at 3.

for instructional purposes. *Id.* at 163:10-14. For example, the school uses the rooms as a speech classroom, a gifted and talented classroom, or sensory rooms. *Id.* at 163:18-20.

The District has made improvements to Catahoula's facilities which were completed during the 2018-2019 school year. *Id.* at 182:18-19. A new building was constructed at the front of the facility for use as an administrative and front office. *Id.* at 182:15-7. Additionally, the school has a new library and a new computer lab. *Id.* The District has demolished old portable buildings at Catahoula, done drainage work, removed trees which increased parking, remodeled the gym, installed a new roof over the gym, and installed new floors in the restrooms and gym. 3/26/21 Rough Tr. 33:13-22 (Blanchard). Previously, the Court found that Catahoula is "physically the worst [school] in the Parish" and that its facilities are a "sharp contrast" from SMP and other schools. 1/20/16 Hearing Tr. 15:11-16:3 (Foote, J.). This was based on observations from site visits in early 2016. The Court has not returned to these schools in the intervening years.

Like Catahoula, SMP is operating below its capacity. At SMP, there are currently 465 students enrolled, but the building can accommodate 800 students. Record Document 409-1 at 3; 3/23/21 Rough Tr. 230:13-15, 242:22-23 (Sylvester). There are several empty classrooms that are not being occupied in any capacity. 3/23/21 Rough Tr. 242:24-25 (Sylvester). Because those classrooms have not been used in many years, the District would need to make renovations such as painting the walls, replacing ceilings, and changing floors before the rooms can be used for students. 3/26/21 Rough Tr. 43:21-

44:7 (Blanchard). ELC can also accommodate additional students. *Id.* at 43:18-21. The need for additional teachers at SMP could be met by reassigning teachers from Catahoula, which as Dr. Frankenberg opined, would have the added benefit of reassuring those students transferred from Catahoula in their new school. 3/23/21 Rough Tr. 243:6-8 (Sylvester); 3/24/21 Rough Tr. 196:22-197:5 (Frankenberg).

Currently, the District is not losing money by keeping Catahoula open. 3/26/21 Rough Tr. 39:3-6 (Blanchard). Were the school to close, the District's costs for teachers would not decrease, nor would the costs for outdoor maintenance at the facility, like lawn care. *Id.* at 39:10-15. The District would see decreased electric bills if it were to fully abandon the school. *Id.* There would likely be a "slight uptick" in transportation costs associated with moving more students from Catahoula to St. Martinville.[31] *Id.* at 39:20-40:4.

Francis has not received any complaints from families at Catahoula about students being bussed approximately ten miles to Parks Primary one day per week to participate in the talented and gifted program at that school. *Id.* at 165:6-24. The distance between Catahoula and Parks Primary and the distance between Catahoula and SMP are approximately the same. *Id.* at 166:6-10.

---

[31] District policy is to provide transportation for any students living more than one mile from the school or for students living where there are safety issues associated with walking to school. 3/26/21/ Rough Tr. 41:10-15 (Blanchard). Superintendent Blanchard estimated that approximately twenty students currently attending Catahoula regularly walk to school and are not provided with transportation by the District. *Id.* at 42:2-23.

## C. Further Relief

The Court finds that further relief is necessary to achieve desegregation in the St. Martinville Zone, and, as such, Plaintiffs' motion for further relief as to student assignment [Record Document 374] is **GRANTED as specified herein**. The District is **ORDERED** to close Catahoula Elementary to grades K to 5 beginning in the 2021-2022 school year.[32] Those students should instead be assigned to ELC or SMP.

The Court has reached this decision for several reasons. First, the steps the District has taken to date have been ineffective at desegregating the St. Martinville Zone. The rezoning largely achieved the anticipated results, but the M-to-M transfers and the STEM program failed to attract white students from Catahoula or other elementary schools to ELC or SMP. Likewise, significant numbers of Black students did not use the M-to-M program to attend Catahoula. Thus, all three schools remain racially identifiable and one-third of Black elementary school students in the District remain in racially identifiable schools.

Second, the burden on a school district is to eliminate the effects of prior *de jure* segregation, "root and branch" by coming forward with a "plan that promises realistically

---

[32] The parties agreed not to consider grades pre-K to 1 at Catahoula and ELC, but the Court ruled that it would "not necessarily be bound by the parties' agreement" and required the District to "promote the[ ] desegregation [of the PK-1 grades at Catahoula and ELC] via the M-to-M program." Record Document 211-1 at 15. Plaintiffs agree with the Court that, as a matter of law, the Court cannot consider or order the District to modify its pre-K program because that is not a mandatory grade. 3/24/21 Rough Tr. 141:13-142:13. Consistent with its prior reservations, the Court now holds that there is "no justification for the non-inclusion" of the mandatory first grade and kindergarten grades in the desegregation standard. *See Flax v. Potts*, 464 F.2d 865, 869 (5th Cir. 1972); La. Rev. Stat. Ann. §§ 17:151.3, 17:222(C)(1).

to work, and promises realistically to work now." *Cowan*, 748 F.3d 233 (quoting *Green*, 391 U.S. at 437-39). The District has failed to put forward an alternate plan to eliminate the vestiges of *de jure* segregation that persist in the St. Martinville Zone that promises to work, and work now, to achieve integration in the St. Martinville Zone.

The Court is not persuaded by Mr. Hefner's testimony that, left alone, the St. Martinville Zone will naturally desegregate. Notably, this was not even Mr. Hefner's initial opinion upon reviewing most of the data in this case. He observed that the Black share of the population in areas currently zoned to Catahoula increased by approximately 5% between 2010 and 2017. In areas currently assigned to ELC and SMP, the white share of the population increased by an average of 3% over the same time period. He gave no estimates as to when one might reasonably expect to see meaningful results at any school based on this information. Doing nothing in the hopes that, at some unspecified future date, ELC, SMP, and Catahoula naturally desegregate is not a reasonable plan that promises to work now.

Mr. Hefner's proposal of redrawing the attendance boundaries for Catahoula to increase the number of Black students zoned to that school likewise is not a reasonable plan because it will not work for the Zone as a whole. As Mr. Hefner acknowledged, rezoning more Black students to Catahoula may bring Catahoula into compliance, but it will have little to no impact on the racial demographics of ELC or SMP. He also explained that because St. Martinville is "demographically isolated," it is not possible to rezone students to achieve integration in those schools. Thus, adopting Mr. Hefner's proposal for

further rezoning in the St. Martinville Zone will still leave a significant proportion of Black elementary students in St. Martin Parish in an identifiably Black school.

In contrast, closing Catahoula will likely result in ELC coming into compliance and SMP coming nearly into compliance with the desegregation standard. Assuming all students at Catahoula remain in public school, total enrollment at the reconfigured SMP would be 522 students, including 325 (62.3%) Black and 183 (35.1%) white students. Record Document 400-22. ELC would have 382 students, including 233 (61.0%) Black and 137 (35.9%) white students. *Id.*

Closing Catahoula is a reasonable and practicable measure. Students from Catahoula already travel to St. Martinville for junior high and high school without issue. Additionally, the parochial school in the District is farther away from Catahoula than either ELC or SMP is from Catahoula, meaning students in the Catahoula area attending the parochial school already travel further distances to that school than students will be required to travel to SMP or ELC. With modest renovations, SMP and ELC can accommodate the students currently assigned to Catahoula, and the teachers currently working at Catahoula can instead work at ELC or SMP to accommodate the increased student enrollment.

The Court understands that the closing of Catahoula will cause a loss to the entire Catahoula community. For example, Superintendent Blanchard, whose mother was the principal at Catahoula for several years, remarked that the school is well-liked in the community and, along with the church, is one of the main pillars of the Catahoula community. 3/26/21 Rough Tr. 32:1-5, 66:2-10 (Blanchard). Closing the school will also

cause a short-term inconvenience to the 130 students who currently attend the school and their parents. But the closure will benefit the education system of the entire Parish in the long run by providing increased opportunities for all students. Most importantly, the school's closure will contribute to the elimination of the vestiges of prior *de jure* segregation. When the Student Assignment Consent Order was being fashioned by the parties, closing all grades at Catahoula was under consideration. That suggestion was met with protests and demonstrations by parents and even a school board member. The parties agreed to try a less drastic approach, as outlined above, by closing the school to only grades 6 to 8 and moving the attendance boundaries. But these efforts did not work to successfully integrate the schools, leaving the only viable and practical solution as the closing of grades K to 5 at Catahoula.

The parties are also **ORDERED** to implement a robust magnet program at SMP and ELC in line with Dr. Frankenberg's recommendations. This includes a year of study and planning such that the program will not go into effect until the 2022-2023 school year. Implementing a robust magnet program at SMP and ELC is a practicable and reasonable measure that will assist with desegregation efforts by incentivizing more white students in the District to transfer to those schools and by offering a program to help bring the ELC, SMP, and Catahoula communities together.

The parties are **ORDERED** to comply with the mandate of the current Student Assignment Consent Order and "work in good-faith to agree to a legally adequate student transfer policy to continue the promotion of desegregative student transfers after the end of the Consent Order." Record Document 211-1 at 20. One plan that should be considered

is the optional or flexible attendance zone between the Parks Zone and the St. Martinville Zone that was suggested by Dr. Frankenberg. The Court recognizes that the District has concerns regarding the constitutionality of optional attendance zones and the legal exposure to which this plan may expose it. However, this is not an excuse for fully failing to consider whether there are any options that the parties agree would be legally permissible and effective at maintaining some of the integration accomplished by M-to-M transfers, especially between the Parks and St. Martinville Zones, after the District is declared unitary.

Finally, the District shall work in good faith with the Plaintiff-Parties to implement this remedial order, including: taking steps to mitigate the negative impact of this closure and identifying alternate uses for the Catahoula facility; detailing the measures the District will take to implement the robust magnet program; and crafting a legally adequate student transfer policy as detailed above. The parties shall propose a new consent order by a date to be determined. The Court reserves all further orders of affirmative relief until such time as the parties propose a new consent order. All provisions of the current Student Assignment Consent Order not inconsistent with this order shall remain in effect until a new consent order is issued. The Court shall retain jurisdiction over the area of student assignment for at **least three years** to monitor the District's compliance with this order. *See Moore*, 921 F.3d at 547 (noting that three years is the typical monitoring period for a new desegregation plan).

## V. Unitary Status—Faculty Assignment

### A. Requirements of the Superseding Consent Order

As part of the Superseding Consent Order, the parties agreed to and the Court entered a consent order regarding faculty assignment ("Faculty Consent Order"). Record Document 211-2. For purposes of the Faculty Consent Order, "faculty" is defined as "teachers" and "any instructor required to have a certificate by the State of Louisiana, including but not limited to classroom teachers, librarians, and counselors." *Id.* at 13 n.26. The Faculty Consent Order adopted the legal standards put in place in the 1969 Consent Decree previously entered in this matter. *Id.* at 12. First, it required that the Board implement policies that assign faculty such that the racial composition of the faculty at any school will not indicate that the school is intended for one race. *Id.* Second, faculty "must be hired, assigned, promoted, paid, demoted, dismissed, and otherwise treated without regard to race, color, or national origin." *Id.*

To effectuate these goals, the Faculty Consent Order contains several remedial measures. The Board agreed to two goals related to the racial makeup of faculty in its schools. *Id.* at 13. First, the ratio of Black-to-white faculty in each school should be within the +/- 15% range of the Black-to-white faculty ratio in the K to 5, 6 to 8, and 9 to 12 grade bands. *Id.* at 13. Second, a minimum of 10% of the faculty at each school should be Black. *Id.* The parties and the Court agreed that failure to meet the goals alone would not prevent a finding of unitary status. *Id.* at 13 n.28.

The Faculty Consent Order required the Board to "encourage, offer, and, in some instances, require transfers and assignments to meet the diversity goal[.]" *Id.* at 13-14.

The Board was also required to implement an agreed upon Recruiting Plan and Employment Procedures. *Id.* at 13. The Recruiting Plan includes numerous provisions, including methods of recruitment and requirements for advertising open positions. *Id.* at 22-32. The Employment Procedures lay out the procedures the District must follow in screening, interviewing, and selecting applicants for open positions. *Id.* at 33-42.

## B. Facts

### 1. Demographics

The Faculty Consent Order established January 2016 as the baseline from which the District would be judged on maintaining and meeting its faculty assignment goals. In January 2016, the District employed 510 people as pre-K to 12 faculty. Record Document 409-2 at 1. Its faculty was 23.2% (119) Black and 76.4% (391) white. *Id.* Two schools—Catahoula and Stephensville—employed a faculty that was less than 10% Black. *Id.* Two schools—Breaux Bridge Elementary and St. Martinville Junior High—employed faculties that fell outside the +/- 15% desegregation standard. *Id.*

As of the 2020-2021 school year, the District employed 480 people as pre-K to 12 faculty. Record Document 409-2 at 3. The District's faculty overall is 24.6% (118) Black and 75.4% (362) white. Record Document 409-2 at 3. The racial compositions of the faculties at five District schools are not compliant with the Faculty Consent Order's diversity goals. *Id.*

| School | 2020-2021 | | | |
|---|---|---|---|---|
| | White | W% | Black | B% | +/- |
| **Elementary (PK-5) Totals** | 197 | 79.4% | 51 | 20.6% | — |
| Breaux Bridge Elementary | 24 | 68.6% | 11 | 31.4% | +10.9% |
| Breaux Bridge Primary | 26 | 81.3% | 6 | 18.8% | -1.8% |
| Catahoula Elementary | 12 | 92.3% | 1 | 7.7% | -12.9% |
| Cecilia Primary | 36 | 83.7% | 7 | 16.3% | -4.3% |
| Parks Primary | 21 | 91.3% | 2 | 8.7% | -11.9% |
| Early Learning Center | 16 | 84.2% | 3 | 15.8% | -4.8% |
| St. Martinville Primary | 23 | 69.7% | 10 | 30.3% | +9.7% |
| Stephensville Elementary | 11 | 91.7% | 1 | 8.3% | -12.2% |
| Teche Elementary | 28 | 73.7% | 10 | 26.3% | +5.8% |
| | | | | | |
| **Middle School (6-8) Totals** | 64 | 61.0% | 41 | 39.0% | — |
| Breaux Bridge Junior High | 17 | 60.7% | 11 | 39.3% | +0.2% |
| Cecilia Junior High | 29 | 78.4% | 8 | 21.6% | -17.4% |
| Parks Middle | 10 | 52.6% | 9 | 47.4% | +8.3% |
| St. Martinville Junior High | 8 | 38.1% | 13 | 61.9% | +22.9% |
| | | | | | |
| **High School (9-12) Totals** | 101 | 79.5% | 26 | 20.5% | — |
| Breaux Bridge High | 37 | 80.4% | 9 | 19.6% | -0.9% |
| Cecilia High | 35 | 85.4% | 6 | 14.6% | -5.8% |
| St. Martinville Senior High | 29 | 72.5% | 11 | 27.5% | +7.0% |
| | 2020-21 | | | | |
| | White | W% | Black | B% | Total |
| **DISTRICT-WIDE TOTAL:** | 362 | 75.4% | 118 | 24.6% | 480 |

*Id.* Three elementary schools have a faculty that is less than 10% Black and over 90% white: Catahoula (92.3% white), Stephensville (91.7% white), and Parks Primary (95.7% white). *Id.;* 3/24/2021 Rough Tr. 222:19-20 (Frankenberg). The student bodies of Catahoula and Stephensville are also identifiably white. Record Document 409-1 at 3. Because of M-to-M transfers, the student body of Parks Primary is no longer racially identifiable, but it was formerly identifiable as a white school. *Id.* at 1, 3. Assuming all schools retain the Black teachers currently employed, Catahoula and Stephensville would meet the 10% threshold by hiring one additional Black teacher, and Parks Primary would meet the threshold by hiring two additional Black teachers. 3/25/21 Rough Tr. 29:22-30:6 (Frankenberg).

In addition, two middle schools fall outside of the +/- 15% diversity goal—St. Martinville Junior High and Cecilia Junior High. Record Document 400-9 at 3. The District's overall middle school faculty is 39% Black and 61% white. Record Document 409-2 at 3. Cecilia Junior High's faculty is 21.6% Black and 78.4% white, meaning the faculty is 17.4 percentage points more white than the overall faculty in the middle school grade band. *Id.* St. Martinville Junior High's faculty is 61.9% Black and 38.1% white, meaning the faculty is 22.9 percentage points more Black than the overall middle school grade band faculty. *Id.* Prior to rezoning in the St. Martinville Zone, St. Martinville Junior High was an identifiably Black school. Record Documents 409-1 at 1. Cecilia Junior High's student body was identifiably white upon entry of the Student Assignment Consent Order, but has since come within the +/- 15% standard. *Id.* at 1, 3.

Other schools which met both diversity goals for the 2020-2021 school year fluctuated throughout the course of supervision. For example, ELC has failed to consistently meet the 10% diversity goal, having three Black teachers in 2015 and only two Black teachers between 2016 and 2018. Record Document 409-2. Beginning in October 2018, ELC added a third Black teacher, which brought it back into compliance. *Id.* at 2. Between January 2016 and October 2020, Parks Primary went from having four Black teachers down to two Black teachers, and fell out of compliance with the 10% diversity goal. Record Document 409-2; 3/26/21 Rough Tr. 132:12-21 (Blanchard). In that same period, Cecilia Junior High employed as many as ten and as few as five Black teachers, hindering its consistent compliance with the diversity goal. Record Document 409-3. At the high school level, the District had thirty-two Black high school teachers in

January 2016 and had only twenty-one Black high school teachers by the 2018-2019 school year. Record Document 409-2 at 1-2. By the 2020-2021 school year, the number of Black high school teachers rebounded to twenty-six District-wide. *Id.* at 3.

