# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

THERESA D THOMAS, ET AL.                    CIVIL ACTION NO. 65-11314

VERSUS                                      JUDGE ELIZABETH E. FOOTE

SCHOOL BOARD ST. MARTIN PARISH

## FACULTY ASSIGNMENT AND QUALITY OF EDUCATION MEMORANDUM RULING

This Memorandum Ruling outlines the Court's reasons for the "Faculty Assignment and Quality of Education Remedial Desegregation Order," filed separately in this record. That Order **ADOPTS IN PART** and **DENIES IN PART** both parties' proposals.[1] The Order represents a partial resolution of the remedial stage of this long-pending litigation.[2]

In 1965, Judge Richard Putnam ruled that the St. Martin Parish School Board (the "Board" or "District") continued to operate racially segregated schools in disregard of the law and ordered that the District desegregate its schools. *Thomas v. St. Martin Par. Sch. Bd.*, 245 F. Supp. 601 (W.D. La. 1965). In 1969, Judge Putnam adopted a desegregation plan that required the District to "take affirmative action to disestablish all school segregation and to eliminate the effects of the dual school system."[3] Among other things, the plan forced the District to establish new attendance zones, pair schools, permit desegregative transfers, and adopt nondiscriminatory employment policies.[4] It also required that all educational programs be conducted without regard to race and

---

[1] Record Documents 522 & 523. Any portion of these proposals dealing with student assignment is moot.
[2] A detailed and complete procedural history can be found in *Thomas v. St. Martin Parish School Board*, 879 F. Supp. 2d 535, 537−42 (W.D. La. 2012) and *Thomas v. School Board St. Martin Parish*, 544 F. Supp. 3d 651, 660−63 (W.D. La. 2021).
[3] Record Document 25-3 at 20.
[4] *Id.* at 20−23.

that the District provide remedial education programs to assist students who previously attended segregated schools.[5] In 1974, the case was placed on the Court's inactive docket.[6]

In 2009, the Chief Judge of the Western District of Louisiana determined that the case was not closed and assigned the case to Judge Rebecca Doherty, who asked the parties to brief whether the Court retained jurisdiction in the matter.[7] The case was then reassigned to the undersigned in 2011.[8] In 2012, the Court ruled that it maintained jurisdiction over the matter. *Thomas*, 879 F. Supp. 2d at 552. The Board appealed, and the Fifth Circuit affirmed, mandating that this Court inquire into "whether the vestiges of *de jure* segregation had been eliminated as far as practicable." *Thomas ex rel. D.M.T. v. Sch. Bd. St. Martin Par.*, 756 F.3d 380, 388 (5th Cir. 2014) (quoting *Bd. of Educ. of Okla. City Pub. Sch. v. Dowell*, 498 U.S. 237, 240 (1991)).

Following the Fifth Circuit's directive, this Court began a multi-year process focused solely on that inquiry. The process required that the parties evaluate whether the Board was unitary in the areas of operation known as the "*Green* factors," identified in the United States Supreme Court case *Green v. County School Board*, 391 U.S. 430 (1968). After engaging in extensive discovery and negotiations, the parties entered a series of consent decrees that addressed the various *Green* factors, including, among others, student assignment, faculty assignment, and quality of education. These consent decrees culminated with the entry of a consolidated order entitled the "Superseding Consent Order" in 2016.[9]

The next stage of the litigation began after a period of Court supervision and the filing of motions by the Board to end that supervision and be declared "unitary" in student assignment,[10]

---

[5] *Id.*
[6] Record Document 25-10 at 2−4.
[7] Record Documents 2, 4, 10 & 39.
[8] Record Document 24.
[9] Record Document 211.
[10] Record Document 365.

faculty assignment,[11] and all aspects of quality of education.[12] In response, Plaintiffs and the United States as Intervenor opposed the motions for unitary status. Plaintiffs, for their part, moved for further relief regarding faculty assignment and employment,[13] student assignment, and quality of education.[14] The Court heard six days of evidence on these motions in March and April 2021 and rendered *Thomas*, 544 F. Supp. 3d at 740. That opinion concluded that the Board failed to meet its consent order obligations and failed to desegregate its school system in student assignment, faculty assignment, and quality of education—discipline and graduation pathways. In effectuating that ruling, the Court closed Catahoula Elementary School and ordered the parties to "craft," "devise," and "develop" remedial measures within the parameters of the Court's directive. *Id.* at 707, 727 & 739.[15] All "further orders of affirmative relief" were reserved until the parties presented "a new consent order." *Id.*

But the parties were unable to jointly craft a desegregation proposal. Thus, the Court was tasked with fashioning that "affirmative relief," or stated another way, determining the appropriate remedies addressing the Board's identified deficiencies. To this end, the Court held a hearing on August 8, 2022, through August 12, 2022. This Memorandum Ruling and the referenced Remedial Desegregation Order arise from that "remedial phase" hearing and address faculty assignment and the remaining quality of education factors—student discipline and graduation pathways.

---

[11] Record Document 338.
[12] Record Document 365. Before the hearing on these motions, the Court began granting the District unitary status in some areas of operation included in the Superseding Consent Order. These areas included transportation, staff assignment, facilities, and extracurricular activities. Record Documents 157, 281, 282 & 381.
[13] Record Document 342.
[14] Record Document 374.
[15] In its ruling, the Court granted unitary status as to all aspects of quality of education (academics) except for graduation pathways. *Thomas*, 544 F. Supp. 3d at 740.

**OVERVIEW & BACKGROUND**

## I.     Remedial Ruling Key

To facilitate an understanding of this ruling, the Court provides the following key to various documents cited throughout its pages:

1) The "Superseding Consent Order" – This term refers to the 2016 consolidated consent orders.[16] This decree provided a plan for eliminating segregation and three years of Court supervision in the specified *Green* areas of operation.

2) The "liability opinion" – This term refers to the Court's June 21, 2021 Memorandum Ruling, *Thomas*, 544 F. Supp. 3d at 740, which addressed the issue of whether the Board attained unitary status as to the *Green* factors remaining under Court supervision. The term "liability hearing" refers to the hearing on those issues held earlier that year.

3) *Borel ex rel. A.L. v. School Board Saint Martin Parish*, 44 F.4th 307 (5th Cir. 2022) – This Fifth Circuit opinion addresses this Court's prior liability ruling, *Thomas*, 544 F. Supp. 3d at 740. The opinion was issued during the fourth day of testimony at the August 2022 remedial phase hearing. A three-judge panel determined that this Court continues to retain jurisdiction over this case. *Id.* at 313. The ruling further held that this Court's liability findings in student assignment, faculty assignment, and quality of education were "not clearly erroneous." *Id.* at 316. Notwithstanding its affirmance in those areas, the Fifth Circuit stated that this Court "abused its discretion in closing Catahoula Elementary School." *Id.* at 317. As a result, the Fifth Circuit reversed

---

[16] Record Documents 211-1 (student assignment), 211-2 at 9−13, 211−2 (faculty assignment), 211-4 (quality of education).

Catahoula's closure and remanded the issue "for consideration of other methods of addressing that concern." *Id.*[17]

4) The "Parties' Consolidated Proposed Remedial Plans" – This document is attached as Attachment A to this ruling. The Court drafted the document to track the overlap and differences in the proposed remedial plans from the Board and Plaintiffs.[18] Once the August 2022 remedial hearing concluded, the Court noted that several of the parties' proposed remedies overlapped in substance, if not exact language and detail. The Court suggested that the parties come together and submit a joint document redlining the specific areas of agreement and dispute. But the Board was unwilling to agree to that idea. In particular, counsel for the Board stated:

> [O]ur client has not given us any authority to agree to any provisions with the plaintiffs. That was their latest directive. And we could not make any joint filing, if there was any indication that there was an agreement between the Board and the plaintiffs. They have expressly directed that we cannot agree to anything. We recognize that there are - - that there are some provisions that are identical between the plans, but our client has not given us authority to enter into any agreements.[19]

Even though the Board refused to cooperate in the exercise, Plaintiffs nevertheless submitted proposed findings of facts and conclusions of law that incorporated a redlined version with both parties' proposals; they used the Board's plan as the underlying framework.[20] Plaintiffs' submission contains ellipses as a stand-in for large areas of overlap. The Court's attached version builds upon Plaintiffs' filing by including the omitted overlapping sections. The blue typeface standard font contains

---

[17] The Court held a hearing on the appropriate student assignment remedies on February 27, 2023, through March 6, 2023.
[18] The parties filed proposed remedial plans before the remedy hearing. Record Documents 522 & 523.
[19] Record Document 576 at 1211:12−22 (John Blanchard).
[20] Record Document 584.

the Board's proposals and areas where the parties agree. The red italicized font denotes Plaintiffs' proposals or any language that differs in substance or form from the Board's proposal. Before the remedial hearing, the United States, as Intervenor, only took a position on the student assignment issue. Following *Borel*, however, the student assignment issue was postponed for a separate hearing, and the United States took no position on faculty assignment. Regarding quality of education, it only requested "that this Court order the District to fully comply with the 2016 Order with respect to discipline."[21]

5) The "remedial ruling" – This term refers to this Memorandum Ruling. Considering the Fifth Circuit's remand regarding student assignment, this ruling does not address student assignment but only faculty assignment and quality of education. The Court will refer to the hearing conducted on August 8, 2022, to August 12, 2022, as the "remedial hearing."

6) The "Faculty Assignment and Quality of Education Remedial Desegregation Order" – This is the Order for remedial relief filed separately with this Memorandum Ruling arising out of the August 2022 remedial hearing. In drafting this Order, the Court used Plaintiffs' post-trial submission entitled "Proposed Desegregation Order" as a framework.[22] That filing contains those areas in which they agree with the Board's proposal. The Court has adopted much of this submission as its Order with reasons and modifications based on its findings detailed in this opinion and the final Order.

---

[21] Record Document 578 at 3. The United States did not move for further relief in these areas, nor did it provide a plan or testimony regarding remedial relief at the August 2022 remedial hearing.
[22] Record Document 584-1.

II.     **Procedural History Post-Liability Ruling**

Seventeen months separated the liability hearing from the remedial hearing, the first held in March 2021 and the latter in August 2022. This delay has negatively impacted the Board's ability to desegregate its schools and has drawn out Court supervision over the District. Any plans for new programs or policies following the Court's liability opinion have been postponed by an entire school year. Unfortunately, the Court can only conclude that the Board's actions caused this delay.

The reasons for that delay merit discussion. As touched on above, the Court ordered the parties to negotiate and "propose a new consent order" to implement specific programs and policies; it "reserve[d] all further orders of affirmative relief until such time as the parties propose[d] a new consent order." *Thomas*, 544 F. Supp. 3d at 740. On August 19, 2021, nearly two months after the Court issued its liability ruling, the Board filed an appeal. The Board represented that it was not seeking a stay of the Court's order and further indicated it was closing Catahoula Elementary.[23] In response, the Court acknowledged its "duty to keep pushing the case forward even as the appeal progress[ed]."[24]

So began a lengthy period of productive negotiations. In talks spanning months, the parties updated the Court on several occasions. On August 25, 2021, when asked by the Court about the effect of the then-recently filed notice of appeal, the Board's counsel stated that the negotiations for a consent decree proposal could moot issues before the Fifth Circuit.[25] On November 5, 2021, in a joint status report, the parties indicated that they had "not reached an impasse on any particular

---

[23] Record Document 424 at 1.
[24] *Id.*
[25] *Id.*

issue" and that the Board intended to enter into a consent order to resolve the remedial phase of the case as soon as December 2022.[26]

On November 22, 2021, the parties submitted another joint status report, stating that they were continuing negotiations and requested more time to file their proposed consent order with the Court.[27] Though a few practical issues remained, the parties reiterated that they had yet to reach an impasse in negotiating a consent decree proposal and were willing and able to continue good-faith negotiations.[28] Indeed, the report stated that the parties had "exchanged and commented on drafts" of the consent orders regarding "graduation pathways, student assignment, faculty, assignment, and discipline."[29] It also stated that the parties were working toward resolving lingering concerns and finalizing those drafts. Still, the parties requested to update the Court at a status conference, which the Court held on November 30, 2021.[30]

During that conference, the parties indicated they could not file a proposed consent decree with the Court by the projected December deadline but said they were continuing negotiations.[31] Counsel for the Board further represented that the briefing schedule on appeal had been continued at the request of counsel to permit extended talks.[32] Based on these reassurances, the Court believed that the parties' submission of a consent decree on all *Green* factors was near at hand.

With that in mind, the Court gave the parties a February 10, 2022 deadline to submit their joint proposal or file a joint report outlining their areas of disagreement.[33] The Court chose the February date at the Board's request because it coincided with the Board's regularly scheduled

---

[26] Record Document 438 at 1−2.
[27] Record Document 439 at 1−2.
[28] *Id.* at 1.
[29] *Id.*
[30] Record Documents 439 at 2 & 442 at 1.
[31] Record Document 442 at 1.
[32] *Id.* at 2.
[33] *Id.* at 3.

meeting.[34] Before agreeing to the deadline, the Court questioned whether the Board could expedite negotiations—possibly through special meetings. In response, the Board's counsel indicated that special meetings were difficult to hold and involved "logistical obstacles."[35]

Despite that representation, the Board conducted a special meeting four days later, on December 3, 2021.[36] The Louisiana Attorney General personally attended that special session, and the Board discussed retaining his representation outside of privately enrolled counsels' presence.[37] On December 14, 2022, the Board then moved to enroll two attorneys employed by the Louisiana Attorney General.[38] The motion to enroll did not explain the reasons for the Attorney General's actions nor limit his representation to the appeal at the Fifth Circuit. In response to the motion, the Court questioned whether the state was usurping the role of the Board's privately retained counsel.[39] The Court requested briefing on the issue and scheduled a hearing for February 2022.

Yet before the Court ruled on the motion to enroll, the Board moved to stay all proceedings on December 28, 2021.[40] The Board also filed a corresponding motion with the Fifth Circuit, seeking immediate relief. *See Borel ex rel. A.L. v. Sch. Bd. St. Martin Par.*, No. 21-30514, 2022 WL 3355807, at *1 (5th Cir. Mar. 3, 2022) (per curiam). In arguing for the necessity of a stay, the Board challenged the Court's jurisdiction over the case pending appeal; it argued that the Court lacked remedial authority to address the Board's constitutional and consent order violations. Days later, on January 3, 2022, the Board filed an amended motion to enroll, clarifying that the Attorney

---

[34] *Id.* at 1.
[35] *Id.*
[36] Record Document 469 at 3.
[37] *Id.*
[38] Record Document 444.
[39] Record Document 446.
[40] Record Document 445.