### 2. The District's Actions—Employment Procedures

As Superintendent, Mr. Blanchard has the final say over all hiring and firing decisions in the District per Louisiana law. 3/26/21 Rough Tr. 18:17-21 (Blanchard). He explained how the District's hiring procedures comply with the Faculty Consent Order. When there is an opening, Supervisor of Human Capital Anthony Polotzola ("Polotzola") is responsible for posting the position for the proper length of time, recruiting for the position, and monitoring the applications. *Id.* at 16:8-11, 20:6-9. Once the application deadline closes, the principal with an opening is permitted to schedule interviews. *Id.* at 16:12-16. The principal is then in charge of establishing a biracial interview committee to interview all applicants selected for an interview and score each person. *Id.* at 16:17-17:3; 3/23/21 Rough Tr. 183:13-15 (Francis). The school then selects the most qualified applicant based on these scores and without regard to race. 3/26/21 Rough Tr. 127:23-128:5 (Blanchard); 3/23/21 Rough Tr. 183:18-22 (Francis). The principal returns the committee's recommendation to Polotzola who ensures all necessary steps in the selection process were followed and then forwards the recommendation to Superintendent Blanchard for final approval. 3/26/21 Rough Tr. 19:2-6 (Blanchard). Superintendent Blanchard has never denied a recommendation when all procedures are

followed and has not had an instance in which has a school has failed to submit the proper documentation that it followed the procedures.[33] *Id.* at 19:6-25.

Teachers already employed in the District who wish to transfer to another school in the District are generally required to go through the interview process with other applicants for the position. 3/26/21 Rough Tr. 129:5-10 (Blanchard). The District does not restrict these transfers based on a teacher's race, meaning that it would not restrict a white teacher from transferring to a school where the faculty is predominantly white. *Id.* at 155:14-156:4. Since implementation of the Faculty Consent Order, the District has forced transfers of teachers one time—in connection with relocating grades 6 to 8 at Catahoula to St. Martinville Junior High. *Id.* at 130:23-131:5. That transfer involved eight white teachers, was not accompanied by any form of monetary or non-monetary incentive, and resulted in four of the eight teachers leaving the District. *Id.* at 165:8-20.

### 3. The District's Actions—Recruitment Plan

As required by the Faculty Consent Order, the District implemented a Recruitment Plan. Record Document 400-8. Anthony Polotzola, the District's Supervisor of Human Capital, was tasked with primary supervision of the Plan's implementation.[34] 3/24/21 Rough Tr. 11:13-15, 13:1-15 (Polotzola). Polotzola, a white man, has held that position

---

[33] The District's Employment Reports can be found at Record Documents 400-46-400-52.

[34] The Recruitment Plan states that the Director of Human Capital is responsible for implementing the Plan. Record Document 400-8 at 3. However, that position no longer exists in the District and Polotzola assumed the responsibility as the Supervisor of Human Capital when Superintendent Blanchard was promoted from Director of Human Capital to Superintendent in 2018. 3/24/21 Rough Tr. 16:11-17:11 (Polotzola); 3/26/21 Rough Tr. 13:14-14:5 (Blanchard).

since 2014. *Id.* at 11:16-18. Prior to that, he was employed as the District's Supervisor of Organizational Structures and as the principal of Cecilia High. *Id.* at 11:19-12:1. Polotzola was a combative witness and was belligerent to Plaintiffs' counsel to the point that the Court had to instruct the witness multiple times to simply respond to questions asked. *Id.* at 31:10-32:16, 54:20-23, 71:9-72:5.

As the individual most directly responsible for implementing and meeting the goals of the Faculty Consent Order, Polotzola demonstrated a concerning lack of awareness regarding the District's goals and progress. First, while Polotzola was aware that the Faculty Consent Order contained percentage goals for the number of Black teachers in each school, he did not know the specific targets.[35] *Id.* at 14:1-5. Second, he was unaware of which schools did not meet the diversity goals at the time of the hearing. *Id.* at 17:23-25.

Nevertheless, Polotzola detailed the steps he takes to recruit teachers to the District.[36] He explained that the District recruits most of its teachers from the University of Louisiana at Lafayette ("UL"). *Id.* at 18:23-25. As part of this recruitment effort at UL, Polotzola and a racially diverse group of four to five principals attend the UL job fair. *Id.* at 18:20-22. The individuals chosen to attend are usually those principals of schools most in need of teachers. *Id.* at 24:16-20. Prior to attending, Polotzola advises them about

---

[35] Polotzola described his role as trying to get "as many more" Black teachers as possible employed in the District. 3/24/21 Rough Tr. 13:22-25 (Polotzola).

[36] Pursuant to the Faculty Consent Order, the District prepared reports containing a description of all recruiting efforts done in the time between reports. Record Document 211-2 at 14-16; 3/26/21 Rough Tr. 82:3-13 (Blanchard). These reports can be found at Record Documents 400-37-400-45.

appropriate recruitment questions and reminds them of the goal of the trip—recruiting teachers to the District. *Id.* at 86:12-22.

Polotzola has attended job fairs at other universities alone, but has had little success recruiting students. *Id.* at 19:1-14. These universities include Louisiana State University, McNeese State University, and Southern University (Baton Rouge campus), a historically black college or university ("HBCU"). *Id.* at 19:4-21. Wiltz, a Black man and an alumnus of Southern University, has attended the Southern University job fair once in the time the District was operating under the Faculty Consent Order. *Id.* at 22:10-16. Wiltz participated in virtual job fairs at HBCUs in the New Orleans area for the first time in the 2020-2021 school year, with no success. *Id.* at 21:14-17, 22:6-9. The District has never sent recruiters to HBCUs in Mississippi or Texas. *Id.* at 22:25-23:2.

The District has sent emails to HBCUs soliciting applications, though the list does not include HBCUs in the state such as Xavier University of Louisiana, Dillard University, or Grambling State University. Record Document 400-40 at 16; 3/24/21 Rough Tr. 22:12-20 (Polotzola), 3/26/21 Rough Tr. 76:21-77:19 (Blanchard). Superintendent Blanchard explained that this must be because the District adopted the email list of HBCUs used in Tangipahoa Parish during its desegregation litigation and those schools were not included on Tangipahoa Parish's list. 3/26/21 Rough Tr. 77:18-23 (Blanchard). Blanchard had never made an effort to identify local HBCUs. *Id.* at 93:8-11. The District has not asked its teachers to contact their alma maters for recruiting purposes, though Polotzola has asked current teachers to share specific job openings with their personal networks. 3/24/21 Rough Tr. 23:15-24:2 (Polotzola). Catahoula principal Francis testified that she

has informally attempted to recruit Black teachers to her school by talking to friends, but she was aware of no formal process for recruiting Black teachers to the District. 3/23/21 Rough Tr. 183:23-185:2 (Francis).

The District has created recruitment brochures, which it distributes primarily at job fairs and on social media. 3/24/21 Rough Tr. 29:2-4 (Polotzola). It does not distribute brochures at local businesses in the community, and Polotzola was not sure whether they are distributed to university partners. *Id.* at 29:9-30:12. The District has not created any recruitment videos. *Id.* at 28:9-10. The District publicizes positions by posting ads in the Teche News, which is the official journal for St. Martin Parish. *Id.* at 33:21-34:18. It also posts job openings on job posting websites for teachers, social media, and Frontline, which is the portal used for applying for an open position. *Id.* at 34:19-35:25. Polotzola shares openings with current teachers by email and will personally email applicants from previous openings to notify them of new open positions. *Id.* at 36:1-37:12.

The District does not have any formal program for recruiting paraprofessionals already working in the District to become teachers or for helping paraprofessionals earn the qualifications needed to teach. *Id.* at 48:15-49:2. The District does have an annual scholarship available to one student from each high school who wants to be a teacher, but there are often no applicants. *Id.* at 49:15-20. Counselors at each school are responsible for publicizing the scholarship. *Id.* at 49:18. Polotzola has never directed the counselors to focus their efforts on recruiting Black students to the program and was unaware of how the counselors advertise the program at each school. *Id.* at 49:24-50:17.

The District has tried to create a club for students interested in teaching, but found no interested students. *Id.* at 50:7-10. Similarly, the District took steps to establish a program where students could begin earning credits toward their teaching degree while in high school, but students did not sign up for the class. *Id.* at 51:20-52:2. The District has no program tracking which of its graduates have enrolled in teaching programs or have bachelor's degrees and it does not keep in contact with graduates. *Id.* at 55:25-57:10.

Superintendent Blanchard opined that the District receives a good number of applicants each year, but those applicants are also applying to neighboring school districts, so the District often has to resort to hiring individuals that are not certified or that are certified but are otherwise less-desirable applicants. 3/26/21 Rough Tr. 122:2-123:13 (Blanchard). Competition for teachers is especially pronounced among Black teachers because there are fewer Black teachers than white teachers in the area and the neighboring school districts are also trying to recruit Black teachers. *Id.* at 125:6-16. Contrary to Superintendent Blanchard, Polotzola opined that the District does not get a lot of applicants of any race for teaching positions. 3/24/21 Rough Tr. 89:9-11 (Polotzola).

**4. Expert Testimony**

The District presented no expert testimony in the area of faculty assignment. Plaintiffs' expert in the area of student assignment, Dr. Frankenberg, also testified about faculty assignment at the hearing. In Dr. Frankenberg's work with school districts, she has assisted districts with plans to recruit Black faculty and desegregate faculties. 3/24/21 Rough Tr. 155:21-24 (Frankenberg). She explained that having a racially diverse faculty

impacts other areas of desegregation. First, faculty demographics and student demographics at a school often reinforce one another. 3/24/21 Rough Tr. 167:1-2, 219:13-19 (Frankenberg). For example, both Catahoula and Stephensville have been nearly all-white in their faculty populations since their establishment in the 1930s and 1970s, respectively. Record Documents 25-3 at 29 and 25-6 at 53. Likewise, their student bodies have remained identifiably white. Record Document 409-1 at 3. The lack of Black teachers at Catahoula and Stephensville therefore reinforces the racial isolation of their racially identifiable white student bodies. 3/24/2021 Rough Tr. 222:21-223:21, 227:9-228:10 (Frankenberg).

Second, the diversity of the faculty can have an impact on discipline and the academic achievement for students in a school. *Id.* at 220:8-16. For discipline, a diverse faculty can help minimize discrepancies in disciplinary outcomes. *Id.* For academic achievement, diverse faculties are better able to identify Black students who should take advanced courses, thus minimizing achievement gaps. *Id.*

Dr. Frankenberg explained that in schools which do not meet the diversity goals, she would expect to see an "all-hands-on-deck" approach to attracting more Black applicants or efforts to use transfers within the district to meet the goals. *Id.* at 233:16-234:13. She testified that she listened to Polotzola's testimony and did not believe what he described was an all-hands-on-deck approach. *Id.* at 234:14-19. For one, the District's approach was largely decentralized—leaving decision-making up to the principal and using decentralized recruitment efforts. *Id.* at 234:19-235:2. She described Polotzola's lack of knowledge about which schools were not meeting the diversity goals as a problem

because that data is the first step in determining if the District needs to focus on hiring, retention, or both, in order to meet its goals. 3/25/21 Rough Tr. 35:11-22 (Frankenberg).

In her review of the District's data, she saw that some hiring and transfer decisions further contributed to the racial identifiability of a school. 3/24/21 Rough Tr. 235:23-236:2 (Frankenberg). She observed that over the course of the Faculty Consent Order, there have been enough job vacancies within the District to allow for hiring that would further the District's diversity goals. *Id.* at 235:20-23. Yet many of the District's hiring decisions contributed to the racial identifiability of faculty in the non-compliant schools. For example, in 2019 and 2020, Stephensville only hired white teachers and only had white candidates for open positions. *Id.* at 235:23-237:7. In 2020, the one faculty member hired at Parks Primary was white, which furthered the racial identifiability of the school. *Id.* Of the twelve teachers that transferred prior to the 2019-2020 school year, five added to the racial identifiability of a school, one reduced the racial identifiability of a school, and the others had no effect. *Id.* at 239:3-11. She opined that this was not an expected finding in a District that was actively trying to diversify its faculty. *Id.* at 239:12-18.

## C. The District is Not Entitled to Unitary Status

To achieve unitary status in the area of faculty assignment, a school district must "establish that its 'current employment practices [are] non-discriminatory and in compliance with constitutional standards' and that 'the adverse effects of any earlier, unlawful employment practices . . . have been adequately remedied.' " *Fletcher*, 805 F.3d at 601 (quoting *Fort Bend Indep. Sch. Dist. v. City of Stafford*, 651 F.2d 1133, 1140 (5th

Cir. 1981)). The Fifth Circuit has also required a showing that the racial composition of the school's faculty "does 'not indicate that the school is intended for either African-American or white students.' " *Id.* (quoting *Anderson*, 517 F.3d at 303). However, this does not mean that a district must achieve an "arbitrary racial quota." *Anderson*, 517 F.3d at 303. As such, the Faculty Consent Order also provides that failure to meet the desegregation goals alone is not a basis to deny the District unitary status. Record Document 211-2 at 13 n.28. Under Supreme Court precedent, a court may also consider whether retaining judicial control over one area of supervision is necessary or practicable to achieve compliance in other areas. *Freeman*, 503 U.S. at 492.

In this case, the District has not achieved unitary status as to faculty because the District has not met the desegregation goals and it has failed to demonstrate good-faith compliance with the Faculty Consent Order, specifically in regard to recruitment efforts.[37] Additionally, retaining supervision over faculty assignment is necessary and practicable for the District to achieve compliance in other areas, especially student discipline.

Comparing the baseline year data to the most recent data reveals that the District, overall, has made little progress towards its goals. In January 2016, the District employed 119 Black teachers. In the 2020-2021 school year, it employed 118 Black teachers. In January 2016, 23.2% of the faculty in the District was Black. For the 2020-2021 school year, 24.2% of the faculty was Black. In January 2016, two schools—Catahoula and Stephensville—had a faculty that fell below the 10% threshold. For the 2020-2021 school

---

[37] The District has faithfully complied with the hiring process laid out in the Employment Procedures. *See supra* Section V.B.2.

year, both schools remained below the threshold and Parks Primary also fell under 10%. In January 2016, two school had faculties falling outside the +/- 15% goal—Breaux Bridge Elementary and St. Martinville Junior High. By the 2020-2021 school year, Breaux Bridge Elementary' s faculty was within the +/- 15% goal, but St. Martinville Junior High's was not, and Cecilia Junior High was also out of compliance. Overall, the District is further from meeting the Faculty Consent Order goals today than it was in January 2016.

Notably, two of the schools that remain non-compliant with the 10% minimum goal, Catahoula and Stephensville, are also schools with identifiably white student bodies. The lack of Black teachers at Catahoula and Stephensville thus reinforces the racial isolation of their racially identifiable white student bodies, signifies that the schools are intended for students of one race, and is evidence of an ongoing vestige of *de jure* segregation.

The District has also failed to show consistent progress over time. In the high school grade band, the District went from thirty-two Black teachers in January 2016, to a low of twenty-one Black teachers for the grade band, and then ultimately improved to twenty-six Black teachers by the 2020-2021 school year. This amount of Black teacher attrition is "remarkable evidence of noncompliance." *See Moore v. Tangipahoa Par. Sch. Bd.*, No. 65-15556, 2019 WL 1936690, at *4 (E.D. La. Apr. 30, 2019) (denying unitary status where the number of Black staff in a district dropped after the district received a provisional grant of unitary status and, several years later, still had not returned to the level of improvements attained when the district received provisional unitary status).

The District highlights that schools like Catahoula and Stephensville would come into compliance by hiring one more Black teacher each. The Court recognizes this, and faced with these numbers alone, likely would have granted the District unitary status. But the District has also failed to demonstrate a good-faith effort to meet the Faculty Consent Order goals. Perhaps most striking in this regard is that Polotzola, the District official most directly tasked with implementing the Recruitment Plan, did not know the specific goals of the Faculty Consent Order and did not know which schools were currently out of compliance with the goals. The Court struggles to comprehend how one can reasonably expect to achieve a goal without even knowing what the goal is or where efforts need to be focused. Polotzola's testimony not only failed to show a good-faith effort to meet the goals, but no real effort at all.

The Court also concludes that the District failed to show good-faith compliance with the Faculty Consent Order because of how it implemented some aspects of the Recruitment Plan. For example, as required by the Recruitment Plan, the District maintained a list of HBCUs and emailed those schools with available job postings. However, the District acquired its list from Tangipahoa Parish and did not evaluate the quality of the list or take steps to ensure it at least included all HBCUs with teaching programs in the state. Similarly, the District attended job fairs at some universities, but did not attend a job fair hosted by several HBCUs in New Orleans until the 2020-2021 school year. Actions such as these demonstrate that the District was doing little more than going through the motions in many respects.

The District failed to fully comply with the Recruiting Plan in other ways as well. The Recruitment Plan required the District to "pursue innovative and effective recruiting tools" to assist efforts to attract candidates. Record Document 211-2 at 25. It provided several examples of tools the District might employ, among them developing recruitment videos, updating recruitment brochures, and distributing these tools in the community and with the District's university partners. *Id.* The District has not maintained contact with its graduates who are in teacher preparation programs, the District did not create a recruitment video, and it does not distribute recruiting brochures or other materials to local businesses or community partners. For recruiting trips, the Recruitment Plan required the District to provide a "required, comprehensive training for those serving as recruitment representatives." *Id.* at 27. The District has not done this. Additionally, the Recruitment Plan calls for using teacher transfers to promote the diversity goal. Record Document 211-2 at 10-11 ("The Board will . . . encourage, offer, and, in some instances, require transfers and assignments to meet the diversity goal of faculty and staff assignments at each of the respective schools."). Yet the District has often allowed teacher transfers that *increased* the racial identifiability of a school's faculty.

The District defends the failure to meet its goals in some schools by discussing the lack of applicants generally, or in the case of schools like Stephensville, the lack of any Black applicants for open positions. It uses this as evidence that it has achieved the Faculty Consent Order goals to the extent practicable. This argument is unpersuasive because, as detailed above, the District has not undertaken all practicable measures to recruit Black applicants for open positions. The District cannot blame its failure to meet

its desegregation goals on the lack of Black applicants for a position when it has not taken all practicable steps to ensure that there are Black applicants for the position.

Finally, the Court finds that retaining supervision over faculty assignment is necessary and practicable for the District to comply with the Superseding Consent Order in the area of discipline. As detailed below, the District has not achieved unitary status in the area of student discipline. *See infra* Section VII. The Court finds persuasive expert testimony that having a diverse faculty is important to improving discipline in the District, and therefore concludes that retaining control over faculty is necessary and practicable to assist with achieving compliance in the area of discipline. For these reasons, the District's motion for unitary status as to faculty assignment [Record Document 338] is **DENIED** and the Court must consider Plaintiffs' motion for further relief.