General was enrolling for the limited and specific purpose of arguing the motion to stay.[41] The

Court did not grant this motion until the hearing held on February 11, 2022.[42]

At the motion to enroll hearing, the Board represented that it was no longer willing to

negotiate with Plaintiffs.[43] The Board explained that the parties worked together until February 8,

2022, when the Board held a meeting to discuss the pending proposals.[44] During that meeting, the

Board voted not to accept any recommendations on any remaining issues. To convey this stance,

the Board's counsel sent a letter informing Plaintiffs that all negotiations had ceased and there was

no agreement on any points.[45] The Court expressed dismay with the Board's new position: The

parties could not implement further remedial measures for fall 2022 as they had intended. And the

Board gave no reason for its change of course. But even without explanation, the Board's reversal

coincidentally occurred following its vote to involve the Attorney General. Nevertheless, the Court

allowed the Attorney General to enroll as counsel for the limited purpose of arguing the motion to

stay.[46]

Following oral argument at the stay hearing, the Court held that it "did not lose jurisdiction

of the parties merely because an appeal was pending from the desegregation order."[47] And because

the Fifth Circuit cannot return jurisdiction that was never lost, this Court had and continued to

retain remedial jurisdiction over this case. The Fifth Circuit, for its part, also denied staying this

case pending appeal, reasoning that the Board did not explain "why it waited many months to seek

---

[41] Record Document 447.
[42] Record Document 469.
[43] *Id.* at 4.
[44] *Id.*
[45] *Id.*
[46] *Id.*
[47] Record Document 489 at 90 (quoting *Plaquemines Par. Comm'n Council v. U.S.*, 416 F.2d 952, 954 (5th Cir. 1969)).

such relief." *Id.* Without a stay, the Court concluded it retained the authority to enforce the Superseding Consent Order and its June 2021 Opinion through remedial proceedings.[48]

Meanwhile, the parties were far from addressing the question before this Court, pending for several months: What remedies would achieve desegregation in the St. Martin Parish School District? With the Board's refusal to engage in further talks, the parties would not answer that question in a joint proposal; addressing the issue required a hearing. Before that hearing, the Court directed each party to draft a revised desegregation plan.[49] In many areas, the parties' suggested remedial measures overlapped in principle if not exact language. Still, the dual proposals had several differences. As recounted above, the Board refused to meet with Plaintiffs to provide the Court with a document that outlined the areas of agreement and disagreement. Creating a new desegregation plan thus became the responsibility of this Court—a responsibility that it takes up reluctantly. Indeed, the Court acknowledged that the parties themselves were best qualified to craft a plan that addresses the concerns of both sides. But without such an agreement, the Court conducted the remedial hearing, featuring expert and fact witness testimony. Considering that testimony and the parties' proposals, the Court adopts the attached Order for the reasons detailed below. But before discussing the evidence adduced at the remedial hearing, the Court first addresses the source of its remedial authority and the legal standard it applies in this matter.

## LEGAL STANDARD

In this case, the Court's remedial authority stems from two, albeit interrelated, sources. First, the Court derives remedial jurisdiction from the District's original constitutional violation. *Borel*, 44 F.4th at 313. As the Fifth Circuit recognized a short time ago, a district court retains

---

[48] *Id.* (citing *Alberti v. Klevenhagen*, 46 F.3d 1347, 1358 (5th Cir. 1995)).
[49] The Court issued a remedial hearing Scheduling Order that included deadlines for expert reports, proposed desegregation plans, and supporting briefs, among other requirements. Record Documents 492 & 493.

jurisdiction over a school desegregation case until the school district eliminates vestiges of past segregation to the extent practicable. *Id.* at 312 (citing *Anderson v. Sch. Bd. of Madison Cnty.*, 517 F.3d 292, 294 (5th Cir. 2008)).  Until then, this Court has "the continuing ability to order affirmative relief" to cure the District's constitutional infirmities. *Id.* (citing *Milliken v. Bradley*, 433 U.S. 267, 282 (1977)).

Second, the Court derives remedial authority from the consent order itself. *Id.* After *Thomas*, 756 F.3d 380, 388, affirmed this Court's jurisdiction in 2014, the parties engaged in extensive discovery. As the trial date approached, the Board entered into several consent orders, consolidated in 2016. *Id.* at 313. In doing so, the Board voluntarily agreed to provide educational programs and services without discriminating based on race. It also agreed to eliminate the vestiges of de jure segregation to the extent practicable. Because the Board assumed these obligations, the Court has remedial jurisdiction to enforce them. *Id.*

While exercising its authority, the Court is mindful of this remedial phase's limited nature.[50] The Board's liability is a question already addressed, *Thomas*, 544 F. Supp. 3d at 740; this Court's conclusion in that regard is a decision already affirmed. *Borel*, 44 F.4th at 316. The only remaining issue now before the Court is a question of remedies. More precisely, what effective relief can address the District's constitutional and consent order violations?

Responding to that inquiry, the parties dispute who bears the burden of proof. In Plaintiffs' view, that burden is the Board's to carry because school districts have an enduring "'affirmative duty' to 'desegregate.'" *Freeman v. Pitts*, 503 U.S. 467, 501 (1992) (Scalia, J., concurring) (quoting *Green*, 391 U.S. at 430). Additionally, Plaintiffs point to the Court's liability ruling, where the Court denied the Board's motion for unitary status and granted Plaintiffs' motion for

---

[50] Record Document 492 at 5−6. Before issuing a Scheduling Order, the Court discussed with the parties the limited scope of this case's remedial phase.

further relief. As this Court once acknowledged, granting a motion for further relief is analogous to a finding of liability.[51] And because liability is already established, Plaintiffs argue that the responsibility for furnishing a desegregative remedy is squarely on the shoulders of the Board. For that reason, Plaintiffs contend that the Board continues bearing the burden of presenting an effective plan to desegregate the District.

The Board initially agreed that it must carry the burden of proof at this remedy stage[52] but changed its position two months later, about seven weeks before the remedial hearing. It now argues that the burden of proof falls on the shoulders of Plaintiffs, who must show that further relief is warranted and what, if any, additional relief is justified. The basis for the Board's argument arises from the injunctive nature of the Superseding Consent Order. In its post-trial brief, the Board distinguishes between "interpreting" injunctions within a desegregation consent decree and "modifying" those injunctions. The Board says this distinction is critical and differentiates the two concepts: A Court "interprets" a consent decree "by enforcing the injunction according to its terms or establishing procedures for enforcement without changing the command of the injunction." *Moore v. Tangipahoa Par. Sch. Bd.*, 864 F.3d 401, 405 (5th Cir. 2017) (cleaned up). By contrast, a Court "modifies" an injunction by requiring "that the injunction be altered . . . in some way." *Id.*

In this case, the Board contends that Plaintiffs seek to modify the Superseding Consent Order. Such a request, the Board thinks, requires that Plaintiffs bear the burden of showing the Superseding Consent Order should be so modified. Put another way, the Board believes that Plaintiffs must prove their entitlement to new relief because they are the beneficiary of the original injunction. At the same time, the Board acknowledges that this Court already granted Plaintiffs'

---

[51] Record Document 489 at 79.
[52] Record Document 491 at 4.

motion for further relief in its liability opinion. Even so, this fact does not alter the Board's reasoning; instead, the Board contends the procedural posture of this case has not changed since the liability phase when Plaintiffs first moved for further relief. The Board believes that Plaintiffs must still prove their entitlement to "specific new relief" just as they needed to support their "general claim" for further relief.

That argument relies on caselaw addressing whether a party seeking to modify an injunction carries the burden of justifying additional restrictions. The Board cites, for instance, *Exxon Corp. v. Texas Motor Exchange of Houston, Inc.*, 628 F.2d 500 (5th Cir. 1980), and argues that Plaintiffs carry the burden of proof as the party that moved for further relief. In *Exxon*, defendants were enjoined from using the name "Texxon" as it violated Exxon's trademark. *Id.* at 502. In response, the defendants changed the name to "Tex-on" as a replacement. Exxon objected to that change and sought to modify the original injunction to apply to the new "Tex-on." *Id.* at 503. But before deciding whether to modify the injunction, the court held it was Exxon—as the moving party—who bore the burden of showing that its trademark had been infringed upon. *Id.* at 504.

*Exxon*, however, is dissimilar in the applicable law, procedural posture, and facts. Perhaps most notable, *Exxon* does not invoke desegregation principles under constitutional law. But that aside, the Court has already decided that Plaintiffs are entitled to specific further relief after concluding the Board was liable for constitutional and consent order violations. *See Thomas*, 544 F. Supp. 3d at 740. And in so holding, the Court determined, in general terms, which expert-endorsed remedies were appropriate and practical for the District to implement. Yet rather than order the Board to implement those measures immediately, the Court allowed the Board to craft specific remedies with Plaintiffs, as detailed in the Court's liability ruling. Now, after violating the

Constitution, breaching its legal obligations, and refusing to cooperate with the opposing parties, the Board, as the established violator, contends the burden is on Plaintiffs to prove, once again, remedial relief is necessary.

In this context, that contention is as illogical as it is contrary to law. As is the case here, "[w]hen a school system has been found to be in violation of the Constitution, local school officials bear the primary responsibility to eliminate . . . all vestiges of state-imposed segregation." *Davis v. E. Baton Rouge Par. Sch. Bd.*, 721 F.2d 1425, 1436 (5th Cir. 1983) (quoting *Milliken*, 433 U.S. at 290). Indeed, "[i]t is incumbent upon the school board to establish that its proposed plan promises meaningful and immediate progress toward disestablishing state-imposed segregation." *Green*, 391 U.S. at 439. Plaintiffs' motion for further relief has already been adjudicated and granted; the Court has already resolved whether additional measures are required. In that regard, Plaintiffs have proven in an earlier phase of litigation that further relief is necessary. The issue now is how to fashion that relief.

And even if, as the Board argues, Plaintiffs have the burden of proving additional specific measures are appropriate, they have done so for the reasons outlined in this Memorandum Ruling. A district court has the "broad" authority to order further relief "for breadth and flexibility are inherent in equitable remedies." *Cowan v. Cleveland Sch. Dist.*, 748 F.3d 233, 239 (5th Cir. 2014) (quoting *Valley v. Rapides Par. Sch. Bd.*, 702 F.2d 1221, 1225 (5th Cir. 1983)). In so ordering, a district court need not "find that [a school district] violated the Constitution, only that it violated the consent decree." *Smith v. Sch. Bd. of Concordia Par.*, 906 F.3d 327, 355 (5th Cir. 2018). Here, the Court established during the liability phase that the Board violated its consent decree and the Constitution. In this remedial phase, Plaintiffs have offered expert and fact

witnesses to support the necessity of their proposed remedies addressing those violations, as detailed below.

In any case, it is well established that the Board must present an appropriate desegregation plan. When a school district is denied unitary status, Supreme Court authority mandates that the school district "come forward with a plan that promises realistically to work, and promises realistically to work now." *Green*, 430 U.S. at 437−38. Whether a desegregation plan "works" turns on whether the plan has "real prospects for dismantling the state-imposed dual system 'at the earliest practicable date.'" *Id.* at 439. If other parties present an alternative plan that demonstrates "more promising courses of action," the Board bears a "heavy burden . . . to explain its preference for an apparently less effective method." *Id.* If the Board cannot meet its burden, "it becomes the responsibility of the district court to develop an adequate remedy." *Davis*, 721 F.2d at 1437.

In that regard, this Court's role is straightforward: It must "sort through the various proposed remedies, exclude those that are inadequate or infeasible and ultimately adopt the one that is most likely to achieve the desired effect: desegregation." *Cowan*, 748 F.3d at 240. In exercising this discretion, the Court must "use its broad and flexible equitable powers to implement a remedy that, while sensitive to the burdens that can result from a decree and the practical limitations involved, promises 'realistically to work *now*.'" *Davis*, 721 F.2d at 1437 (quoting *United States v. DeSoto Par. Sch. Bd.*, 574 F.2d 804, 811 (5th Cir. 1978)).

Here, the Court weighed the proposed remedies of both parties based on the hearing testimony and determined which remedies would most effectively and practicably achieve the goals of school desegregation in St. Martin Parish. The Order the Court is entering is the product of both Plaintiffs' and the Board's evidence. As stated above, in drafting the Order accompanying this opinion, the Court used Plaintiffs' post-trial submission entitled "Proposed Desegregation

Order" as a framework.[53] Plaintiffs' submission contains those areas in which they agree with the Board's proposal and their own proposals. The Court has adopted much of this submission as its Order, with reasons and modifications based on its findings below.

In summary, as discussed in each section of this ruling, Plaintiffs have proven through expert and fact testimony that the constitutional and consent order violations identified in the Court's liability opinion are current and will likely persist in the future. To the extent that the parties' proposals diverge, Plaintiffs have also proven that the nature and extent of the injunctive relief sought is effective and practicable in eliminating the existing violations. In some areas, the Court has tweaked the implementation of that relief in minor respects; thus, if the Board is correct that Plaintiffs bear the burden of proof, they have carried their burden.

## ANALYSIS

## I.    Faculty Assignment

Under the Superseding Consent Order portion related to faculty assignment ("Faculty Assignment Consent Order"), the District agreed to implement policies that assigned faculty such that the racial composition of the faculty at any school would not indicate that the school was intended for one race. *Thomas*, 544 F. Supp. 3d at 694. The District also agreed that its faculty "must be hired, assigned, promoted, paid, demoted, dismissed, and otherwise treated without regard to race, color, or national origin."[54]

Effectuating these objectives required that the District advance specific "diversity goals." *Id.* Among them, the Board agreed to ensure a specified ratio of Black and White teachers and to provide equal employment opportunities throughout the District.[55] But the Board fell short of these

---

[53] Record Document 584-1.
[54] Record Document 211-2 at 12.
[55] "The Board agreed to two goals related to the racial makeup of faculty in its schools. First, the ratio of Black-to-White faculty in each school should be within the +/- 15% range of the Black-to-White faculty

goals on several fronts, as identified in this Court's prior liability ruling. *Id.* at 700−02. In that same ruling, the Court ordered the parties to revise aspects of the Faculty Assignment Consent Order to remedy the Board's shortfalls. The opinion included general remedial measures for the parties' consideration, advanced by Plaintiffs' educational policy expert, Dr. Erica Frankenberg. *Id.* at 704−06.

Dr. Frankenberg returned to testify at the remedial hearing. She is a tenured professor at Pennsylvania State University in the College of Education, a research associate for the Center of Rural Education and Communities, an affiliate faculty member at Pennsylvania State University School of Law, and the co-editor of the *Review of Educational Research*.[56] She received a Ph.D. in educational policy, a master's degree from Harvard University, and an undergraduate degree from Dartmouth College, where she wrote a thesis focusing on school desegregation in Mobile, Alabama.[57] Dr. Frankenberg's work concentrates on integration and racial equality within schools, encompassing student and faculty assignments.[58]  She has written extensively about both and has worked with school districts nationwide regarding desegregation plans.[59]  Dr. Frankenberg has been retained as an expert in legal cases before.[60]

---

[56] ratio in the K to 5, 6 to 8, and 9 to 12-grade bands. Second, a minimum of 10% of the faculty at each school should be Black." *Thomas*, 544 F. Supp. 3d 651 at 694 (citations omitted).