## VI. Further Relief—Faculty Assignment

### A. Requested Relief

Plaintiffs filed a motion for further relief in regard to faculty assignment. Record Document 342. They request that the Court order the District to "adopt several best practices regarding faculty assignment, recruitment, and hiring." Record Document 404 at 39. They propose several short-term actions, including: involving Black staff and principals much earlier in the recruitment, interview, applicant selection, and hiring process; visiting more than one HBCU job fair and sending white and Black recruiters together to job fairs and universities; adopting strategies other schools are successfully using like offering dual enrollment courses at the high school, mentoring students during college, offering scholarships to paraprofessionals in the District, and mentoring current

Black teachers in the District to improve Black teacher retention. *Id.* at 39-40. Plaintiffs also propose long-term actions such as teaming with a local university, like UL or Southern University, to establish a direct pipeline and mentorship program for Black students interested in teaching, and opportunities for existing Black non-certified staff to transition to certified teachers. *Id.* at 40. Plaintiffs also ask the Court to order that the District adopt the hiring policies used in Tangipahoa Parish and develop a process for self-assessments to identify sources of Black teacher attrition. *Id.* at 40-41.

The United States took no position as to further relief regarding faculty. Record Document 401 at 13. The District opposes all remedial measures and suggests reasons that each is not necessary, reasonable, or practicable. Record Document 403.

## B. Facts

### 1. Teacher Retention

Each year the District hires between sixty and eighty teachers to replace those that left. 3/26/21 Rough Tr. 138:1-8 (Blanchard). Superintendent Blanchard testified that he did not consider this to be abnormal or indicative of a problem with teacher retention. *Id.* at 138:17-23. Because Polotzola is tasked with recruiting applicants to the District, he has knowledge about teacher attrition in the District. 3/24/21 Rough Tr. 60:25-61:8 (Polotzola). While he does not closely track rates of attrition, Polotzola is always aware of which schools have openings and, through that, knows which schools tend to have higher turnover rates. *Id.* at 62:2-15, 64:7-13. Polotzola could access the data needed to track attrition by race, but does not do so. *Id.* at 66:21-67:4. He also does not make a

special effort to identify why Black teachers are leaving the District, even if there are multiple Black teachers leaving a particular school in a short time span. *Id.* 68:13-69:6.

In Polotzola's experience, most teachers report that they are leaving to accept a position closer to their home; they do not want to commute more than fifteen minutes. *Id.* at 69:6-12, 89:2-7. However, at the hearing, numerous teachers testified that they did not live in the town in which they taught. *See, e.g.,* 3/23/21 Rough Tr. 243:14-17, 243:21:244:22 (Sylvester); 3/23/21 Rough Tr. 177:3-5 (Francis); 3/22/21 Rough Tr. 189:3-5 (Trahan).

In the Cecilia Zone, the District has a program where teachers from Francophone regions come teach and live in the community. 3/24/21 Rough Tr. 59:9-12 (Polotzola). The District supports these teachers by sponsoring programs which help them find housing and transportation, and introducing them to community members. *Id.* at 59:15-60-4. The District has no comparable program to introduce teachers who are new to St. Martin Parish to the District. *Id.* at 60:10-21. Polotzola was unaware of the term "affinity group" and testified that the District does not sponsor any groups such as one for Black teachers in St. Martin Parish. *Id.* at 60:20-24. For schools that are struggling to retain teachers, the District has no program in place to increase the retention rates besides a mentor program. *Id.* at 63:6-16, 65:6-9, 66:8-16. The District takes actions to retain all teachers—like competitive salary, professional development, and assistance becoming certified—but makes no efforts specifically targeted at retaining Black teachers. 3/26/21 Rough Tr. 139:6-140:7 (Blanchard).

The Court heard anecdotal testimony from three teachers in the District. All three teachers testified that other faculty and staff in the District often rely on racial biases and false stereotypes to misperceive Black teachers as aggressive, loud, tough, intimidating and not needing protection or support. 3/22/2021 Rough Tr. 196:23-197:22 (Trahan); 3/22/21 Rough Tr. 238:14-239:5, 243:7-23 (Jordan); 3/23/2021 Rough Tr. 137:22-140:21, 142:10-15, 143:25-144:12 (Narcisse). Retired teacher Melissa Narcisse, a Black woman, grew up in the District and attended public schools in the District. 3/23/21 Rough Tr. 132:6-14 (Narcisse). Narcisse spent twenty-eight years of her twenty-nine-year teaching career as a first-grade teacher at Breaux Bridge Primary. *Id.* at 133:2-4. During her time teaching in the District, Narcisse felt that because Black teachers were stereotyped as "tougher," they were assigned students with more difficult behavior problems. *Id.* at 135:1-7. She also testified about an incident with her former principal where she was given an end-of-year evaluation score that she felt was unwarranted and lower for reasons other than performance. *Id.* at 138:8-11. Narcisse brought her concerns about the principal to the District and filed a formal grievance alleging racial discrimination. *Id.* at 139:13-141:24. Polotzola's was responsible for investigating complaints from teachers about racial discrimination. 3/24/21 Rough Tr. 69:18-70:20 (Polotzola). When Narcisse brought her concerns about racial discrimination to Polotzola, he dismissed her concerns and told her that Black teachers always play the "race card." 3/23/21 Rough Tr. 140:6-14 (Narcisse).

A teacher from Breaux Bridge High testified about an incident which occurred on January 20, 2021 where the District forced Black teachers to change clothes or be sent

home for wearing shirts associated with Alpha Kappa Alpha Sorority, Inc., a Black sorority, to celebrate Vice President Kamala Harris's inauguration as the first woman, first Black person, first graduate of an HBCU, and first member of that Black sorority to hold the office. 3/22/2021 Rough Tr. 199:15-210:14 (Trahan). Joy Trahan, a Black second-year business education teacher and a member of Alpha Kappa Alpha, wore the shirt. 3/22/21 Rough Tr. 188:13-22, 199:15-210:14. (Trahan). The District's treatment of this issue upset her so much that she began looking for a new job. *Id.* at 203:9-17.

Superintendent Blanchard made the decision to ask the Black teachers to cover the shirts or go home after receiving complaints from white teachers. 3/26/21 Rough Tr. 156:5-158:25 (Blanchard). But he did not know that the shirt was related to Alpha Kappa Alpha or had a cultural meaning until that evening. *Id.* Although a Black assistant principal also wore the shirt, the Superintendent did not consult with any Black staff before deciding to send people home. 3/22/21 Rough Tr. 204:15-205:3 (Trahan); 3/26/21 Rough Tr. 167:19-168:12 (Blanchard). Superintendent Blanchard did, however, consult Polotzola before making his decision. 3/26/21 Rough Tr. 167:19-168:12 (Blanchard).

## 2. Dr. Frankenberg's Recommendation—Teacher Retention

Dr. Frankenberg opined that retention of Black teachers in a district is crucial to meetings its diversity goals. 3/24/21 Rough Tr. 229:25-230:1 (Frankenberg). She explained that if a district does not retain its Black teachers, meeting diversity goals requires not only increasing the number of Black teachers in a district, but replacing those who left. *Id.* at 230:1-10. In St. Martin Parish, she observed that even in schools that did not fall outside either diversity goal, the District was not effectively retaining teachers.

For example, St. Martinville Senior High has never fallen outside either goal, but for several years the school saw a loss in Black teachers. Record Document 409-2; 3/25/21 Rough Tr. 34:3-12 (Frankenberg).

To increase teacher retention, Dr. Frankenberg first recommended that the District begin tracking teacher attrition in such a way that they can identify whether and where teacher attrition rates are affecting the District's ability to reach its diversity goals. 3/25/21 Rough Tr. 246:3-5 (Frankenberg). This tracking should be done in such a way that the District can identify particular schools that are losing Black teachers at a higher rate than others. *Id.* at 246:22-247:3. This tracking puts the District in the position to focus on things like mentoring and improving the conditions at schools where the Black teacher attrition rate is high. *Id.* at 246:14-21. She recommended that the District take actions such as establishing formal mentoring programs aimed at retaining Black teachers and other efforts to improve the "climate" for Black teachers in the District's schools so teachers are more likely to stay. *Id.* at 246:14-18.

### 3. Dr. Frankenberg's Recommendation—Stephensville Elementary

Since the entry of the Faculty Consent Order, Stephensville has had only one Black teacher. Record Document 409-2. While it is geographically distant from the rest of the District, it is close to St. Mary Parish which has a sizable Black population. 3/24/2021 Rough Tr. 247:24-248:18 (Frankenberg). About 28% of St. Mary Parish residents who work in "education, training and library occupations" in St. Mary Parish are racial minorities. Record Document 400-10 at 2; 3/24/2021 Rough Tr. 119:7-19 (Cooper). Not all educators in St. Mary Parish work for the St. Mary Parish school board. 3/24/21 Rough

Tr. 251:12-24 (Frankenberg). An incentive that the District can use to recruit Black teachers from St. Mary Parish is increased pay: the average teacher salary in the District is $52,141 versus $47,504.77 in St. Mary Parish. *Id.* at 249:15-250:2; Record Document 400-11.

Dr. Frankenberg recommended that the District focus on recruiting from St. Mary Parish, especially for Stephensville. 3/24/21 Rough Tr. 247:24-250:2 (Frankenberg). Superintendent Blanchard expressed reservations about attempting to recruit teachers from neighboring St. Mary Parish because that action would likely result in more intense competition between the districts as they stop honoring their agreements not to "steal" teachers from each other. 3/26/21 Rough Tr. 137:6-19 (Blanchard). However, Dr. Frankenberg suggested that the District could cooperate with St. Mary Parish to jointly recruit Black teachers. 3/24/21 Rough Tr. 247:24-249:14 (Frankenberg).

### 4. Other Recommendations

Dr. Frankenberg testified that teacher transfers could be used to help the District meet its desegregation goals. 3/24/21 Rough Tr. 240:4-12 (Frankenberg). For example, she noted that Black teachers could be transferred to some of the elementary schools in the District that have less than 10% Black teachers. *Id.* She did not recommend that the District immediately do involuntary transfers. *Id.* at 241:14-17. Instead, she suggested that it could look at financial incentives or incentives such as helping teachers achieve professional goals by transferring to other schools. *Id.* at 241:17-25. Superintendent Blanchard opined that he did not think monetary rewards would be successful in incentivizing voluntary transfers of faculty in the District based on the experience of a

neighboring parish. 3/26/21 Rough Tr. 135:19-136:18 (Blanchard). He has not considered offering other incentives—like the opportunity to teach a special curriculum or the opportunity for professional growth—to incentivize voluntary transfers in St. Martin Parish. *Id.* at 136:19-137:4.

Dr. Frankenberg recommended that the District implement an equity-focused "grow your own" program to assist in recruiting more diverse teachers. 3/24/21 Rough Tr. 243:10-12 (Frankenberg). This could involve supporting paraprofessionals already working in the District to earn the qualifications needed to teach and working to develop a pipeline of students who graduate from the District and return there to teach. *Id.* at 243:16-21. This might look like identifying students who are potential teacher candidates as early as junior high and providing them with opportunities such as curriculum offering course work required to be a teacher, partnerships with teachers in the District, and possibly even contracts to teach in the District prior to graduation.[38] *Id.* at 239:21-244:9. Dr. Frankenberg admitted that it could be five years from the time of implementation before the District sees its own students return to teach, but she thought there could be benefits before that in the form of developing relationships with the universities program participants attend. 3/25/21 Rough Tr. 42:6-19 (Frankenberg).

For schools that are not meeting faculty diversity goals, Dr. Frankenberg recommended having a biracial committee interview all candidates, regardless of whether

---

[38] Dr. Frankenberg did not consider what the District has done thus far to be in line with best practices for a grow your own program. 3/24/21 Rough Tr. 244:10-17 (Frankenberg).

there is a diverse pool of applicants.[39] 3/24/21 Rough Tr. 237:18-238:3 (Frankenberg). Further, she recommended that the District adopt a policy, like that in Tangipahoa Parish, whereby any hiring decision that will contribute to the racial identifiability of a school must be explained in writing and reviewed by the superintendent before the decision is finalized. *Id.* at 245:10-20. She explained that a process such as this helps the District remain conscious of how decisions that seem unrelated are actually part of an interdependent decision-making process that can affect the District's ability to reach its goals. *Id.* at 245:20-25.

### C. Further Relief

Having denied the District's motion for unitary status, the Court concludes that further relief is warranted and Plaintiffs' motion for further relief [Record Document 342] is **GRANTED as stated herein**. The parties are **ORDERED** to develop a method for the District to ascertain its Black teacher attrition rates and to develop policies to assist the District in retaining Black teachers. The Court is persuaded by Dr. Frankenberg's opinion that taking steps to improve Black teacher retention will assist the District in reaching its goals, especially given the fact that District officials testified that there is competition with neighboring parishes for Black teachers. While recognizing the limited value of anecdotal testimony, the Court also finds that the testimony of Black teachers in the District supports a finding that the efforts suggested by Dr. Frankenberg to improve teacher retention are warranted. Taking steps to improve retention rates is a reasonable and

---

[39] Currently, the Employment Procedures only require that the District interview with a biracial hiring committee when there is a diverse applicant pool. Record Document 211-2 at 40.

practicable measure to meet the goals of the Faculty Consent Order and eliminate the vestiges of prior *de jure* segregation in the area of faculty assignment.

The parties are also **ORDERED** to revise the aspects of the District's Recruitment Plan and Employment Procedures related to recruitment, interview, and hiring procedures. The parties should consider modifications such as adopting the hiring process, or aspects thereof, used in Tangipahoa Parish; working to develop relationships with university partners; increasing outreach to HBCUs; adding measures to decrease the number of teacher transfers negatively impacting diversity in schools and to increase the number of teacher transfers contributing to diversity;[40] developing strategies to better market the District's scholarship program to students, especially Black students; implementing programs to assist paraprofessionals and other non-certified staff in the District in efforts to become certified teachers; and implementing a "grow your own" program like that described by Dr. Frankenberg. The Court finds that these measures are all reasonable and practicable.

The District shall work in good faith with the Plaintiff-Parties to implement this remedial order. The parties shall propose a new consent order. In crafting measures of success, the parties should consider that a "grow your own" program will not produce a teacher for at least five years. The Court reserves all further orders of affirmative relief until such time as the parties propose a new consent order. All provisions of the current

---

[40] The Court is not ordering that the parties consider involuntary transfers. The evidence showed that this may result in teacher attrition and Dr. Frankenberg expressly stated she does not recommend this. The Court is ordering that the parties consider whether there are incentives that the District might offer to teachers willing to accept transfers that will contribute to integration efforts.

Faculty Consent Order not inconsistent with this order shall remain in effect until a new consent order is issued. The Court shall retain jurisdiction over the area of faculty assignment for **at least three years** to monitor the District's compliance with this order. *See Moore*, 921 F.3d at 547 (noting that three years is the typical monitoring period for a new desegregation plan).

## VII.    Unitary Status—Quality of Education—Discipline

### A. Requirements of the Superseding Consent Order

The portion of the Superseding Consent Order dedicated to quality of education (discipline) ("Discipline Consent Order") was intended to ensure "that the District administers student discipline in a fair and non-discriminatory manner, addresses disproportionate assignment of exclusionary sanctions to Black students, and provides all students with an equal opportunity to learn in a safe, orderly, and supportive environment." Record Document 211-4 at 8. To that end, it required that the District "ensure that students remain in the regular classroom environment to the greatest extent possible under the Comprehensive Discipline Plan." *Id.* at 8. Further, it prohibited the District from administering exclusionary disciplinary consequences prior to attempting and documenting non-exclusionary corrective strategies and interventions, except where this was not permitted by law.[41] *Id.*

The parties agreed to three categories of remedial measures: 1) professional development, 2) discipline policies and procedures, and 3) discipline data collection,

---

[41] Exclusionary discipline is discipline that requires removal from the classroom and loss of instruction. Record Document 211-4 at 5; 4/16/21 Rough Tr. 156:5-7 (Wiltz).

review, and self-assessment. *Id.* at 11-19. For professional development, the District was required to, among other things, contract with a qualified consultant to help the District "effectively administer discipline, especially with regard to (a) effective classroom management, including Culturally Responsive instruction; and (b) school discipline and race, including practices for identifying and reducing racially disparate discipline." *Id.* at 11. The District was required to provide all personnel responsible for classroom management and student discipline with training taught by the consultant or administrators who have successfully completed training with the consultant.[42] *Id.* After the initial training, the District was required to provide four hours of school discipline training per school year to all personnel. *Id.* at 12.

The Discipline Consent Order required the District to revise its disciplinary policies and Discipline Plan prior to the 2016-2017 school year. *Id.* at 12-17. The revision was to be done with input from the consultant, teachers and administrators in the District, and

---

[42] The Discipline Consent Order detailed the minimum content that should be addressed in the trainings. Record Document 211-4 at 11-2. This included "training on cultural responsiveness, de-escalation tactics, and the use of conflict resolution programs." *Id.* at 11. It stated that:

> Cultural Responsiveness training should address the: "five components essential to [Culturally Responsive Classroom Management (CRCM)]: (a) recognition of one's own ethnocentrism and biases; (b) knowledge of students' cultural backgrounds; (c) understanding of the broader social, economic, and political context of our educational system; (d) ability and willingness to use culturally appropriate classroom management strategies; and (e) commitment to building caring classroom communities."

*Id.* at 12 n.20 (quoting Weinstein, C. S., Tomlinson-Clarke, S., & Curran, M. (2004). *Toward a Conception of Culturally Responsive Classroom Management.* Journal of Teacher Education, 55(1), 25-38).

the Plaintiff-Parties. *Id.* at 12. The parties agreed to numerous revisions that needed to be included in the revised Discipline Plan. *Id.* at 13-16. Among these were that the Discipline Plan must:

(a) include a detailed and clearly defined system of Graduated Infractions,[43] corrective strategies, and consequences that minimize the number of lost days of instruction to the least amount of days possible;

. . .

(c) objectively define behavioral infractions at every level (including whether the behavior should be handled in the classroom or through referral and the definition of habitual or repetitive misconduct);

(d) incorporate Culturally Responsive [44] and developmentally appropriate tiered prevention and intervention strategies;

(e) incorporate a continuum of alternatives to exclusionary discipline (including Behavior Intervention Plans (BIPs), reflective writing assignments, conflict resolution, and restorative justice practices);

(f) address the limited circumstances under which the use of exclusionary consequences and the involvement of law enforcement is permitted;

(g) address appropriate consequences and/or interventions for infractions related to tardiness or truancy;

. . .

(i) incorporate behavioral supports for students with multiple referrals[.]