[56] Record Document 569-5 at 1 (Frankenberg Report). Even though an expert report can be hearsay, the Court urged both parties to agree to allow the reports into evidence provided that the experts testified in accordance with their reports. As the Court explained, doing so permits the Court and the parties to move more efficiently with testimony. But in response to the Court's encouragement, the Board objected to their inclusion into evidence without specifics on the nature of its objection or pointing to any specific content in the expert reports. The Court ruled, however, that *all* expert reports and curriculum vitae—previously submitted by all parties—of testifying experts be admitted to the extent that they assist the Court in understanding testimony in preparation for the hearing and provide efficiency in the examination process. Record Document 559 at 5.

[57] Record Documents 569-5 at 1 (Frankenberg Report) & 572 at 64:22−65:3 (Frankenberg).

[58] Record Document 569-5 at 1 (Frankenberg Report).

[59] *Id.*

[60] *Id.*

The Court also heard testimony from the Board's expert in teacher recruitment and employment, Dr. Nathan Roberts. Dr. Roberts is the Dean of the College of Education at the University of Louisiana at Lafayette.[61] He received his undergraduate degree, J.D., and Ph.D. in education leadership, research, and counseling from Louisiana State University.[62] Dr. Roberts is a faculty member in the Department of Educational Foundations and Leadership at the University of Louisiana at Lafayette.[63] He is well-versed in the current state requirements for teacher residents in Louisiana.[64] He has personal experience discussing recruitment with school district recruiters from Louisiana and Texas.[65]

At the remedial hearing, Dr. Frankenberg testified that she had reviewed the most recent faculty assignment data and that issues identified in the 2021 liability hearing remained.[66] In particular, she stated that multiple schools were still out of compliance with the Faculty Assignment Consent Order's diversity goals. For the 2021−2022 school year, Breaux Bridge Elementary, Stephensville Elementary, Cecilia Junior High, and St. Martinville Junior High are schools that fell outside the agreed-upon bounds for faculty assignment.[67] For elementary schools, where the percentage of Black teachers is at the lowest, Dr. Frankenberg explained that attrition for Black teachers was still disproportionately high.[68] The same was true, she said, for Cecilia Junior High, a school with a racially identifiable White faculty.[69] Dr. Frankenberg stated that more Black teachers had left the District in 2021−2022 than in 2020−2021.[70] Citing this information,

---

[61] Record Document 571-10 at 1 (Roberts Report).
[62] Id. at 11.
[63] Id. at 1.
[64] Id.
[65] Id.
[66] Record Document 572 at 189:16−192:23 (Frankenberg).
[67] Id. at 190:3−191:8.
[68] Record Documents 572 at 190:3−191:8 (Frankenberg) & 569-5 at 10−11 (Frankenberg Report).
[69] Record Document 569-5 at 10−11 (Frankenberg Report).
[70] Id. at 11.

she testified that the conclusions she shared during the liability hearing regarding the measures necessary to address the vestiges of discrimination in faculty assignment had not changed after reviewing the 2021−2022 faculty assignment data.[71]

In this remedial phase, Plaintiffs and the District propose new and revised faculty assignment provisions that tackle many issues identified in the Court's liability ruling. Some proposed measures overlap; others diverge. The Court will review recruitment, hiring, retention, transfers, and data reporting remedies in turn.

### a.  Recruitment

#### i.  *Outreach & Recruiting Activities*

Along with the goals above, the Board adopted a Recruiting Plan in the Faculty Assignment Consent Order, which enunciated several recruitment steps and requirements for advertising open positions. *Id.* at 697. Based on this Court's factual findings in its liability opinion, the District did not undertake "all practicable measures to recruit Black applicants for open positions." *Id.* at 702. When it came to historically black college or university ("HBCU") outreach, in particular, the Court concluded that the "District was doing little more than going through the motions." *Id.* The Board's inadequate recruitment attempts hindered its ability to diversify its faculty District-wide and partly led to its denial of unitary status. *Id.* at 701−02.

Dr. Frankenberg approved the parties' new agreed-upon HBCU outreach measures in the remedial phase.[72] These strategies include, among others, communicating with university placement offices and emailing vacancy notices directly to local and out-of-state HBCUs.[73] Dr.

---

[71] Record Document 572 at 191:11−15 (Frankenberg).

[72] Record Document 572 at 207:12 (Frankenberg).

[73] Attachment A at pp. 4–5. Plaintiffs suggest language that further specifies aspects of the agreed-upon proposals. Though the language does not result in significant substantive differences, it provides more explicit detail and clarity.

Frankenberg said that maintaining direct contact in such a way will help the District engage in a "comprehensive, active effort" to recruit Black teachers.[74] Ongoing communication, she opined, is an easy means to gain early knowledge of potential applicants before they graduate.[75]

Dr. Frankenberg further recognized the need for remedial measures addressing in-person recruitment at job fairs, particularly utilizing the District's HBCU alumni. She explained that HBCU engagement at job fairs follows best practices and effectively responds to the shortcomings identified at the liability hearing.[76] To this end, she approved the parties' agreed-upon in-person recruitment measures, including the District's participation at job fairs at local and regional HBCUs and public universities.[77] While attending those job fairs, Plaintiffs and the Board agree that the District must ensure its staff has the resources they need to succeed—including advertising materials, diverse teams, and suitable technology.[78] In addition, each party suggests deploying the District's HBCU alumni in strategic recruitment operations—like job fairs—to promote the District to college students.[79] Dr. Frankenberg believed this staff-alumni involvement was critical to establishing a pipeline between the District and HBCUs.[80] Along with Dr. Frankenberg, the Board's expert, Dr. Roberts, thought these proposals were all valuable recruitment tactics.[81] He explained that the parties' revised job fair protocols would "ensure[] accountability" and "benefit" the diversity efforts of the District.[82]

---

[74] Record Document 572 at 209:19 (Frankenberg).

[75] Record Document 569-7 at 4 (Frankenberg Rebuttal Report).

[76] Record Documents 572 at 188:9−14 (Frankenberg) & 569-5 at 12–13 (Frankenberg Report).

[77] Plaintiffs suggest that the outreach to HBCUs extends to surrounding states. Record Document 569-5 at 11–12 (Frankenberg Report). As noted above, Plaintiffs add greater specificity to the Board's proposed language, clearly incorporating the names of HBCUs in the region.

[78] Attachment A at p. 9.

[79] *Id.* at p. 8.

[80] Record Document 569-5 at 11 (Frankenberg Report).

[81] Dr. Roberts summarized these recruitment measures when reviewing how the measures will attract teacher candidates. Record Document 575 at 953:16−22 (Roberts).

[82] Record Document 571-10 at 5 (Roberts Report).

Beyond HBCU outreach, the experts are in similar accord regarding the parties' suggested advertising measures.[83] The agreed-upon proposals include new provisions like encouraging teachers to share vacancies within professional and personal networks, advertising in a local newspaper in neighboring St. Mary Parish to recruit Black faculty members, and adding vacancy notices on more virtual platforms.[84] Dr. Roberts said promoting vacancies with these broad strategies is the best way to reach future educators.[85] Dr. Frankenberg agreed. She opined that advertising openings, in the ways the parties suggest, would further help the District to "diversify [its] applicant pool."[86] As with the university outreach provisions, Dr. Frankenberg concluded that these advertising measures align with "best practices."[87]

In sum, the parties' agreed-upon recruiting measures involve a diverse array of promotional channels to attract a diverse array of candidates. Most importantly, each outreach method is a reasonable and practicable strategy the District can implement now. *See Green*, 391 U.S. at 439. These outreach provisions are thus incorporated into the District's Remedial Desegregation Order.[88]

ii.     ***Early Access to Students & Grow Your Own***

As the testimony at the remedial hearing suggested, finding quality candidates takes significant work.[89] But the experts agree that one key to hiring qualified teachers is advertising, interviewing, and hiring early.[90] One way to do so is by connecting with university students in

---

[83] *See id.*; Record Document 572 at 188:9−14 (Frankenberg).
[84] Attachment A at p.4. Plaintiffs propose language broadening the scope of HBCU outreach to specifically include HBCUs in nearby states, like Texas and Mississippi. They also broaden the use of advertising in St. Mary Parish. *Id.*
[85] Record Document 571-10 at 4 (Roberts Report).
[86] Record Document 569-5 at 13 (Frankenberg Report).
[87] *Id.*
[88] Faculty Assignment Remedial Desegregation Order at pp. 7−10.
[89] *See* Record Document 575 at 939:12−20 (Roberts).
[90] Record Documents 575 at 960:13−17 (Roberts) & 569-7 at 4 (Frankenberg Rebuttal Report).

teaching programs.[91] Both parties agree that the District should continue cultivating and expanding university partnerships and encouraging college students to apply for positions in St. Martin Parish.[92] Along with the early access measures related to university students, the experts agree that the hiring process could begin before college and as early as high school. To this end, both parties support identifying young students within the District who show interest in the teaching profession and offering them specific opportunities—teacher-related coursework, mentorships, and university-application support.[93] In making a teaching career more appealing, both parties also support the District's continued offering of at least three scholarships for students accepted into a Louisiana teacher preparation program.[94] Dr. Roberts said identifying interested students early will help the District hire teachers in the surrounding area once the students graduate college.[95]

Apart from enticing young students to pursue education careers, the experts similarly agree that the District should recruit from its existing staff pool.[96] Each proposed plan generally incorporates measures to assist paraeducators in becoming certified teachers. But Plaintiffs' plan is more extensive as it further clarifies specific steps the District can take to support the

---

[91] Record Document 569-7 at 4 (Frankenberg Rebuttal Report).

[92] One agreed-upon strategy requires the District to continue its relationship with Grambling State University for its "Call Me MISTER" program—a program designed to encourage Black male high school students to enter the teaching profession. Programs like these are based on research and support a more diverse teacher pipeline. Record Documents 569-5 at 12 (Frankenberg Report) & 571-10 at 5 (Roberts Report). In their plan, Plaintiffs suggest more specific steps to maintain contact with District graduates. Attachment A at pp. 9–10.

[93] Attachment A at pp. 11–13. The experts likewise approve of these measures. *See* Record Document 572 at 201:16–19 (Frankenberg); Record Document 575 at 960:13–17 (Roberts).

[94] Attachment A at p. 11. The experts offered their support for this measure. Record Documents 572 at 203:23–204:2 (Frankenberg) & 575 at 961:6–9 (Roberts). Though the District previously maintained a scholarship program, the program fell into disuse, and years would pass without any applicants. *Thomas*, 544 F. Supp. 3d at 698. The Court removes the requirement that three scholarships be dispensed only once per high school in a school year. *See* Record Document 575 at 961:10–18 (Roberts). If the District does not offer all scholarships for any given reason, it must explain why in the annual Recruiting Report. Faculty Assignment Remedial Desegregation Order at p. 25.

[95] Record Document 575 at 960:13–18 (Roberts).

[96] Record Documents 575 at 959:5–14 (Roberts) & 572 at 201:16–20 (Frankenberg).

certification process.[97] These "comprehensive"[98] steps include creating surveys to elicit interest, holding in-person sessions to promote certification, and helping paraeducators earn certification hours.[99] Dr. Frankenberg explained that these additional steps added further "clarification" that the District's plan lacked.[100] At any rate, the parties' plans overlap in principle. And Dr. Frankenberg explains that recruiting future certified teachers among current employees is an effective recruitment tool to diversify the teaching workforce; it has a track record of success in other school districts.[101] Or, as succinctly put by Dr. Roberts: "Recruiting in your own backyard has a strong chance of succeeding."[102] The Court thus concludes that the parties' expert-endorsed recruitment measures are reasonable and practicable strategies that realistically plan to work. *See Davis*, 721 F.2d at 1437. Accordingly, these measures are incorporated, as detailed, in the District's Remedial Desegregation Order.[103]

### b.  Hiring

In the Faculty Assignment Consent Order, the District also adopted Employment Procedures outlining measures for screening, interviewing, and selecting applicants. *Thomas*, 544 F. Supp. 3d at 694. As noted in the liability ruling, however, the District's broader faculty assignment shortcomings convinced the Court that the hiring process needed revising. *Id.* at 706.

---

[97] *See* Record Document 572 at 201:20−22 (Frankenberg).
[98] *Id.* at 203:3.
[99] Attachment A at pp. 10–11. The Board believes the Court should refrain from incorporating these "grow your own" specifics in the Remedial Desegregation Order. It says that any argument otherwise should be waived because Plaintiffs did not suggest these specific revisions before the hearing when they conceded the Board's plan was generally acceptable. The Court bases the measures contained in the Remedial Desegregation Order on expert testimony and evidence and does not view Plaintiffs' "concession" as broadly as the Board. Plaintiffs, moreover, do not have the final say on whether this Court should or should not consider certain remedial measures. Instead, this Court is obligated to "sort through the various proposed remedies, exclude those that are inadequate or infeasible and ultimately adopt the one that is most likely to achieve the desired effect: desegregation." *Cowan*, 748 F.3d at 240.
[100] Record Document 572 at 201:22 (Frankenberg).
[101] Record Document 569-5 at 12 (Frankenberg Report).
[102] Record Document 571-10 at 5 (Roberts Report).
[103] Faculty Assignment Remedial Desegregation Order at pp. 14–17.

In this remedial phase, the parties suggest minor updates to the District's Employment Procedures.[104] And aside from a few semantic differences, the dual hiring proposals largely coincide.[105] That said, Plaintiffs propose one measure the Board contests—the unqualified use of biracial hiring committees.

Biracial hiring committees serve a singular function: interviewing candidates applying for teaching positions.[106] Included in the committees' panel are principals and other District employees. Notably, the District must ensure the panel is racially balanced, including at least two White and two Black members. The former Faculty Assignment Consent Order required the District to employ these hiring panels in limited circumstances: Biracial committees were only triggered when the aspiring candidates were racially diverse.[107]

In Plaintiffs' view, restraining the committees' use in that way limits their potential. Plaintiffs believe that the District should instead utilize biracial hiring panels for *every* vacancy, no matter the racial makeup of candidates. On this basis, Plaintiffs say the committees will better assist the Board in attracting Black teachers. To support their argument, Plaintiffs point to the observations of their expert, Dr. Frankenberg. In her testimony, Dr. Frankenberg promoted incorporating Black teachers into the hiring process to a greater extent.[108] Doing so, she explained, signaled to aspiring candidates that the District valued diversity.[109] Dr. Frankenberg also promoted injecting greater consistency into the Board's hiring process. Under Plaintiffs' proposal, she observed, the screening procedures will not depend upon the applicants' race; the process would

---

[104] For example, in the way of new minor provisions, the parties agree to expand a few responsibilities to principals, like notifying the Superintendent when a resignation occurs. Attachment A at p. 14.
[105] *Id.* at pp. 15–18.
[106] *Id.* at pp. 16–17.
[107] Record Documents 211-2 at 40 & 572 at 198:2−6 (Frankenberg).
[108] *Id.* at 198:20−199:4.
[109] *Id.* at 199:1−4.

remain the same for every interview.[110] As a result, Dr. Frankenberg said Plaintiffs' proposed framework avoids any perceived "disincentive" for interviewing diverse candidates.[111]

Yet the Board opposes broadening the use of the biracial committees and does so for three reasons. First, the Board argues that hiring remedies are unnecessary. Citing *Thomas*, 544 F. Supp. 3d at 700 n.37, the Board reiterates that the District "faithfully complied with the hiring process laid out in the Employment Procedures."[112] Second, the Board argues that diversity to a nondiverse pool of applicants is irrelevant and that such a committee would serve little benefit to a one-race candidate pool. Finally, the Board says this measure will create more administrative burdens on the District and its Black faculty.