*Id.* at 14-15.

---

[43] The Discipline Consent Order defines Graduated Infractions to mean "a system of progressive discipline such that as the behavior becomes more serious or safety-threatening, it is met with increasingly more serious sanctions." Record Document 211-4 at 10.

[44] The Discipline Consent Order defines "culturally responsive" as "the skills, knowledge and attitudes associated with effective educational practices for students from diverse racial, socio-economic and cultural backgrounds." Record Document 211-4 at 10.

The remedial measures adopted for data collection, review, and self-assessment include a requirement that the District use a data collection system which would allow it to regularly examine discipline "referral data in order to identify improvements and areas of concern particularly with respect to office discipline referrals, out-of-school suspension, and lost days of instruction." *Id.* at 17. It also detailed the data that should be included in the District's reports to the Court and Plaintiff-Parties. *Id.* at 17-18.

The Discipline Consent Order required that the District work to eliminate all disparities identified in the baseline year, here the 2015-2016 school year. *Id.* at 10, 19. The District was required to show "continuous progress" across three consecutive school years, though the failure to eliminate all disparities "may not be the sole basis for granting or denying" unitary status in discipline to the District. *Id.* at 19. As defined by the Discipline Consent Order, "continuous progress" requires that there be:

> [M]easurable improvement across two or more years as indicated by reductions in days of lost instruction, percentage of students issued one or more in-school suspensions ("ISS"), percentage of students issued one or more out-of-school suspensions ("OSS"), and number of office referrals as compared to the prior school year. Measureable [sic] improvement shall be reflected in specific indicators identified in advance by the District based on the Baseline Year data. The indicators will, at a minimum, include reductions in:
> > i. the percentage of Black students who receive one or more Office Discipline referrals ("ODRs");
> > ii. the percentage of Black students who receive one or more ISS or OSS; [and]
> > iii. the number of instructional days that Black students lose as consequences for discipline (e.g., ISS and OSS).

*Id.* at 9.

### B. Facts

#### 1. The Data

Plaintiffs' expert Dr. Anne Gregory testified regarding student discipline. Dr. Gregory is a professor at the Graduate School of Applied and Professional Psychology at Rutgers University. Record Document 400-15 at 1. She earned her undergraduate degree from Brown University, a master's in education from Harvard University, and a Ph.D. in clinical and community psychology from the University of California, Berkley. *Id.* Dr. Gregory's work focuses on school discipline, racial equity in school discipline, and using empirically based strategies to reduce racial disparities in school discipline. 3/22/21 Rough Tr. 73:18-21 (Gregory). She has published extensively in this area, presents on the topic frequently, and has worked with school districts in several states. *Id.* at 74:9-75:1. Dr. Gregory has not worked with other schools in Louisiana and has never visited St. Martin Parish. *Id.* at 160:15-17, 160:24-161:2.

In 2020, Dr. Gregory analyzed student discipline data from the 2015-2016, 2016-2017, 2017-2018, and 2018-2019 school years. *Id.* at 91:25-92:3. She highlighted several key data points. First, the lost days of instruction for Black students in the District was persistently high between the 2015-2016 school year and the 2018-2019 school year. *Id.* 92:7-15. In the 2015-2016 school year, Black students lost 5,760 days of instruction and in the 2018-2019 school year, Black students lost 5,673 days. Record Document 400-3 at 1. At Breaux Bridge Junior High, Cecilia Junior High, Breaux Bridge High, and Cecilia High, approximately one-half of Black students lost days of instruction due to exclusionary

discipline during the 2018-2019 school year. 4/16/21 Rough Tr. 173:16-21 (Wiltz); Record

Document 277-1 at 45.

| Referrals by Type | 2015-2016 | | 2016-2017 | | 2017-2018 | | 2018-2019 | | 2019-2020[45] | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Black Students | White Students | Black Students | White Students | Black Students | White Students | Black Students | White Students | Black Students | White Students |
| Lost Days of Instruction[46] | 5,760.91 | 2,169.11 | 4,632.96 | 2,052.16 | 5,369.93 | 2,000.11 | 5,673.05 | 2,407.41 | 4,350 | 1,884 |
| Office Referrals[47] (Unduplicated)[48] | 1,473 | 890 | 1,240 | 681 | 1,271 | 712 | 1,468 | 844 | 1,296 | 675 |
| Alternative School Referral | 169 | 60 | 148 | 56 | 136 | 27 | 83 | 22 | 51 | 25 |
| In-School Suspension | 753 | 290 | 684 | 246 | 623 | 284 | 815 | 333 | 704 | 291 |
| Out-of- School Suspension (Duplicated)[49] | 1,546 | 699 | 1,516 | 709 | 1,146 | 499 | 879 | 418 | 529 | 274 |
| Alternative to Suspension Program (PBC) | – | – | – | – | 76 | 48 | 849 | 402 | 627 | 292 |
| Non-Punitive Behavioral Supports (Duplicated) | 102 | 34 | 72 | 27 | 108 | 36 | 90 | 41 | 262 | 110 |

Record Document 400-3 at 1. Second, the gap between lost instruction days for white

students and Black students remained persistently high during that time period. 3/22/21

Rough Tr. 92:15-20 (Gregory). In the 2015-2016 school year, white students had 2,169

---

[45] Data for the 2019-2020 school year is not comparable to other years because the schools stopped offering in-person instruction in March 2020 due to the COVID-19 pandemic.

[46] This total includes students receiving a referral to the Alternative to Suspension Program, OSS, and ISS. 4/16/21 Rough Tr. 167:20-25 (Wiltz)

[47] Office Referrals totals a referral entered into the Louisiana Department of Education Office Referral form. 4/16/21 Rough Tr. 56:5-10 (Wiltz). A referral does not mean that a student received a disciplinary consequence. *Id.* at 56:11-24.

[48] "Unduplicated" totals are the number of students receiving a particular disciplinary consequence. 4/16/21 Rough Tr. 56:25-57:5 (Wiltz). In other words, if a student received multiple office referrals, only one is included in the displayed totals.

[49] "Duplicated" totals are the number of a particular disciplinary consequence given, even if one student received multiple consequences. 4/16/21 Rough Tr. 57:7-9 (Wiltz). In other words, each consequence received is counted.

days of lost instruction, and in the 2018-2019 school year, white students had 2,407 lost days of instruction. Record Document 400-3 at 1.

Third, Dr. Gregory noted that while the number of OSS issued to Black students seems to have dropped substantially between the 2015-2016 school year and the 2018-2019 school year, this decrease was matched almost evenly by the number of Alternative to Suspension Program referrals.[50] *Id.*; 3/22/21 Rough Tr. 93:1-13 (Gregory). In the 2015-2016 school year, there were 1,546 OSS issued to Black students and no referrals to the Alternative to Suspension Program because it did not yet exist. Record Document 400-3 at 1. In the 2018-2019 school year, Black students were issued an OSS 879 times and Black students received 849 referrals to the Alterative to Suspension Program. *Id.* Combined, the District issued 1728 OSS or Alternative to Suspension Program referrals to Black students during the 2018-2019 school year. *Id.*

Fourth, the number of ISS issued to Black students increased from 753 in the 2015-2016 school year to 815 in the 2018-2019 school year. *Id.* Fifth, the number of documented non-punitive behavioral supports is low in comparison to the number of ISS, OSS, Alternative to Suspension Program referrals, and office referrals issued each year.[51]

---

[50] The Alternative to Suspension Program was implemented in the 2017-2018 school year. Record Document 277-1 at 4. For a full explanation of the Alternative to Suspension Program, *see infra* Section VII.B.6.

[51] Notably, the number of documented non-punitive behavioral supports increased drastically from the 2018-2019 school year (131 documented) to the 2019-2020 school year (372 documented). Record Document 400-3 at 1. However, because of statewide school shutdowns due to the COVID-19 pandemic, the 2019-2020 school year data is not a complete school year's worth of data and is therefore not being considered by the Court. Further, even with this increase in non-punitive behavioral supports, it does not appear that other disciplinary measures—such as office referrals—were decreasing relative to other years. *Id.*; 3/22/21 Rough Tr. 98:14-99:2 (Gregory).

Record Document 400-14 at 3; 3/22/21 Rough Tr. 96:9-24, 113:5-18 (Gregory). For example, in the 2018-2019 school year, the District documented only 90 non-punitive behavioral supports for Black students, but issued 879 OSS, 402 referrals to the Alternative to Suspension Program, and 815 ISS. Record Document 400-3 at 1.

While the disparity between Black students and white students persists, the District did substantially reduce the number of Black students receiving alternative school referrals[52] between the 2015-2016 school year and the 2018-2019 school year—from 169 referrals in 2015-2016 to 83 in 2018-2019. Record Document 400-3 at 1. Wiltz attributes this to the District's focus on only using this consequence when a student's behavior is so severe that it warrants expulsion or is legally required to result in that recommendation. 4/16/21 Rough Tr. 57:10-58:10 (Wiltz).

Dr. Gregory first issued expert reports in this matter in 2015 where she analyzed discipline data in the District and made recommendations that were taken into consideration when crafting the governing Discipline Consent Order. 3/22/21 Rough Tr. 78:9-10 (Gregory). She explained that in 2015, she created a logistic regression model based on student discipline data from the 2012-2013, 2013-2014, and 2014-1015 school years. *Id.* at 86:13-14, 87:14-16.

---

[52] An alternative school referral refers to a student who is expelled from his or her school and instead assigned to the District's alternative school. 4/16/21 Rough Tr. 110:19-111:2 (Wiltz).

Table 1: Logistic regression models predicting receipt of OSS by grade level.

| Variable | Elementary Grades | | | | Middle Grades | | | | High School Grades | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | OR | | LB | UB | OR | | LB | UB | OR | | LB | UB |
| Race\ethnicity | | | | | | | | | | | | |
| Black | 2.72 | *** | 2.27 | 3.26 | 2.29 | *** | 1.98 | 2.65 | 2.49 | *** | 2.15 | 2.88 |
| Hispanic | 0.91 | | 0.45 | 1.83 | 1.09 | | 0.61 | 1.94 | 0.78 | | 0.38 | 1.59 |
| Asian | 0.77 | | 0.30 | 1.95 | 0.26 | * | 0.09 | 0.74 | 0.42 | * | 0.18 | 0.96 |
| Other | 1.00 | | 0.30 | 3.36 | 0.75 | | 0.17 | 3.4 | 1.41 | | 0.39 | 5.00 |
| FRPM eligible | 2.81 | *** | 2.05 | 3.84 | 1.83 | *** | 1.51 | 2.22 | 1.93 | *** | 1.63 | 2.28 |
| Grade | 1.44 | *** | 1.33 | 1.56 | 1.14 | ** | 1.04 | 1.24 | 0.79 | *** | 0.75 | 0.84 |
| Male | 4.13 | *** | 3.46 | 4.93 | 2.56 | *** | 2.24 | 2.92 | 1.99 | *** | 1.74 | 2.27 |
| Year | | | | | | | | | | | | |
| Y (1314) | 1.13 | | 0.94 | 1.36 | | | 0.84 | 1.15 | 0.91 | | 0.77 | 1.06 |
| Y (1213) | 1.03 | | 0.86 | 1.24 | 1.03 | | 0.88 | 1.2 | 0.95 | | 0.81 | 1.11 |

Notes: $p<.05$, **$p<.01$, ***$p<.001$. OR = Odds Ratio. LB = Lower Bound and UB = Upper Bound. White is the reference group for race\ethnicity. SY 1415 is the reference group for year.
All models using school fixed effects. Grades were clustered from pre-k to 5th grade (elementary), 6th to 8th grades (middle), and 9th to 12th grades (high). ES = 12,829. MS = 5,339. HS = 6,946.

Record Document 400-13. Her 2015 multi-factor regression analysis found that discipline-related racial disparities in the District were not explained by the socioeconomic status, gender, school, or grade-levels of students. 3/22/21 Rough Tr. 87:13-89:23, 170:17-171:7 (Gregory). Thus, she concluded at the time that race was an illicit factor that impacted disciplinary referrals. *Id.* She testified that this remains true. *Id.* at 170:17-171:7.

Dr. Gregory also addressed the ongoing racial disparities she observed. 3/22/21 Rough Tr. 102:5-21 (Gregory). For example, in the 2018-2019 school year, a Black student was 3.75 times more likely to be referred to alternative school than a white student in the District, 2.23 times more likely to receive ISS, 1.97 times more likely to receive OSS, 1.88 times more likely to receive an office referral, and 1.96 times more likely to lose a day of instruction. Record Document 400-3 at 2.

| School Year | Alt. School | ISS | OSS | Office Referrals | Lost Days | Assigned to Detention (PBCJ) |
|---|---|---|---|---|---|---|
| 15-16 EOY | 2.92x | 2.35x | 1.93x | 1.76x | 1.92x | |
| 16-17 EOY | 2.70x | 2.68x | 1.88x | 1.96x | 2.16x | |
| 17-18 EOY | 5.08x | 2.03x | 1.99x | 1.94x | 2.00x | |
| 18-19 EOY | 3.75x | 2.23x | 1.97x | 1.88x | 1.96x | 1.88x |
| 19-20 EOY | 2.16x | 2.2x | 2.1 x | 2.00x | 2.00x | 2.04x |

*Id.* Comparing the 2018-2019 school year to the baseline year, a Black student's likelihood of being referred to alternative school has increased, a Black student's likelihood of receiving ISS has slightly decreased, a Black student's likelihood of receiving OSS has slightly increased, a Black student's likelihood of receiving an office referral has increased, and a Black student's likelihood of losing a day of instruction has slightly increased. *Id.*

Dr. Gregory also compared the rates of OSS for Black students and white students from the 2014-2015 school year through the 2018-2019 school year. 3/22/21 Rough Tr. 106:3-6 (Gregory). Overall, there was a decline in the number of OSS. *Id.* However, the rate at which OSS was issued at the middle and high school grade bands remained alarmingly high compared to national averages. *Id.* at 106:5-8; Record Document 400-14 at 1. For example, in the high school grade band, approximately 22% of Black students in the District received an OSS in the 2018-2019 school year. Record Document 400-14 at 1. For the 2015-2016 school year, the national data shows that approximately 13% of Black students received OSS. 3/22/21 Rough Tr. 107:23-108:2. Thus, the rate in the District is far above the national average. *Id.*

### 2. The District's Actions—Positive Behavior Intervention Supports

To meet requirements of the Discipline Consent Order such as reducing racial disparities and limiting the use of exclusionary discipline, the District elected to use the

Positive Behavior Intervention Support System ("PBIS"). Record Document 409-3 at ¶ 2; 4/16/21 Rough Tr. 154:16-155:8 (Wiltz). All District schools have long utilized the program, as its use has been mandated by the State of Louisiana since 2004. Record Document 409-3 at ¶ 7; 4/16/21 Rough Tr. 67:17-68:1, 68:14-20, 154:13-15 (Wiltz). PBIS is preventative programming intended to enhance positive behaviors and eliminate misconduct and resulting disciplinary actions. *Id.* at ¶ 6(b). It is based on a framework called a multi-tiered system of support ("MTSS"), which is a data-driven problem-solving framework intended to improve outcomes for students. Record Document 409-3 at ¶ 3. Data-based decision-making involves critical analysis of data to determine whether different strategies demonstrate success in meeting goals and whether adjustments are necessary to ensure improvement if goals are not being met. 3/22/21 Rough Tr. 152:17-153:7 (Gregory). Data-based decision-making is thus key to fidelity of implementation for a PBIS plan. *Id.* at 159:3-9.

    The PBIS MTSS involves three "tiers" of behavior. Record Document 409-3 at ¶ 3.



*Id.*[53] Tier 1, represented in the base of the triangle above, is where all students receive prevention programming. *Id.* at ¶ 4. Tier 1 interventions focus on establishing, communicating, modeling, and rewarding expected behaviors. *Id.* Schools provide these universal supports to all students and present a series of lessons about the rules and expectations multiple times each year. *Id.* at ¶s 4 and 6(f).

 Students who do not respond to Tier 1 interventions should receive additional supports as ways to remedy their behavior in Tier 2 and Tier 3. *Id.* at ¶ 5. According to the PBIS model, approximately 5% to 10% of students typically receive support at Tier 2 in a school district, and approximately 1% to 5% of students typically receive support at Tier 3. *Id.* In other words, each Tier involves more intensive supports and should be used for a smaller number of students.

All employees are trained in PBIS, and each school has PBIS Plans to address the particular needs of their school. *Id.* at ¶ 6. The schoolwide PBIS Plan includes behavioral expectations for all areas of campus. *Id.* at ¶ 6(a). During the first few professional development days each year, the principals of all District schools are required to review and instruct the faculty and staff on PBIS rules and expectations. *Id.* at ¶ 6(c).

Each year, the principal of each school is required to create a PBIS Team consisting of classroom teachers and administrators. Record Document 409-3 at ¶ 6(g); 4/16/21 Rough Tr. 127:13-18 (Wiltz). The PBIS Teams meet regularly; some schools meet monthly, some every nine weeks, and some are convened as necessary more regularly.

---

[53] This graphic displays the multi-tiered support system used for behavior and academics. For purposes of this analysis, the academic instruction pyramid is not relevant.

Record Document 409-3 at ¶ 6(g). These Teams work in conjunction with others in the building to develop behavior intervention plans for students and conduct functional behavioral assessments which are intended to determine the root cause of a child's behavior. 4/16/21 Rough Tr. 128:3-20 (Wiltz).

### 3. The District's Actions—Monitoring

As the Supervisor of Child Welfare and Attendance in the District, Fred Wiltz is tasked with monitoring discipline at the District's schools through the use of the J-Campus student information system. 4/16/21 Rough Tr. 12:8-22, 55:18-19 (Wiltz). In addition to the aforementioned school PBIS Teams, the District has a Discipline Committee comprised of a staff member from each school and central office staff. *Id.* at 13:6-13. This Committee meets monthly to review discipline data. *Id.* at 12:24-13:1. Wiltz also regularly consults with school administrators to discuss the reasons for exclusionary discipline and to determine strategies to reduce such occurrences. *Id.* at 55:18-56:4.