None of the Board's objections are persuasive. First of all, whatever compliance the Board cites, it did not help the District achieve desegregation in faculty assignment to the extent practicable. *Id.* at 700 ("In this case, the District has not achieved unitary status as to faculty because the District has not met the desegregation goals and it has failed to demonstrate good-faith compliance with the Faculty Consent Order."). And when prior remedies have not achieved desegregation, a school district remains obligated "to take all steps necessary to eliminate the vestiges of the unconstitutional *de jure* system." *Hull v. Quitman Cnty. Bd. of Edu.*, 1 F.3d 1450, 1453 (5th Cir. 1993) (quoting *Freeman*, 503 U.S. at 485). This is why the Court granted further relief and ordered the parties to revise the Board's "interview[] and hiring procedures." *Thomas*, 544 F. Supp. 3d at 706.

And contrary to the Board's belief, biracial committees are not irrelevant to non-diverse candidates. Dr. Frankenberg testified that requiring diverse hiring committees for each vacancy

---

[110] *Id.* at 199:13.
[111] *Id.* at 199:12−18.
[112] Record Documents 555 at 26 & 583 at 7.

"sends a really important signal to prospective teachers that this is a district that values and prioritizes [the] input of its black educators."[113] Similarly, the use of these committees "help[s] signify at a very early stage the District's commitment to racial diversity"[114] and that "there will be diverse faculty peers."[115] Moreover, teachers of color who serve on the committee "can help to identify [assets] that diverse candidates might have" that non-diverse hiring groups may otherwise overlook.[116]

In addition to these benefits, the testimony showed that this measure has other practical implications that can streamline the Board's hiring process. For example, requiring diverse hiring committees for every vacancy ensures consistency and uniformity in the Board's hiring procedure. In her testimony, Dr. Frankenberg said that using these panels for each opening "doesn't create any sort of disincentive to having [a racially diverse] interview pool"[117] because "every vacancy [would have] the same . . . interview process."[118] Put another way, "[y]ou know that you are going to have to use a biracial committee no matter what."[119]

Lastly, the Court is skeptical that this measure will further burden the District's Black staff. If anything, the Board's current utilization of biracial committees underscores the practicable nature of this remedy. St. Martin Parish School Board Superintendent Allen Blanchard said principals use diverse hiring committees "as a matter of practice" for each vacancy.[120] And in the last year, the District has used diverse hiring committees for every opening.[121]

---

[113] Record Document 572 at 198:20−199:4 (Frankenberg).
[114] *Id.* at 199:2−4.
[115] Record Document 569-5 at 14 (Frankenberg Report).
[116] Record Document 572 at 199:22−25 (Frankenberg).
[117] *Id.* at 198:7−15.
[118] *Id.* at 199:12−13.
[119] *Id.* at 198:7−15.
[120] Record Document 576 at 1416:10−14 (Blanchard).
[121] *Id.* at 1416:6−9.

Considering the District's prior failures to recruit and increase Black faculty, the Court concludes that this measure is an effective means to help achieve desegregation. The Board has not met its "heavy burden" in explaining "its preference for an apparently less effective [desegregation] method." *Green*, 391 U.S. at 439; *see also Cowan*, 748 F.3d at 240. Plaintiffs have, instead, come forward with a more effective plan that realistically plans to work. *Green*, 430 U.S. at 439. Even assuming Plaintiffs bore the burden of proof in this context, the Court concludes they have met that burden given the evidence and testimony adduced at the remedial hearing. For these reasons, the Court adopts Plaintiffs' proposed biracial hiring committee measure, as outlined in the District's Remedial Desegregation Order.[122]

### c. Retention

Dr. Frankenberg once observed that "retention of Black teachers in a district is crucial to meeting[] its diversity goals." *Thomas*, 544 F. Supp. 3d at 704. Unfortunately, the Court identified issues with the Board's Black teacher attrition in its liability ruling. *Id.* at 703−04. That ruling, as a result, required the parties to consider several retention strategies endorsed by Dr. Frankenberg. During this remedial phase, however, the parties' positions are at odds. This lack of consensus is evident in the competing proposals.[123]

The Court begins with Plaintiffs' four retention remedies. Each measure is based on Dr. Frankenberg's suggestions identified during the liability phase. *See id.* at 704. First, Plaintiffs suggest implementing a survey to investigate the possible causes of teacher attrition. The survey's data would help assess District-wide patterns and specific schools losing Black teachers.[124] In reviewing the data, the District would self-reflect on its progress and develop retention strategies

---

[122] Faculty Assignment Remedial Desegregation Order at pp. 20–21.
[123] Attachment A at pp. 18–19.
[124] Record Document 569-5 at 15 (Frankenberg Report).

based on its review.[125] The District is no stranger to conducting surveys.[126] Indeed, for a different purpose, it already uses "a climate and culture" questionnaire that typically has a response rate of 98 or 99 percent.[127] Superintendent Blanchard acknowledged at the remedial hearing that conducting surveys has not been burdensome for the District.[128]

Second, Plaintiffs' plan includes a recruitment and retention advisory group.[129] The proposed group would comprise District teachers, staff, and, if willing, Black community partners. This advisory committee would aim to identify issues and develop teacher recruitment and retention solutions. Soliciting community input aligns with best practices, as both experts attest.[130] Dr. Frankenberg explained that involving the community in such a process would assist the District's efforts to attract and keep Black teachers.[131] Dr. Roberts, for his part, noted that including the community can help make teachers feel welcomed and valued.[132]

Third, Plaintiffs' plan expands the District's existing mentorship infrastructure and provides specific steps for assisting junior Black teachers.[133] Dr. Frankenberg said this proactive measure would address an underlying cause of high attrition among Black teachers: lack of support.[134] Also pertinent, the mentorship proposal includes steps that help introduce new teachers to other staff and the broader St. Martin Parish community.[135] Mentorship for Black instructors

---

[125] Attachment A at pp. 18–19.
[126] Record Document 576 at 1412:7−22 (Blanchard).
[127] Id.
[128] Id. at 1413:2−6, 1390:1−4.
[129] Attachment A at pp. 2–3. Notably, this particular measure is found under "Recruitment." As introduced during the remedial phase, however, this measure was presented alongside the other retention remedies. As a result, the Court analyzes the retention advisory group as such.
[130] Record Documents 571-10 at 4 (Roberts Report) & 569-7 at 4 (Frankenberg Rebuttal Report).
[131] Record Documents 572 at 243:8−7 (Frankenberg) & 569-5 at 15 (Frankenberg Report).
[132] Record Document 571-10 at 4 (Roberts Report).
[133] Attachment A at pp. 18–19.
[134] Record Documents 572 at 204:21−205:1 (Frankenberg) & 569-5 at 15 (Frankenberg Report).
[135] Record Document 569-5 at 15 (Frankenberg Report).

has effectively retained Black teachers in other desegregation cases. *See Lee v. Randolph Cnty. Bd. of Educ.*, No. 3:70-cv-847, 2021 WL 2554622, at *9 (M.D. Ala. Jun. 22, 2021) ("Black teachers are assigned mentors through their tenure year to promote retention."). And historically, the District used mentorships with success.[136] Indeed, it recently reinstated a mentoring program for new and incoming teachers.[137]

Finally, Plaintiffs' plan includes at least one hour of semi-annual retention training. The training will instruct District personnel on best practices for creating an environment that supports Black teachers.[138] Dr. Frankenberg says this training can further the District's efforts in achieving its diversity goals "and formalize" the District's faculty assignment plan.[139] The District previously utilized similar training for retaining teachers, though not specifically for Black teachers.[140]

The Board's plan, by contrast, includes none of these remedies. And indeed, the Board stresses that retention measures are beyond the original consent decree's scope.[141] Consequently, the Board says that this Court never had the authority to order teacher retention remedies. In its post-trial brief, the Board relies on *Anderson*, 517 F.3d at 303, making "clear that [faculty assignment] requirements do not establish an arbitrary racial quota." Using that authority, the Board says that a net loss of six Black high school teachers from 2016 to 2021 could not have been and was not "remarkable evidence of noncompliance" with the Faculty Assignment Consent Order.[142]

---

[136] Record Document 576 at 1413:18−1414:6 (Blanchard).
[137] *Id.*
[138] Attachment A at pp. 18–19.
[139] Record Document 569-5 at 15 (Frankenberg Report).
[140] Record Document 576 at 1415:9−20 (Blanchard).
[141] Record Document 583 at 31.
[142] Record Document 555 at 32 n.103.

But that, of course, is not the case. For one thing, the Fifth Circuit explicitly affirmed the finding that the Board's efforts in retaining Black teachers fell short of the Faculty Consent Order requirements. *Borel*, 44 F.4th at 315. In upholding this Court's decision, the three-judge panel acknowledged that the decrease in Black teachers was a supporting fact for denying unitary status. *Id.* The Fifth Circuit, moreover, has already established that this Court has the authority to correct the District's "constitutional infirmity" and "enforce" the Board's "consent order obligations." *Id.* at 312 (quoting *Brumfield v. La. St. Bd. of Educ.*, 806 F.3d 289, 298 (5th Cir. 2015)). Therefore, arguing that this Court had no legal foundation for ordering retention remedies is meritless.

Additionally, numerical benchmarks are a common component in desegregation orders to assess remedial efforts. *See, e.g.*, *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 25 (1971) ("[T]he use made of mathematical ratios" is an appropriate "starting point in the process of shaping a remedy" when it does not serve as an "inflexible requirement"). But that aside, the Board's quota argument misses the point: Failing to meet numerical goals did not, by itself, lead to the Board's denial of unitary status. Unlike the school district declared unitary in *Anderson*, 517 F.3d at 303, the St. Martin Parish School Board was not "keenly aware" of its consent order requirements. In fact, this Court has recognized, in various contexts, how the Board reneged on its voluntary commitments. Beyond failing to meet its diversity goals, the Board neither complied with the consent order in good faith nor made consistent progress in reducing racial disparities in the District's faculty over time. Indeed, the Court's liability opinion noted the Board's disregard for its diversity goals in express terms: "[T]he individual most directly responsible for implementing and meeting the goals of the Faculty Consent Order . . . demonstrated a concerning lack of awareness regarding the District's goals and progress." *Thomas*, 544 F. Supp. 3d at 697. That person "was unaware of which schools did not meet the diversity goals at the time of the

hearing," or what those specific targets were. *Id.* Making matters worse, the Board took no special steps to address teacher retention despite losing Black teachers. In sum, concluding that the Board violated its consent obligations was not a determination based on an "arbitrary" quota; it was a conclusion based on "thorough" factual findings and one affirmed by the Fifth Circuit in *Borel*, 44 F.4th at 315.

Perhaps recognizing that this argument has been addressed once before, the Board justifies its theory on alternative grounds: The District's faculty assignment disparities are not as significant as other school districts where retention remedies were found appropriate.[143] Put another way, even if the Court has the authority to institute Plaintiffs' retention remedies, the Board says the present facts warrant none. Notably, the Board believes that the District has improved in retaining teachers. It points to evidence showing it has more Black teachers than surrounding districts and increases in Black faculty—up from 23.2 % in January 2016 to 27% in 2021−2022.[144] For these reasons, the Board contends the additional remedial measures urged by Plaintiffs are unnecessary and inappropriate.

That other school districts had faculty assignment disparities of greater magnitude in other desegregation cases does not undermine this Court's liability findings. Nor does it undermine its conclusion that retention remedies are appropriate. During the liability phase, the Court was persuaded that "the District was not effectively retaining teachers" and that "taking steps to improve Black teacher retention [would] assist the District in reaching its goals." *Thomas*, 544 F. Supp. 3d at 704, 706. With that in mind, the Court concluded that improving "retention rates [was] a reasonable and practicable measure to meet the goals of the Faculty Consent Order and eliminate the vestiges of prior *de jure* segregation in the area of faculty assignment." *Id.* at 706. However

---

[143] Record Document 598 at 10.
[144] *Id.*

the Board reframes it, this Court determined retention measures were appropriate considering the broader context of the District's liability; the retention steps were one component in a comprehensive strategy to address the Board's faculty assignment shortfalls—shortfalls that stubbornly persist, according to Dr. Frankenberg.[145] After reviewing the most recent faculty data, she confirmed that the District continues to maintain racially identifiable schools, and her retention recommendations remain unchanged.[146]

Also unchanged is the conclusion made by this Court in its liability ruling: Retention remedies are appropriate to address the Board's consent order and constitutional violations. *Id.* at 706. To this end, Plaintiffs have presented a competing plan demonstrating the availability of "more promising courses of action." *Green*, 391 U.S. at 439; *see also Cowan*, 748 F.3d at 240. Dr. Frankenberg said each of Plaintiffs' proposed retention measures was important.[147] The strategies are a "comprehensive" way to benefit the District's teachers, schools, and community.[148] She noted that failing to include these measures could frustrate the District's ability to meet its faculty assignment goals.[149] Though the Board may disagree, it has not proposed an effective way to address teacher attrition and retention.[150] Nor has it provided a reasonable justification for rejecting the retention measures this Court has already concluded reasonable and practicable.[151] In this

---

[145] Record Document 572 at 189:16−192:23 (Frankenberg).

[146] *Id.*

[147] *Id.* at 206:21−207:3.

[148] *Id.*

[149] *Id.* at 207:19.

[150] The only measure related to retention the Board suggested is requiring the District review voluntary exit interviews to track teacher attrition. *Id.* at 204:13−20. The Board, in fact, already conducts exit interviews but admitted that no one filled them out because exit interviews were voluntary and solicited after the termination of employment. This measure alone, Dr. Frankenberg believed, was insufficient for the reasons noted above. Nevertheless, such an analysis may offer helpful insight into why teachers leave the District. However, the Order will require the District to request these interviews before the teacher's separation from the District. Thus, this measure is incorporated into the District's Remedial Desegregation Order.