The Louisiana State Department of Education ("LDOE") requires that each school conduct the Tiered Fidelity Inventory ("TFI") every year. Record Document 409-3 at ¶ 7(e). Thus, each school's implementation of PBIS is evaluated annually via the TFI.[54] *Id.* The District's School Safety Coordinator, Khristy Hulin, leads the TFI evaluation with the assistance of an out-of-District consultant, Dr. Kara Hill, an independent consultant who previously worked with Louisiana State University and the LDOE exclusively relative to PBIS. *Id.* at ¶ 7(e)(i). The TFI is intended to evaluate how well the school is implementing

---

[54] An example of each school's TFI evaluation can be found at Record Documents 409-9 at 2, 24, 40, 62, 82, 102, 122, 142, and 164, 409-10 at 2, 24, 44, and 70, and 409-11 at 2, 22, and 42.

its PBIS plan via review of documentation and interviews of a selection of the school's faculty, administration, and students. *Id.* at ¶ 7(e)(ii).

### 4. The District's Actions—Training

As required by the Discipline Consent Order, the District contracted with the Intercultural Development Research Association ("IDRA") to consult regarding discipline in the District. 4/16/21 Rough Tr. 15:3-17 (Wiltz). The IDRA conducted an initial training with all District employees and a second training with a smaller group of employees which included a representative from each school—usually a principal or assistant principal—and members from the central office. *Id.* at 13:8-13, 16:18-17:1. This training covered topics such as recognizing cultural biases and taking account of differences between children in discipline. *Id.* at 17:4-13. The trainings did not cover topics such as reducing ethnocentrism or the history of racial segregation, which the Discipline Consent Order required the training to include. *Id.* at 139:4-13; Record Document 211-4 at 12 n.20. The small group that received the additional training was tasked with going back to their respective schools and working to ensure the training was being put into effect. 4/16/21 Rough Tr. 17:17-25 (Wiltz). This includes regularly reviewing the discipline, even narrowing the review down to the level of a single teacher who may need additional support to reduce the need for some disciplinary actions. *Id.* at 18:5-14.

Since the initial training, the District has continued to contract with the IDRA or other consultants to provide the required four hours of annual training. *Id.* at 18:21-19:22; Record Documents 409-12, 409-13, 409-14, 409-15, 409-16, and 409-17. The

District has also provided training in areas such as non-violent crisis intervention and PBIS Tier 2 interventions. *Id.* at 66:12-67:6; Record Document 409-15 at 21-22.

### 5. The District's Actions—Discipline Plan

As required by the Discipline Consent Order, the District consulted with the IDRA when revising its Discipline Plan.[55] 4/16/21 Rough Tr. 97:20-100:21 (Wiltz); Record Documents 211-4 at 14, 409-7. The new Discipline Plan was enacted at the end of the 2015-2016 school year and has remained in effect ever since. Record Document 409-7; 4/16/21 Rough Tr. 102:12-19 (Wiltz). All parents, faculty, and staff within the District received a copy. *Id.* at 102:3-9. The Plan lists PBIS as a behavioral support implemented at each school. Record Document 409-7 at 9.

The Plan breaks student behaviors into three categories—Type A, Type B, and Type C behaviors. Record Document 409-7 at 10-15. In each category, the Plan lists

---

[55] In this consultation with the IDRA, the District considered the elements required by the Discipline Consent Decree, including whether the Plan had: a clearly defined system of graduated infractions, corrective strategies, and consequences; clear descriptions of expected positive behaviors; objective definitions of behavioral infractions at every level; incorporation of culturally responsive and developmentally appropriate tiered prevention and intervention strategies; incorporation of a continuum of alternatives to exclusionary discipline; description of the limited circumstances under which exclusionary consequences and involvement of law enforcement is permitted; appropriate consequences and/or interventions for infractions related to tardiness or truancy; communication of policies of exclusionary discipline in a clear manner; incorporation of behavioral supports for students with multiple referrals; incorporation of protections for students with disabilities; inclusion of guidelines for communications with parents and guardians to address an infraction and transitioning back to the school and/or classroom environment; detailing of policies to provide suspended students with reasonable opportunities to complete regular academic work and earn equivalent grade credits to other students and not require punitive work assignments; and use of terms and designations that completely align with the terms and designations used in the District's electronic student records management system. 4/16/21 Rough Tr. 97:20-100:5; Record Document 211-4 at 14-15.

behaviors (accompanied by examples or definitions for each) and the consequences that could be issued in response. *Id.*; 4/16/21 Rough Tr. 118:7-10 (Wiltz). For a Type A behavior—which is a minor behavioral infraction that has warranted an office discipline referral—a teacher has the option of imposing a range of consequences including reprimand, having a conference with a parent or guardian, issuing a recess detention, loss of privileges, or a PBIS Tier 1 response. Record Document 409-7 at 10; Rough Tr. 118:16-20 (Wiltz). Type A infractions include violating classroom rules, willful disobedience, making a false report against another student, and stealing something of low value. Record Document 409-7 at 10. Type B behaviors—which are more severe than Type A behaviors—include repeated Type A behaviors, vandalism, leaving class or school grounds without permission, stealing something of high value, or making a false report against authority. *Id.* at 11-12; 4/16/21 Rough Tr. 118:23-119:4 (Wiltz). For these infractions, teachers have the option of consequences such as conferences with a parent or guardian, ISS, OSS, suspension from the bus, reprimand, or PBIS Tiers 2 and 3 responses. Record Document 409-7 at 11-12. Finally, for Type C behaviors—the most severe category of behaviors—consequences include immediate referral to the principal, a conference with a parent or guardian, OSS, ISS, and suspension or expulsion from the bus. Record Document 409-7 at 13; 4/16/21 Rough Tr. 120:3-5 (Wiltz). Consequence options listed for Type C behaviors do not include PBIS responses of any Tier. Record Document 409-7 at 13. Behaviors in this category span a wide range, including: repeated Type A or Type B behaviors; use or possession of a controlled substance; use or control of tobacco, a lighter, or alcohol; possession of or discharge of a weapon; crimes such as

assault and battery, arson, burglary or criminal damage to property; bullying or harassment; and habitual tardiness or absences. *Id.* at 13-14; 4/16/21 Rough Tr. 120:3-8, 121:25-122:4 (Wiltz).

### 6. The District's Actions—Other Strategies

In an effort to reduce the number of OSS issued, the District piloted a Positive Behavior Center. 4/16/21 Rough Tr. 39:5-12 (Wiltz). This program, also called the Alternative to Suspension Program, allows students to avoid an OSS by being transported from their home school to Parks Middle School, where they are able to complete their normal classwork via Google Classrooms. *Id.* at 39:9-18, 42:8-43:16. However, students are not receiving traditional instruction from a teacher; there are three staff members assigned to the center to assist students with the work assigned by their teachers. *Id.* at 44:15-45:4. Students are not counted absent from class, but this is considered a lost day of instruction for purposes of the student discipline statistics. *Id.* at 39:18-20; Record Document 400-3 at 1.

The District has also created other programs to attempt to reduce the need for disciplinary consequences. First, it started a fight diversion program in which students participate in conflict diversion programs with counselors at the District's Health Center. 4/16/21 Rough Tr. 61:17-22 (Wiltz). Students successfully completing the program do not receive an OSS, even for behavior such as serious fights. *Id.* at 62:1-4. The program has not been successful to date. *Id.* at 64:2-6. Wiltz attributes this failure to the unwillingness of parents to participate in the program. *Id.* at 62:4-9. The District has not taken steps to formally ascertain why parents are hesitant to participate nor has it worked

to develop an alternate program that does not require parental involvement. *Id.* at 176:14-177:3. Second, during the 2019-2020 school year, the District trained employees in the use of "circles" as a method of conflict resolution. *Id.* at 88:25-89:22; Record Document 409-16 at 8-9. However, because the training was conducted on March 7, 2020 and the District closed all schools on March 13, 2020 due to the COVID-19 pandemic, this technique had not been employed. 4/16/21 Rough Tr. 90:22-91:21 (Wiltz).

Wiltz acknowledged that even though the Discipline Consent Order requires that the District attempt to use and document non-exclusionary strategies prior to using exclusionary discipline, the District does not have a process in place to ensure that happens. 4/16/21 Rough Tr. 141:21-142:3 (Wiltz).

### 7. Expert Testimony

Dr. Gregory expressed concern about how, as the rates of OSS decreased in the District, other forms of exclusionary discipline increased in use in the District. 3/22/21 Rough Tr. 110:14-17 (Gregory). She noted that other districts in the country do not see the same trends and opined that a good prevention program will result in the reduction of all forms of exclusionary discipline. *Id.* at 110:17-22. Keeping students in the classroom is important because removal from the classroom correlates with detriments in academic achievement and a reduction in graduation rates. *Id.* at 111:2-17.

Using the high school grade band as an example, Dr. Gregory explained that the number of non-punitive behavioral supports documented for Black students in the District was not proportional to the number of OSS issued to Black students. *Id.* at 113:5-18.



Figure 9. High School Level, 9th to 12th Grade Comparing Supports and OSS

Record Document 400-14. She reasoned that, if one assumes that OSS is used for students who have behavioral issues that need to be addressed, then the District should have had a much higher rate of non-punitive supports being employed for those students. 3/22/21 Rough Tr. 113: 5-18 (Gregory). In other words, this data suggests that the District is not properly using and documenting non-punitive behavioral supports because if it were, it would be using and documenting non-punitive behavioral supports for many of the students receiving OSS before escalating to issuing an OSS, and there would be more documented non-punitive supports. From data like this, Dr. Gregory opined that the District was not reserving exclusionary consequences for limited circumstances as required by the Discipline Consent Order. *Id.* at 148:16-149:4.

She explained that if the District were implementing PBIS with fidelity, "the proof is in the pudding," and she would expect to see a reduction in the number of office referrals, ISS, and OSS in the District. *Id.* at 122:20-123:3. For example, Dr. Gregory noted that OSS is a "Tier 3" intervention under the PBIS system, which means approximately 2% to 5% of students should be receiving this intervention under a PBIS

plan. *Id.* at 124:5-14. In the District high schools, however, over 20% of Black students received one or more OSS.[56] *Id.* Similarly, she explained that school districts successfully implementing PBIS with fidelity have lower racial disparities in OSS rates than the national average. *Id.* at 131:17-132:6. Schools implementing PBIS with fidelity at Tier 1 also see a reduction in office referrals because when non-punitive supports are successful, they interrupt rereferral into the disciplinary system. *Id.* at 98:19-25, 99:10-24, 121:15-17, 173:15-174:1, 183:11-13. Lowering the percentage of students referred into the discipline system is connected to increasing engagement, belonging, and connection, thus keeping students in the classroom. *Id.* at 123:6-17.

Dr. Gregory opined that the District was not in compliance with the Discipline Consent Order's mandate that the District not administer exclusionary disciplinary consequences before attempting and documenting corrective strategies and prevention. *Id.* at 140:4-18. She explained that this conclusion is based on her review of records submitted by the District showing that there are high rates and numbers of exclusionary discipline consequences for Black students and low rates of non-exclusionary or non-punitive behavioral supports. *Id.* at 140:9-14.

She also opined that the District is not complying with the Discipline Consent Order's mandate that the District ensure students remain in the classroom environment to the greatest extent possible based on the fact that there had not been a substantial

---

[56] While Dr. Gregory's analysis did not look at the behaviors that led to any specific OSS, she rejected the notion that this number could be the result of 20% of Black students in the high school exhibiting safety-threatening behaviors because that number is simply too high to be plausible based on her experience. 3/22/21 Rough Tr. 163:17-20, 168:15-169:10 (Gregory).

reduction in the number of office discipline referrals or ISS. *Id.* at 140:15-25. This same data led her to conclude that the District was not successfully implementing and incorporating cultural responsiveness and developmentally appropriate prevention and intervention strategies as required by the Discipline Consent Order. *Id.* at 147:13-23.

Dr. Gregory explained that she was not provided with evidence that the District was implementing behavior supports for students with multiple office referrals as required by the Discipline Consent Order, but she opined that even if it was, those interventions were not successful because the data shows students are coming into the discipline system repeatedly. *Id.* at 149:8-19. From her review of the District's Discipline Plan, Dr. Gregory concluded that the District's policies in regard to PBIS were vague. *Id.* at 143:15-21. For example, the Plan mentions Tier 1, Tier 2, and Tier 3, but does not specify what actions constitute each type of response or when a student accesses each support. *Id.* at 144:24-145:4.

Additionally, Dr. Gregory reviewed the District's self-evaluations and concluded that it was not effectively identifying improvements in areas of concern as required by the Discipline Consent Order. *Id.* at 150:17-151:11. For example, she noted that in a 2019-2020 report, the District reported that it was making strides and moving in a positive direction in regard to racial disparities. *Id.* at 151:5-8. However, the District did not point to data to support this assertion. *Id.* at 151:8-13. She explained that an effective evaluation would look at data, even down to the individual school level, and use that to examine the results, what the District did to achieve that result, and how it can be improved. *Id.* at 151:11-17.

Dr. Gregory also reviewed the District's TFIs for the 2017-2018 school year. Record Document 409-4 at ¶ 1. She concluded that the materials did not indicate the degree to which each school was authentically engaging in data-based, self-critical reflection on their PBIS implementation whereby they utilize their assessment to develop comprehensive action plans for improvement. *Id.* at ¶ 3. Dr. Gregory also opined about how the discipline data she reviewed aligned with the District's assessments. For example, she observed that, overall, the District appeared to have rated schools as fully implementing each Tier—on average, the Tier 1 rating was 96%, Tier 2 was 84% and Tier 3 was 97%. *Id.* at ¶ 5. She observed that the TFI manual states that, "[a]s a general rule, a score of 70% for each tier is accepted as a level of implementation that will result in improved student outcomes. . . ." *Id.* (quoting OSEP Technical Assistance Center on Positive Behavioral Interventions and Supports, *School- wide PBIS Tiered Fidelity Inventory* (Sept. 2019), https://www.pbisapps.org/Resources /SWIS%20Publications /SWPBIS%20Tiered%20Fidelity%20Inventory%20(TFI).pdf.). From this, Dr. Gregory concluded that the District's ratings are inconsistent with its results; if it was implementing PBIS as it rated itself, she would expect that the District was achieving outcomes such as reductions in office discipline referrals, ISS, and OSS, and it is not. *Id.*

As a second example, she noted that eleven of the sixteen schools indicated that at least 5% of their students receive Tier 2 supports. *Id.* at ¶ 9. However, District records indicated that only 108 non-punitive behavioral supports were issued to Black students and 36 such supports to white students that school year, which is far below 5% of enrolled

district students. *Id.*; Record Document 400-3 at 1 and 409-1 at 2. Thus, the District's disciplinary data did not support its self-reported Tier 2 evaluation.

### 8. District Faculty and Staff Opinions

The District presented no expert opinion in the area of discipline and instead relied on facts presented by District officials. While recognizing that this is not expert testimony, the Court finds value in the opinion of individuals directly involved in discipline in the District and therefore considered this evidence.

When directly questioned as to why the discipline discrepancies between Black students and white students had not decreased over time, Wiltz explained that in his experience, the type of discipline issues the District faces changes rapidly from year to year. 4/16/21 Rough Tr. 47:3-17 (Wiltz). For example, in the last two years, the District has encountered more issues with students using Snapchat and other social media apps to have arguments outside of school or out of view of school administrators, and that leads to behavior problems during the school day that the District is unable to anticipate. *Id.* Mr. Wiltz, a Black man, candidly opined that while this issue has occurred with students of both races, the problem has been more pronounced among Black students because issues in the broader Black community are spilling into the school context. *Id.* at 47:18-53:8. One example he used was a large fight between seven or eight Black students that occurred before 7:45 a.m. on the first day of a school year. *Id.* at 52:10-19. When the fight broke out, the District was unaware of the conflict brewing between the students over the summer, and nobody from the community alerted the District to

the problem so that the District could work to defuse the situation before it escalated to the level that discipline such as OSS could not be avoided. *Id.* at 52:19-53:8.

He also explained that for data like office referrals, comparing the baseline year data to the 2018-2019 school year data may not be a fully accurate comparison because in 2015-2016, schools may not have been documenting each and every office referral. *Id.* at 162:24-163:7. Stated differently, those numbers may look like they have not improved when, in fact, they have decreased but the data does not show that because simultaneously with the decrease in the actual number of referrals, the District began recording each referral. *Id.* He recalled that the District may not have had a conversation with faculty and staff about documenting every incident until the 2017-2018 school year. *Id.* at 163:12-164:7.

Wiltz testified that he has never found an instance where an employee discriminated against a student and issued disciplinary consequences because of the student's race. *Id.* at 132:9-13. He is in charge of disciplinary appeals in the District, and has never found in his appeal/complaint investigations that a student was disciplined because of his or her race. *Id.* at 123:18-124:2, 124:25-125:17. He testified that he would not tolerate "any administrator or anyone discriminating against a child because of their race or any other factors[.]" *Id.* at 132:2-3.

Former Breaux Bridge Primary teacher Melissa Narcisse testified in conflict with Wiltz's assertions regarding the impact of race in discipline, however. She stated that the District disciplines Black students more harshly than white students for similar conduct. 3/23/21 Rough Tr. 146:1-22 (Narcisse). She observed that some white staff harbor racial

biases against Black students. *Id.* at 148:12-149:12. For example, in recent years, some white teachers have disparaged Black students' natural hair. *Id.*

### C. The District is Not Entitled to Unitary Status

The parties dispute who bears the burden of proof as to discipline. According to Plaintiffs, the burden for achieving unitary status and further relief in this area is no different than with other factors—it is Defendant's burden to show that it has complied in good faith with the Discipline Consent Order and eliminated the vestiges of the prior discrimination to the extent practicable. Record Document 416 at 52-53. The District contends that it has the burden of "complying with the remedial measures of the Consent Order Regarding Quality of Education," but "when it comes to discipline, Plaintiff Parties bear the burden of proving intentional discrimination in discipline beyond mere disparities in statistics." Record Document 415 at 3 n.5. It supports this argument by citing *Tasby v. Estes*, 643 F.2d 1103, 1108 (5th Cir. 1981). The United States does not directly address this dispute, but does not include the *Tasby* standard in its proposed legal conclusions. Record Document 414 at 7-13.