[151] The Court notes that Plaintiffs' proposal included a measure requiring the District to provide space for Black teachers "to build community." Attachment A at p. 19. This specific remedy was controversial, as both Superintendent Blanchard and Fred Wiltz, the District's Desegregation Implementation Officer,

33

regard, the Board has not met its "heavy burden" in explaining "its preference for an apparently less effective [desegregation] method." *Green*, 391 U.S. at 439; *see also Cowan*, 748 F.3d at 240. The Court's conclusion on this issue is no different, even if Plaintiffs carried the burden. Accordingly, the Court incorporates Plaintiffs' proposed retention strategies, as outlined in the District's Remedial Desegregation Order.[152]

### d. Transfers

Aside from retention measures, the most significant differences between the parties' faculty assignment proposals are their respective teacher transfer provisions. In the liability opinion, the Court observed that the District did not restrict teacher transfers based on race. *Thomas*, 544 F. Supp. 3d at 702. And at times, the District "allowed teacher transfers that increased the racial identifiability" of the school's faculty. *Id.* (emphasis removed). That ruling also ordered the parties to consider remedies to "decrease the number of teacher transfers" that "negatively" impact school diversity and "increase the number of teacher transfers contributing to diversity." *Id.* at 706.

In this remedial phase, the Board suggests addressing the transfer issue by "assign[ing] teachers and encourag[ing] and offer[ing] transfers to teachers in such a manner as to enhance the District's ability to meet its . . . diversity goals."[153] Plaintiffs believe, however, that this directive alone is insufficient. According to Plaintiffs, the Board's transfer policy, as written, would not prohibit the District from granting transfers that worsen racial identifiability. Put another way,

---

expressed similar concerns and questioned its feasibility. Record Documents 576 at 1389:9−17 (Blanchard) & 574 at 861:1−13 (Wiltz). The Court will not adopt this proposal as written while acknowledging that the District can "gauge interest" and determine if such a group should be established. *See* Record Document 574 at 861:25−10 (Wiltz).
[152] Faculty Assignment Remedial Desegregation Order at pp. 22–23.
[153] Attachment A at p. 20.

Plaintiffs argue that the Board's transfer provision is unlikely to "achieve[] the greatest degree of desegregation possible under the circumstances."[154]

In contrast to the Board's proposal, Plaintiffs say their plan is tailored to address the Board's history of approving segregative transfers. Plaintiffs explain that it does so, among other ways, by clarifying how school officials and District administrators must respond to requests for segregative transfers and defining exceptions for "extraordinary circumstances."[155] Stressing that last point, Plaintiffs note that their plan imposes no absolute bar on segregative transfers; such transfers may be granted if an "extraordinary reason" exists.[156] Plaintiffs' proposal defines an "extraordinary reason" as not normal or typical. One noted example, for instance, includes a "teacher's need to be in proximity to a child with special needs."[157] The proposed restriction also has a limited scope. Plaintiffs explain that the provision is only invoked if the transfer creates or worsens racial identifiability at a receiving or sending school.

Despite Plaintiffs' clarification, the Board fervently opposes the proposed transfer measure for two reasons.[158] First, the Board says the measure will severely restrict certain teachers within the District. Some teachers, the Board explains, would be unable to transfer from a racially identifiable school, while colleagues at other schools could move where they wish.[159] That restriction—or the Board's perception of it—gives rise to the Board's second concern: The measure's effect on recruitment. The Board points to Dr. Robert's testimony in raising this second issue. He said transfer restrictions could impair the District's recruiting efforts, especially

---

[154] Record Document 597 at 14 (quoting *Davis*, 721 F.2d at 1435).
[155] Attachment A at p. 14 n.4.
[156] *Id.*
[157] *Id.*
[158] Record Document 583 at 30.
[159] Record Document 575 at 968:21−25 (Roberts).

considering Louisiana's teacher shortage.[160] Citing his experience with the teacher-hiring market in south Louisiana, he testified that newly-minted and experienced teachers often prefer to work in districts with less restrictive transfer policies.[161] Dr. Roberts thus reasoned that transfer restrictions would have a "detrimental effect" on recruitment.[162] Superintendent Blanchard expressed a similar concern, worrying that more restrictive transfer guidelines would hinder the Board's recruitment potential.[163]

Considering these opposing plans and arguments, the Court faces two competing principles in crafting the Remedial Desegregation Order. On the one hand, this Court must implement measures that desegregate the District's faculty. *See Green*, 391 U.S. at 439. Dr. Frankenberg says that restrictive transfers are a means to achieve that end.[164] She explained that creating safeguards limiting teacher transfers would help prevent worsening racial identifiability.[165] Considering the multiple schools in St. Martin Parish that are within the faculty diversity goals, Dr. Frankenberg clarified that the transfer measure would be "infrequently" invoked.[166] This is especially so, she stressed, if the other aspects of the remedial faculty assignment plan are faithfully implemented.[167] Despite its limited application, however, Dr. Frankenberg opined that the transfer measure is a "helpful" safeguard in providing protections that prevent the exacerbation of segregation.[168] Viewed in this way, Plaintiffs' transfer measure has significant merit.

---

[160] *Id.* at 965:24−966:1, 967:2−5.
[161] *Id.* at 963:12−970:11.
[162] *Id.*
[163] *Id.*
[164] Dr. Frankenberg testified at the remedial hearing that before the 2019−2020 school year, the District granted twelve transfers, five of which exacerbated the racial identifiability of one or both schools and only one of which reduced racial identifiability. Record Document 572 at 196:3−5 (Frankenberg).
[165] *Id.* at 249:11−15.
[166] *Id.* at 248:7−17.
[167] *Id.*
[168] *Id.* at 249:11−15.

On the other hand, the Court must adopt desegregative measures that *realistically* plan to work. *Green*, 391 U.S. at 439 (emphasis added). Testimony from Dr. Roberts shed doubt on whether Plaintiffs' transfer proposal is a practical policy. Dr. Roberts testified that "the ability to transfer is a recruitment tool;"[169] if "you put a restriction on that ability . . . it deters people" from wanting to "start their careers in that school system."[170] He explained that teachers might choose to transfer for various reasons.[171] And while transfers may be rare, perceived transfer flexibility, or the lack thereof, is a consideration for teachers when beginning their careers in a school system.[172] Some teachers, he elaborated, "would be willing to go to a school system and start in a school that maybe they wouldn't want to start in originally[,] if they could transfer later down the line to the school they want to go to."[173] Such testimony raises concerns about the impact of implementing the measure as Plaintiffs urge.

In weighing these two considerations, the Court concludes that the evidence weighs in favor of Plaintiffs' proposal, with some more permissive modifications specified below. The Court finds that Plaintiffs' inclusion of an expeditious process for review of any transfer requests gives the plan flexibility and is not a bar per se to segregative transfers. The Superintendent will approve or deny all segregative transfers, and Plaintiffs will have an opportunity to object if an approval increases faculty disparities at a sending or receiving school.[174]

The Court also finds Dr. Frankenberg's testimony persuasive when she opined that the measure would see minimal use, especially if the District implements the remaining faculty

---

[169] Record Document 575 at 963:17 (Roberts).
[170] *Id.* at 963:22−23.
[171] *Id.* at 965:15−17.
[172] *Id.* at 964:12.
[173] *Id.* at 963:18−21.
[174] Faculty Assignment Remedial Desegregation Order at pp. 22–23.

assignment remedies as ordered.[175] With four racially identifiable schools and few teachers seeking transfers generally, the transfer provision will create a necessary safeguard without imposing an unreasonable restriction on the District's operations. Indeed, this is a much less severe measure than transfer mandates in other desegregation cases where courts have ordered school districts "to reassign . . . faculty . . . so that the racial composition of the teachers at each of [the] schools did not indicate that the school was intended for black or white students." *United States v. Nettleton Line Consol. Sch. Dist.*, No. 1:69-cv-063, 2020 WL 5237806, at *7 (N.D. Miss. Sept. 2, 2020).

Perhaps most importantly, however, the Court is aware of the constitutional issues this case implicates. Where racial identifiability in faculty persists, a "school board must do everything within its power to recruit and reassign teachers so as to provide for a substantial degree of faculty integration." *United States v. Indianola Mun. Separate Sch. Dist.*, 410 F.2d 626, 630 (5th Cir. 1969). Having once concluded that the Board maintains racially identifiable schools, this remedial transfer measure is an important safeguard to ensure the District does not further exacerbate racial identifiability. *See Thomas*, 544 F. Supp. 3d at 702 (finding that the District "allowed teacher transfers that increased the racial identifiability" of the school's faculty).

Not only is the measure consistent with desegregation law and this Court's liability ruling, but it is also consistent with the District's current practices. In Superintendent Blanchard's account, he took a "stricter approach" in the past year, denying transfers "unless [they] absolutely. . . decrease[d] . . . the disparities in the faculty."[176] He stated, in fact, that he intends to continue that

---

[175] Record Document 572 at 248:7−17 (Frankenberg).
[176] Record Document 576 at 1408:13−16 (Blanchard).

practice of prohibiting non-desegregative transfers.[177] Such an exercise supports the practicability of implementing the transfer aspect of Plaintiffs' plan.

   None of this is to say that the Court is blind to the District's challenges. Testimony at the remedial hearing showed that rural parishes face teacher shortages. To the extent this measure may hamper recruitment, the Court expands upon the language outlining what an "extraordinary" reason may entail for the District to grant a segregative transfer. Dr. Roberts and Superintendent Blanchard explained that teachers might wish to transfer for several reasons, but paramount among them, teachers choose to transfer to be in the same school attendance zone as their child.[178] Therefore, such an exception is incorporated into the District's Remedial Desegregation Order.

   Aside from blocking segregative transfers, Dr. Frankenberg identified other ways to increase staff diversity. She endorsed, for example, non-monetary incentives that encourage voluntary transfers to reduce racial identifiability. These incentives include leadership opportunities and extracurricular activities.[179] Dr. Frankenberg testified that because the District has "already identified and employed these teachers, presumably provided training, [and] know[s] them to be effective," transfers of this nature "can be a way of redistributing teachers . . . in ways that could further the desegregation of both the sending and the receiving school" without relying on external candidates.[180] Providing opportunities as a means to incentivize voluntary transfers is reasonable and practicable.

   With all this in mind, the Court concludes that the Board has not met its "heavy burden" in explaining "its preference for an apparently less effective [desegregation] method." *Green*, 391 U.S. at 439; *see also Cowan*, 748 F.3d at 240. Plaintiffs have, instead, come forward with a more

---

[177] *Id.* at 1408:19−1409:5.
[178] Record Documents 576 at 1396:8−21 (Blanchard) & 965:16−23 (Roberts).
[179] Record Document 572 at 194:7−9 (Frankenberg).
[180] *Id.* at 194:20−25.

effective plan that realistically plans to work. *Green*, 430 U.S. at 439. Even assuming Plaintiffs

bore the burden of proof in this context, the Court concludes they have met that burden given the

evidence and testimony adduced at the remedial hearing. Accordingly, the Court incorporates

Plaintiffs' proposed transfer measures with the caveats detailed above in the District's Remedial

Desegregation Order.[181]

### e.  Reporting & Objections

All these faculty assignment remedies will prove fruitless without a meaningful effort on

the part of the Board to implement the measures. One way to help ensure follow-through is robust

data collection. In the past, the Board has fallen short in collecting relevant data. And as noted

above, the District has a history of not knowing its faculty assignment obligations. *See Thomas*,

544 F. Supp. 3d at 697. To prevent a similar outcome, the Court incorporates the new reporting

requirements endorsed by the parties and Dr. Frankenberg.[182] These reporting requirements

include additional self-assessments and more detailed recordation from practices at job fairs.

Along with the requirements, the Court re-adopts the data collection provisions found in

the earlier Faculty Assignment Consent Order, not included in the Board's proposal.[183] The

process for raising objections is likewise consistent with the terms of the Faculty Assignment

Consent Order.[184] Reporting across the critical areas of the District's faculty is necessary, given

the District's failure to engage in good-faith efforts to eliminate the vestiges of segregation related

to faculty assignment. These data collection measures are thus practicable and justified. *See*

*Anderson*, 517 F.3d at 298 (noting the Court should not release the District from judicial oversight

until it proves that it "has done all that it could to remedy the segregation caused by official action")

---

[181] Faculty Assignment Remedial Desegregation Order at p. 18 n.4, pp. 23–24.
[182] Record Document 572 at 204:11−20 (Frankenberg).
[183] Record Document 211-2 at 30.
[184] Record Document 211-2 at 16.

(quoting *Price v. Austin Indep. Sch. Dist.*, 945 F.2d 1307, 1314 (5th Cir. 1991)). Accordingly, the reporting measures are included, as outlined, in the Remedial Desegregation Order.[185]

## II.   Quality of Education—Discipline

The portion of the 2016 Superseding Consent Order dedicated to quality of education—discipline ("Discipline Consent Order") required the District to "administer[] student discipline in a fair and non-discriminatory manner."[186] The District sought to "address[] disproportionate assignment of exclusionary sanctions to Black students," and it agreed to "provide[] all students with an equal opportunity to learn in a safe, orderly, and supportive environment."[187]

Essential to meeting these goals was addressing disparities in exclusionary discipline. *Id.* Exclusionary discipline is a form of punishment requiring removal from and the loss of classroom instruction; its overuse diminishes student engagement and success. *Thomas*, 544 F. Supp. 3d at 707 n.41. Acknowledging this reality, the District agreed in the Discipline Consent Order to ensure students remained in the regular classroom setting to the greatest extent possible. *Id.* at 707. It also agreed to refrain from administering exclusionary discipline before attempting and documenting non-exclusionary corrective strategies and interventions. *Id.* But based on the factual findings outlined in the liability opinion, the Court found that the District exhibited a lack of "continuous progress" in this area. *Id.* at 724. To remedy the Board's violations, the liability ruling granted further relief regarding student discipline; the Court ordered the parties to "devise a detailed plan" to implement several measures identified by Plaintiffs' expert in school psychology and school discipline, Dr. Anne Gregory. *Id.* at 726−27.