In *Tasby*, a school district was operating under a consent order that included remedial measures applicable to student discipline. *Tasby*, 643 F.2d at 1104. While this order was in effect, parents of Black children in the district filed a motion for further relief alleging that the district was violating portions of the order, like the requirement that the district develop a clear discipline policy, and alleged that the district "had administered student discipline in a racially discriminatory fashion." *Id.* at 1105. As a remedy for the alleged violation of the desegregation order, the parents sought "appointment of a Special

Master to develop and implement a student disciplinary system, a preliminary injunction prohibiting the suspension of black students at a rate in excess of that at which white students were suspended, an order requiring [the district] to produce monthly data on student discipline, and attorneys' fees and costs." *Id.* After a hearing on the matter, the district court granted the district's motion to dismiss the motion for further relief. *Id.*

On appeal, the parents argued that the district court erred in denying their motion as to whether the district administered discipline in a discriminatory manner. *Id.* at 1107. The court explained that student discipline is "fundamentally unlike student assignment and transfer, faculty hiring and discharge, the allocation of economic resources, and the like" because in those instances, "decisions by school officials which bear more heavily on one race than another may reflect disparate treatment that cannot be explained on grounds other than race." *Id.* at 1108. Thus, it concluded that discipline should not be treated like the other factors. *Id.* Instead of the defendant having the burden to "show that the disproportionate racial consequences of the decision were not the product of a racially discriminatory purpose," the plaintiff would have the burden to show "that the administration of student discipline in the [district] is motivated by a discriminatory purpose." *Id.* at 1108.

This Court is not persuaded that it must apply this burden to Plaintiffs. First, there is a key factual distinction between *Tasby* and the instant case. In *Tasby*, the Fifth Circuit affirmed the district court's finding that the district had otherwise complied with the operating desegregation order and, as explained below, this Court does not reach the same conclusion. Second, the standard employed in *Tasby* seems to be in direct conflict

with later jurisprudence holding, without qualification, that a court need not make a "new and independent finding of discrimination" to deny a district unitary status, *Moore*, 921 F.3d at 549, and that a court does "not need to find that [a district] violated the Constitution, only that it violated the consent decree[,]" before ordering further relief. *Smith*, 906 F.3d at 335. *See also Little Rock Sch. Dist. v. Arkansas*, 664 F.3d 738, 751 (8th Cir. 2011) (citing *Freeman*, 503 U.S. at 491-92) (applying the two-part good-faith compliance and elimination of the prior vestiges of discrimination to the extent practicable standard to a case involving student discipline); *Fisher v. Tucson Unified Sch. Dist.*, 652 F.3d 1131, 1140-41 (9th Cir. 2011) (reviewing unitary status as to discipline under the two-part good-faith compliance and elimination of the prior vestiges of discrimination to the extent practicable standard). Nevertheless, out of an abundance of caution, the Court will consider whether the Plaintiff-Parties have satisfied this burden in addition to considering the burden applied to the *Green* factors.

The Court turns first to the inquiry applied to all other factors when considering unitary status—whether the District has shown that it has complied in good faith with the Discipline Consent Order for a reasonable period of time and eliminated the vestiges of the prior discrimination to the extent practicable. *Anderson*, 517 F.3d at 297. Under this standard, the District has failed to achieve unitary status because it has failed to show that it complied in good faith with the Discipline Consent Order for a reasonable period of time and because it has failed to eliminate the vestiges of prior discrimination to the extent practicable.

The Court finds that the District has failed to comply with the Discipline Consent Order in several ways. First, it has not reduced its reliance on exclusionary discipline and it is not using and documenting its use of non-punitive interventions. The Discipline Consent Order's goal is to avoid students' exclusion from the classroom by using non-punitive or preventative strategies. Doc. 211-4 at 8. The Consent Order requires that: (a) exclusionary discipline be administered only under limited circumstances, and (b) the District document the use of non-punitive and preventative strategies before using any exclusionary discipline. *Id.*

The District has failed to comply with both mandates. Testimony at the hearing established that during the baseline year, there were two main forms of exclusive discipline in use in the District, ISS and OSS. With those two disciplinary methods being used, Black students lost 5,761 days of instruction during the baseline year. In the 2017-2018 school year, the District began a new program, the Alternative to Suspension program, to reduce its use of OSS. While the Court applauds the District's efforts to consider ways to avoid issuing students OSS, this program is still a form of exclusive discipline and counts towards the District's lost days of instruction. With all three disciplinary methods being used in the 2018-2019 school year, Black students lost 5,673 days of instruction. A simple comparison between the baseline year and the last school year under consideration reveals that the District reduced the lost days of instruction due to exclusionary discipline by a mere eighty-eight days, which is not a meaningful reduction. Thus, the District has not shown that it is reducing its use of exclusionary

discipline and, likewise, has not shown that it is employing exclusionary discipline only in limited circumstances.

The data regarding OSS and the Alternative to Suspension program in the 2018-2019 school year is also striking. During the baseline year, the District issued 1,546 OSS to Black students. By the 2018-2019 school year, this number was reduced to 879, but the number of Alternative to Suspension program referrals was 849. This suggests that instead of reducing the use of exclusionary discipline, the District has shifted the type of exclusionary discipline issued—using the Alternative to Suspension program instead of OSS. This, again, shows that the District is not limiting the use of exclusionary discipline.

The data also shows that the District has a low rate of documented non-punitive behavioral supports. This demonstrates that the District is not using non-punitive supports, or at least not documenting their use, prior to using exclusionary discipline. The Court is persuaded by Dr. Gregory's testimony regarding the correlation between discipline such as OSS and the use of non-punitive supports. That is, if OSS is appropriately being reserved for the most serious behaviors, students receiving OSS should often have a history of non-punitive supports before the disciplinary consequences escalate to OSS, meaning higher rates of OSS should be accompanied by more non-punitive behavioral supports. In the 2018-2019 school year, the District documented 90 non-punitive behavioral supports for Black students. It issued 879 OSS. These numbers are not proportional, again showing that the District is failing to implement or failing to document the use of non-punitive behavioral supports prior to resorting to exclusive discipline such as OSS. Black students were also more likely to receive office referrals, a

data point that is associated with failure to use non-punitive preventative measures. In the 2018-2019 school year, Black students were referred to the office 1,468 times—a number that has remained nearly the same since the baseline year.

Wiltz testified that the District does not have a system in place to ensure that teachers use non-exclusionary methods of discipline. The District's lack of a tracking or monitoring mechanism shows a lack of commitment to using non-exclusionary discipline. It also makes it impossible for the District to ensure that the faculty and staff are consistently using and document non-exclusionary options of non-punitive behavioral supports.

Additionally, the Discipline Consent Order identifies a conflict diversion program as an alternative to exclusionary discipline that is designed to address the underlying factors that lead to negative behavior. Record Document 211-4 at 11. The District created a program, but only about ten students have participated in it since its inception during the 2018-2019 school year. Thus, this program is not being used as a real alternative to exclusionary discipline. Wiltz blames the low participation on the hesitance of parents to permit students to participate. Faced with this reality, however, the District has not conducted any formal surveys to determine why parents are not participating in the conflict resolution program, nor has the District developed an alternative that would not require parental involvement. In essence, the District took no action to improve the conflict diversion program as an alternative to exclusionary discipline, even though the program is designed to address issues such as fights, which the evidence shows is a behavior contributing to the use of exclusionary discipline in the District.

The District has also failed to comply with the Discipline Consent Order because it has failed to implement PBIS with fidelity. The District chose to adopt this plan as a means of reaching the goals of the Discipline Consent Order. Successful implementation of this system of support relies on data-based decision-making. Data-based decision-making involves critical analysis of data to determine whether different strategies demonstrate success in meeting goals and whether adjustments are necessary to ensure improvement if goals are not being met. As testified to by Dr. Gregory, the District has not critically analyzed the data available to it. *See supra* Section VII.B.7.

The District's results also demonstrate that it is not implementing the plan with fidelity. The Court is persuaded by Dr. Gregory's testimony that a key indicator that PBIS is being implemented with fidelity at Tier 1 is a reduction in office referrals. Yet, the District's data shows that it is maintaining high rates of office discipline referrals: 1,473 office referrals were issued to Black students in 2015-2016 compared to 1,468 in 2018-2019. The District has not provided evidence of its use of Tier 2 and Tier 3 interventions, besides the documented non-punitive behavior supports. However, the percentage of Black students receiving documented non-punitive supports is far below the percentages of students who should be receiving supports in a properly implemented Tier 2 and Tier 3 intervention program—between 5% and 10% of students should receive Tier 2 supports and between 1% and 5% should receive Tier 3 supports. Yet, for the 2018-2019 school year, less than 3% of Black students received any documented non-punitive behavioral supports. Thus, the Court does not have the evidence it needs to conclude that the District is implementing Tier 2 and Tier 3 supports in a meaningful way.

In addition to failing to show good-faith compliance with the Discipline Consent Decree, the District has failed to eliminate the ongoing vestiges of *de jure* desegregation to the extent practicable. In 2015, Dr. Gregory conducted a statistical analysis of discipline data and concluded that the observed racial disparities in discipline are not attributable to factors such as socioeconomic status, gender, school, or grade-levels of students. The disparities were attributable to race. Such statistical analyses have been accepted in other circuits to identify the vestiges of discrimination in a school system. *See, e.g., Jenkins v. Missouri*, 122 F.3d 588, 598 (8th Cir. 1997); *United States v. Yonkers Bd. of Educ.*, 123 F. Supp. 2d 694, 709 (S.D.N.Y. 2000); *Vaughns v. Bd. of Educ. of Prince George's Cnty.*, 18 F. Supp. 2d 569, 591 (D. Md. 1998). Since that time, the disparities in four of the five tracked categories of discipline have *increased*, even if only slightly. This data shows both a lack of "continuous progress" as defined by the Discipline Consent Order, but also that the District has not eliminated or reduced the ongoing vestiges of *de jure* segregation to the extent practicable.

For these reasons, the Court denies the District's motion for unitary status as to quality of education (discipline) under the traditional analysis applied to all other factors under consideration. Even if the Court were to apply the *Tasby* burden, the Court would reach the same result. In *Tasby*, the parents argued that their statistical evidence showing disproportionate punishment of Black students and prior judicial findings of racially discriminatory enforcement of disciplinary procedures "combine to establish a prima facie case [of racial discrimination] against the school district." *Tasby*, 643 F.2d at 1107. The Fifth Circuit sorted the statistical evidence into three categories: 1) evidence that Black

students were disciplined more frequently than white and Mexican-American students; 2) evidence that Black students receive a disproportionately higher share of the "most extreme" disciplinary measures; and 3) evidence that the disparities between white and Black students' disciplinary outcomes was most acute in schools where there was the most difference between the percentage of white teachers and Black students. *Id.* Faced with this, the Fifth Circuit held that "no inference of discriminatory intent is warranted from the facts presented." *Id.* at 1108. The court found that the statistical evidence "fails to account for the many variables at work in the process of disciplining children." *Id.* In a footnote, the court suggested that evidence that Black students received more severe punishments than white students for the same disciplinary offenses when all other factors were virtually equal could satisfy the burden. *Id.* at 1107 n.1.

The statistical analysis presented by Dr. Gregory is more detailed than that before the court in *Tasby* and, therefore, allows the Court to conclude that the observed racial disparities are in fact a function of race, not other factors such as gender, socioeconomic status, school, or grade-level. Further, regression analyses, which control for multiple variables, have been held to "support an inference of motive for disparate treatment" in other areas of law. *See, e.g., Tyler v. Union Oil Co. of Ca.*, 304 F.3d 379, 392 (5th Cir. 2002) (accepting a regression analysis as proof of age discrimination); *Siler-Khodr v. Univ. of Tex. Health Sci. Ctr. San Antonio*, 261 F.3d 542, 546-47 (5th Cir. 2001) (relying on a regression analysis to show sex discrimination). Thus, the Court likewise accepts Dr. Gregory's analysis as evidence that the disparities are a product of racial discrimination, not other social ills or variables. Also persuasive to the Court is the testimony of the Black

teacher who personally observed the disparate treatment of Black students and the simple statement by Wiltz—the District's Child Welfare and Attendance Officer—that Black students present more behavioral problems than do white students.

In sum, the Court concludes that the District has failed to comply with the Discipline Consent Order in good faith, that the District has failed to eliminate the vestiges of discrimination in the area of discipline, and that, if required, Plaintiffs have met their burden of proof under *Tasby*. As such, the District's motion for unitary status as to quality of education (discipline) [Record Document 365] is **DENIED**. The Court now addresses Plaintiffs' motion for further relief.

## VIII.  Further Relief—Quality of Education—Discipline

### A.  Relief Requested

Plaintiffs request that the Court reissue the requirements that the District show "continuous progress" as defined in the Discipline Consent Order over three years by reducing racial disparities in office referrals, ISS, OSS, and lost instructional days on an annual basis. Record Document 416 at 42. They seek a Court order requiring the District to closely track office discipline referrals to critically assess any racial disparities and, where appropriate, identify and address any potential teachers who are the source of the disparities. *Id.* They ask that the Court order the District to offer training focused on race and ethnicity bias and its impact on discretionary discipline. *Id.* at 43. They seek an order that the District clarify policies and procedures related to prevention strategies, delivery of behavioral supports, and alternatives to suspension, and an order that the District take additional steps to implement the PBIS framework and associated practices consistently.

*Id.* They ask that the District's monitoring focus on ensuring a positive climate in the schools, and includes surveying teachers about equitable administration of discipline, clarification of culturally responsive PBIS procedures, and documenting the implementation with fidelity to ensure data-based, race-conscious decision-making. *Id.* Finally, they seek an order that the District fully implement non-exclusionary discipline alternatives, like the conflict diversion program, across all schools. *Id.* at 43-44. This would require the training of school officials in this program and an extensive analysis of why this program has not had full participation in the past. *Id.* The United States proposes no remedial measures. Record Document 414.

### B. Expert Recommendations

Dr. Gregory recommended that the District continue the efforts in the Discipline Consent Order, but strengthen them. 3/22/21 Rough Tr. 121:6-10 (Gregory). She recommended that the District strengthen educators' capacity to prevent disciplinary interactions and that the District take steps to clarify its PBIS procedures, strengthen its implementation, and improve documentation of implementation. *Id.* at 121:10-17. She suggested that the schools focus on "iterative improvement and continual reflection" using their data—they should use their ability to collect and track data to evaluate who is using certain discipline programs and determine whether the disciplinary actions or behavioral supports are effective. *Id.* at 122:3-10, 151:17-21.

For training, Dr. Gregory emphasized the importance of doing more than simple workshop trainings. To be successful, the literature shows that educators need implementation supports like coaching, demonstration, and feedback from mentors. *Id.*

at 126:8-20. She recommended that the District ensure that training includes cultural responsiveness professional development. *Id.* at 126:20-22. Bias awareness training would help reduce the flow of students into the discipline system by building trusting relationships, engagement, de-escalation skills, "cultural confidence," and educating teachers about how bias factors into moments of discretion in discipline. *Id.* at 126:22-127:7.

Dr. Gregory also made recommendations about how the District could improve its existing conflict diversion program. First, she recommended the District review the program to evaluate how well it is being implemented. *Id.* at 137:5-7. She recommended that the District engage in strategic communication with families to increase family participation in the diversion program in the District. *Id.* at 137:9-11. She recommended that the District start following up with students who have completed the program to ascertain if they need additional supports. *Id.* at 137:7-9. Dr. Gregory opined that getting buy-in from staff, students, and families is key to a successful program. *Id.* at 128:7-10. She explained that when there is buy-in from students, students will self-refer to the program and raise issues with a trusted adult before they develop into bigger conflicts. *Id.* at 137:15-18. The culture in the school is important—it should be a norm for students to participate and reach out to a trusted adult. *Id.* at 137:19-138:9. She explained that students who have participated in this type of program, when it is well-run, are less likely to later enter the discipline system. *Id.* at 127:21-128:4.

Specifically related to PBIS, Dr. Gregory recommended that the District update its Discipline Handbook, which currently only vaguely mentions PBIS. *Id.* at 143:13-21. She

opined that the Handbook should include clear policies for what kind of corrective strategies are to be used, when they are to be used, and the procedures for doing so. *Id.*

## C. Further Relief

Having found that the District has not complied with the current Discipline Consent Order and that, as implemented, the measures currently in place have not been effective at eliminating the ongoing vestiges of discrimination to the extent practicable, the Court finds that further relief is warranted and Plaintiffs' motion for further relief [Record Document 374] is **GRANTED as stated herein**.

Based on the evidence presented at the hearing and the opinions and recommendations of Dr. Gregory, the Court concludes that all measures suggested by Plaintiffs are reasonable and practicable. The measures are directly responsive to issues identified at the hearing. For example, the District's current Discipline Plan contains a long list of behaviors that can result in exclusionary discipline beyond safety-threatening offenses. Thus, the District permits the issuance of OSS for many different student infractions unrelated to dangerous, criminal, or violent behavior. Revising these polices is a reasonable measure that is practicable to help the District reduce its use of exclusionary discipline.

While the District provided its faculty and staff with the four hours of mandatory training with a qualified consultant as required by the Discipline Consent Order, the evidence at the hearing showed that the training did not cover all topics listed in the Discipline Consent Order. Therefore, ordering additional training that covers these topics and incorporates Dr. Gregory's suggestions is a reasonable and practicable measure. The

topics specifically requested by Plaintiffs, race and ethnicity bias and its impact on discretionary discipline, are in line with those recommended by Dr. Gregory as likely to be effective at producing results.

As a final example, the evidence shows that while the District has attempted to implement a conflict diversion program, it has not been successful, in part because it has not had buy-in from parents and students in the District. Dr. Gregory explained that when successful, these programs become part of the ethos of a school and students will voluntarily participate in the program before conflicts escalate. Given Wiltz's testimony about the District having problems with conflicts between students that are remaining unknown to the District until they escalate into a fight for which the District must issue exclusionary disciplinary consequences, the Court concludes that making a concerted effort to successfully implement programs such as the conflict diversion program is a reasonable and practicable measure.

The parties are **ORDERED** to devise a detailed plan to implement the aforementioned relief requested by the Plaintiffs. *See supra* Section VIII.A. *See also* Record Document 416 at 42-44. The District shall work in good faith with the Plaintiff-Parties to implement this remedial order. The parties shall propose a new consent order. The Court reserves all further orders of affirmative relief until such time as the parties propose a new consent order. All provisions of the current Discipline Consent Order not inconsistent with this order shall remain in effect until a new consent order is issued. The Court shall retain jurisdiction over the area of quality of education (discipline) for **at least three years** to monitor the District's compliance with this order. *See Moore*, 921 F.3d at

547 (noting that three years is the typical monitoring period for a new desegregation plan).