---

[185] Faculty Assignment Remedial Desegregation Order at pp. 24–26.
[186] Record Document 211-4 at 8.
[187] *Id.*

Dr. Gregory returned to testify on the parties' proposals at the remedial hearing. Dr. Gregory is a professor at the Graduate School of Applied and Professional Psychology at Rutgers University.[188] She earned her undergraduate degree from Brown University, a master's degree in education from Harvard University, and a Ph.D. in clinical and community psychology from the University of California, Berkley.[189] Dr. Gregory's work focuses on school discipline reform, equity in school discipline, and reducing disparities in school discipline.[190] She has published extensively in this area, presents on the topic frequently, and has worked with school districts in several states.[191]

Dr. Jonathan Brice, the Board's expert in school discipline policy, also testified at the remedial hearing. Dr. Brice co-founded School Equity Solutions ("SES"), the District's discipline consultants.[192] He earned his undergraduate degree from the University of Baltimore, his master's in science from Townson University, and his master's and Ed.D. in education, administration, planning, and social policy from Harvard University Graduate School of Education.[193] He has three decades of experience as a teacher, school administrator, and school district executive. Additionally, he served as a U.S. Deputy Assistant Secretary in the Office of Elementary and Secondary Education.[194] He has focused his career on reducing out-of-school suspensions in several school districts nationwide.[195] Dr. Brice helped create and provide professional development to the District's staff and is assisting the District in building a discipline response framework. This includes developing supports, monitoring discipline incidents, redesigning the

---

[188] Record Document 569-20 at 7.
[189] Record Document 573 at 475:25−476:2 (Gregory).
[190] *Id.* at 477:2−4.
[191] *Id.* at 477:5−11, 478:8−12.
[192] Record Document 571-14 at 2 (Brice Report).
[193] *Id.* at 18.
[194] *Id.* at 2.
[195] *Id.*

District's code of conduct, and increasing the District's student-focused support program and strategies.[196]

At the remedial hearing, the experts each noted, to a varying degree, that discipline disparities remain in the District. Dr. Gregory testified, for example, that "persistent racial disparities . . . have not budged much from 2015 to 2022."[197] During the 2021−2022 school year, "black students were 2.5 [times] more likely than white students to receive one or more in-school suspensions," and risk ratios indicate that Black students are approximately twice as likely to receive in-school suspensions, out-of-school suspensions, and office discipline referrals.[198] Additionally, the District's use of non-punitive supports continues to be vastly outnumbered by its use of exclusionary discipline, suggesting that out-of-school suspensions and other exclusionary practices are not "being issued . . . for serious behaviors that indicate areas of need."[199] Dr. Brice testified that racial disparities remained stable across recent years.[200] He agreed that the significant disparities stem "[i]n part, from an overuse of exclusionary discipline practices for subjective offenses specifically."[201]

### a.  *Clear Code of Conduct*

To aid in reducing the District's discipline disparities, Dr. Gregory identified several strategies during the liability phase. One of her recommendations included remodeling the District's discipline code of conduct to de-emphasize exclusionary discipline. In the liability

---

[196] *Id.* at 3.
[197] Record Document 573 at 486:6−11 (Gregory).
[198] *Id.* at 497:13−22.
[199] Record Document 574 at 593:5−11 (Gregory).
[200] Record Document 576 at 1305:7−1308:21 (Brice).
[201] Record Documents 576 at 1301:6−9 (Brice) & 573 at 486:12−14 (Gregory). Even Superintendent Blanchard acknowledged the District's exclusionary discipline struggles. He agreed that the "district has not met the goal it would like to in terms of reducing disparities." Record Document 576 at 1428:18−23 (Blanchard).

opinion, the Court concluded that such a revision was necessary because the District had a troubling knack for excluding students from the classroom. *Id.* That ruling explained how teachers issued school suspensions "for many different student infractions unrelated to dangerous, criminal, or violent behavior." *Id.* at 726. Making matters worse, the District's over-commitment to exclusionary discipline went unmitigated: It had no "system in place" to prevent or limit its use. *Id.* For these reasons, at the liability hearing, Dr. Gregory recommended revising the discipline code to address "exclusionary discipline beyond safety-threatening offenses" and incorporate research-backed discipline strategies. *Id.*

In this remedial phase, both parties agree that the District should revise its code to incorporate clear discipline policies and procedures—among them, graduated infractions, prevention strategies, delivery of behavioral supports, and alternatives to exclusionary discipline.[202] At the remedial hearing, Dr. Gregory again offered her insight on the specifics involved with revising a discipline code. She testified, for example, that the District's new code should outline a multi-leveled discipline response framework—one that describes the corrective strategies that may be used within each level of disciplinary responses, when those strategies are to be used, and finally, the procedures for documenting discipline response before using exclusionary discipline. Among other suggestions, Dr. Gregory recommended that the discipline response framework graduate from least to most severe.[203] Dr. Brice agreed. He explained that a

---

[202] Attachment A at pp. 25–28. Plaintiffs' suggested additions are carried over from the former Discipline Consent Order. Record Document 211-4 at 14–16. While the parties agree to the revision in principle, the Board's proposal lacks express language detailing the specific strategies to incorporate into the code of conduct. In its post-trial brief, the Board claims it has already undergone revisions incorporating the strategies above and believes the additional detail in Plaintiffs' plan is unnecessary. Even so, the Court finds that having clear language in the Remedial Desegregation Order will better assist the Board in implementing its provisions and help the District understand what is expected. The Court thus adopts Plaintiffs more explicitly phrased proposal.

[203] Record Document 573 at 522:18−22, 523:12−19 (Gregory).

graduated system of infractions creates clear expectations and consequences.[204] Having those expectations, he continued, will lead to a supportive school environment and consistent discipline responses throughout the District.[205]

Relatedly, both experts endorsed adding further clarity to the District's Positive Behavior Interventions and Supports Strategies ("PBIS"). PBIS "is preventative programming intended to enhance positive behaviors and eliminate misconduct and resulting disciplinary actions." *Id.* at 713. The three Tiers of PBIS incorporate different types of interventions. At the first level, the interventions establish, communicate, model, and reward expected behaviors. *Id.* at 713−14. These primary interventions or "universal supports" are given to all students and serve as the foundation for the PBIS model. *Id.* As one advances into Tier Two and Three, however, the interventions become more intensive and student specific. *Id.* at 714. Because most students respond to universal supports in Tier One, the more intensive Tier Two and Three interventions are designed for a smaller subset of students. *Id.*

As Dr. Gregory stressed at the liability hearing, rates of exclusionary discipline drop when school systems implement PBIS "with fidelity."[206] *Id.* at 718. A basis of PBIS is applying preventative strategies like praising certain behaviors or establishing reward incentives to help encourage positive behavior.[207] These practices, Dr. Gregory observed, can lead to "a reduction in office discipline referrals . . . [and] racial disparities in office discipline referrals."[208] Dr. Brice, for his part, opined that preventative strategies are effective for most students and easy for teachers to implement.[209] Even so, the experts noted that preventative strategies alone are not equally effective

---

[204] Record Document 576 at 1249:17−24 (Brice).
[205] *Id.*
[206] PBIS principles also form a significant foundation for much of the District's discipline code revision.
[207] Record Document 569-21 at 1 (Gregory Rebuttal Report).
[208] Record Document 573 at 516:6−17, 516:23−517:6 (Gregory).
[209] Record Document 576 at 1310:22−1311:9 (Brice).

for everyone. Indeed, some students require more focused support in building skills and addressing behavior that leads to removal.[210] Both experts agree that the new code's policies should outline processes and procedures for identifying high-risk students, supporting them, and following up on that support.[211] These supports are a part of the PBIS framework and include, among others, skill-building interventions, anger management, and partnerships with mental health providers.[212]

As each expert stressed, another material benefit of a clear code is its guidance to teachers: An explicit and thoughtful code will better instruct educators on redirecting misbehavior in their classrooms. Because teachers are on the "front line[s]" of discipline challenges,[213] the experts agree that the code's format must allow educators to understand what interventions are expected of them.[214] That guidance will ensure teachers learn "they are responsible" for classroom-based responses to low-level discipline incidents.[215] By the same token, clear directions will help reduce knee-jerk reactions to exclusionary discipline.[216]

With all this in mind, revising the District's discipline policies in these ways is a reasonable and practicable remedy to address discipline disparities.[217] Accordingly, the Court incorporates the discipline revision guidelines, as outlined, into the District's Remedial Desegregation Order.[218]

---

[210] Record Document 573 at 489:11−17, 521:13−522:5 (Gregory).

[211] Record Documents 573 at 518:5−15 (Gregory) & 571-15 at 2−3 (Brice Rebuttal Report).

[212] Record Document 573 at 519:1−14 (Gregory).

[213] Id. at 519:11.

[214] Id. at 523:19−524:21.

[215] Record Document 576 at 1238:11−13 (Brice).

[216] Id. at 1238:10−20.

[217] The parties also agree to conduct information sessions with parents and students to review the discipline code of conduct. Plaintiffs suggest adding further clarity to such an exercise by ensuring the sessions "include clear explanation[s] of the school's" data collection system. Dr. Gregory explained the importance for "families and students who read [the discipline code] to understand what are [their] options," including for intervention. Record Document 573 at 524:1−4 (Gregory). The Court likewise incorporates this measure into the District's plan.

[218] Discipline Remedial Desegregation Order at pp. 27–30.

### b. *Behavioral Support Teams*

To ensure fidelity of PBIS implementation, Plaintiffs propose that the District's Remedial Desegregation Order include a provision from the previous Discipline Consent Order—school-based behavioral support teams.[219] Behavioral teams are a way to ensure that schools at the building level implement PBIS with fidelity. Alongside other functions, the teams identify underlying issues contributing to behavior infractions.[220] They also help struggling students develop individualized support under the PBIS model's higher Tiers.[221]

Though the Board does not oppose behavioral support teams, it did not include a provision that mandates their use in its proposal.[222] In fact, according to the Board, it has maintained behavioral teams for years and "does not intend to dismantle them."[223] As referenced above, the Board consented to implement school-based teams in the prior Discipline Consent Order.[224] But rather than expressly reference the teams in its remedial proposal, the Board concentrates on the teams' "support functions." Indeed, the Board thinks that mandating behavioral teams, as Plaintiffs suggest, would turn the focus on "form over function."[225] In the Board's view, the effort could also hinder its flexibility in pursuing other discipline-related strategies.[226]

In effect, however, the Board objects to a distinction without much difference: Both parties' plans support behavioral teams and outline the work the teams do to advance PBIS principles. If the groups are maintained as the Board says, the only effect of adopting Plaintiffs' proposal is holding the Board accountable to follow through with a mandate written in express terms. Since

---

[219] Record Document 211-4 at 15.
[220] Record Document 573 at 503:12–504:6 (Gregory).
[221] *Id.*
[222] Record Document 598 at 17.
[223] *Id.*
[224] Record Document 211-4 at 15–16.
[225] Record Document 583 at 37.
[226] Record Document 598 at 18.

violating the Discipline Consent Order, the Board does not explain how removing the behavioral team provision will help ensure it implements PBIS with fidelity or addresses its student discipline shortcomings.

On the contrary, the testimony persuades the Court that behavioral teams are a significant component of high-fidelity PBIS implementation.[227] Dr. Gregory explained that "well-functioning behavior support teams that use data to guide their decision-making are key to sustaining schoolwide multi-tiered systems of support" and that "schools that implement tiered behavioral supports with fidelity have school level teams that meet regularly."[228] She further testified that schools that successfully leverage PBIS to reduce discipline referrals typically "have had teaming and monthly teams meeting [to track] fidelity."[229] And "when school districts are . . . trying to build [an] infrastructure of behavioral support in their districts," using behavioral support teams is a "pretty common practice."[230]

Mandating the use of these teams, moreover, will create no undue hardship for the District. Superintendent Blanchard testified that the District "currently" maintains behavioral support teams. Specifically, he said that "[e]very school has a team" that reviews behavior, identifies supports for students with challenging behavior, and tries to alter that behavior.[231] According to the Superintendent's testimony, there are also "discipline review team[s]" or "school level discipline team[s]" at each school that conducts reviews of data.[232] With this existing framework, Dr. Brice testified that schools have various options when compiling behavioral support teams.[233]

---

[227] Record Document 573 at 505:23−506:4 (Gregory).
[228] Record Document 569-21 at 15 (Gregory Rebuttal Report).
[229] Record Document 573 at 510:6−12 (Gregory).
[230] *Id.* at 505:17−20.
[231] Record Document 576 at 1373:15−19 (Blanchard).
[232] *Id.* at 1369:18−24.
[233] *Id.* at 1324:16−1325:6 (Brice).

Accordingly, the Court concludes that this measure is practicable and reasonable. The Board has not met its "heavy burden" in explaining "its preference for an apparently less effective [desegregation] method." *Green*, 391 U.S. at 439; *see also Cowan*, 748 F.3d at 240. Plaintiffs have, instead, come forward with a more effective plan that realistically plans to work. *Green*, 430 U.S. at 439. Even assuming Plaintiffs bore the burden of proof in this context, the Court concludes they have met that burden given the evidence and testimony adduced at the remedial hearing. Requiring school-based behavior teams will ensure the Board fulfills its agreed-upon mandate from the prior Discipline Consent Order. The District's new Remedial Desegregation Order shall thus include language to that effect.[234]

### c. *Restorative Justice Program*

Though a fight diversion initiative was in place under the Discipline Consent Order, it was no blueprint for success. The program was created to reduce out-of-school suspensions for physical conflict; its implementation required parental involvement. As identified in the Court's liability ruling, however, the program was fraught with setbacks. *See Thomas*, 544 F. Supp. 3d at 723, 727. Though many issues abetted the program's downfall, the District's anemic effort in improving the initiative as an alternative to exclusionary discipline stands out among the rest. *Id.* at 723 ("[T]he District took no action to improve the conflict diversion program as an alternative to exclusionary discipline, even though the program is designed to address issues such as fights.").

In re-imagining a conflict diversion program in this remedial phase, both experts agree it should focus on "restorative justice." Restorative justice practices seek to improve relationships and reduce physical conflict with strategies that can be used to "solve a number of issues."[235] Such practices do so by teaching students to "unpack" problems, understand why they made certain

---

[234] Discipline Remedial Desegregation Order at p. 30.
[235] Record Document 576 at 1269:6−7 (Brice).

decisions, and resolve disagreements "peacefully" through methods like "peace circles."[236] If the District can successfully leverage restorative justice practices in a new initiative, both experts cited various benefits that could result. Dr. Gregory, for her part, praised the attributes of the restorative justice model by citing its malleable nature. She noted, for example, that the District can use restorative practices as universal supports to prevent behavioral challenges and as part of intervention strategies to correct misbehavior.[237] Dr. Brice agreed. He stressed that restorative justice methods help reduce the number of fights on school grounds.[238] Dr. Brice believed that a well-planned conflict diversion initiative could meaningfully reduce exclusionary discipline in the District.[239]

Both parties agree to adopt the provisions of the Board's prospective "Restorative Justice Program."[240] Though it is not yet in place, the parties agree to incorporate thoughtful steps to develop the initiative, like consulting with students who participated in the former conflict diversion program. Such an exercise will be conducted through focus groups to provide information about what the District "can do to create conditions that would expand a restorative practices strategy."[241] Once the Restorative Justice Program is in place, the parties agree to provisions requiring the District to track its success to ensure the new initiative does not once again fall by the wayside.[242] For all these reasons, establishing a Restorative Justice Program is

---

[236] Record Documents 576 1269:25−1270:3 (Brice) & 571-14 at 16 (Brice Report).
[237] Record Document 573 at 519:1−7 (Gregory).
[238] Record Document 576 at 1269:6−9 (Brice).
[239] Record Document 571-14 at 16 (Brice Report). Plaintiffs also suggest implementing a climate survey. In their post-trial brief, Plaintiffs say that such a survey is found in the Board's proposal, which is inaccurate. The experts did not testify or discuss specifically incorporating a climate survey as described in Plaintiffs' discipline proposal.
[240] Attachment A at p. 28.
[241] Record Document 576 at 1270:18−21 (Brice).
[242] Attachment A at p. 28.

reasonable and practicable; the Court thus includes this agreed-upon measure in the District's Remedial Desegregation Order.[243]

### d. *Professional Development*

As this Court concluded in its liability ruling, the District's professional development was incomplete and inadequate. *Id.* at 714. Though the District provided faculty training, it did not provide training on the full panoply of topics as required by the Discipline Consent Order. *Id.* In this remedial phase, each party's proposal includes provisions mandating wide-ranging professional development workshops approved by experts.[244] Notably, the Board has begun training staff with prevention, intervention, and equity-oriented offerings.[245] Both experts agree to a requirement of at least four hours of this training per year, supplemented with refreshers.[246]

While the parties agree to those additional training measures, they dispute the entire expanse of the District's professional development obligations. Plaintiffs, for their part, seek to require express language on teacher-specific supports: They request that the Board track discipline referrals to assess racial disparities and identify and address potential "teachers who are the source of [those] disparities."[247] Once the review identifies these teachers, Plaintiffs propose that the Board provide them additional support through coaching, demonstration, and mentor feedback.[248] Plaintiffs say this tactic will aid in reducing discipline disparities by addressing the teachers most significantly contributing to them.