## IX. Unitary Status—Quality of Education—Academics

### A. Requirements of the Superseding Consent Order

The portion of the Superseding Consent Order dedicated to quality of education (academics) ("Academics Consent Order") was intended to ensure that the "District provides equal educational opportunities to its students by collecting, tracking, and analyzing its course assignments, graduation rates, and in-grade retention rates with an eye toward addressing racial disparities in those areas." Record Document 211-4 at 8. As such, it included remedial measures related to academics in the areas of 1) course assignment, 2) graduation rates, and 3) in-grade retention. *Id.* at 20-25. Course assignment further breaks down into the categories of program assignment, admissions criteria, and graduation pathways. *Id.* at 20-22. Because the parties do not dispute that the District has complied with the requirements related to program assignment and admissions criteria, Record Document 393 ¶s 7-8, the Court does not address requirements related to these areas. Graduation pathways refers to the state-mandated types of diplomas a high school student in Louisiana can earn. Currently, students in grade 10 choose a curriculum pathway for graduation: either a course of study which will lead to a college eligible diploma (called a "TOPS University" diploma) or a course of study which will lead to a career diploma (called a "Jump Start" diploma). [57]

---

[57] At the time the Academics Consent Order was adopted, high schools in the state of Louisiana issued different types of high school diplomas. Record Document 211-4 at 21 n.24. These two types were 1) a Career diploma and 2) a College and Career diploma,

Related to graduation pathways, the Academics Consent Order mandates that the "Board shall take steps to eliminate and avoid, to the extent practicable, racial disparities in all diploma programs District-wide and to increase Black student enrollment in the most academically rigorous and college preparatory diploma programs in its secondary schools." Record Document 211-4 at 21. To reduce racial disparities in diploma programs, the District agreed to review its criteria for recommending that students seek each type of diploma and its practices associated with recommending students for diploma pathways to identify modifications that could reduce the underrepresentation of Black students in college preparatory diploma programs. *Id.* at 22. The District agreed to advertise the different pathways, at a minimum, by holding preregistration meetings with parents and students in grades 8 to 12 to explain course offerings and diploma requirements, sending home packets containing this information, and asking parents to return a form stating that they have received and reviewed the information. *Id.* The District agreed to design a plan to "ensure all parents and students are well informed about all the diploma tracks," to "attract and recruit Black students to seek" a TOPS University diploma, and to "retain Black students on the path to attaining" TOPS University diplomas. *Id.* at 22-23.

For graduation rates, the District was required to "take steps to eliminate and avoid, to the extent practicable, racial disparities in graduation rates in its secondary

which further included two possible courses of study. *Id.* In the intervening years, the State of Louisiana changed the diploma types to those described above. The Jump Start diploma is best comparable to a Career diploma, and a TOPS University diploma is best comparable to a College and Career diploma. 3/32/21 Rough Tr. 58:19-59:4, 66:18-67:8 (Balfanz). This ruling will refer only to the diploma types by their current names.

schools." *Id.* at 23. The Academics Consent Order defined a racial disparity to be a "more than 5 percentage (5%) point difference between the cohort graduation rates for Black and White students." *Id.* at 23. The District was required to annually calculate and report the "number and percentage of high school graduates/dropouts using the cohort survival rate by school, by type of diploma granted, and by race" and the "district-wide high school graduation/dropouts by type of diploma granted and by race." *Id.* Reports were also to include steps the District took to address disparities in the previous years and proposals for the next school year. *Id.* at 24.

For in-grade retention rates, the District was required to "take steps to eliminate, to the extent practicable, racial disparities within in-grade retention rates in all schools." *Id.* at 24. A disparity in in-grade retention rates was "defined as a variance of more than 5 percentage (5%) points, in (1) each school's in-grade retention rates; (2) Grade-Bands' in-grade retention rates; and (3) district-wide total in-grade retention rates." *Id.* Like graduation rates, the District had various reporting obligations, and these included reporting the steps taken to address disparities. *Id.*

"Progress" is defined in the Academics Consent Order "as (1) increasing the proportion of all ninth Grade students who graduate from high school within four years, (2) increasing total numbers of students graduating from high school, and (3) reducing intra-race and between-school variances for in-grade retention, graduations/dropouts and type of diplomas granted." *Id.* at 19.

### B. Facts

#### 1. Data—Graduation Pathways

As explained above, pursuant to the state requirements, the District offers two types of high school diplomas. The TOPS University diplomas ("TOPS diploma") are the college preparatory degrees needed to apply to the state university system. 3/23/21 Rough Tr. 53:1-11 (Balfanz). To graduate with a TOPS diploma, students are required to enroll in and pass the courses in the TOPS pathway. *Id.* A Jump Start diploma, in contrast, is a "career ready" diploma. 3/26/21 Rough Tr. 207:17-24 (Dalcourt). To graduate with a Jump Start diploma, a student takes courses designed to prepare for a vocational occupation, but the Jump Start diploma does not contain all the requirements for admission to a four-year Louisiana state college or university. 3/23/21 Rough Tr 53:18-22, 54:5-9 (Balfanz). If a graduate with a Jump Start diploma desires to enroll in a four-year state college or university, he or she would first need to attend a community college to obtain the requisite college preparatory courses and then apply to a college or university for the last two years. *Id.* at 57:21-58:9.

Because the State of Louisiana changed to this diploma program after entry of the Academics Consent Order, the Court only has three years of data before it to review. 3/23/21 Rough Tr. 66:8-67:3 (Balfanz). Additionally, data for the 2019-2020 school year may be somewhat skewed by a one-year change in how the District allowed students to complete their diplomas because of the COVID-19 pandemic.[58] 3/26/21 Rough Tr.

---

[58] Simply put, the District expanded opportunities for students to both graduate and to complete the coursework needed to advance grades on schedule. 3/26/21 Rough Tr. 224:11-226:1 (Dalcourt).

224:11-226:1 (Dalcourt). However, the Court will still consider this data, especially because students must select their diploma pathway in grade 10 and there are significant barriers to changing from a TOPS diploma to a Jump Start diploma. *Id.* at 209:1-8 (explaining that if a student waits until after grade 11 to switch between diploma pathways, he or she will likely not graduate on time). Thus, even if more students graduated at the end of the 2019-2020 school year, the type of diploma the student earned is unlikely to have been impacted because the Court is assuming that the choice of diploma had been made about two years before the pandemic's disruptions.

The Academics Consent Order was silent as to the variance standard by which the District's success would be judged. However, Plaintiffs and the District have agreed to adopt the 5 percentage point variance used in the other areas for academic achievement. Record Documents 415 at 35 and 416 at 36. In every year under review, there were disparities greater than 5 percentage points in each high school. District-wide, the disparity was never less than 7 percentage points.

**Percent of Cohort Earning TOPS University Diploma**

|  | 2017-2018 | 2018-2019 | 2019-2020 |
|---|---|---|---|
| **BBHS** |  |  |  |
| Black | 35% (40) | 40% (38) | 54% (62) |
| White | 47% (55) | 58% (60) | 64% (72) |
| *Variance* | -12 | -18 | -10 |
|  |  |  |  |
| **CHS** |  |  |  |
| Black | 46% (36) | 49% (30) | 65% (34) |
| White | 52% (74) | 55% (72) | 55% (51) |
| *Variance* | -6 | -6 | +10 |
|  |  |  |  |
| **SMHS** |  |  |  |
| Black | 35% (43) | 39% (41) | 32% (34) |
| White | 41% (29) | 28% (23) | 46% (29) |
| *Variance* | -6 | +11 | -14 |
|  |  |  |  |
| **Total** |  |  |  |
| Black | 38% (119) | 42% (109) | 48% (130) |
| White | 48% (158) | 49% (155) | 57% (152) |
| *Variance* | -10 | -7 | -9 |

Record Document 400-6. At Breaux Bridge High ("BBHS"), Black students earned a TOPS degree anywhere from 10 percentage points to 18 percentage points less than white students. *Id.* At Cecilia High ("CHS"), Black students earned a TOPS degree at a rate 6 percentage points below white students in the 2017-2018 and 2018-2019 school years, but in the 2019-2020 school year, this changed drastically, and Black students earned a TOPS degree at a rate of 10 percentage points more than white students. *Id.* St. Martinville Senior High ("SMHS") similarly experienced drastic swings in the data from year-to-year. *Id.* In the 2017-2018 school year, Black students graduated with TOPS diplomas 6 percentage points below the rate at which white students earned a TOPS diploma. *Id.* In the 2018-2019 school year, the variance reversed—Black students earned

a TOPS degree at a rate of 11 percentage points higher than white students. *Id.* In the 2019-2020 school year, this data reversed again, and Black students earned a TOPS degree at a rate of 14 percentage points lower than white students at SMHS. *Id.*

About 39% (366 of 929) of the District's Black high school students attend SMHS and about 38% (357 of 929) of the District's Black high school students attend BBHS. Record Document 409-1. The remaining 22% of Black high school students (206 of 929) attend CHS, which also has 43% of the District's white high school students—the largest percentage of white high school students in the District (452 of 1,052). *Id.* But the percentage of Black students enrolled in the TOPS pathway at SMHS and BBHS has consistently been below Black enrollment in the TOPS pathway at CHS. Record Document 400-17 at 2. In 2018-2019, for example, 49% of Black graduates of CHS earned TOPS degrees, but only 39% of Black students graduating from SMHS and 40% of Black students graduating from BBHS earned TOPS degrees. *Id.* The differences between Black enrollment in the TOPS pathway at CHS and the other two high schools slightly exceeded these 10 percentage point gaps in 2017-2018 and were even greater in 2019-2020. *Id.*

### 2. The District's Actions—Graduation Pathways

As required by the State, counselors and principals meet with students starting in grade 8 to get them initially scheduled for high school, discuss graduation pathways, create a five-year graduation plan, and provide other related information. 3/26/21 Rough Tr. 208:10-209:8 (Dalcourt). Once in high school, students and parents have multiple meetings with District officials regarding graduation, and information packets are sent home to parents. *Id.* at 204: 12-14, 208:10-209:25. At the end of a student's grade 10

year, the student must select a graduation pathway. *Id.* at 208:24-209:1. A parent is required to approve the decision. *Id.* at 208:10-209:8; 4/16/21 Rough Tr. 190:23-191:7 (Blanchard).

Kevin Dugas, the principal of SMHS, testified about how his school shares information about the graduation pathways. As principal, Dugas played a role in drafting the school's graduation plan created pursuant to the Academics Consent Order. Record Document 400-16 at 7; 3/24/21 Rough Tr. 128:11-15 (Dugas). Under this plan, school faculty meets with students and parents to help them make informed decisions about graduation pathways. Record Document 400-16 at 7; 3/24/21 Rough Tr. 130:2-5 (Dugas). At the meetings, SMHS staff discuss the requirements of each diploma pathway with the student and their families. 3/24/21 Rough Tr. 130:17-20 (Dugas). Counselors begin by talking about the TOPS diploma, but do not recruit or heavily encourage students to pursue that path over the Jump Start diploma pathway. *Id.* at 131:8-14. SMHS takes no action specifically targeted at increasing the number of Black students electing to pursue the TOPS diploma, and it has not been instructed on how to do so by the District. *Id.* at 134:10-20, 138:14-139:4.

The District has not taken the specific steps required by the Consent Order to increase Black students' enrollment in the TOPS pathway. 4/16/21 Rough Tr. 207:11-209:14 (Blanchard). The District has no specific program to eliminate the racial disparities in the TOPS pathway, though Dr. Dalcourt, the District's Director of Curriculum and Instruction, testified that the District has asked the principals to ask their teachers and guidance counselor to "reach out" to Black families and "encourage the students to

participate." *Id.* at 201:15-20; 3/26/21 Rough Tr. 202:16-24 (Dalcourt). The District has not engaged expert assistance to increase the number of Black students attempting to earn a TOPS degree or to retain Black students in that pathway. 4/16/21 Rough Tr. 207:11-15 (Blanchard). Despite the appreciably lower percentage of Black students in the TOPS pathway at SMHS and BBHS as compared to CHS, the District has not provided personnel at SMHS and BBHS with any training, guidance, or other resources to increase Black graduates in the TOPS pathway. 3/24/21 Rough Tr. 138:14-139:4 (Dugas); 3/26/21 Rough Tr. 205:13-24 (Dalcourt); 4/16/21 Rough Tr. 206:22-25 (Blanchard).

While individual teachers may encourage specific students to pursue a certain pathway when they see potential in that child, the District does not have a formal program in place to identify students that would do well in classes required for a TOPS diploma. 4/16/21 Rough Tr. 193:11-14, 205:11-206:14 (Blanchard). Similarly, guidance counselors direct students to enroll in the TOPS pathway based on the counselors' belief about the student's aptitude or the student's ability to succeed in the TOPS pathway. 4/16/21 Rough Tr. 201:21-202:2, 204:15-20 (Blanchard). The District does not provide any trainings or consistent direction to counselors to address racial disparities or ensure that more Black students are enrolling in the TOPS pathway. *Id. at* 202:11-203:23.

The District does not train teachers or counselors on how to talk about TOPS diplomas with students and parents generally, and it does not provide a script for those conversations. *Id.* at 202:11-203:2; 3/26/21 Rough Tr. 203:1-8, 204:22-205:12 (Dalcourt). Dr. Dalcourt does review the PowerPoint presentations used at each school when talking to families about the diplomas to ensure the presentations are not

discouraging students from pursuing a TOPS degree. 4/16/21 Rough Tr. 199:2-10 (Blanchard); 3/26/21 Rough Tr. 203:12-25 (Dalcourt). In one instance, Dr. Dalcourt intervened to stop counselors from telling students that a course was too difficult. 3/26/21 Rough Tr. 206:10-13 (Dalcourt).

The District has established a career center where students pursuing a Jump Start degree can come to take higher level courses that earn dual enrollment credits toward a technical degree. 4/16/21 Rough Tr. 194:20-195:12 (Blanchard). The District also partners with local businesses to provide students with internships and, possibly, post-graduate employment. *Id.* at 196:14-197:4.

### 3. Data—Graduation Rates

For the last two school years, no high school in the District has had a variance of greater than 5 percentage points between the graduation rate of Black and white students. Record Document 400-5. Thus, for the 2018-2019 and 2019-2020 school years, there was no disparity in graduation rates as defined by the Academics Consent Order.[59]

---

[59] As previously mentioned, 2019-2020 school year data was impacted by the COVID-19 pandemic. *See supra* p. 138 and note 58. Because of this, the 2019-2020 school year data is not a wholly even comparison with earlier years.

**High School Graduation Rates by High School**

| | 2016-2017 | 2017-2018 | 2018-2019 | 2019-2020 |
|---|---|---|---|---|
| **BBHS** | | | | |
| Black | 84% (58) | 72% (83) | 83% (79) | 88% (100) |
| White | 83% (114) | 78% (91) | 85% (88) | 91% (103) |
| *Variance* | +1 | -6 | -2 | -3 |
| | | | | |
| **CHS** | | | | |
| Black | 94% (46) | 83% (65) | 89% (54) | 98% (51) |
| White | 93% (98) | 77% (109) | 90% (119) | 99% (92) |
| *Variance* | +1 | +6 | -1 | -1 |
| | | | | |
| **SMHS** | | | | |
| Black | 87% (94) | 80% (99) | 74% (78) | 89% (93) |
| White | 81% (50) | 81% (57) | 78% (63) | 87% (55) |
| *Variance* | +6 | -1 | -4 | +2 |
| | | | | |
| **Total** | | | | |
| Black | 88% (198) | 78% (247) | 81% (211) | 90% (244) |
| White | 86% (262) | 78% (257) | 85% (270) | 93% (250) |
| *Variance* | +2 | 0 | -4 | -3 |

Record Document 400-5. During the 2017-2018 school year, variances at two schools exceeded 5 percentage points—at CHS, Black students graduated at a rate of 6 percentage points higher than white students, and at BBHS, white students graduated at a rate of 6 percentage points higher than Black students. *Id.* In the 2016-2017 school year, there was a 6 percentage point variance in graduation rates, with more Black students graduating that year. *Id.* District-wide, there has not been a variance greater than 5 percentage points during the period of supervision. *Id.*

### 4. Data—In-Grade Retention Rates

By the end of the 2019-2020 school year, there were no disparities District-wide or in each school's in-grade retention rates.[60] Record Document 400-4. Even in the 2018-2019 school year, only a single school, BBHS, had a defined disparity. *Id.* At BBHS, there was a 5.53 percentage point variation, with 8.59% of Black students retained and 3.06% of white students retained. *Id.* at 3. Similarly, in the 2017-2018 school year, one school, Breaux Bridge Junior High, had a disparity, but it was because more white students were retained than Black students. *Id.* at 2.

From the 2015-2016 school year through the 2019-2020 school year, the overall elementary-level in-grade retention rates never varied by greater than 5 percentage points. *Id.* at 1. The only elementary school to have a variance greater than 5 percentage points more than once during the period of supervision is Teche Elementary. *Id.* At Teche Elementary, Black students were retained in-grade at a rate 5.15 percentage points higher than white students in the 2015-2016 school year and 8.71 percentage points higher in the 2016-2017 school year. *Id.* However, by the 2017-2018 school year, the variance dropped to .71 percentage points, and has since remained in compliance with the goal. *Id.*

Similarly, the variances at the junior high and high school grade bands have never exceeded the 5 percentage point variance. *Id.* at 2. At these grade bands, no school was

---

[60] Once again, the COVID-19 pandemic likely impacted this data by decreasing the number of students retained.

out of compliance for more than one school year, and only two schools were out of compliance for even one year. *Id.* at 1-2.

### 5. The District's Actions—Graduation Rates and In-Grade Retention

To reach the Academic Consent Order's goals related to graduation rates and in-grade retention rates, the District chose to use a Response to Intervention ("RTI") process. 3/26/21 Rough Tr. 191:5-8 (Dalcourt). This program, like PBIS, is a tiered intervention program. *Id.* at 190:9-20. Basically, the program requires that a school closely monitor every student on key indicators of success in school: attendance, behavior, and course performance. 3/23/21 Rough Tr. 16:14-23 (Balfanz). Like PBIS, Tier 1 interventions are a schoolwide or gradewide prevention strategy; Tier 2 is used when there is a small group of students with a similar problem or challenge for which it is more efficient to handle as a group rather than with each student individually; and Tier 3 is very customized, often individual or very small group, solutions to address significant challenges that need to be dealt with acutely. *Id.* at 87:5-88:9.