---

[243] Discipline Remedial Desegregation Order at pp. 30–31.
[244] Record Document 573 at 492:22−493:2 (Gregory); Attachment A at pp. 30–31.
[245] Record Document 573 at 492:22−493:2 (Gregory).
[246] Record Documents 573 at 501:21−502:4 (Gregory) & 576 at 1318:14−23 (Brice). To be sure, Dr. Brice noted that 8 hours was optimal. Record Document 576 at 1267:21−1268:6 (Brice), 1318:7−9. He further explained that refreshers are already built into the current framework. *Id.* at 1272:11−14.
[247] Attachment A at p. 29.
[248] *Id.*

The Board, however, takes a different view; it believes this extra monitoring measure is unnecessary at best and harmful at worst. At its best, the Board claims the teacher tracking provision is superfluous because the District presently maintains an adequate data review process.[249] This current data review, the Board explains, identifies school level areas of concern regarding punitive measures and lost days of instruction.[250] The review also flags high-referring teachers; when they are identified, the Board already has a method in place to offer those teachers tailored support in classroom management.[251] With this framework, the Board thinks its practices achieve the outcome Plaintiffs seek—a process that can identify high-referring teachers to offer them additional support; thus, any further remedies are unneeded.

That aside, the Board believes the specific phrasing of Plaintiffs' proposal will likely do more harm than anything. By its terms, Plaintiffs' proposed measure "identif[ies] and address[es] any potential teachers who are the *sources* of the [discipline] disparities."[252] The Board worries such language is accusatory; it says the wording stigmatizes teachers who are chosen to receive extra support. It also stresses the difficulty in implementing such measures without clearly explaining "disparities" or when supports should be triggered.[253] The Board says that such a framework offers no guidance on what situations require intervention.

As a threshold matter, the Court disagrees with the Board's belief that such a measure is unnecessary. For one, Dr. Gregory noted that the level of office discipline referrals in the District indicates a "need for greater professional development around prevention and defusion [sic]. . . of lower level issues."[254] She explained that coaching and follow-up support for high-referring

---

[249] Record Document 598 at 20.
[250] *Id.*
[251] *Id.*
[252] Attachment A at p. 29.
[253] Record Document 598 at 20.
[254] Record Document 573 at 498:6−8 (Gregory).

teachers has been shown to eradicate racial disparities in classrooms and to "reduce the use of exclusionary discipline, reduce the use of punitive reprimands, and increase positive praise."[255] Dr. Gregory said that teachers who refer many students "out of their classroom" and who "issu[e] a lot of discipline referrals" typically "need more support in classroom management."[256] Providing follow-up support, moreover, is common in school districts and not an unusual request.[257]

Additionally, the Court concluded in its liability ruling that implementing measures to track referrals closely was appropriate. *Id.* Indeed, in the liability phase, Plaintiffs advanced this measure in their motion for further relief; they sought an order requiring the District to "closely track office discipline referrals to critically assess any racial disparities and . . . identify and address any potential teachers who are the source of the disparities." *Id.* at 725. Given the Board's Discipline Consent Order violations, the Court concluded such a measure "reasonable and practicable." *Id.*

Though the Court appreciates the Board's current efforts, the Court cannot enforce an obligation absent express language. Predicating a desegregation order on good intentions and informal assurances is not the aim of the Court's remedy-crafting exercise. In Dr. Brice's words, "[i]f you don't put it in the plan, then you can't be held responsible."[258] So at the very least, the Court concludes that some measure should be in place to track referrals and the teachers that issue them.

But the Board's more significant concern about the measure's phrasing has merit. Indeed, the Court acknowledges the breadth of nuance Plaintiffs' proposed provision fails to capture. Some teachers may face more discipline challenges than others through no fault of their own.[259]

---

[255] *Id.* at 496:8−10, 16−22.
[256] *Id.* at 492:5−9.
[257] *Id.* at 493:21−24.
[258] Record Document 576 at 1257:10−11 (Brice).
[259] *Id.* at 1376:8−25.

According to Dr. Brice, classifying teachers with that misfortune as a "source" of discipline disparities could be perceived as unsupportive.[260] As a further impediment to its implementation, the measure does not clearly state what a "disparity" entails.[261] In consequence, the language oversimplifies the complexity of discipline interactions and disregards the delicacy with which the District must approach these situations.[262] On these bases, Dr. Brice believed that Plaintiffs' proposed measure could exacerbate a problem other steps in the Remedial Desegregation Order seek to remedy: the lack of teacher support.

Still, the parties' competing arguments are not mutually exclusive. The Court can adopt a measure that requires the Board to identify and address high-referring teachers without using accusatory language. In doing so, the Court turns to the testimony of Dr. Brice, who does not contest the basis of Dr. Gregory's testimony. Indeed, Dr. Brice supports recording discipline information at the classroom level and addressing teachers who need more support in classroom management. [263] He took issue, however, with how Plaintiffs phrased the measure. According to Dr. Brice, a better approach would be to formulate a process that achieves the same end but avoids making teachers "feel like they are . . . the problem."[264]

When asked by the Court how this translates into express language, he explained that a more supportive teacher measure would state, "the District will implement a . . . weekly discipline review practice that seeks to find out where incidents are occurring, during what time, and in what location."[265] If incidents continue occurring "in the same location" and at the "same time," the review will alert the District that a particular teacher may need more classroom management

---

[260] *Id.* at 1319:12−17.
[261] Record Document 573 at 630:2−631:9 (Gregory).
[262] Record Document 576 at 1254:7−16 (Brice).
[263] *Id.* at 1243:16−23.
[264] *Id.* at 1244:1−2.
[265] *Id.* at 1256:3−7.

support.[266] It is then "the responsibility of the school administration . . . to visit that classroom, to

sit in [,] and to see what is taking place, and then provide support to that teacher."[267]

      While neither parties' proposal included such language, this Court builds upon Dr. Brice's

suggestion as outlined in the Remedial Desegregation Order.[268] Such a measure will provide an

express mandate requiring the Board to closely track referrals and address areas of concern when

its review alerts the District to discipline issues. The provision does not accuse teachers of being

the "source of disparities" and permits the Board a degree of flexibility in determining the context

of teacher-student discipline encounters. By the Board's admission, implementing such a measure

is feasible. As noted above, the District already conducts similar weekly reviews to track referral

rates.[269] When high-referring instructors are flagged, the District already provides them with

federally funded individualized support in classroom management.[270] Moreover, the training

provided by School Equity Solutions—Dr. Brice's consulting company—provides a strong

foundation for coaching and follow-up support. As Dr. Brice testified, "support and follow-up is

built into the [training] program because the people that are doing the training are actually in the

building[,] and they are able to follow up."[271] With all this in mind, the Board has not met its

"heavy burden" in explaining "its preference for an apparently less effective [desegregation]

method." *Green*, 391 U.S. at 439; *see also Cowan*, 748 F.3d at 240. This reasonable and

practicable referral tracking measure is therefore adopted, as detailed, in the Remedial

Desegregation Order.[272]

---

[266] *Id.* at 1256:13−16.
[267] *Id.* at 1256:17−19.
[268] Discipline Remedial Desegregation Order at pp. 31–32.
[269] Record Document 576 at 1257:17−1258:3 (Brice).
[270] *Id.* at 1423:22−1424:7 (Blanchard).
[271] *Id.* at 1272:20–23 (Brice).
[272] Discipline Remedial Desegregation Order at pp. 31–32.

### e.  *Data Collection & Reporting*

Without timely discipline data collection, Dr. Gregory testified that the District would be "severely impaired" in its ability to implement supports.[273] Plaintiffs thus propose ensuring the District reviews the discipline data each month.[274] Dr. Brice testified that the District should review data at District, building, grade, and classroom levels to bolster behavioral supports.[275] Dr. Gregory testified that the District must analyze data by rates and counts. When disaggregated by race, Dr. Gregory said that analysis by counts would allow the District to determine if it has "a large proportion of [a] particular population impacted."[276] She further stressed that the District must also calculate rates because they consider school enrollment and are not influenced by shifts in that enrollment.[277] Finally, reporting on and analyzing risk ratios allows the District to monitor whether racial disparities in discipline increase, decrease, or remain stable over time.[278]

The data collection described above is feasible and practicable for the District to implement. Indeed, the District has already been trained in data collection and review, and nearly every provision was included in the preceding Discipline Consent Order. Director of Child Welfare and Attendance of the District, Fred Wiltz,[279] testified that District administrators had been trained to input discipline data into the student information system.[280] Moreover, Dr. Brice testified that School Equity Solutions has trained District administrators on analyzing data—including by race, student, and referring teacher—and has provided administrators with a template they can use in

---

[273] Record Document 574 at 586:17–25 (Gregory).
[274] Record Documents 574 at *581*:8–22 (Gregory) & 576 at 1314:5–8 (Brice).
[275] Record Document 576 at 1243:5–17 (Brice).
[276] Record Document 573 at 485:9–12 (Gregory).
[277] *Id.* at 484:6−14.
[278] These measures are from the former Discipline Consent Order. Record Document 211-4 at 17−19.
[279] For an overview of Wiltz's background, *see Thomas*, 544 F. Supp. 3d at 670.
[280] Record Document 574 at 867:3−6 (Wiltz). Most of these tracking provisions are nearly identical with the former Discipline Consent Order. Record Document 211-4 at 17–18.

the process.[281] Dr. Brice opined that it is "doable" for the District to continue to review data to identify students with multiple referrals.[282] Accordingly, the Court incorporates these data collection measures, as detailed, into the District's Remedial Desegregation Order.[283]

## III.     Quality of Education—Graduation Pathways

"Graduation pathways" is another component of the quality of education factor. The phrase refers to the state-mandated types of diplomas Louisiana high school students can earn. *Thomas*, 544 F. Supp. 3d at 727. The St. Martin Parish School District offers a single pathway that culminates in a college-eligible degree called the "TOPS University" diploma. As an obligation in the Superseding Consent Order dedicated to quality of education—academics ("Academics Consent Order"), the Board agreed to take reasonable steps to avoid racial disparities in all diploma programs. *Id.* at 728. The Board also agreed "to increase Black student enrollment in the most academically rigorous and college preparatory programs in its secondary schools."[284] The Board did not meet these goals for the reasons outlined in the Court's liability ruling. *See id.* at 738.

In that same opinion, the Court granted further relief, requiring the parties to consider strategies endorsed by Dr. Robert Balfanz, Plaintiffs' expert in the field of academics and education in high school and grade school. *Id.* at 739. Among the general strategies were ways to strengthen the District's academic interventions, methods of building supportive classroom environments, and approaches for recruiting and supporting Black students throughout the pathway process.

---

[281] Record Document 576 at 1314:2−1315:11 (Brice).
[282] *Id.* at 1315:16−22.
[283] Discipline Remedial Desegregation Order at pp. 33–34.
[284] Record Document 211-4 at 21.

At the remedial hearing, Dr. Balfanz returned to testify[285] regarding graduation pathways. Dr. Balfanz earned an undergraduate degree from Johns Hopkins University, a Ph.D. in education from the University of Chicago, and is currently a professor in the School of Education at Johns Hopkins University.[286] Dr. Balfanz's work revolves around school dropout prevention, increasing high school graduation rates, improving college readiness, and strategies for closing academic and graduation gaps for low-income students and students with disabilities.[287] He has worked directly with school districts to identify reasons students are not graduating and to develop and test strategies for increasing graduation rates.[288]

During the remedial phase, Dr. Balfanz confirmed that gaps in Black and White student participation in the TOPS program remained at nine percent.[289] Citing the most recent data from the 2021−2022 school years, Dr. Balfanz noted that 56 percent of White graduates were earning a TOPS pathway diploma compared to 47 percent of Black students. That nine-point participation gap mirrors the gap discussed in this Court's liability ruling.[290] *See id.* at 738 ("The racial disparities for each high school have remained at least 7 percentage points District-wide. This is greater than the agreed-upon 5 percentage point variance standard, thus demonstrating that the vestiges of prior *de jure* segregation remain in this area.").  In this remedial phase, the parties have proposed mostly overlapping pathways plans incorporating strategies that address those disparities.[291]

---

[285] The Board did not offer an expert to opine on the parties' graduation pathways proposals.
[286] Record Document 569-24 at 7.
[287] Record Document 573 at 264:18−265:1 (Balfanz).
[288] *Id.*
[289] *Id.* at 277:7−12.
[290] *Id.*
[291] The Court notes that it is readopting the five-percentage point variance standard in the Pathway Remedial Desegregation Order. This percentage was agreed upon during the liability phase to apply to graduation pathways. *See Thomas*, 544 F. Supp. 3d at 738 ("The parties are in agreement that the Court should use the

### a. Dissemination of Information

In its liability opinion, the Court identified several issues in how the District communicated pathway information to students. To address that problem, Dr. Balfanz suggested a measure to revamp the District's outreach strategy: begin the pathway "campaign" before high school. *Id.* at 736. At the remedial hearing, Dr. Balfanz explained that junior high students are at an inflection point in their education—a period when they are figuring out what they want from their school experience and how they can best achieve their education goals.[292] That is why Dr. Balfanz believed middle school is an opportune period for pathway outreach to students and families, even though students select their graduation pathway in high school.[293] In line with this theory, both parties' proposals incorporate provisions ensuring young students in middle school know the courses that guarantee TOPS pathway eligibility.[294]

The parties' proposals also ensure the District communicates with parents and families. The agreed-upon outreach measures require that the District connect families considering a pathway program with other people who have had similar life experiences and have taken a college preparatory pathway.[295] Dr. Balfanz observed that such a framework allows students and their guardians to receive information about the TOPS program from people they know and trust.[296] For this and the reasons above, the Court concludes that these agreed-upon measures are reasonable and practicable actions the Board can take to help address ongoing disparities; they are incorporated in the Remedial Desegregation Order.[297]

---

same 5 percentage point variance standard applied in the other areas of academics as the standard for determining variance.").

[292] Record Document 573 at 269:18−270:1 (Balfanz).

[293] *Id.*

[294] Attachment A at pp. 34–36.

[295] *Id.*

[296] Record Document 569-24 at 2 (Balfanz Report).

[297] Pathway Remedial Desegregation Order at pp. 36–37.

### b.   *Peer-to-Peer Program*

In the liability phase, the Court observed that the District lacked a cohesive academic support structure for Black students because the Board did not attract or retain Black students in the TOPS diploma program. Dr. Balfanz identified several practical tools the Board could employ to address that attainment gap at the liability hearing. *Id.* at 739–40. In this remedial phase, one of those identified strategies has a place in both parties' proposals—a peer-to-peer mentorship program.[298]

This agreed-upon measure will connect Black students in the TOPS pathway with other students considering the TOPS University diploma.[299] The program aims to increase Black enrollment in the TOPS pathway and advanced courses. Dr. Balfanz praised the advantages of the mentorship framework, opining that mentorships offer students a dual sense of security. He said they help students understand that they are not the only one of a specific type of student in that particular pathway and help students realize that support is available. [300]

Despite the parties' overlapping support for peer-to-peer mentors, Plaintiffs propose going even further: They seek to incorporate adult mentors from the District's staff. This addition, Plaintiffs contend, provides significant benefits for Black students—especially in areas where peer-to-peer mentorships fall short. To support their argument, Plaintiffs cite a study relied upon by Dr. Balfanz from the Centers for Disease Control ("CDC").[301] The study surveyed students from several schools nationwide; its findings underscored the importance of human connection for school-age children. In particular, students who thought an adult cared for them as a person at

---

[298] Attachment A at pp. 36–37.
[299] *Id.*
[300] Record Document 573 at 270:20−271:14 (Balfanz).
[301] *Id.* at 290:2−6.

school reported half the mental health challenges of students who did not.[302] The study also showed that only one-third of Black students reported that an adult in their school knew and cared about them as a person.[303] Citing this data, Plaintiffs say that the District's Black students are more likely to experience mental health challenges.[304] Such challenges, Plaintiffs believe, correspond with weakened academic performance.[305] Plaintiffs argue that incorporating adult mentors is one way to address this issue.

In the Board's view, however, this measure is a solution searching for a problem; it says that Plaintiffs lack evidence showing the District's Black students struggle in the same ways as the Black students in the CDC study. Because the study sheds no specific light on the students from St. Martin Parish, the Board believes it carries little weight. The Board thus contends that Plaintiffs lack a sound basis for including adult mentors in the District's pathways plan.

But the Board's argument contradicts the conclusions the Court made in its liability ruling. This Court acknowledged then that creating mentorship opportunities was reasonable considering the Board's pathway violations. *See id.* at 738. As the Court once noted, the District "failed to comply with the requirement that it take steps to reduce racial disparities in the number of students selecting the TOPS diploma pathway." *Id.* Because the District took no "steps to reduce these disparities," the Court concluded that the District did not eliminate de jure segregation to the extent practicable. *Id.* To remedy those disparities, Dr. Balfanz said at the remedial hearing that maintaining adult mentors in a school system was important to student success because they can mitigate students' feelings of isolation: They help students feel welcomed and cared for at

---

[302] *Id.*
[303] Record Document 569-25 at 2 (Balfanz Rebuttal Report).
[304] *Id.*
[305] *Id.*

school.[306] Consequently, Dr. Balfanz believed that adult mentors help dismantle the social barriers thwarting academic achievement, particularly in advanced courses that can lead to pathway disparities.[307]

To be clear, Dr. Balfanz stressed that this measure requires only the slightest human connection.[308] And adult mentors need only spend a short time cultivating relationships with mentees.[309] Rather than constant contact, this measure emphasizes consistent interaction— meaning two affirmative greetings a week from the mentor to the student.[310] In this way, exchanges need not be longer than thirty seconds each as long as they occur regularly.[311] Luckily, the Board already has in place the infrastructure to support this measure's implementation. Superintendent Blanchard testified that the District currently encourages its staff to develop relationships with students.[312] He also testified that this proposed measure is practical.[313]

All in all, the Board has not provided reasonable justification for rejecting this measure and thus failed to meet its burden in explaining "its preference for an apparently less effective [desegregation] method." *Green*, 391 U.S. at 439; *see also Cowan*, 748 F.3d at 240. The Court will thus adopt the peer-to-peer program and the adult mentorship provision into the District's Remedial Desegregation Order.[314]

---

[306] Record Documents 573 at 290:2−6 (Balfanz) & 569-25 at 2 (Balfanz Rebuttal Report).
[307] Record Document 569-25 at 2 (Balfanz Rebuttal Report).
[308] Record Document 573 at 290:16−23 (Balfanz).
[309] *Id.*
[310] *Id.* at 290:11−25.
[311] *Id.* at 291:1−3.
[312] Record Document 576 at 1358:20−1359:4 (Blanchard).
[313] *Id.*
[314] Pathway Remedial Desegregation Order at pp. 38–39.

### c. *Academic Assistance & Data Collection*

Students can only graduate with a TOPS University diploma after taking advanced high school courses. To better equip students for success in those classes, the parties proposed incorporating additional tutoring in their proposals—a measure supported by Dr. Balfanz.[315] This tutoring concentrates on students struggling due to academic gaps and aims to address those gaps as early as possible.[316] Dr. Balfanz said, "[t]utoring has been shown to be a highly effective academic intervention, which provides customized, as needed, academic supports."[317] Moreover, focusing the tutoring on students "just in time" before or early after they select a pathway "is essential to enabling more students to succeed in the TOPS University Pathway."[318]

The parties each similarly include Response to Intervention Teams ("RTI" Teams) in their respective plans.[319] These teams are composed of individuals who review data and implement proactive strategies to address academic issues and educational support. RTI teams can serve multiple functions related to monitoring students' academic achievement. *See Thomas*, 544 F. Supp. 3d at 735−36, 738−39. In their proposals, both parties agree to use the District's existing RTI infrastructure to enable rapid intervention when a student first shows the need for additional support.[320] Dr. Balfanz supports the use of RTI teams in this context.[321] He explained that the earlier the District could address a student's academic struggles, the better the District could mitigate adverse performance effects.[322] Implementing this tactic thus requires thoughtful

---

[315] Attachment A at pp. 37–38. Plaintiffs rearrange the wording in this section, but the principal is the same.
[316] *Id.*
[317] Record Documents 569-24 at 4 (Balfanz Report) & 573 at 271:21−272:11 (Balfanz).
[318] Record Document 569-24 at 4 (Balfanz Report).
[319] Attachment A at pp. 38–39.
[320] *Id.*
[321] Record Documents 573 at 272:15−273:23 (Balfanz) & 569-24 at 3 (Balfanz Report).
[322] Record Document 569-24 at 4 (Balfanz Report).

monitoring. Dr. Balfanz specifically recommended the frequent monthly review included in both parties' proposals.[323]

Beyond assessing the success of interventions with individual students, Dr. Balfanz suggested that the District consider broader data patterns and trends across high school students.[324] He explained that the data review aims to determine whether current measures increase TOPS pathway preparation and success.[325] The methods for tracking pathway data include following ninth-grade course failures by school and race, and grade point average ("GPA") by race of students enrolled in the TOPS University pathway.[326] Dr. Balfanz believed this tracking requirement would allow the District to make "mid-course corrections" if its current strategies prove ineffective.[327] He further stressed that early course corrections are preferable to waiting until graduation before knowing whether a tactic works.[328]

Even so, the Board's proposed plan excludes this data-tracking measure. According to the Board, these proposed data-tracking requirements serve no material benefit; instead, the Board contends that the tracking measure will only increase its wasted time performing "bureaucratic exercises." Further, the Board argues that there is no explanation of how collecting the additional data has anything to do with the "efficacy" of tracking the Board's efforts in graduation pathways.

In making that last point, however, the Board fails to address Dr. Balfanz's testimony on the subject. Dr. Balfanz said that having fewer Black students fail ninth-grade courses is essential in making more students eligible and prepared for the TOPS University pathway.[329] To that end,

---

[323] *Id.*

[324] Record Document 573 at 280:5−13 (Balfanz).

[325] *Id.* at 280:5−22.

[326] *Id.*

[327] Record Document 569-24 at 4 (Balfanz Report).

[328] Record Document 573 at 287:11–20 (Balfanz).

[329] Record Document 569-25 at 1 (Balfanz Rebuttal Report).

tracking ninth-grade course failures and the GPA by race of students enrolled in the TOPS University pathway was a "critical" tool in addressing pathway disparities.[330] Dr. Balfanz opined that this measure would allow the school system to assess the success of interventions on the cohort's success in the TOPS pathway more efficiently.[331] Without this data, Dr. Balfanz believed the District would lack the information it needs to improve academic outcomes.

For these purposes, tracking this data is not just a "bureaucratic exercise;" the measure is a "small" undertaking that can make a "big difference."[332] Indeed, the ease of adopting this measure underscores its feasibility. Dr. Balfanz explained that reviewing broader data trends could take as little as ten additional minutes of work for the District.[333] The District, in fact, already intends to track most of the necessary data categories in Plaintiffs' proposed plan, and the District already has access to an existing RTI team infrastructure.[334] Therefore, reviewing broader trends will not impose a significant administrative burden.[335]

Based on the above, the Board has not met its "heavy burden" in explaining "its preference for an apparently less effective [desegregation] method." *Green*, 391 U.S. at 439; *see also Cowan*, 748 F.3d at 240. Plaintiffs have, instead, come forward with a more effective plan that realistically plans to work. *Green*, 430 U.S. at 439. Even assuming Plaintiffs bore the burden of proof in this context, the Court concludes they have met that burden given the evidence and testimony adduced

---

[330] Record Documents 569-25 at 1 (Balfanz Rebuttal Report) & 573 at 287:1−24 (Balfanz).
[331] Record Document 573 at 287:1−24 (Balfanz).
[332] *Id.* at 287:25.
[333] *Id.* at 283:14−25.
[334] Superintendent Blanchard only identified one category the District does not currently track: GPA by race. Justifying its exclusion, he said: "We just didn't feel that volume of information was necessary." Record Document 576 at 1363:20−1364:12 (Blanchard).
[335] Record Document 573 at 283:14−25 (Balfanz).

at the remedial hearing. For these reasons and those above, Plaintiffs' proposed data-tracking measures are included in the Remedial Desegregation Order.[336]

### d.  Additional Training

In its liability ruling, this Court identified one last area in graduation pathways needing revision: the teacher training framework. *Thomas*, 544 F. Supp. 3d at 738−39. The Court found that the Board did not train staff to market pathways information to students and families. *Id.* at 739. Relatedly, the District never directed school counselors to address racial disparities or ensure that more Black students enrolled in the TOPS pathway.

Pointing to these shortcomings, Plaintiffs propose in this remedial phase additional measures incorporating more professional development. According to Plaintiffs, the training will assist teachers in promoting the TOPS pathway and increase Black student enrollment and success. The primary focus of the training will be supportive classrooms and their role in student achievement. [337] The Board, for its part, believes the measure is unnecessary. In the Board's view, requesting such training is a thinly veiled attempt for Plaintiffs to exert "direct control" over the training process. Lacking any notable benefits, the Board says the training measure will not help students choose a pathway program. After all, the Board stresses that selecting a pathway is a voluntary decision.

Though that last point may be valid, the Court finds that mandating additional training is appropriate. Dr. Balfanz stated that staff training on promoting student participation and success within the TOPS pathway is vital.[338] That is because supportive classroom environments are "central" to a student's success.[339] Therefore, training teachers to foster these environments is

---

[336] Pathway Remedial Desegregation Order at pp. 39–40.
[337] *Id.* at p. 39.
[338] Record Document 573 at 293:14−18 (Balfanz).
[339] Record Document 569-24 at 2 (Balfanz Report).

indispensable to an "excellent" pathways plan.[340] The District has conducted such training in the past.[341] And Superintendent Blanchard agreed that incorporating "presentations at faculty meetings about [] pathways" would be "easy."[342]

Based on the above, implementing additional pathway training is a reasonable and practicable means of reducing pathway disparities. Accordingly, the Board has not met its "heavy burden" in explaining "its preference for an apparently less effective [desegregation] method." *Green*, 391 U.S. at 439; *see also Cowan*, 748 F.3d at 240. Plaintiffs have, instead, come forward with a more effective plan that realistically plans to work. *Green*, 430 U.S. at 439. Even assuming Plaintiffs bore the burden of proof in this context, the Court concludes they have met that burden given the evidence and testimony adduced at the remedial hearing. The measure is thus incorporated into the District's Remedial Desegregation Order.[343]

## IV.     Compliance & Termination

Finally, the Court re-incorporates the "Compliance and Termination" provisions from the Superseding Consent Order regarding faculty assignment and quality of education.[344] Though the District would have the Court adopt a plan allowing it to move for unitary status as early as 2024, the Court refuses to adopt such a framework. As noted by this Court in its prior liability ruling, "the Court shall . . . retain jurisdiction" over these areas for "**at least three years** to monitor the District's compliance with this order." *Thomas*, 544 F. Supp. 3d at 707, 727, 739 (citing *Moore v. Tangipahoa Par. Sch. Bd.*, 921 F.3d 545, 547 (5th Cir. 2019) (noting that three years is the typical monitoring period for a new desegregation plan)). The District's actions over the last year—sudden

---

[340] Record Document 573 at 298:10−13 (Balfanz).
[341] Record Document 576 at 1422:7−9 (Blanchard).
[342] *Id.* at 1422:10−12.
[343] Pathway Remedial Desegregation Order at p. 40.
[344] *Id.* at p. 41.

and unexplained changes in positions and general obstructionism—severely undermine its request to have leave to file for unitary status at the end of the 2023−2024 school year.[345] For these reasons, the earliest date the Board may file a motion for unitary status will be ninety days after filing the July 1, 2026, end-of-year reports.

## CONCLUSION

Having previously concluded that the Board was liable for constitutional and consent order violations in faculty assignment and quality of education, the Court adopts the reasonable and practical Remedial Desegregation Order filed alongside this ruling. For the above reasons, the measures included within that Order are effective, workable, and practicable. *Dowell*, 498 U.S. at 249−50 (1991); *Davis v. Bd. of Sch. Comm'rs of Mobile Cnty.*, 402 U.S. 33, 37 (1971). If appropriately implemented, the Court is persuaded that these measures will realistically achieve the desired effect for the St. Martin Parish School District in faculty assignment and quality of education: desegregation. *See Cowan*, 748 F.3d at 240. With that in mind, the Court **ADOPTS IN PART** and **DENIES IN PART** both parties' proposals.[346]

**THUS DONE AND SIGNED** this 25th day of May, 2023.

ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE

---

[345] Remedial Desegregation Order at 42.
[346] Record Documents 522 & 523. Any portion of these proposals dealing with student assignment is moot.