When executed properly, a school will design an intervention when it observes a student starting to slip in any of the target areas; for example, if a student starts attending school less often, starts to get in trouble, or is struggling in classwork. *Id.* at 16:20-23. Typically, interventions are monitored to observe if they work; if they do not work, the school must repeat the process with a new evidence-based strategy in an iterative process until the school finds something that does work. *Id.* at 16:23-17:3.

The District has an overall plan and each school has its own version. 3/26/21 Rough Tr. 186:11-14 (Dalcourt). The District's use of RTI pre-dates its entry into the

Academics Consent Order. *Id.* at 187:13-17. The contours of the plan have remained nearly identical since entry of the Academics Consent Order, but the interventions used have not because the District modifies the interventions as the research changes regarding which interventions will be effective. *Id.* at 188:2-6. The District identifies students needing additional supports using a universal screening assessment or standardized tests for grade levels that do not have universal screening assessments available. *Id.* at 190:9-191:4. Dr. Dalcourt described RTI interventions used for issues such as absenteeism, but admitted that she was not sure whether these interventions were documented as required by Academics Consent Order. *Id.* at 226:10-25. While each school is individually responsible for implementing its own plan, the District monitors the schools and meets with school administrators when their plans are not having the desired effect. *Id.* at 193:3-8.

### 6. Expert Testimony

The District presented no expert testimony in the area of academics. The Court heard testimony from Plaintiffs' expert, Dr. Robert Balfanz. Dr. Balfanz earned an undergraduate degree from Johns Hopkins University, a Ph.D. in education from the University of Chicago, and is currently a professor in the School of Education at Johns Hopkins University. Record Document 400-19 at 1. Dr. Balfanz's work centers around school dropout prevention, increasing high school graduation rates, improving college readiness, and strategies for closing academic and graduation gaps for low income students and students with disabilities. 3/23/21 Rough Tr. 8:14-22 (Balfanz). He has worked directly with school districts in states such as Louisiana, Mississippi, and Alabama

to identify reasons students are not graduating and to develop and test strategies for increasing graduation rates. *Id.* at 8:25-9:18. Dr. Balfanz testified credibly regarding graduation rates, in-grade retention, and graduation pathways.

Dr. Balfanz reviewed the District's in-grade retention reports, annual graduation rate reports, and data regarding which type of diploma students earned at graduation. *Id.* at 13:12-24. He focused on data for the 2016-2017, 2017-2018, and 2018-2019 school years because these years had comparable data. *Id.* at 14:15-19. From this data, he concluded that the overall academic success of Black students in the District had declined by the 2018-2019 school year and gaps between Black student and white student achievement persisted. *Id.* at 15:19-16:8. For example, in the 2018-2019 school year, Black high school students were nearly twice as likely to be retained District-wide as white students. *Id.* at 30:23-31:17. This variance was worse than the baseline year and all the years thereafter. *Id.*

Dr. Balfanz explained that in-grade retention rates are an important marker of academic achievement because they correlate with high-school graduation—if a student is held back a grade, his or her likelihood of graduating high school are greatly reduced. *Id.* at 26:12-27:21. This is especially pronounced for students who fall behind at grade 9. *Id.* at 27:1-13. He opined that graduation rates are a school district's most important educational outcome metric because to find a job paying enough to support a family, a student will almost certainly need a high school diploma. *Id.* at 47:14-48:5.

Dr. Balfanz concluded that the in-grade retention and graduation data for the District reveals patterns inconsistent with the faithful and complete implementation of

RTI. *Id.* at 17:22-18:1. He explained that if RTI was well implemented and executed, the data would broadly show steady progress and eventually accelerating progress after three to five years. *Id.* at 18:5-8; 101:14-102:5. However, the District's data reveals variability and an up-and-down trajectory, with the outcomes for Black students and racial variances being consistently worse across school levels and in the District-wide figures during the three-year period after the Academics Consent Order was put into place. *Id.* at 17:22-18, 41:1-6, 76:13-77:11. Significantly, though, these variances were almost exclusively occurring within the 5 percentage point variance—meaning even with these fluctuations, schools were in compliance with the goal set by the Academic Consent Order.

In his review of the District and school plans, Dr. Balfanz observed that the plans omit key details and show inconsistencies in what the schools focus on year-to-year. *Id.* at 16:3-18:10. For example, in the 2018-2019 report BBHS describes poor student attendance as a reason for increases in in-grade retention rather than a problem to be solved through the RTI process. *Id.* at 18:11-19:14. As an example of data-based decision-making, if RTI is fully and faithfully implemented, a school would provide a list of strategies that it attempted to try to improve attendance and it would not conclude that poor attendance is beyond the school's control. 3/23/21 Rough Tr. 32:2-15, 84:18-86:9 (Balfanz).

Overall, he explained that when implemented fully and faithfully, RTI data and reporting can be expected to shed light on what strategies have worked, what struggles schools have encountered, what efforts are being made to ascertain why a strategy did not work, and reasons why disparities or retention rates increased. *Id.* at 126:12-18. The

District's RTI plans and reporting, however, do not show that the District has attempted interventions in the various tiers or addressed obstacles faced by students to determine how to help students improve. *Id.* at 17:4-21, 126:18-25.

Dr. Balfanz also addressed graduation pathways. He explained that having students earn a TOPS diploma is the "full opportunity" degree because with a TOPS diploma, a student can choose to go directly to a four-year university, choose to go to a community college, or choose to go get a technical degree. *Id.* at 70:3-9. Students earning a Jump Start degree ultimately have the same opportunities, but going to a four-year university requires additional steps after high school graduation, like attending community college to earn the necessary prerequisites for a four-year school. *Id.* at 70:7-18. He emphasized that students are making diploma pathway decisions in grade 10, when they are often too young to have a full understanding of what is best for their future, and therefore diplomas that offer students the most opportunities are valuable. *Id.* at 70:11-23.

Dr. Balfanz opined that to achieve equitable outcomes in graduation pathways, school districts need to do more than give families information and let them make their own decision. *Id.* at 62:5-9.They have to "campaign" for the college preparatory degrees. *Id.* This involves making sure parents understand how the job market has changed and connecting families with people who have had similar life experiences that can speak about the available options. *Id.* at 62:5-63:1. For districts experiencing disparities, the solutions go as far back as middle school, where districts can start making sure students are taking the classes needed to be eligible for the classes they will need to earn a diploma

like a TOPS diploma. *Id.* at 63:5-19. This includes making sure students feel welcome and supported in the classes. *Id.* at 72:1-18.

From the District's data, Dr. Balfanz observed that both Black and white students were earning TOPS diplomas at a higher rate at the end of the supervision period, but the racial disparity persists. *Id.* at 67:20-68:2. He opined that the District was not making the sort of sustained efforts necessary to reduce disparities in graduation pathways. *Id.* at 73: 10-12, 91:1-4. He observed that the District's main effort was making sure students and parents were notified of deadlines for decisions, and he did not consider this to be the information needed to be "well informed" about the pathway decision. *Id.* at 73:10-18, 90:22-25. He lauded the District for allowing students to take courses necessary for a college preparatory degree without admission requirements. *Id.* at 73:24-74:5.

## C. The Board is Entitled to Unitary Status as to Graduation Rates and In-Grade Retention

The Court concludes that the District is entitled to unitary status in the areas of graduation rates and in-grade retention. In both areas, the District has demonstrated its good-faith compliance with the Academics Consent Order and has, to the extent practicable, eliminated the vestiges of prior *de jure* segregation.

The Court turns first to graduation rates. With respect to graduation rates, the Board was required to take steps to eliminate, to the extent practicable, racial disparities in graduation rates, which is defined as a variance of more than 5 percentage points for each high school and also District-wide. Record Document 211-4 at 23. With a few minor exceptions, the District has successfully accomplished this. In the last four years, only one high school (BBHS in 2017-2018) has had a slight variance where white students

graduated at a rate of 6 percentage points over Black students. Any other variances in the last four years favored Black students. Thus, the District has complied in good faith with the Academics Consent Order's mandate that it reduce racial disparities to less than a 5 percentage point variance. That the District has done this is also evidence that it has eliminated, to the extent practicable, the vestiges of prior *de jure* segregation in this area.

The Board has also carried its burden of showing that it eliminated, to the extent practicable, disparities that existed in the baseline year for in-grade retention rates with respect to retention in (1) each school; (2) each grade band; and (3) District-wide. Record Document 211-4 at 24-25. Similar to graduation rates, a disparity for in-grade retention is defined as a variance of more than 5 percentage points. *Id.* at 23. The data clearly showed no disparities for in-grade retention by the end of the 2019-2020 school year, either District-wide or by school. Even in the 2018-2019 school year, only a single school had a defined disparity, but its variation was only .53 percentage points above the disparity range. In the 2017-2018 school year, the only disparity was because more white students were retained than Black students. Thus, like graduation rates, the District has complied in good faith with the Academics Consent Order's mandate that it reduce racial disparities to less than a 5 percentage point variance. Again, that the District has done this is also evidence that it has eliminated, to the extent practicable, the vestiges of prior *de jure* segregation in this area.

The Court acknowledges that the trends in the areas of in-grade retention and graduation rates have not always been positive and that there is evidence that the District

could be implementing RTI more effectively to make improvements in this area. In fact, the Court encourages the District to make these efforts. However, based on the data before the Court, it concludes that the District has achieved unitary status in the areas in-grade retention rates and graduation rates. The parties stipulated that the District was in compliance with the portion of the Academics Consent Order pertaining to course assignment (except as it relates to graduation pathways), and the Court therefore also concludes that the District has achieved unitary status in this area. Record Document 393 at 2. Therefore, the District's motion for unitary status as to quality of education (academics) [Record Document 365] is **GRANTED in part**. It is **GRANTED** as to in-grade retention rates, graduation rates, and program assignment. For the reasons stated below, it is **DENIED** as to graduation pathways. Because the Court has granted the District's motion for unitary status as to graduation rates and in-grade retention rates, Plaintiffs' motion for further relief in these areas [Record Document 374] is **DENIED**. The Court turns now to graduation pathways.

### D. The Board is Not Entitled to Unitary Status as to Graduation Pathways

As to graduation pathways, the Board was required to "take steps to eliminate and avoid, to the extent practicable, racial disparities in all diploma programs District-wide and to increase Black student enrollment in the most academically rigorous and college preparatory programs in its secondary schools" and agreed to take certain steps related to this goal. Record Document 211-4 at 20-23. The parties are in agreement that the Court should use the same 5 percentage point variance standard applied in the other areas of academics as the standard for determining variance.

The District has not met its burden of showing good-faith compliance with the Academics Consent Order and it has not eliminated the vestiges of prior *de jure* segregation to the extent practicable in this area. While it complied with the basic mandates of the Academics Consent Order's advertising mandates—speaking to families about the decision, sending information packets home to parents, and requiring parent approval of a student's choice—the information shared was largely about the logistics of making a decision, not the implications of the decision and why students should select a TOPS pathway. Additionally, and most importantly, by the District's own admission, it has fully failed to comply with the requirement that it take steps to reduce racial disparities in the number of students selecting the TOPS diploma pathway. Therefore, the Court concludes that the District has not shown good-faith compliance with the Academics Consent Decree in this respect.

Perhaps because of this lack of good-faith compliance, the District has also failed to show that it has eliminated the vestiges of prior *de jure* segregation to the extent practicable in this respect. The racial disparities for each high school have remained at least 7 percentage points District-wide. This is greater than the agreed-upon 5 percentage point variance standard, thus demonstrating that the vestiges of prior *de jure* segregation remain in this area. And because the District has not taken steps to reduce these disparities, the Court cannot conclude that the 7 percentage point variance is a practicable elimination of the prior *de jure* segregation.

The District's motion for unitary status as to graduation pathways [Record Document 365] is **DENIED** in this respect. The Court turns next to Plaintiffs' motion for further relief in this area.

## X.    Further Relief—Quality of Education—Graduation Pathways

### A.  Requested Relief

In the area of graduation pathways, Plaintiffs request that the Court order the District to strengthen its training and monitoring regarding RTI to increase Black students' access to advanced courses and the TOPS diploma track. Record Document 416 at 68. They urge the Court to order that training related to graduation pathways focus on developing supportive classroom environments that will prepare students to succeed in advanced courses. *Id.* Plaintiffs seek an order that the District develop programs to prepare and recruit middle-grade students for advanced high school coursework, support grade 9 students as they transition to high school, and increase mentorship programs and foster positive relationships between students and educators. *Id.* at 69. They also request an order that the District seek technical assistance from the Equity Assistance Center and/or others to develop the aforementioned programs and to devise comprehensive diploma track counseling. *Id.* The United States took no position on this issue. Record Document 414. The District contends that Plaintiffs' proposed remedies are "vague," impracticable, and may take many years to show results. Record Document 417 at 6.

## B. Expert Recommendation

Dr. Balfanz provided recommendations regarding how the District can reduce disparities in the rates of students choosing to pursue a TOPS diploma. He explained that starting at least in in the middle-school grades is crucial to success. 3/23/21 Rough Tr. 96:15-97:3 (Balfanz). Even if students are not explicitly choosing their diploma pathway in middle school, the class choices and experiences in those classes will affect their high school trajectories. *Id.* Using strategies such as RTI intensely for students in grade 9 can also have an impact. *Id.* at 97:6-13. Dr. Balfanz acknowledged that the decision of which pathway a student chooses is ultimately up to students and parents, but also opined that schools could have an impact on this when they effectively "campaign" for the college preparatory degrees. *Id.* at 62:5-9, 119:13-16. As previously mentioned, this involves making sure parents understand the realities of the current job market and providing mentoring opportunities. *Id.* at 62:5-63:1.

## C. Further Relief

Having concluded that the District has not achieved unitary status in regard to one aspect of the quality of education (academics: graduation pathways) factor, the Court finds that further relief is necessary in that area. Plaintiffs' motion for further relief as to quality of education (academics) [Record Document 374] is **GRANTED as stated herein**. The Court finds that the measures suggested by Plaintiffs are reasonable and practicable measures to reduce disparities in diploma pathways. As Dr. Balfanz testified, while the decision of diploma pathway is ultimately up to an individual student, a school

district can take many steps to appropriately influence that decision, such as training those individuals discussing the decision with families in the most effective ways to market the college preparatory degrees or creating mentorship programs. Thus far, the District has not attempted to do any of this.

The parties are **ORDERED** to develop a revised consent order taking into account Plaintiffs' proposed remedies. *See supra* Section X.A. *See also* Record Document 416 at 68-69. When crafting how the parties will measure the success of these additional measures, the parties should consider that even immediate efforts will not show final results for several more years. The District shall work in good faith with the Plaintiff-Parties to implement this remedial order. The Court reserves all further orders of affirmative relief until such time as the parties propose a new consent order. All provisions of the current Academics Consent Order related to graduation pathways not inconsistent with this order shall remain in effect until a new consent order is issued. The Court shall retain jurisdiction over the area of quality of education (academics: graduation pathways) for **at least three years** to monitor the District's compliance with this order. *See Moore*, 921 F.3d at 547 (noting that three years is the typical monitoring period for a new desegregation plan).

## XI.    Conclusion

The length of time that this district has been under supervision weighs heavily on the Court. As the Fifth Circuit pointed out, "[f]ederal supervision of local school systems was intended as a temporary measure to remedy past discrimination." *Thomas*, 756 F.3d

at 387 (quoting *Dowell*, 498 U.S. at 247-48). This supervision, especially since the 2016 Superseding Consent Order, has imposed affirmative obligations on the District which it now perceives as unnecessary. The Court acknowledges that these affirmative obligations are a burden to the District. The Court agrees that neither the law nor society should impose upon a school district the obligation to cure all of our ills. But the elimination of *de jure* racial discrimination is a necessary obligation of any school district and, therefore, the burden imposed is a constitutionally mandated one.

For the reasons stated herein, Defendant's motion for unitary status as to student assignment [Record Document 365] is **DENIED**. Plaintiffs' motion for further relief as to student assignment [Record Document 374] is **GRANTED.** The District is **ORDERED** to close Catahoula Elementary to grades K to 5 beginning in the 2021-2022 school year. The parties are **ORDERED** to craft a plan to implement a robust magnet program at SMP and ELC in line with Dr. Frankenberg's recommendations and a plan to "work in good-faith to agree to a legally adequate student transfer policy to continue the promotion of desegregative student transfers after the end of the Consent Order." The parties shall propose a new consent order by a date to be determined. The Court reserves all further orders of affirmative relief until such time as the parties propose a new consent order. All provisions of the current Student Assignment Consent Order not inconsistent with this order shall remain in effect until a new consent order is issued.

Defendant's motion for unitary status as to faculty assignment [Record Document 338] is **DENIED**. Plaintiffs' motion for further relief as to faculty assignment [Record Document 342] is **GRANTED**. The parties are **ORDERED** to develop a method for the

District to ascertain its Black teacher attrition rates and to develop policies to assist the District in retaining Black teachers. The parties are also **ORDERED** to revise the aspects of the District's Recruitment Plan and Employment Procedures related to recruitment, interview, and hiring procedures. The parties shall propose a new consent order. In crafting measures of success, the parties should consider that a "grow your own" program will not produce a teacher for at least five years. The Court reserves all further orders of affirmative relief until such time as the parties propose a new consent order. All provisions of the current Faculty Consent Order not inconsistent with this order shall remain in effect until a new consent order is issued.

Defendant's motion for unitary status as to quality of education [Record Document 365] is **GRANTED in part** and **DENIED in part**. It is **GRANTED** as to all aspects of quality of education (academics), except for graduation pathways. It is **DENIED** as to graduation pathways. It is **DENIED** as to quality of education (discipline). Plaintiffs' motion for further relief as to quality of education [Record Document 374] is **GRANTED in part** and **DENIED in part**. The motion is **GRANTED** as to discipline and graduation pathways and **DENIED** as to all remaining aspects of quality of education (academics). The parties are **ORDERED** to work together to revise the consent order in this area as detailed in Sections VIII.C and X.C. The Court reserves all further orders of affirmative relief until such time as the parties propose a new consent order. All provisions of the current Superseding Consent Order pertaining to the Quality of Education not inconsistent

with this order shall remain in effect until a new consent order is issued. A status conference is **SET** for **July 27, 2021** at **9:30 a.m.** to address scheduling related to this order. The Court will contact the parties directly to provide call-in information.

      **THUS DONE AND SIGNED** this 21st day of June, 2021.

ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE