# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE DIVISION

THERESA D. THOMAS, ET AL.                    CIVIL ACTION NO. 65-11314

VERSUS                                       JUDGE ELIZABETH E. FOOTE

SCHOOL BOARD ST. MARTIN PARISH

## MEMORANDUM RULING REGARDING CATAHOULA ELEMENTARY

### Table of Contents

**MEMORANDUM RULING** .................................................................................................... 3

**BACKGROUND** ................................................................................................................... 6

**LEGAL STANDARD** ........................................................................................................ 20

**EXPERTS** ......................................................................................................................... 23

**ANALYSIS** ....................................................................................................................... 27

**I.    Reopening Catahoula as a PK–5 school is not a reasonable, feasible, or workable remedy to eliminate de jure segregation** .................................................................. 27

    **A. The Board proposes reopening Catahoula as it was pre-closure without offering or considering any other desegregation alternatives, except for a magnet program previously ordered by the Court** ....................................... 27

    **B. Like the Board's plan, Mr. Hefner's three options exacerbate racial identifiability in St. Martinville elementary schools** ..................................... 48

    **C. Mr. Hefner's three options adversely affect the District overall** ................. 57

    **D. Mr. Hefner's natural desegregation theory is flawed** .................................... 63

    **E. Mr. Hefner's previous 2020 proposal, addressed in *Thomas I* and *Borel*, would have an adverse effect on the District overall** ..................................... 68

    **F. Neither Mr. Hefner nor the Board presents adequate alternatives** ............. 69

II.    **Plaintiffs and the Government offer reasonable, feasible, and workable remedies to eliminate de jure segregation, limit unequal burdens on Black families, and lessen the negative impact on the magnet school** .................................................................. 70

    A.    **The Government proposes reopening Catahoula Elementary as a PK−K school, limiting young students' exposure to racially identifiable schools, and allowing St. Martinville and Catahoula students to attend the magnet school as early as possible** ............................................................. 71

    B.    **Plaintiffs propose reopening Catahoula Elementary as a PK−1 school with a revised attendance zone, limiting the unequal burdens on Black families and supporting the magnet program** ...................................................... 74

    C.    **Though the Board objects to Plaintiffs' and the Government's proposals, it does not dispute their desegregative benefits or suggest any other reasonable alternative solutions** .......................................................................... 78

III.   **Dr. Frankenberg proposes the reasonable, feasible, and workable option of reopening Catahoula Elementary as a sixth-grade academy, avoiding the exacerbation of racial identifiability across the St. Martin Parish School District**  82

IV.    **Reopening Catahoula in Fall 2023 under any grade configuration would threaten the viability of the magnet program in the St. Martinville attendance zone** .......... 88

**CONCLUSION & REMEDIAL ORDER** ................................................................ 92

## <u>MEMORANDUM RULING</u>

On remand in this continuing desegregation case, this opinion considers one issue: What student assignment plan, if any, would allow Catahoula Elementary to reopen while eliminating the vestiges of de jure segregation to the extent practicable?[1] In its June 21, 2021 ruling, *Thomas v. School Board St. Martin Parish ("Thomas I")*, 544 F. Supp. 3d 651, 740 (W.D. La. 2021), this Court denied the St. Martin Parish School Board's ("District" or "Board") request for unitary status. It held that, as to student assignment in general, the Board failed to comply with the 2016 Superseding Consent Order and continued to violate the constitutional rights of the children in the St. Martinville Zone. After weighing testimony from teachers, District staff, and experts, the Court found that Catahoula Elementary School, located in the St. Martinville Zone, was built in an all-White town for all-White students during the height of de jure segregation. *Id.* at 655. Consequently, it ordered that the District close Catahoula Elementary. The Court also ordered that the parties work together to craft a new desegregation order that would institute a "robust" magnet program at St. Martin Primary ("SMP") and the Early Learning Center ("ELC"), comply with the mandate of the Student Assignment Consent Order, and develop a legally adequate student transfer policy to ensure that the schools desegregated as a result of the Minority to Majority ("M-to-M") transfers would remain so desegregated after the Court's supervision ended. *Id.* at 693.

The Fifth Circuit in *Borel on behalf of A.L. v. School Board St. Martin Parish*, 44 F.4th 307, 314 (5th Cir. 2022), upheld this Court's determination that "the remaining racial imbalances [as to student assignment] are vestiges of de jure segregation." The three-judge panel similarly

---

[1] The Court has previously issued an opinion and order on the issues of Faculty Assignment and Quality of Education. *Thomas v. Sch. Bd. St. Martin Par. ("Thomas II")*, No. CV 65-11314, 2023 WL 3679056 (W.D. La. May 25, 2023); Record Document 681. A detailed procedural history can be found in that opinion. *Thomas II*, 2023 WL 3679056, at *3−5.

upheld this Court's conclusion that the Board failed to comply with the consent order, agreeing that the District was not entitled to unitary status in student assignment. Even so, the Fifth Circuit held that closing Catahoula Elementary "at this stage in the proceedings" was an abuse of this Court's discretion. *Id.* at 316. For that reason, it reversed the closure of Catahoula Elementary and remanded the case for "consideration of other methods of addressing [the] concern" of vestiges of segregation in student assignment. *Id.* at 317. In doing so, the Fifth Circuit suggested that this Court consider again redrawing attendance zones and examining whether the Catahoula area was naturally desegregating due to population shifts. *Id.*

This Court, in response, held a hearing on February 28, 2023, through March 6, 2023 (the "Spring 2023" hearing) to consider alternatives on remand. Presented at that hearing were seven student assignment plans offering varying degrees of desegregative benefits. Plaintiffs,[2] Intervenor Plaintiffs ("Government"),[3] and the District[4] have each moved for the Court to adopt their respective proposals. The Board's expert presented three alternative options, and Plaintiffs' expert offered her own recommendation. Notably, the District endorsed no desegregative alternatives, seeking instead to reopen Catahoula Elementary for grades PK through five with the same attendance zones existing when it closed in 2021. Such an "alternative" would revive Catahoula Elementary as a racially identifiable White school and exacerbate the Black racial identifiability at the ELC and SMP by 4.8 and 7.1 percentage points, respectively.[5]

Two other events since the close of evidence affect this opinion. First, the Court has entered a consent order once again attempting to establish a "robust" magnet program at the ELC

---

[2] Record Document 615.
[3] Record Document 614.
[4] Record Document 611.
[5] Record Document 657 at 20 (Frankenberg). At present, with Catahoula closed, the ELC is very close to falling within the +/-15% desegregation standard at +16.8% above the districtwide elementary Black enrollment percentage of 47.4%.

and SMP to open in Fall 2024 as a desegregative tool.[6] Second, the parties submitted a "Joint Motion Regarding Attendance Zones" on June 14, 2023, supplemented on June 21, 2023, upon which the Court has not yet acted.[7] That proposal does not affect the scope of this opinion because the agreement does not affect the Catahoula Elementary attendance zone under the Board's plan. Instead, it moves the St. Martinville elementary and middle school attendance boundaries generally northward into the Breaux Bridge and Parks Zones at one point; at another, it moves the Parks Zone generally southward into the St. Martinville Zone. The Catahoula area is located generally eastward from these suggested modifications. The Court understands this proposed order intends to institute a long-term desegregation solution to outlast any Court supervision and Minority to Majority ("M-to-M") transfers.

Though the modified boundaries do not change the demographic makeup of Catahoula under the Board's proposed student assignment plan, they do change the racial makeup of the St. Martinville elementary schools—the ELC and SMP—by increasing the number of students at those schools. Consequently, SMP's and the ELC's racial demographics in the proposed consent order differ from those at the evidentiary hearing. The Court has questions about the parties' Joint Motion and cannot approve the proposed consent order without further study.[8] For completeness, however, the Court will include both sets of data in this opinion: The data presented at the Spring 2023 student assignment hearing and the data submitted in connection with the June 2023 Joint Motion Regarding Attendance Zones.

---

[6] Record Document 694. This motion was filed on June 9, 2023.
[7] Record Documents 697 & 699.
[8] The Court held a hearing on July 26, 2023, to review with the parties the issues with the Joint Motion Regarding Attendance Zones. The parties are to confer and submit a filing detailing a timeline for a revised submission by August 3, 2023.

For the reasons that follow, the Court **ADOPTS** Plaintiffs' proposal[9] for reopening Catahoula Elementary with the reservations expressed below. The District's and Government's motions[10] to adopt their proposed student assignment plan are each **DENIED**.

## BACKGROUND

Serving approximately 7,400 students, the St. Martin Parish School District operates schools in four separate attendance zones: Breaux Bridge, Cecilia, Parks, and St. Martinville.[11] Before 2016, all but one of these attendance zones had a single school for each grade level offered. The outlier was St. Martinville, which provided grades PK−8 at Catahoula Elementary while also offering those grades at St. Martinville Junior High (grades 6–8), SMP (grades 2−5), and the ELC (grades PK−1). Because all students at the ELC matriculated to SMP for grades 2−5, the ELC and SMP were essentially a single school located on two campuses, approximately 1.3 miles apart. The distance from Catahoula to SMP is about 11.3 miles, whereas the ELC and Catahoula are separated by about 12.0 miles. *Thomas I*, 544 F. Supp. 3d at 665. In 2015, the students attending the ELC (67% Black, 30% White) and SMP (71% Black, 26% White) were overwhelmingly Black; those attending Catahoula were overwhelmingly White (7% Black, 92% White).[12]

To help minimize the racial identifiability of the ELC, SMP, and Catahoula, the parties in this litigation entered into a series of consent orders from 2015 through 2016. As they developed these orders, closing all grades at Catahoula was under consideration. That suggestion, however,

---

[9] Record Document 615.

[10] Record Documents 611 & 614.

[11] The District also operates a school, Stephensville Elementary, whose enrollment figures fall outside the acceptable +/-15% desegregation standard, explained below. But the parties agree, and the Court has found that the Stephensville Elementary attendance zone is geographically isolated such that no further practicable measure can be utilized to further desegregation. Therefore, the Stephensville Elementary zone shall not be a consideration in this ruling.

[12] Record Document 211-1 at 9.

was met with protests and demonstrations by parents and even a school board member. So the parties tried a less drastic approach: They agreed to shut down grades six through eight at Catahoula and adjust the attendance boundaries, rezoning more Black students from St. Martinville to Catahoula Elementary. *Id.* at 693.

In creating the modified boundaries, the parties looked beyond the predominately White Catahoula area, southwest, toward the St. Martinville boundary stopping short of Bayou Teche's eastern banks.[13] The parties agreed to rezone the mostly Black students residing there to Catahoula Elementary, but only for grades two through five. For grades PK−1, these rezoned students would continue attending the ELC, a St. Martinville school much closer to their homes.[14] This new area is referred to in this litigation as the "annex" or "annexed zone." Attached to this opinion as Exhibit A is a map that illustrates the makeup of the Catahoula attendance zone both before and after the addition of the annex.[15] The areas outlined in red are the pre-2016 Catahoula and St. Martin attendance zones. The area shaded in light yellow (and in the inset) is the annex. The annex extends into the St. Martinville Zone and includes parts of the City of St. Martinville. With this zone reconfiguration and majority-to-minority (M-to-M) transfer options, the 2016 Student Assignment Consent Order sought to desegregate elementary schools throughout the District.[16] The following year, in May 2017, the parties added an additional feature to this desegregation plan, creating a Science, Technology, Engineering, and Math ("STEM") magnet program at SMP and the ELC, which the Court approved.[17]

---

[13] *Id.* at 15.

[14] *Id.*

[15] Record Document 211-1 at 45.

[16] Because the various consent orders as to each of the *Green* factors were signed over a period of time, the Court entered a consolidated consent order in 2016, known as the "Superseding Consent Order." Record Document 211.

[17] Record Document 222. The actual wording of the 2017 order creates a STEM magnet program for the "St. Martinville Zone." *Id.* The STEM program was not implemented at Catahoula in that a primary goal

Yet the mere establishment of these zones and programs was not the ultimate test of the Board's compliance. To gauge the success of the Student Assignment Consent Order, the parties adopted, and this Court approved, a +/-15% deviation standard from districtwide Black student enrollment as a "reasonable starting point."[18] Compliance with the +/-15% standard is judged by looking at districtwide actual enrollment of Black students by grade band for the preceding school year as reported to the Court on June 30 of the respective year. According to the consent order, the percentage of Black or White students enrolled in a particular school in the District should not fall outside the +/-15% of the districtwide actual enrollment of Black students for that specific grade band (elementary, middle, and high school). If it does, the school is considered racially identifiable.[19]

The school system operated under that consent decree for the following four years. In 2020, the Board sought to end federal oversight and moved for "unitary status."[20] The Board believed it had achieved desegregation to the extent practicable in each area of school operation, known as *Green* factors, still under Court supervision at the time. *Green v. Cnty. Sch. Bd.*, 391 U.S. 430 (1968). These *Green* areas included student assignment, faculty assignment, and quality of education (academics and discipline).[21] While the United States only opposed the District's motions concerning student assignment and discipline,[22] Plaintiffs opposed the District's motion

---

[18] of the STEM program was to incentivize White students at Catahoula to transfer to SMP. The program failed due to poor planning and even worse execution, as detailed in *Thomas I*, 544 F. Supp. 3d at 672−75.

[18] Record Document 211-1 at 11.

[19] For example, in the 2015−2016 school year, the actual enrollment percentage for Black students was 46.0%. *Id.* Thus, an elementary school within the District was in compliance with the +/-15% standard if its actual Black enrollment was between 31% and 61%. *Id.*

[20] Record Documents 338 & 365.

[21] Since 2015, the Court has granted the District unitary status in the areas of extracurricular activities, transportation, staff assignment, facilities, and aspects of quality of education related to both graduation and retention rates. Record Documents 157, 281, 282 & 381; *see also Thomas I*, 544 F. Supp. 3d at 737.

[22] Record Document 373.

in all areas. They also moved for further relief, arguing that additional measures were necessary to address the District's consent order and constitutional shortcomings.[23]

To determine whether the District achieved unitary status, this Court held a trial in March 2021, hearing testimony from District staff, Black teachers, and experts for each *Green* area. The product of that hearing was this Court's June 2021 liability opinion, *Thomas I*, 544 F. Supp. 3d at 739–40, which held that the District failed to achieve unitary status regarding student assignment, faculty assignment, and quality of education, including student discipline and graduation pathways. The Court also concluded that further relief was necessary to comply with the 2016 Consent Order and to eliminate the vestiges of de jure segregation remaining in the District's school system. *Id.*

In reaching that decision, the Court reasoned that the District's student assignment desegregative strategies were ineffective. *Id.* at 679–83. The M-to-M transfers, magnet program, attendance zone changes, and removal of grades six through eight from Catahoula did not achieve the desired results. By 2020, Catahoula, SMP, and the ELC remained racially identifiable,[24] and one-third of Black elementary students attended racially identifiable schools. As for post-unitary plans, the Court observed that the Board had no strategies to maintain the levels of desegregation achieved at the end of Court supervision. *Id.* at 682.

After making those findings, the Court endorsed a generalized expert-backed plan consisting of four components. First, the Court closed Catahoula Elementary School for grades K

---

[23] Record Documents 285, 342, 374 & 374-1.

[24] In the school year 2020−2021, the last year under consideration by the Court in its March 2021 hearing, the ELC was 66.1% Black, 30.6% White, and at +20.2% above the districtwide elementary percentage of Black students. SMP was 69.8% Black, 27.7% White, and +24.0% above the districtwide elementary percentage of Black students. Catahoula (PK through 5) was 23.1% Black, 73.8% White, and -22.8% below the districtwide elementary percentage of Black students. Looking at just Catahoula's grades 2−5, the racial identifiability was more pronounced. For those grades, the student population was 21.0% Black, 75.3% White, and -24.9% below the districtwide elementary percentage of Black students. *Thomas I*, 544 F. Supp. 3d at 668; Record Document 651-11 at 3.

to 5, moving its students to the primary schools in the St. Martinville Zone and aiming to increase integration at SMP and the ELC. Second, the Court ordered the District to develop a "robust" magnet program at SMP and the ELC for implementation in the 2022−2023 school year. The goal of the magnet was to attract White students from around the District to SMP and the ELC through voluntary attendance. Third, the Court ordered the Board to consider optional or flexible attendance zones throughout the District to help increase integration. This last measure aimed to spur the District to craft a legally adequate districtwide transfer system, promoting desegregative student transfers after the end of the consent order and M-to-M transfers. Though the Court outlined the general contours of these last two measures, it largely left the specifics for the parties to develop together and include in a new desegregation order. Closing Catahoula, by contrast, was the only initial mandatory injunction the Court ordered. Lastly, the Court ordered the Board to comply with the other terms of the consent order, which permanently enjoined the Board "from operating a dual public school system which segregates students on the basis of race . . . in the area of student assignment."[25]

Twenty-five months have passed since this Court's liability opinion, and lingering issues remain unresolved. The responsibility for the multi-year delay lies with the Board. As this Court noted in its Faculty Assignment and Quality of Education Memorandum Ruling, *Thomas II*, 2023 WL 3679056, at *3, that delay has negatively impacted the Board's ability to desegregate its schools and has drawn out Court supervision. Any plans for new programs or policies following the Court's 2021 liability decision have been postponed by at least an entire school year.

The Court recounts the following to better understand the Board's obstruction from June 2021 to March 2023. The District waited until October 2021 to appeal *Thomas I* to the Fifth

---

[25] Record Document 211 at 4.

Circuit, arguing that this Court lacked remedial jurisdiction over the case or, in the alternative, that this Court erred in denying the District unitary status. *See Borel*, 44 F.4th at 310−11. The Board did not immediately request a stay in this Court or the Fifth Circuit. In fact, it initially communicated to the Court its willingness to engage in consent order negotiations, possibly "mooting" issues on appeal.[26]

On November 5, 2021, in a joint status report, the parties indicated that they had "not reached an impasse on any particular issue" and that the Board intended to enter into a consent order to resolve the remedial phase of the case as soon as December 2021.[27] On November 22, 2021, the parties submitted another joint status report, stating that they were continuing negotiations and requested more time to file their proposed consent order with the Court.[28] Though a few practical issues remained, the parties reiterated that they had yet to reach an impasse in negotiating a consent decree. Indeed, the report stated that the parties had "exchanged and commented on drafts" of the consent orders in all areas, including student assignment.[29] The parties then requested to update the Court at a status conference, which the Court held on November 30, 2021.[30] During that conference, the parties said they could not file a proposed consent decree with the Court by the projected December deadline but were continuing negotiations.[31] Counsel for the Board further recounted that the briefing schedule on appeal had been continued at the request of counsel to permit extended talks.[32] Based on these reassurances, the Court believed that the parties' submission of a consent decree in all areas, including student assignment, was near at hand.

---

[26] Record Document 424 at 1.
[27] Record Document 438 at 1−2.
[28] Record Document 439 at 1−2.
[29] *Id.*
[30] Record Documents 439 at 2 & 442 at 1.
[31] Record Document 442 at 1.
[32] *Id.* at 2.

With that in mind, the Court gave the parties a February 10, 2022 deadline to file a joint report outlining their areas of disagreement.[33] The Court chose the February date at the District's behest because the day coincided with the Board's regularly scheduled meeting.[34] Yet before agreeing to the February deadline, the Court questioned whether the Board could expedite negotiations and its consideration—possibly through a special meeting. The Board's counsel responded that special meetings were difficult to hold and involved "logistical obstacles."[35]

Despite that representation, the Board conducted a special meeting four days later, on December 3, 2021.[36] The Louisiana Attorney General personally attended the meeting, and the Board discussed retaining his representation outside of privately enrolled counsels' presence.[37] On December 14, 2021, the Board moved to enroll two attorneys employed by the Attorney General.[38] The motion to enroll did not explain the Attorney General's actions nor limit his representation to the pending appeal in the Fifth Circuit. In response to the motion, the Court questioned whether the State was usurping the role of the Board's privately retained counsel.[39] The Court requested briefing on the issue and scheduled a hearing for February 2022.

Yet before the Court ruled on the motion to enroll, the Board moved to stay all proceedings on December 28, 2021.[40] The Board also filed a corresponding motion with the Fifth Circuit, seeking immediate relief. *See Borel ex rel. A.L. v. Sch. Bd. St. Martin Par.*, No. 21-30514, 2022 WL 3355807, at *1 (5th Cir. Mar. 3, 2022) (per curiam). In arguing for the necessity of a stay, the Board challenged the Court's jurisdiction over the case pending appeal; it

---

[33] *Id.* at 3.
[34] *Id.* at 1.
[35] *Id.*
[36] Record Document 469 at 3.
[37] *Id.*
[38] Record Document 444.
[39] Record Document 446.
[40] Record Document 445.

argued that the Court lacked remedial authority to address the Board's constitutional and consent order violations. Days later, on January 3, 2022, the Board filed an amended motion to enroll, clarifying that the Attorney General was enrolling for the limited and specific purpose of arguing the motion to stay.[41] The Court, in response, considered that request at the already-scheduled February hearing.[42]

Meanwhile, the Board refused to compromise with Plaintiffs on crafting any desegregation orders. At the February motion to enroll hearing, the Board represented that it was no longer willing to negotiate with Plaintiffs.[43] The Board explained that the parties worked together until February 8, 2022, when the Board held a meeting to discuss the pending proposals.[44] During that meeting, the Board voted not to accept any recommendations on any remaining issues. To convey that stance, the Board's counsel sent a letter informing Plaintiffs that all negotiations had ceased and there was no agreement on any points.[45] Along a similar timeline, all efforts to establish a magnet program "fizzled out."[46] According to the District's Desegregation Compliance Officer (now Superintendent) Frederick Wiltz, that undertaking came to a halt in December 2021.[47] Although the Board, in cooperation with Plaintiffs' expert Dr. Peter Piazza, conducted surveys of the parents as to the potential magnet theme in Fall 2021, no further efforts were made until the end of the following school year. The Court expressed dismay with all these developments: The parties could not implement remedial measures like creating the "robust" magnet program for Fall 2022 as they had intended. The Board, for its part, gave no

---

[41] Record Document 447.
[42] Record Document 469.
[43] *Id.* at 4.
[44] *Id.*
[45] *Id.*
[46] Record Document 658 at 49 (Wiltz).
[47] Record Documents 657 at 48 & 658 at 49−52 (Wiltz).

reason for its change of course, though it is noteworthy that the Board's reversal coincided with its decision to engage the Attorney General.

Nevertheless, the Court allowed the Attorney General to enroll as counsel for the limited purpose of arguing the motion to stay.[48] And following oral argument on that issue, the Court denied the stay, reasoning that it "did not lose jurisdiction of the parties merely because an appeal was pending from the desegregation order."[49] Because the Fifth Circuit cannot return jurisdiction that was never lost, this Court concluded that it had continued to retain authority over the remedial proceedings. In like manner, the Fifth Circuit denied staying this case pending appeal, stating that the Board did not explain "why it waited many months to seek such relief." *Id.*

Without a stay, the Court continued enforcing the Superseding Consent Order and its June 2021 opinion.[50] To that end, it set a period for gathering additional discovery, issued a scheduling order, and held a hearing in August 2022 to determine the appropriate measures to remedy the Board's constitutional and consent order violations in faculty assignment, quality of education, and student assignment. On the fourth day of the August hearing, the Fifth Circuit issued *Borel*, 44 F.4th at 316, upholding this Court's 2021 liability findings and concluding that this Court's reasoning was "not clearly erroneous."

Regarding student assignment, however, the Fifth Circuit took issue with the only Court-ordered injunction. Though this Court held that closing Catahoula was necessary to address constitutional concerns, the Fifth Circuit rejected that conclusion, finding instead that this Court "abused its discretion." *Id.* at 317. The three-judge panel offered two reasons for so holding. One

---

[48] Record Document 469 at 4.
[49] Record Document 489 at 90 (quoting *Plaquemines Par. Comm'n Council v. U.S.*, 416 F.2d 952, 954 (5th Cir. 1969)).
[50] *Id.* (citing *Alberti v. Klevenhagen*, 46 F.3d 1347, 1358 (5th Cir. 1995)).

was that closing Catahoula "would not immediately resolve racial imbalances," and this Court "should have considered other 'equally effective alternatives'" before "jumping ahead" to an "extreme remedy." *Id.* (cleaned up) Other alternatives were available, said the panel, like attendance zone modifications suggested by the Board's expert.

Next, the Fifth Circuit reasoned that closing Catahoula was not "absolutely necessary." *Id.* In the panel's view, the Board was "making slow-but-steady progress in the removal of vestiges of state-imposed segregation." *Id.* One possibility for the progress, the panel suggested, was that the Catahoula area has undergone and will continue to undergo natural desegregation— an opinion advanced by the Board's expert. At the same time, the panel also praised the Student Assignment Consent Order—which removed three grades from Catahoula and changed its attendance zones—for increasing racial diversity at Catahoula, the ELC, and SMP. *Id.* Citing these examples, the Fifth Circuit held that this Court's past successes proved that further "improvement" is possible "without the extreme remedy of a school closure." *Id.* The Fifth Circuit, moreover, "commend[ed]" this Court "for its continued efforts in overseeing the District's desegregation." *Id.* It held that "progress has been made and progress can continue through the implementation of other reasonable, feasible, and workable remedies." *Id.* In that spirit, the Fifth Circuit remanded the case for "consideration of other methods of addressing [the] concern" regarding the vestiges of segregation in student assignment. *Id.*

Following *Borel*'s ruling, the Court could not resolve lingering student assignment issues at the August 2022 remedial hearing without additional evidence, so proceedings were rescheduled for February 28 through March 6, 2023.[51] To prepare for trial, the Court requested that the parties produce revised student assignment proposals that, among other measures,

---

[51] The parties agreed on the day that *Borel* was handed down that all evidence in the areas of faculty assignment and quality of education had been submitted. The Court ruled on those factors in *Thomas II*, leaving student assignment as the only outstanding factor.

specified how to reopen Catahoula. But as the hearing date drew near, the District resumed its delay and obstruction tactics. The Board, for instance, changed its position on the Court's authority to consider student assignment measures and submitted an untimely expert report.[52] The latter circumstance, the Court held, evinced "bad faith" and required the Board to pay all costs and fees the Government and Plaintiffs incurred to depose the Board's expert on short notice.

Once the hearing on the student proposals began, the issues multiplied: The District failed to provide any plan other than reopening Catahoula as it was at the time of the Court's June 2021 ruling; it was inconsistent in its position regarding its own expert's testimony; and it failed to provide any concrete proposals for the magnet program or for eliminating long-term desegregation. Indeed, the parties waited until the eve of trial to inform the Court that they had agreed "in principle" to establish a new and effective magnet school at the ELC and SMP. And while Plaintiffs' and the Government's experts provided additional alternatives at the hearing for changing attendance zones to promote long-term desegregation, the Board provided none. By the end of the hearing, however, the Board reversed course and agreed to negotiate with the other parties to craft a student assignment plan. However, the Board made it clear that the negotiations would not include any student assignment plan for Catahoula—it remained steadfast that Catahoula must reopen as it was in 2021, a PK−5 school with the same attendance zone. Once the hearing adjourned, the Court set a negotiation deadline for April 20, 2023, and a briefing deadline for May 5, 2023.[53]

At the end of May 2023, however, the Court had neither the jointly proposed consent orders nor the parties' post-trial briefs. The reasons for such a circumstance are documented

---

[52] Record Documents 601, 610 & 640.
[53] Record Document 645.

extensively in the record.[54] But, in short, approving the settlements took three Board votes and three deadline extensions unenthusiastically granted by this Court.[55] Though the Board authorized its counsel to finalize the terms of a magnet proposal, the initial draft lacked critical language detailing the purpose and function of the new program. Amending the proposal took several weeks, as the Board opposed several revisions suggested by Plaintiffs. But eventually, the parties settled the dispute, and the Court adopted their joint order on June 9, 2023, establishing a robust magnet program at SMP and the ELC.[56]

By its terms, the Magnet Consent Order offers a clear explanation of what a magnet program entails; it provides for a one-year planning process in consultation with Plaintiffs and the Government; it offers benchmarks that measure the Board's progress; it outlines the steps the Board must take throughout the planning, promotion, and implementation phases; and it projects opening the revitalized magnet program for the 2024 school year. A primary goal of the joint proposal is to attract White students—including those that the Board envisions enrolling at Catahoula—to the ELC and SMP, both predominantly Black schools. But the new program—even if successful—would not bring more Black students to Catahoula Elementary; the new program can only incentivize White students to transfer out of Catahoula, which would reduce the ratio of White to Black students.

A week after this Court adopted the magnet proposal, on June 14, 2023, the parties filed the Joint Motion Regarding Attendance Zones, as mentioned above.[57] In that motion, the parties propose altering the Breaux Bridge, Parks, and St. Martinville attendance zones beginning in the

---

[54] Record Documents 660, 663 & 678.
[55] *Id.*
[56] Record Document 694.
[57] Record Document 697.

2023−2024 school year.[58] The effects of those alterations on demographics are detailed in a supplemental filing submitted on June 21, 2023.[59] Though the proposal alters the racial makeup of the ELC and SMP, the agreed-upon changes do not provide a solution to the issues addressed in this opinion: Under what student assignment plan, if any, can Catahoula Elementary reopen? Thus, the parties' consent order does not eliminate this Court's job on remand to find "reasonable, feasible, and workable remedies" in place of closing Catahoula.

To that end, the parties and their experts provided seven proposals for the Court's consideration: (1) The Board proposed reopening Catahoula as a PK−5 school, as it was in 2021; (2)−(4) Mr. Michael Hefner, the Board's expert, discussed his three plans (plans that the Board did not endorse) to rezone the ELC/SMP children to Catahoula and reopen the schools for grades PK−5; (5) the United States proposed reopening Catahoula for grades PK−K; (6) Plaintiffs proposed reopening Catahoula as PK−1 school; and (7) Dr. Erica Frankenberg, Plaintiffs' expert, addressed her plan to reopen Catahoula as a zone-wide sixth-grade academy. This memorandum ruling discusses and analyzes each of these proposed measures.

Of course, considering other options while upholding the Student Assignment Consent Order and the constitutional rights of the St. Martin Parish children is easier said than done. As noted, the student assignment measures outlined in this Court's June 2021 opinion were designed to work in tandem to achieve a goal eluding the District for five decades: desegregation. With a core component of that framework upended, the Court must now engage in an awkward exercise, retrofitting desegregation remedies into a new strategy that includes reopening a predominantly

---

[58] *Id.*
[59] Record Document 699.

White school located in a predominantly White community with the reputation as a "sundown town."[60]

Adding further complexity, this Court has revisited the potentially "effective alternatives" referenced by the Fifth Circuit: moving the Catahoula attendance zone to include more Black students and re-examining whether the Catahoula area is naturally desegregating. But this Court has again found these measures and theories inadequate for the reasons detailed in this opinion. As for considering zoning changes to Catahoula, the Court notes that the Board endorsed no plan to expand the Catahoula attendance zone. And the unendorsed alternate modifications offered by the Board's expert are again rejected by this Court as ineffective: The proposals put the burden of desegregation on the Black children currently attending the ELC and SMP, deprive them of the opportunity to participate in the magnet program, and exacerbate the segregated nature of those schools. Regarding the natural desegregation theory, the Board's expert presented outdated population data and reached his conclusions by comparing incompatible data sets. As the other more qualified expert demographers testified, the Board's expert's methodology was flawed and his conclusions incorrect; they agreed that no such natural desegregation is occurring in the Catahoula area. In the Board's post-hearing brief, it largely abandoned such a theory.[61]

With these reservations, this Court next undertakes its obligation on remand, as described in *Borel*: determining how to best reopen Catahoula to foster further desegregation without harming the desegregative progress made since its closure.

---

[60] Record Document 569-3 at 6. A "sundown town" is a term that refers to a community that is known for being unwelcoming or even dangerous for Black people, especially after the sun goes down. The term derives from the practice of posting signs in some communities that directed "colored people" to leave town by sundown.

[61] Record Document 686.

## LEGAL STANDARD

Before reviewing the merits of each proposal, this Court will first assure itself of its authority to order remedial relief. In this case, the Court's remedial authority stems from two, albeit interrelated, sources. First, the Court derives remedial jurisdiction from the District's original constitutional violation. *Borel*, 44 F.4th at 313. As the Fifth Circuit recognized a short time ago, a district court retains jurisdiction over a school desegregation case until the school district eliminates vestiges of segregation to the extent practicable. *Id.* at 312 (citing *Anderson v. Sch. Bd. of Madison Cnty.*, 517 F.3d 292, 294 (5th Cir. 2008)). Until then, this Court has "the continuing ability to order affirmative relief" to cure the District's constitutional infirmities. *Id.* (citing *Milliken v. Bradley*, 433 U.S. 267, 282 (1977)).

Second, the Court derives remedial authority from the consent order itself. *Id.* The Board entered into several consent orders from 2015 through 2016. *Id.* at 313. In doing so, the Board voluntarily agreed to provide educational programs and services without discriminating based on race. It also agreed to eliminate the vestiges of de jure segregation to the extent practicable. Because the Board assumed these obligations, the Court has remedial jurisdiction to enforce them. *Id.*

While exercising its authority, the Court is mindful of this remand's limited nature. The Fifth Circuit has already affirmed the "liability" determination that the District has failed to eliminate the vestiges of racial segregation in the St. Martinville Zone. *See Borel*, 44 F.4th at 314. It also affirmed that "undisputed objective data demonstrates that the School Board failed to satisfy [the desegregation] standard in several schools," including SMP, the ELC, and Catahoula. *Id.* The Fifth Circuit nevertheless reversed Catahoula's closure because it believed it was a "harsh" remedy given that other "equally, or perhaps, more effective alternative" options

20

were available. *Id.* at 317. So, on remand, this Court's task now is to assess which alternate plan, if any, will "place persons unconstitutionally denied an opportunity or advantage in 'the position they would have occupied in the absence of discrimination.'" *United States v. Virginia*, 518 U.S. 515, 547 (1996) (quoting *Milliken*, 433 U.S. at 280) (internal alterations omitted).

Although the Board initially agreed it had the burden of proof, it changed course and now contends that Plaintiffs bear the burden of proving their entitlement to relief.[62] The basis for the Board's argument arises from the injunctive nature of the Superseding Consent Order. In its post-trial brief, the Board again distinguishes between "interpreting" injunctions within a desegregation consent decree and "modifying" those injunctions. The Board says this distinction is critical and differentiates the two concepts: A Court "interprets" a consent decree "by enforcing the injunction according to its terms or establishing procedures for enforcement without changing the command of the injunction." *Moore v. Tangipahoa Par. Sch. Bd.*, 864 F.3d 401, 405 (5th Cir. 2017) (cleaned up). By contrast, a Court "modifies" an injunction by requiring "that the injunction be altered . . . in some way." *Id.*

Here, the Board asserts that Plaintiffs seek to "modify" the Superseding Consent Order. Such a request, the Board thinks, requires that Plaintiffs bear the burden of showing the Superseding Consent Order should be so modified. Put another way, the Board believes that Plaintiffs must prove their entitlement to new relief because they are the beneficiary of the original injunction and are seeking to alter it. The Board, at the same time, acknowledges that this Court already granted Plaintiffs' motion for further relief in its liability opinion. Even so, this fact does not alter the Board's reasoning; instead, the Board contends the procedural posture of this case has not changed and that Plaintiffs must prove their entitlement to "specific new relief" just as they needed to support their "general claim" for further relief.

---

[62] Record Document 491 at 4.

But contrary to the Board's belief, "[u]ntil it has achieved the greatest degree of desegregation possible under the circumstances, the Board bears the continuing duty to do all in its power to eradicate the vestiges of the dual system." *Davis v. E. Baton Rouge Par. Sch. Bd.*, 721 F.2d 1425, 1435 (5th Cir. 1983). And when a school district is denied unitary status, Supreme Court authority mandates that the school district "come forward with a plan that promises realistically to work, and promises realistically to work now." *Green*, 391 U.S. at 437−38. Whether a desegregation plan "works" turns on whether the plan has "real prospects for dismantling the state-imposed dual system 'at the earliest practicable date.'" *Id.* at 439. If other parties present an alternative method that demonstrates "more promising courses of action," the Board bears a "heavy burden . . . to explain its preference for an apparently less effective method." *Id.* If the Board cannot meet its burden, "it becomes the responsibility of the district court to develop an adequate remedy." *Davis*, 721 F.2d at 1437.

And even if, as the Board argues, Plaintiffs have the burden of proving additional specific measures are appropriate, they have done so for the reasons outlined in this memorandum ruling. A district court has the "broad" authority to order further relief "for breadth and flexibility are inherent in equitable remedies." *Cowan v. Cleveland Sch. Dist.*, 748 F.3d 233, 239 (5th Cir. 2014) (quoting *Valley v. Rapides Par. Sch. Bd.*, 702 F.2d 1221, 1225 (5th Cir. 1983)). In so ordering, a district court need not "find that [a school district] violated the Constitution, only that it violated the consent decree." *Smith v. Sch. Bd. of Concordia Par.*, 906 F.3d 327, 335 (5th Cir. 2018). During the liability phase, the Court established that the Board violated its consent decree and the Constitution. Additionally, Plaintiffs' motion for further relief has already been adjudicated and granted. The Court, in other words, has already resolved whether additional measures are required. In that regard, Plaintiffs have proven in an earlier phase of litigation that

further relief is necessary. The issue now is how to fashion such relief. And Plaintiffs and the Government, on remand, have offered expert and fact witnesses to support the necessity of their proposed remedies addressing those constitutional concerns, as detailed below.

The Court, for its part, has a straightforward role in crafting relief: It must "sort through the various proposed remedies, exclude those that are inadequate or infeasible and ultimately adopt the one that is most likely to achieve the desired effect: desegregation." *Cowan*, 748 F.3d at 240. In exercising this discretion, the Court must "use its broad and flexible equitable powers to implement a remedy that, while sensitive to the burdens that can result from a decree and the practical limitations involved, promises 'realistically to work *now*.'" *Davis*, 721 F.2d at 1437 (quoting *United States v. DeSoto Par. Sch. Bd.*, 574 F.2d 804, 811 (5th Cir. 1978)).

With that in mind, the Court will weigh each proposal's respective (1) effectiveness, (2) practicability, and (3) promptness in accomplishing desegregation. And, in the end, "[w]hatever plan is adopted will require evaluation in practice," and the Court will "retain jurisdiction until it is clear that state-imposed segregation has been completely removed." *Green*, 391 U.S. at 439. The Court will thus monitor the implementation of the chosen plan for at least three years. *See Moore*, 921 F.3d at 547. After sifting through the various proposals and weighing these factors, this Court adopts Plaintiffs' plan based on the lay and expert evidence produced by Plaintiffs. Thus, even if Plaintiffs have the burden of proof in this matter, they have carried that burden.

## EXPERTS

Experts retained by the parties aided the Court in reviewing the parties' proposals. In some cases, they have even proposed measures of their own. The testimony from these individuals will be used throughout this opinion in discussing the merits and weaknesses of each plan.

Plaintiffs' expert, Dr. Erica Frankenberg, returned to testify at the remedial hearing as an expert in school desegregation, racial equality in schools, school choice, and best practices for magnet and school desegregation plans. She is a tenured professor at Pennsylvania State University in the College of Education, a research associate for the Center of Rural Education and Communities, an affiliate faculty member at Pennsylvania State University School of Law, and the co-editor of the *Review of Educational Research*. She received an Ed.D. in Education Policy and a master's degree from Harvard University, and an undergraduate degree from Dartmouth College, where she wrote a thesis focusing on school desegregation in Mobile, Alabama. Dr. Frankenberg's work concentrates on integration and racial equality within schools, encompassing student and faculty assignments. She has written extensively about both and has worked with school districts nationwide regarding desegregation plans. Dr. Frankenberg has been retained as an expert in legal cases before.[63]

Plaintiffs also tendered Mr. William Cooper as an expert in racial demographics, mapping, and census data. Mr. Cooper has an undergraduate degree in Economics from Davidson College in Davidson, North Carolina. Since 1986, he has prepared redistricting maps of approximately 750 jurisdictions for voting rights litigation. He has analyzed and prepared election plans in over 100 jurisdictions for two or more decennial censuses. He has also served as an expert in other school desegregation cases.[64]

For its part, the Government retained the services of Dr. Seigel-Hawley, who was tendered as an expert in racial equality in schools, school choice, and best practices for magnet and desegregation plans. Dr. Siegel-Hawley is an associate professor at Virginia Commonwealth

---

[63] Record Document 649-2 at 1. The parties stipulated that all expert reports and curriculum vitae (previously submitted by all parties) of testifying experts will be admitted to the extent that they assist the Court in understanding testimony in preparation for the hearing and provide efficiency in the examination process. Record Document 631 at 2−3.

[64] Record Document 649-3 at 7.

University in its Department of Educational Leadership. She earned a Ph.D. in Urban Schooling from the University of California-Los Angeles, a master's in Education Policy and Management from Harvard University, a Master of Arts in Teaching from Johns Hopkins University, and a Bachelor of Arts in History and Sociology from the University of Virginia.

Her current research focuses on school diversity and isolation in PK−12 schools, the relationship between racial isolation in schools and neighborhoods, and the relationship between various forms of school choice and school diversity. She has published two books, more than twenty-five peer-reviewed articles about school diversity in leading education journals and law reviews, and numerous policy and practitioner publications. Dr. Siegel-Hawley regularly works with school districts on educational equity, school choice, and school diversity issues. Additionally, she is a fellow with the National Education Policy Center and on the research advisory panel for the National Coalition on School Diversity.[65]

The Government also tendered Mr. Matthew Cropper as an expert in racial demographics, mapping, and census data. Mr. Cropper received an associate degree from Hocking College in Geographic Information Systems and an undergraduate degree from The Ohio State University, with a specialty in Geographic Information Systems and Analytical Cartography. Mr. Cropper primarily works with school districts; his practice concerns facilitating comprehensive school redistricting studies, demographic analysis, and facility planning. He works in K−12 school planning, focusing on student assignment, capacity, and transportation. He has owned and managed a K−12 consulting business since 2005 and has worked with hundreds of school districts nationwide and internationally. He has also served as an expert in several school desegregation cases.[66]

---

[65] Record Document 650-1 at 2.
[66] Record Document 650-2 at 3.

Finally, the Board again retained Mr. Michael Hefner as an expert in racial demographics, mapping, and census data. Mr. Hefner earned his undergraduate degree in business administration from the University of Southwestern Louisiana in 1978 and an online J.D. from Concord Law School in 2008. School districts have retained him as an expert in numerous school desegregation cases in Louisiana, including Evangeline, Bossier, DeSoto, and St. Mary Parishes. The Department of Justice has retained Mr. Hefner as an expert in two school desegregation cases in Louisiana where his student assignment plans were utilized, and the districts were later declared unitary. Mr. Hefner was a member of the school board in Lafayette Parish, which neighbors St. Martin Parish, from 1990 to 2010.[67]

Overall, Mr. Hefner lacks the credentials of the other demographic experts. He bases his testimony on a generally accepted computer program, and his testimony is most accurate when he limits it to that program's results. However, as is discussed in more detail below, his testimony loses credibility when it strays from that narrow lane, as with his theory of natural desegregation. Additionally, he views himself as an advocate for the Board. After the March 2021 hearing, he was interviewed by a local news station and voiced his "legal" opinion that this case would have been closed years ago but for a "technical mistake" and that Catahoula should be reopened.[68] In the June 2021 liability ruling, this Court concluded that several of Mr. Hefner's assertions were based on inaccurate and unreliable data; it gave little weight to his testimony and the conclusions he made in his reports. *See Thomas I*, 544 F. Supp. 3d at 688−89. As to Mr. Hefner's testimony in the Spring 2023 hearing, the Court details in this opinion those assertions it finds accurate and those it finds inaccurate.

---

[67] Record Document 400-26 at 9.
[68] Record Document 575 at 189–94 (Hefner).

## ANALYSIS

**I.      Reopening Catahoula as a PK–5 school is not a reasonable, feasible, or workable remedy to eliminate de jure segregation.**

The Board is the only party to this litigation endorsing a plan to reopen Catahoula as a PK−5 elementary school. The District's expert, Mr. Hefner, offered three additional options to that same end, though the Board does not endorse them. The Court will thus begin its analysis by examining these four plans and addressing whether reopening Catahoula to serve grades PK−5 is appropriate. The answer, in short, is no. Neither the District's proposal nor Mr. Hefner's three options are "reasonable, feasible, or workable" desegregation alternatives on remand. *See Borel*, 44 F.4th at 317. They are, in fact, quite the opposite. Reopening Catahoula as a PK−5 school would create two schools with seven years of dual grades within the District, impose a more significant burden on Black families, and threaten to derail the magnet program being established in the ELC and SMP. Perhaps most importantly, and explained in more detail below, reopening Catahoula as a PK−5 school would exacerbate the racial identifiability of the District's schools, a problem this Court seeks to avert to the extent possible. This opinion will first address the Board's proposal and then turn to Mr. Hefner's three unendorsed options for returning Catahoula to a PK−5 school.

**A. The Board proposes reopening Catahoula as it was pre-closure without offering or considering any other desegregation alternatives, except for a magnet program previously ordered by the Court.**

Citing "public feedback," the Board has refused to consider desegregative measures other than returning to the *status quo ante*. While developing a proposal, its actions demonstrated bad faith, ineptitude, or a mixture of both. Whatever its intent, the facts show that the Board found racial demographics of trivial importance in its immediate, unstudied objective: reopening

Catahoula as it was, whatever the cost. The Court will explore in more detail below the inconsistencies with the Board's prehearing public advertisements and filings with the Court, the Board's counsel's change in position during the hearing, and finally, the confusion among the Board members regarding the student assignment plan they voted to approve. But first, this Court will examine the segregative effect of the Board's proposal to reopen Catahoula.

For reasons that will become clearer below, this Court must assume in its analysis that the Board's plan to reopen Catahoula Elementary "as it was" means readopting the attendance zone and grade configuration in operation just before the school closed. At that time, the Catahoula attendance zone included the pre-2016 boundaries and the "split zone," or "annex." As mentioned above, the annex was a creation of the parties' 2016 consent order. The consent order modified Catahoula's attendance boundaries such that the zone hooked southwestward into St. Martinville; its westernmost portion stopped shy of Bayou Teche. This annex, depicted below, shaded in orange, was an extension of the pre-2016 Catahoula Zone, shaded in yellow.[69]

[*Intentionally Left Blank*]

---

[69] Record Document 211-1 at 15−16, 45.

**St. Martinville and Catahoula Zone (Grades PK−1) Before Catahoula's Closure 2016–2021**[70]



The annexed area was populated mainly by Black families who were rezoned to Catahoula Elementary to promote integration. But to keep the youngest students closer to their school, PK−1 students living in the annex did not attend Catahoula; they remained at the ELC, a school in the St. Martinville Zone, then transferred to Catahoula Elementary for grades 2−5.[71] This is sometimes referred to as a "split grade" arrangement. The following map shows the area of student assignment for grades 2−5 at Catahoula. All other students in the remainder of the Catahoula Zone attended Catahoula for grades PK through five without interruption.[72]

---

[70] Record Document 649-6 at 18. Mr. Cooper created a virtual map outlining the different configurations under the Board's, Mr. Hefner's, and Plaintiffs' proposals. It can be found at https://online.caliper.com/mas-874-drp-290-ujr/maps/ldlvnet3003weluv8qql [https://perma.cc/R4S5-LZNA]; *see supra* note 70.
[71] Record Document 659 at 43 (Hefner).
[72] Record Document 211-1 at 15.

29

### St. Martinville and Catahoula Zones (Grades 2−5) Before Catahoula's Closure 2016–2021[73]



The Court now turns to the segregative effects of the Board's plan concerning the ELC, SMP, and Catahoula. Just before the Court closed Catahoula Elementary, there were 130 students, of whom 73.8% were White and 23.1% were Black, resulting in a -22.8% variance from the districtwide enrollment of Black elementary students and well outside the agreed-upon +/-15% variance, making Catahoula a racially identifiable White school. For grades 2−5, the demographics for students from the original Catahoula Zone and the annex were slightly worse. Of these eighty-one students, 75.3% were White, and 21.0% were Black, bringing that grade band to -24.9% outside districtwide elementary Black enrollment.[74] These numbers formed the

---

[73] Record Document 649-6 at 18. A more detailed view of these maps can be found at https://online.caliper.com/mas-874-drp-290-ujr/maps/ldlvnet3003weluv8qql [https://perma.cc/R4S5-LZNA].

[74] Record Document 651-11 at 3.

basis of this Court's and the Fifth Circuit's conclusions that the Board breached its Student Assignment Consent Order and the Constitution. *See Thomas I*, 544 F. Supp. 3d at 779−83.

The enrollment projections if Catahoula is reopened under the Board's plan are almost identical to those 2021 numbers. Based on projected actual enrollment, Dr. Frankenberg calculated that reopening Catahoula as a PK−5 school under the Board's plan would result in a total student population of 109, with 68.8% White students and 24.8% Black students, yielding a -22.6% variance from the districtwide elementary Black enrollment percentage.[75] As a result, the Board's plan would reopen Catahoula as a racially identifiable school with nearly the same racial identifiability as when it closed in 2021.

The proposed reopening would further exacerbate the racial identifiability of the ELC and SMP. Currently, the ELC has a population of 376 students, with 122 White and 241 Black, yielding a 64.1% Black attendance and a 32.4% White attendance, a +16.8% variance from the districtwide elementary Black enrollment percentage.[76] But Dr. Frankenberg calculated that under the Board's plan, the ELC would enroll 345 students, with 69.0% Black and 28.4% White, placing the school outside the desegregation standard at +21.6%. Consequently, the Board's plan would worsen the ELC's Black racial identifiability by 4.8 percentage points.[77]

---

[75] Record Document 649-6 at 3. Based on residential enrollment, Mr. Hefner's calculations are almost identical. He predicted that reopening Catahoula as a PK−5 school under the Board's plan would result in a total student population of 104, with 68.2% White students and 25.0% Black students, yielding a -22.4% variance from the districtwide elementary enrollment Black percentage of 47.4%. Record Document 658 at 266–67 (Hefner). Mr. Hefner provided these numbers at the Court's request. As is explained below in the body of the opinion, neither Mr. Hefner's report nor his initial testimony at the hearing contained these numbers. *See id.* at 263−67.

[76] Record Document 651-11 at 4.

[77] Record Documents 649-6 at 3 & 657 at 15–17, 19−21 (Frankenberg). Based on residential enrollment, Mr. Hefner calculated that the Board's plan would enroll 357 students at the ELC, with 28.3% White and 69.2% Black students, yielding a variance of +21.8%. Record Document 658 at 267 (Hefner); *see supra* note 75.

As for SMP, the elementary school currently serves 478 students, with 141 White and 322 Black, yielding a 67.4% Black and 29.5% White attendance and creating a +20.0% variance from the districtwide elementary Black enrollment percentage.[78] Under the Board's plan, however, the school would enroll 400 students, 74.5% of whom would be Black and 22.5% White. This yields a variance of +27.1%, worsening the Black racial identifiability by 7.1 percentage points.[79]

| St. Martin Parish Schools Actual Enrollment Demographics 2022−23[80] | | | | |
|---|---|---|---|---|
| School | Total | % White | % Black | +/-15% Black |
| Catahoula Elementary PK-5 | 0 | 0.0% | 0.0% | 0.0% |
| Early Learning Center PK-1 | 376 | 32.4% | 64.1% | 16.8% |
| St. Martinville Primary 2-5 | 478 | 29.5% | 67.4% | 20.0% |

| St. Martin Parish Schools Projected Actual Enrollment Under Board's Proposal[81] | | | | | |
|---|---|---|---|---|---|
| School | Total | % White | % Black | Difference From Actual | +/-15% Black |
| Catahoula Elementary PK-5 | 109 | 68.8% | 24.8% | | -22.6% |
| Early Learning Center PK-1 | 345 | 28.4% | 69.0% | +4.8% | 21.6% |
| St. Martinville Primary 2-5 | 400 | 22.5% | 74.5% | +7.1% | 27.1% |

Even under the modifications suggested in the pending Joint Motion Regarding Attendance Zones, the reopening of Catahoula Elementary under the Board's plan would exacerbate the racial identifiability of the ELC and SMP. The ELC would serve 349 students, with 66.5% Black and 31.5% White students, increasing the Black student population by 5.0 percentage points. SMP would serve 435 students, with 66.9% Black and 30.6% White, increasing the Black student population by 4.9 percentage points. Catahoula would reopen as a racially identifiable White school, serving 124 students, with a 30.6% Black and 63.7% White

---

[78] Record Document 651-11 at 4.
[79] Record Documents 649-6 at 3 & 657 at 15−17, 19−21 (Frankenberg). Mr. Hefner testified that, based on residential enrollment, the Board's plan would enroll 430 students at SMP, with 22.1% White and 75.1% Black students, yielding a variance of +27.7%. Record Document 658 at 268 (Hefner); *see supra* note 75.
[80] Record Document 651-11 at 4.
[81] Record Documents 649-6 at 3 & 657 at 15−17, 19−21 (Frankenberg).

student population. Under the proposed zoning configurations, 1,577 of 3,525 elementary students would be zoned to racially identifiable schools if the Court adopted the attendance zones proposed in the Joint Motion and the Board's proposal.[82]

To illustrate this conclusion and to further analyze the effect of the proposed Joint Motion Regarding Attendance Zones on student racial makeup, the Court will examine the percentage by which each school would deviate from the +/-15% standard under each of the various plans submitted for the Court's consideration. This is the standard the parties agreed to use to determine whether a school is racially identifiable. But the performance of this analysis has been complicated by the errors in the data submitted to the Court. Mr. Hefner, the Board's expert, admitted he used the wrong baseline for determining the +/-15% disparity for each school in both his testimony at the Spring 2023 hearing and in the demographics submitted in support of the Joint Motion. The parties agreed that the appropriate method for calculating the +/-15% is to use the districtwide grade band percentage of Black students enrolled for each year being examined. For the 2022–2023 school year now under consideration, the districtwide percentage for Black elementary students is 47.4%. Despite the parties' agreement, however, Mr. Hefner used the districtwide grade band percentage of Black students enrolled for the year 2016–2017, which was 47.8%. This is not a small mistake. The error means that Mr. Hefner underestimated the racial disparity in predominantly Black schools, as is illustrated in the below analysis. Even so, the error does not affect the data he provided regarding the number of students at each school and the racial makeup of those students, whether based on actual enrollment or residence.[83]

---

[82] Record Document 699-1 at 6. These figures are based on residential demographics and the parties' proposed attendance zone revisions, now pending before the Court. Record Documents 697 & 699. This calculation does not consider Stephensville Elementary.

[83] Mr. Hefner confessed his error at the July 26, 2023 hearing that the Court conducted to address issues it identified in the Joint Motion Regarding Attendance Zones. No transcript of that hearing is yet available. Although the Court had noted the error in the numbers Mr. Hefner submitted in support of the Joint

The Court will now address the percentages by which the district schools would deviate from the +/-15% standard under the Board's plan to reopen Catahoula as a PK-5 school if the attendance zones outlined in the Joint Motion were adopted. The Court will first look at the numbers provided by Mr. Hefner and then the corrected numbers. Mr. Hefner provided the following chart:

| St. Martin Parish Schools<br>Joint Proposal Under the Board Plan with ELC Annex Configuration Demographics[84] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **School** | **Total** | **White** | **% White** | **Black** | **% Black** | **Other** | **% Other** | **+/-15% Black\*** |
| Breaux Bridge Primary PK-2 | 587 | 197 | 33.6% | 364 | 62.0% | 26 | 4% | 14.2% |
| Breaux Bridge Elementary 3-5 | 417 | 136 | 32.6% | 260 | 62.4% | 21 | 5% | 14.6% |
| Catahoula Elementary PK-5 | 124 | 79 | 63.7% | 38 | 30.6% | 7 | 6% | -17.2% |
| Cecilia Primary PK-2 | 669 | 394 | 58.9% | 207 | 30.9% | 68 | 10% | -16.9% |
| Teche Elementary 3-5 | 553 | 316 | 57.1% | 188 | 34.0% | 49 | 9% | -13.8% |
| Parks Primary PK-4 | 270 | 158 | 58.5% | 105 | 38.9% | 7 | 3% | -8.9% |
| Early Learning Center PK-1 | 349 | 110 | 31.5% | 232 | 66.5% | 7 | 2% | 18.7% |
| St. Martinville Primary 2-5 | 435 | 133 | 30.6% | 291 | 66.9% | 11 | 3% | 19.1% |
| Stephensville Elementary PK-8 | 121 | 117 | 96.7% | 0 | 0.0% | 4 | 3% | -47.8% |
| Totals | 3525 | 1640 | 46.5% | 1685 | 47.8% | 200 | 6% | |
| *The SY2022 District PK-5 Residential Demographics has +/-15% range from 32.8% to 62.8% Black. | | | | | | | | |

Again, this chart accurately displays the total enrollment of students and the racial identity of those students. What is not accurate is the last column of the chart, which indicates the percentage of deviation from the +/-15% standard. Mr. Hefner provided the range he used to determine this last column at the bottom of the chart. He identifies the +/-15% range as between 32.8% and 62.8%, revealing that he used an assumed baseline of 47.8%. Using the correct baseline of 47.4% from the 2022-2023 school year, the Court has calculated the +/-15% deviation under the Board's plan and with the attendance zones proposed in the Joint Motion in the chart below. Under both Mr. Hefner's original numbers and the corrected numbers, all three schools—Catahoula, the ELC, and SMP—are racially identifiable under the Board's plan to

---

Motion, the Court was not aware that Mr. Hefner had made this error throughout his testimony in this Court, including the Spring 2023 hearing.
[84] Record Document 699-1 at 6.

reopen Catahoula, even with the zone modifications suggested for the ELC and SMP in the Joint Motion.

| St. Martin Parish Schools<br>Joint Proposal Under the Board Plan with ELC Annex Configuration Demographics[85] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| School | Total | White | % White | Black | % Black | Other | % Other | +/-15% Black* |
| Breaux Bridge Primary PK-2 | 587 | 197 | 33.6% | 364 | 62.0% | 26 | 4% | 14.6% |
| Breaux Bridge Elementary 3-5 | 417 | 136 | 32.6% | 260 | 62.4% | 21 | 5% | 15% |
| Catahoula Elementary PK-5 | 124 | 79 | 63.7% | 38 | 30.6% | 7 | 6% | -16.8% |
| Cecilia Primary PK-2 | 669 | 394 | 58.9% | 207 | 30.9% | 68 | 10% | -16.5% |
| Teche Elementary 3-5 | 553 | 316 | 57.1% | 188 | 34.0% | 49 | 9% | -13.4% |
| Parks Primary PK-4 | 270 | 158 | 58.5% | 105 | 38.9% | 7 | 3% | -8.5% |
| Early Learning Center PK-1 | 349 | 110 | 31.5% | 232 | 66.5% | 7 | 2% | 19.1% |
| St. Martinville Primary 2-5 | 435 | 133 | 30.6% | 291 | 66.9% | 11 | 3% | 19.5% |
| Stephensville Elementary PK-8 | 121 | 117 | 96.7% | 0 | 0.0% | 4 | 3% | -47.4% |
| Totals | 3525 | 1640 | 46.5% | 1685 | 47.8% | 200 | 6% | |
| *The SY2022 District PK-5 Residential Demographics has +/-15% range from 32.4% to 62.4% Black. | | | | | | | | |

If Catahoula remained closed, by contrast, the numbers under the Joint Motion Regarding Attendance Zones look quite different. Based on residential demographics and excepting Stephensville Elementary, only one grade school in the District would fall outside the +/-15% standard. That school, Cecilia Elementary, would fall outside the standard by only -1.5%. This is a remarkable result for a District where, during the 2015−2016 school year, ten schools across the District were racially identifiable.[86] The racial demographics of the grade schools in the St. Martinville Zone, as proposed in the Joint Motion and with Catahoula closed, are illustrated in the chart below. The Court has taken the chart provided by Mr. Hefner and corrected it using the proper baseline for the +/-15% calculation. The chart illustrates that adopting the Joint Motion's proposed attendance zones and keeping Catahoula closed would effectively and immediately desegregate the grade schools in St. Martin Parish.

---

[85] In applying the appropriate Black elementary enrollment percentage, the Court notes that Breaux Bridge's racial identifiability increases while Cecilia's slightly decreases.

[86] Record Document 211-1 at 9; *see also Thomas I*, 544 F. Supp. 3d at 666 ("[D]uring the 2015-2016 school year, ten schools in the District were racially identifiable.").

| St. Martin Parish Schools Joint Proposal Elementary School with Catahoula Closed Demographics[87] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| School | Total | White | % White | Black | % Black | Other | % Other | +/-15% Black* |
| Breaux Bridge Primary PK-2 | 587 | 197 | 33.6% | 364 | 62.0% | 26 | 4% | 14.6% |
| Breaux Bridge Elementary 3-5 | 417 | 136 | 32.6% | 260 | 62.4% | 21 | 5% | 15.0% |
| Catahoula Elementary PK-5 | 0 | 0 | 0.0% | 0 | 0.0% | 0 | 0% | 0.0% |
| Cecilia Primary PK-2 | 669 | 394 | 58.9% | 207 | 30.9% | 68 | 10% | -16.5% |
| Teche Elementary 3-5 | 553 | 316 | 57.1% | 188 | 34.0% | 49 | 9% | -13.4% |
| Parks Primary PK-4 | 270 | 158 | 58.5% | 105 | 38.9% | 7 | 3% | -8.5% |
| Early Learning Center PK-1 | 390 | 139 | 35.6% | 240 | 61.5% | 11 | 3% | 14.1% |
| St. Martinville Primary 2-5 | 518 | 183 | 35.3% | 321 | 62.0% | 14 | 3% | 14.6% |
| Stephensville Elementary PK-8 | 121 | 117 | 96.7% | 0 | 0.0% | 4 | 3% | -47.4% |
| Totals | 3525 | 1640 | 46.5% | 1685 | 47.8% | 200 | 6% | |
| *The SY2022 District PK-5 Demographics has +/-15% range from 32.4% to 62.4% Black. | | | | | | | | |

In addition to immediately desegregating the parish grade schools, adopting the student attendance zones proposed in the Joint Motion and keeping Catahoula closed would also effectively desegregate the schools in the long term. Importantly, the above numbers reflect student residency and were produced by the parties at the Court's request. Student residency numbers do not account for transfer students enrolled in schools outside their residential zone.[88] Residential figures do not consider any desegregative effects of the potential magnet program, nor do they reflect the M-to-M transfers. As Mr. Hefner explained, residential enrollment numbers are "a baseline because it's really your worst-case scenario. It doesn't have any advantage of any further desegregative effects that could be brought on by transfers or [magnet] programming or things along those lines."[89] Keeping Catahoula closed and adopting the student attendance zones proposed in the Joint Motion is the only clear path before the Court to effectively desegregate the parish-wide grade schools in both the short and long term.

All parties—including the Board—agree that reopening Catahoula as a PK−5 school under the District's plan would impede desegregation in the St. Martinville Zone's elementary

---

[87] Record Document 699-1 at 4.
[88] *Id.* at 13.
[89] Record Document 658 at 256 (Hefner).

36

schools. Dr. Frankenberg, Plaintiffs' expert, testified that the Board's proposal would send any desegregative progress made in the last few years "in the opposite direction."[90] She explained that under both the District's and Mr. Hefner's proposals, "a substantial portion of the entire district" would be "even further from the desegregation standard."[91] The Board's and Mr. Hefner's proposals, she continued, establish two schools serving the same grades in the St. Martinville Zone[92]—a "hallmark" of racial segregation. *Id.* at 678. Even considering the zone changes in the Joint Motion, the Board's suggested configuration means several hundred more students will be relegated to racially identifiable schools until they matriculate to secondary school.[93] The Government's expert, Mr. Cropper, explained that reopening Catahoula as a PK−5 school (under the Board or Mr. Hefner three proposals) would require rezoning a significant number of White students from St. Martinville to Catahoula. In doing so, it "does not resolve the high" racial imbalances at SMP and the ELC.[94]

Though the District understands that reality, it offers no other desegregative basis to mitigate the harm. Mr. Allen Blanchard, the District Superintendent of schools at the time of the hearing,[95] acknowledged this fact. He testified that the District failed to propose new solutions to address desegregation and only requested a return to the *status quo ante*.[96] The reason, he said, was this: The Catahoula community "wants their school back."[97] Superintendent Blanchard

---

[90] Record Document 657 at 21 (Frankenberg).
[91] *Id.* at 20–21.
[92] *Id.* at 33.
[93] Record Document 656 at 157 (Frankenberg).
[94] *Id.* at 38 (Cropper). Such an exodus of White students from the ELC and SMP means that the magnet program would have to attract many more White students to be successful as a desegregative tool. *Id.* at 181 (Frankenberg). The effect of reopening Catahoula as a PK−5 under the Board or Mr. Hefner's proposals is discussed in more detail later in the opinion in a separate section.
[95] Mr. Blanchard retired in early summer after the hearing. He was replaced by Mr. Fred Wiltz, who served as the District's Desegregation Compliance Officer. Record Document 657 at 48 (Wiltz).
[96] Record Document 658 at 187–88, 208−09 (Blanchard).
[97] *Id.* at 133.

further explained that the District understood that its racial demographics would worsen under its proposal: "There is going to be a period of time where the numbers don't look right, and you maybe move away from what you want."[98] But with a robust magnet program, the Superintendent believed, the District would eventually meet its desegregation goals.[99]

Even if true, the District provides no analysis indicating how its plan would affect the magnet school opening at SMP or the ELC.[100] As noted above, for every White student rezoned to Catahoula Elementary, the magnet program in St. Martinville must attract another White student to maintain the current Black-to-White ratio. To be successful as a desegregative tool, the magnet school must attract additional White students to meet the +/-15% desegregation goal. Thus, the Board's plan frontloads the magnet program with a heavier burden. Indeed, Dr. Frankenberg testified that if Catahoula reopened using the 2021 zones as the District proposes, the ELC would require "36 additional nonblack students" and "St. Martinville Primary would need an additional 78 nonblack students" transferring to the magnet school to come within compliance.[101] With Catahoula closed, by contrast, the ELC would need ten White students, and SMP would need thirty-eight White students to bring the schools into compliance with the desegregation standard.[102] Former Superintendent Blanchard's remarks also ignore that the magnet program cannot desegregate Catahoula under the Board's plan without reducing the total number of students enrolled (109, according to Dr. Frankenberg, and 104, according to Mr. Hefner). This is because the program only allows White students at Catahoula to transfer out of the school; it does not allow more Black students to transfer into the school. Without experts

---

[98] *Id.* at 209.
[99] *Id.* at 209–10.
[100] *Id.* at 208.
[101] Record Document 657 at 18 (Frankenberg).
[102] Record Document 656 at 181 (Frankenberg).

supporting its position and considering the demonstrable increased segregative effects of the Board's plan, the District's student assignment proposal is a hope without a prayer.

So why did the Board propose a plan that only exacerbates the racial identifiability of the District's schools? The Board said it all began with its public listening sessions. In December 2022, the District aimed to collect input from around the parish for re-assigning students when Catahoula Elementary reopened—a plan the Board was to present to this Court on remand.[103] The Board's appellate attorney, an employee of the Louisiana Attorney General's Office, conducted these sessions.[104] Based on the "public comments" received at these gatherings, the Board sought to reopen Catahoula as a PK through fifth-grade school because, in the words of Superintendent Blanchard, the people in the Catahoula "community wanted their school reopened."[105]

But the feedback from the sessions was not only from Catahoula families. Superintendent Blanchard testified that during the Board's listening sessions, "people from St. Martinville indicated that [they] didn't want their children bused to another community."[106] The Superintendent also testified about written comments regarding the Board's proposed student assignment plan. This included feedback asking that Catahoula remain closed because the Black community was concerned about White families' opposition to the presence of Black children and worried about Black students' well-being and treatment at Catahoula.[107] Board member Wanda Vital, a Black woman, testified that Black families in the St. Martinville Zone are

---

[103] Record Documents 651-8, 651-9 & 657 at 58 (Wiltz).

[104] Record Document 658 at 189 (Blanchard). The Attorney General served as appellate counsel for the Board, but at the time of these public hearings, the Fifth Circuit had already rendered *Borel*. The Court allowed the Attorney General to enroll in this litigation at the district court level for the sole purpose of arguing the motion to stay pending appeal. Record Document 469 at 4. The Attorney General's office withdrew after that ruling. *Id.*

[105] Record Document 658 at 123 (Blanchard).

[106] *Id.* at 121.

[107] *Id.* at 232, 235.

hesitant to send their children to Catahoula because they are concerned that Black children are unsafe or unwelcome.[108]

Additionally, the testimony of the principals of the ELC and SMP called into question which "community" members in Catahoula want "their" school back. SMP principal Lisa Sylvester testified that SMP students who previously attended Catahoula have already effectively integrated into the school and are thriving there. After Catahoula closed, sixty to seventy students from Catahoula enrolled at SMP, and Ms. Sylvester testified that those students had successfully integrated into the SMP community.[109] She has not observed cliques of Catahoula students who remain socially separate from other SMP students.[110] Nor has she received complaints from Catahoula students or parents about the ability of students to transition into the school.[111] She has, on the contrary, observed friendships between former Catahoula and SMP students.[112]

Similarly, the ELC's principal, Jessica Landry, testified that the ELC absorbed twenty-two former students after Catahoula Elementary closed.[113] These students were spread across the ELC's three grade levels and several classrooms.[114] According to Ms. Landry, former Catahoula parents have only shared positive feedback about the ELC.[115] The only negative ELC comments, she continued, were from people whose children did not attend the school.[116] Like Ms. Sylvester, Ms. Landry observed that the former Catahoula students made friends with the other students and expressed to her how much they enjoyed the ELC's unique programs and after-school

---

[108] Record Document 659 at 142 (Vital).
[109] Record Document 655 at 66, 86 (Sylvester).
[110] *Id.* at 86−87.
[111] *Id.* at 88–89.
[112] *Id.* at 87.
[113] *Id.* at 36 (Landry).
[114] *Id.* at 42.
[115] *Id.* at 38.
[116] *Id.*

activities.[117] Thus the Government and Plaintiffs presented anecdotal evidence to contradict the anecdotal evidence supplied by the Board.

And as will become clear from the following discussion, the Board put forth its proposal to reopen Catahoula as a PK−5 school without the benefit of any demographic data showing the effect of its plan on the racial identifiability of the St. Martinville Zone schools. What follows is a recounting of a confusing and convoluted chronology of how the Board arrived at the proposal it presented to the Court. To bolster its plan to reopen Catahoula with the same attendance zone at the time of closure, the Board enlisted Mr. Hefner to produce attendance demographic reports and attendance zone maps. Though Mr. Hefner was prepared to explore other alternatives, the Board refused.[118] Indeed, in soliciting Mr. Hefner's services, the Board did not direct him to consider districtwide desegregation, nor did it ask Mr. Hefner to consider reopening the school with limited grade bands.[119] Ms. Vital, a Board member, confirmed this in her testimony.[120]

To comply with the Board's request, Mr. Hefner produced three options for the Board's review, detailing various configurations for reopening Catahoula as a PK−5 school. After Mr. Hefner presented his options, the Board voted in December 2022 to disseminate its student assignment plan for public input.[121] The wording of the flyers the Board circulated represented that the Board was proposing reopening Catahoula as it was "at the time of [its] closure: a PK−5 school."[122] Catahoula's attendance zones were also advertised as "the same as they were" in 2021 with "no additional changes."[123] The District's plan, in effect, was nothing new.

---

[117] *Id.* at 43.
[118] Record Document 659 at 38–39.
[119] Record Document 658 at 171–72 (Blanchard).
[120] Record Document 659 at 148 (Vital).
[121] Record Document 648-3.
[122] *Id.* at 1.
[123] *Id.*

The Board's public advertisements, however, contained an inconsistency. While the wording of the advertisements stated in general terms that the Board was proposing a return to the 2021 attendance zones, the map attached was from Mr. Hefner's Option 1.[124] And none of Mr. Hefner's options corresponded with the Board's stated goal of reopening Catahoula Elementary with its 2021 attendance boundaries; instead, Mr. Hefner's proposals outlined three new configurations. As discussed in more detail below, Mr. Hefner's Option 1, in particular, suggested rezoning all PK−5 students living in the entire Catahoula Zone to Catahoula Elementary. But, as noted, in 2021, students in PK−1 residing in the annex—the area added to Catahoula's Zone in the 2016 Consent Order—did not attend Catahoula until grade 2; they attended the ELC for PK−1.[125] In short, the map supplied to the public with the Board's student assignment plan was not an illustration of 2021 zone configurations; it was a new proposal altogether. And importantly, Mr. Hefner's data for Option 1 showed more Black students attending Catahoula than was accurate under a plan to return Catahoula "as it was."

[*Intentionally Left Blank*]

---

[124] *Id.* at 5.
[125] Record Document 211-1 at 15–16.

**Map Attached to the Board's Public Proposal**[126]



The only desegregative remedy in the District's public proposal was developing a magnet program—a measure ordered by this Court in June 2021, more than eighteen months before. The Board's flyer that discussed the magnet program contained only a few written lines regarding possible "Dance" and "Visual Arts" classes at the ELC and SMP.[127] It was the language from this flyer describing the magnet program that the Board filed into the record in preparation for the Spring 2023 hearing as its "proposal" for a magnet program.[128] The Board also took a decisive stance against implementing optional attendance zones, reasoning without further explanation that such a configuration "would not enhance or maintain desegregation."[129] How the Board reached that conclusion is unclear from the proposal's terms or the record, as no

---

[126] Record Document 648-3 at 5.
[127] *Id.* at 2.
[128] Record Document 611-1.
[129] Record Document 648-3 at 2.

official who testified at the hearing remembered any discussions about flexible attendance zones.[130]

Two weeks after circulating its student assignment plan with the inconsistent map, the Board voted to adopt it on January 5, 2023. In the published minutes detailing its vote, the Board officially "approved to reopen Catahoula Elementary School as it was at the time of closure: a PK−5 school."[131] The Board also voted to keep the attendance zones "the same as they were with no additional changes" before Catahoula closed.[132] As mandated in the scheduling order, counsel for the Board submitted to the Court in writing the Board's student assignment plan. Like the public proposal, the plan filed in Court proposed reopening Catahoula "under the same configuration and same attendance zones in the Superseding Consent Order."[133] But also like the public proposal, the submitted plan contained Mr. Hefner's demographic data for Option 1. As noted above, under Mr. Hefner's Option 1, all students in PK−5 living in the Catahoula Zone, including the annex, would attend Catahoula Elementary. According to the 2021 boundary configurations, however, students in PK−1 living in the annex attended the ELC. Because the students living in the annex are mainly Black, the demographic data submitted by the Board to the Court overstated the number of Black students who would attend Catahoula Elementary under the Board's supposed plan.

At first blush, the difference between the pre-closure Catahoula Zone and Mr. Hefner's Option 1 configuration may seem minor. The annexed zone, after all, is relatively small and includes just under twenty PK−1 students.[134] But with Mr. Hefner's projected attendance of 121 total students at Catahoula under Option 1, adding those students would increase the Black

---

[130] *See* Record Document 658 at 61 (Wiltz).
[131] Record Document 648-1 at 1.
[132] *Id.*
[133] Record Document 611 at 5.
[134] Record Document 658 at 261 (Hefner).

enrollment at Catahoula, placing the school closer to the +/-15% desegregation goal.[135] In that way, the Board's filed plan vastly overstated the number of Black children at Catahoula, presenting a rosier picture of the racial demographics for Catahoula Elementary and the ELC than was accurate.[136]

The confusion and contradictions did not end there. On the second day of trial, when the inconsistencies in the Board's court-submitted plan were discovered, counsel for the Board explained that the District really meant to adopt Mr. Hefner's Option 1, not the 2021 "split zone configuration," where the annexed PK−1 students remained at the ELC. Counsel stated that the misrepresentation in the court filings was his error.[137] Because the Court could not reconcile the Board's minutes, its public representations, its filed plan, and counsel's assertions, the Court was unsatisfied with counsel's representation and sought confirmation from the Board itself: Did the District intend to reopen Catahoula "exactly as it was before it closed," with grades PK−1 in the annex remaining at the ELC, or did it intend to approve Mr. Hefner's Option 1 proposal, sending the former annexed students to Catahoula Elementary?

After the hearing recessed, the Board conducted a special meeting later that evening on March 1, 2023. There, the Board ratified a prepared statement, which counsel read aloud in open court the following day:

> The Board previously voted to request that the Court reapprove the reopening of Catahoula Elementary in the same grade configuration and with the exact attendance zone boundaries as when the school was closed. The Board intended this would include the same assignment pattern as when the school closed. That is with grades pre-K to 1 within the original Catahoula zone and grades 2 to 5 from the original and annexed zones, and with the grades pre-K to 1 in the annexed

---

[135] Mr. Hefner acknowledged, however, as is discussed in more detail below, that his Option 1 plan would exacerbate the racial identifiability of the ELC by 5.6 percentage points and SMP by 6.7 percentage points, pushing both schools further outside of the +/-15% desegregation standard. Record Document 651-4 at 10.
[136] *Id.*
[137] Record Document 656 at 138 (John Blanchard).

area remaining at ELC. When the Board was presented with Mr. Hefner's Option 1, members were unaware that the numbers included the PK−1 students from the annexed zone and never intended for those younger students to be reassigned to Catahoula. The Board understands the confusion that may have arisen because of the error in the Option 1 data set and apologizes to the Court for its role in creating such confusion. The Board is committed to continuing to work in good faith and cooperatively as this matter moves forward.[138]

The Board, in short, sought to keep the 2021 annexed attendance zone that assigned students to Catahoula and the ELC based on their grade level. In the same breath, the Board rejected all three proposals its expert, Mr. Hefner, had created. Importantly, this meant that the Board had no demographic data—either to present to the Court[139] or at its vote—demonstrating the racial makeup of Catahoula Elementary, the ELC, or SMP if Catahoula were reopened with the same configurations "as when the school closed."

While attempting to explain the mix-up, the testimony of two Board members at the Spring 2023 hearing only added further confusion. First, Ms. Wanda Vital testified that it was her impression that the Board voted to approve an option created by Mr. Hefner, but she later contradicted that testimony.[140] The president of the Board, Mr. Russel Foti, also testified and, in essence, claimed the Board's vote to adopt its student assignment plan was a "misunderstanding."[141] When initially seeking expert input, Mr. Foti explained that the Board asked Mr. Hefner to create a report re-creating the zone "as it was when [Catahoula] was

---

[138] Record Document 648-4 at 3.

[139] At the hearing, Mr. Hefner testified concerning the residential demographics for the ELC, SMP, and Catahoula if Catahoula was reopened under the zones in the 2016 Consent Order. But those numbers were not part of his original report or hearing testimony. They were supplied by Mr. Hefner at the request of the Court and over the other parties' objections. On the fourth day of the hearing, the Court stated that it could not make its determinations without this information. Record Document 658 at 266–67 (Hefner). The Court observed that "the Board has . . . no expert to testify about their plan . . . but the Court [was] interested in Mr. Hefner's version of these numbers" for the Board's plan. *Id.* at 266. Importantly, these new demographic numbers were calculated by Mr. Hefner and presented to the Court after the Board's March 1, 2023 vote.

[140] Record Document 659 at 140 (Vital).

[141] *Id.* at 169 (Foti).

closed."[142] After Mr. Hefner seemingly did so, the Board members did not "discuss [the former annex zone] in any way"; they just "assumed it was in the plan."[143] But after making that statement, when asked did "the Board vote[] to endorse Mr. Hefner's No. 1 option[?]" Mr. Foti responded with "Right."[144] Based on the testimony of Mr. Foti and Ms. Vital, it became apparent that the Board was unaware of which student assignment plan it endorsed before the hearing and unaware of which plan it presented to this Court.

Still worse, this confusion and these contradictions raised a troubling question: Did the Board consider any student assignment data before agreeing to reopen Catahoula "just as it was before it closed?" The answer was "no," according to District officials.[145] It is undisputed that the only racial demographic information available to the Board was Mr. Hefner's—information that supported his three rejected options. Mr. Hefner confirmed that he never provided the Board with any numbers showing the racial makeup of the three schools in question that did not include sending the PK−1 students in the annex to Catahoula.[146] Perhaps, as Mr. Foti explained, the Board misunderstood its vote and conflated the attendance zone modifications in Mr. Hefner's proposal with the 2021 Catahoula attendance zone. Even if true, when faced with its mistake, the Board took a conclusive position without understanding the resulting segregative effects of its decision on the ELC, SMP, and a reopened Catahoula. Making such an uninformed choice with so much at stake makes at least one thing clear: Reopening Catahoula was the Board's only focus. That its plan would relegate "approximately one-third" of the District's "Black elementary students" to racially identifiable schools was inconsequential. *Thomas I*, 544 F. Supp. 3d at 689.

---

[142] *Id.* at 167.
[143] *Id.* at 169.
[144] *Id.*
[145] Record Documents 658 at 174–76 (Blanchard), 235−36 (Hefner) & 659 at 169 (Foti).
[146] Record Document 658 at 247−50 (Hefner).

Lastly, its merits aside, the Board's proposal has a legal impediment preventing its adoption: By its nature, the District's plan contravenes *Borel*'s directive on remand. In its ruling, the Fifth Circuit instructed this Court to "consider other equally effective alternatives before imposing" the "drastic" remedy of closing a school. In so holding, the panel left undisturbed this Court's prior findings supporting student assignment measures to cure the Board's constitutional violations. *Borel*, 44 F.4th at 317. Specifically, the Fifth Circuit held that this Court's conclusion that Catahoula Elementary was built in an all-White town for White students was "plausible in light of the record"; it held that the "remaining racial imbalances [in the area of student assignment] are vestiges of de jure segregation." *Id.* at 314. Although the panel overturned Catahoula's closure, it reaffirmed this Court's authority to order "equally effective" alternative remedies in its stead. *Id.* at 317 (quoting *Valley v. Rapides Par. Sch. Bd.*, 646 F.2d 925, 940−41 (5th Cir. 1981)). In the Board's view, that means reopening Catahoula as it was pre-closure. But such a proposal is not a remedy, much less an "equally effective alternative," *id.*; it is the readoption of a *status quo ante* that failed to integrate the District meaningfully. And because it lacks a basis in law, evidence, or documented success, the Court rejects the Board's proposal as an "effective" desegregative measure. *See id.*

### B. Like the Board's plan, Mr. Hefner's three options exacerbate racial identifiability in St. Martinville elementary schools.

Lacking a viable proposal from the Board, the Court next turns to the three alternatives for reopening Catahoula proposed by Mr. Hefner. Like the Board's proposal, each option suggests reopening Catahoula as a full-fledged PK−5 school. As explained, however, the Board does not endorse any of these proposed alternatives, instead maintaining an unwavering allegiance to the prior zone configurations. Yet even without the District's express endorsement,

the Board presented Mr. Hefner's testimony for consideration. And because the Court is not constrained to consider only the parties' three plans (and retains the broad authority to devise its own plan), the Court will evaluate and discuss the effectiveness of Mr. Hefner's three options below. *See Davis*, 721 F.2d at 1437 (affirming a district court's plan, which the parties had not offered). Nevertheless, like the Board's plan, Mr. Hefner's three options exacerbate racial identifiability in the St. Martinville elementary schools. Though Mr. Hefner believed such a circumstance would change over time through demographic shifts, the Court disagrees and again deems Mr. Hefner's theory unreliable.

### 1.   Mr. Hefner's Option 1



To begin with, Mr. Hefner's Option 1[147] is closest to the Board's plan; it would reopen Catahoula and assign students based on the geographic boundary in effect before the school's closure. But unlike the Board's proposal, children in the formerly annexed area would attend grades PK−5 at Catahoula without interruption. According to Mr. Hefner's testimony, eliminating the St. Martinville PK−1 annex would result in a more substantial desegregative impact on Catahoula compared with the Board's plan.[148] To be sure, Option 1 would reopen Catahoula with 121 students, 30.6% of whom would be Black and 63.6% White.[149] These numbers place Catahoula just outside the +/-15% desegregation standard at -16.8% below districtwide elementary Black student enrollment. In his report and trial testimony, Mr. Hefner admitted that under Option 1, the ELC's and SMP's Black racial identifiability increases. The ELC would reopen with 338 students, 69.8% of whom would be Black and 27.5% White, increasing Black racial identifiability by 5.6 percentage points, from +16.8% to +22.4%. SMP, on the other hand, would reopen with 410 students, 74.1% of whom would be Black and 22.9% White, increasing Black racial identifiability by 6.7 percentage points from +20.0% to +26.7%.[150]

As mentioned above, the parties have submitted the Joint Motion Regarding Attendance Zones that would bring more elementary and middle school students from Breaux Bridge and Parks into the St. Martinville Zone.[151] The Court has not yet approved that proposed order, and the agreement does not affect Catahoula's attendance boundary or grade configuration under any

---

[147] Record Document 651-4 at 8; As noted above, a more detailed view of these maps can be found at https://online.caliper.com/mas-874-drp-290-ujr/maps/ldlvnet3003weluv8qql [https://perma.cc/R4S5-LZNA]; *see supra* note 70.
[148] Record Document 658 at 248 (Hefner).
[149] *Id.* at 273.
[150] *Id.* at 273–74; *see also* Record Document 651-4 at 10 (presenting these numbers in a graphic format). These are projected actual student enrollment numbers, not residential enrollment.
[151] Record Document 699-1 at 5.

of the parties' plans. It does, however, affect the racial makeup of the ELC and SMP by enrolling more students in those schools. For that reason, the figures cited above regarding the percentage increase in Black students at the ELC and SMP change slightly with the parties' joint proposal.

The Court intended to compare this demographic data to the data produced at the Spring 2023 hearing to evaluate each of Mr. Hefner's plans. However, as to Option 1, the Court notes that there is an error in the data submitted supporting the Joint Motion as to that option. The error is that the student assignment data for Mr. Hefner's Option 1 and Option 2 are identical.[152] The submitted data shows the same total number of students and the percentages of Black-to-White students for all three schools under both options. As will be explained as the Court continues discussing each of Mr. Hefner's options, Option 1 incorporates the smallest land area and the smallest number of students to be zoned to Catahoula out of Mr. Hefner's three plans. Option 2 increases the number of students zoned to Catahoula from Option 1, and Option 3 increases that number from Option 2. Thus, the student assignment numbers from Option 1 to Option 2 cannot remain the same.

Additionally, the numbers submitted for Option 1 in the Joint Motion are not consistent with the residential numbers Mr. Hefner presented at the Spring 2023 hearing. At that hearing, Mr. Hefner testified that under his Option 1 and based on residence, Catahoula would enroll a total of 122 students, whereas, in the Joint Motion, that number is 142.[153] But the Joint Motion does not affect the number of students attending Catahoula, only the number attending the ELC and SMP. Thus, Mr. Hefner's Option 1 total enrollment number for Catahoula submitted with the Joint Motion should have been the same as at the Spring 2023 hearing. Regarding Option 2, Mr. Hefner's total enrollment numbers submitted at the hearing and in support of the Joint

---

[152] *Id.* Mr. Hefner, Mr. Cooper, and Mr. Cropper all verified these proposed enrollment numbers for each party's and experts' respective plans in the Joint Motion. Record Documents 697-2, 697-3 & 697-4.
[153] *Compare* Record Document 651-4 at 9, *with* Record Document 699-1 at 5.

Motion are the same: 142. At this point, and for these reasons, the Court surmises that error is the only explanation for the twenty-student discrepancy and that the error is contained in the Option 1 data, not the Option 2 data.[154]

The Court conducted a hearing on July 26, 2023, to discuss this discrepancy and other issues it identified in the Joint Motion Regarding Attendance Zones. At that hearing, Mr. Hefner admitted that the demographic numbers for Option 1 were different from Option 2. He acknowledged that submitting the same numbers for both options was his mistake. Mr. Hefner then supplied the correct Option 1 numbers under the Joint Motion, and counsel for the Board confirmed these numbers in an email sent after the hearing. Using these corrected numbers, if the Court adopts the Joint Motion, Option 1 still exacerbates racial identifiability at the ELC and SMP. Catahoula would reopen with 122 students, 30.3% of whom would be Black and 63.9% White. The ELC would reopen with 341 students, 66.6% of whom would be Black and 31.4% White, increasing the Black student population by 5.1 percentage points. SMP would reopen with 445 students, 66.7% of whom would be Black and 30.8% White, increasing the Black student population by 4.7 percentage points. Based on the demographic numbers in the parties' proposed order, 1,577 of 3,525 elementary students would be zoned to racially identifiable schools under Option 1.[155]

---

[154] The Court scheduled a hearing to address this discrepancy. Record Document 704.

[155] Record Document 699-1 at 5. These figures are based on residential demographics and the parties' proposed attendance zone revisions, now pending before the Court. Record Documents 697 & 699. This calculation does not consider Stephensville Elementary.

## 2.  Mr. Hefner's Option 2



Mr. Hefner's Option 2[156] proposes a seemingly modest change from Option 1; it expands the former zone with a narrow sliver from Highway 47, straddling the western banks of Bayou Teche further into St. Martinville. Figure A, depicted immediately below, shows Option 2's expanded boundary in green and its short distance from the ELC and SMP, highlighted with red blocks. Though Mr. Hefner proposed rezoning students to Catahoula that live directly across the bayou from the ELC and SMP, he said this configuration created a more lasting desegregative effect. Option 2 would reopen Catahoula with 141 students, 34.8% of whom would be Black and 60.3 White.[157] While the boundary line moves slightly, these numbers place Catahoula within the +/-15% desegregation standard (-12.6%). But the price of doing so is steep for the ELC and SMP. The ELC, for instance, would reopen with 328 students, 70.1% of whom would be Black and 27.1% White, increasing Black racial identifiability by 5.9 percentage points, from +16.8%

---

[156] Record Document 651-4 at 8; As noted above, a more detailed view of these maps can be found at https://online.caliper.com/mas-874-drp-290-ujr/maps/ldlvnet3003weluv8qql [https://perma.cc/R4S5-LZN A]; *see supra* note 70.
[157] Record Documents 651-4 at 14 & 658 at 281−82 (Hefner).

to +22.7%.[158] SMP would reopen with 400 students, 74.5% of whom would be Black and 22.5% White, increasing Black racial identifiability by 7.1 percentage points, from +20.0% to +27.1%.[159]

**Figure A**[160]



Turning to the demographic statistics submitted in the Joint Motion Regarding Attendance Zones, if Catahoula were reopened under Option 2, the school would serve 142 students, 34.5% of whom would be Black and 60.6% White. The ELC would reopen with 331 students, 66.8% of whom would be Black and 31.1% White, increasing the Black student population by 5.3 percentage points. SMP would reopen with 435 students, 66.9% of whom would be Black and 30.6% White, increasing the Black student population by 4.9 percentage points. Based on the demographic numbers in the parties' Joint Motion Regarding Attendance

---

[158] Record Document 658 at 281 (Hefner).
[159] *Id.*
[160] Record Documents 649-7 & 649-11.

Zones, 1,435 of 3,525 elementary students would be zoned to racially identifiable schools under Option 2.[161]

### 3. Mr. Hefner's Option 3



Finally, Mr. Hefner's Option 3[162] proposes the most significant change to Catahoula's former attendance zone. His third proposal dips its boundaries further southwest into the existing St. Martinville attendance zone and incorporates even more Black students than either Options 1 or 2. The additional area Mr. Hefner added is shown in red on the map above and in Figure B below. Figure B also depicts the relative location of the ELC and SMP, each highlighted with a red block. Like Option 2, Option 3 extends to the eastern banks of Bayou Teche, similarly sending students who live directly across the bayou from the ELC and SMP to Catahoula. But

---

[161] Record Document 699-1 at 5. These figures are based on residential demographics and the parties' proposed attendance zone revisions, now pending before the Court. Record Documents 697 & 699. This calculation does not consider Stephensville Elementary.

[162] Record Document 651-4 at 8; As noted above, a more detailed view of these maps can be found at https://online.caliper.com/mas-874-drp-290-ujr/maps/ldlvnet3003weluv8qql [https://perma.cc/R4S5-LZN A]; *see supra* note 70. The Court notes that Mr. Cooper's virtual map has an inconsistency regarding Mr. Hefner's Option 3. It erroneously shows Option 3's boundary extending westward beyond St. John Bridge Road. This additional territory, however, in not in Mr. Hefner's proposal.

unlike Option 2, this proposal delves further into the St. Martinville attendance boundary, continuing south along the bayou's border and down the middle of the St. Martinville Zone. Option 3 would reopen Catahoula with 186 students, 46.2% of whom would be Black and 48.4% White.[163] Along with Option 2, these numbers place Catahoula within the +/-15% desegregation standard (-1.0%). Still, neither SMP nor the ELC fares any better with this proposal. The ELC would reopen with 315 students, 70.2% of whom would be Black and 27.3% White, increasing Black racial identifiability by 6.0 percentage points, from +16.8% to +22.8%.[164] SMP would reopen with 368 students, 73.4% of whom would be Black and 23.9% White, increasing present-day Black racial identifiability by 6.0 percentage points, from +20.0% to +26.0%.[165]

**Figure B**[166]



Turning to the demographic statistics submitted in the Joint Motion Regarding Attendance Zones, if Catahoula were reopened under Option 3, Catahoula Elementary would

---

[163] Record Documents 651-4 at 18 & 658 at 287 (Hefner).
[164] *Id.*
[165] *Id.*
[166] Record Documents 649-7 & 649-12.

serve 189 students, 46.6% of whom would be Black and 48.1% White. The ELC would reopen with 318 students, 66.7% of whom would be Black and 31.4% White, increasing the Black population under the proposed zone modifications by 5.2 percentage points. SMP would reopen with 401 students, 65.1% of whom would be Black and 32.7% White, increasing the Black student population by 3.1 percentage points based on residential enrollment. Both fall outside the desegregation standard. Based on the demographic numbers in the parties' proposed order, 1,388 of 3,525 elementary students would be zoned to racially identifiable schools under Option 3.[167]

### C.  Mr. Hefner's three options adversely affect the District overall.

To reopen Catahoula Elementary for a small number of White students, Mr. Hefner's options disadvantage a much larger group: the students at the ELC and SMP and the Black students whom he proposes rezoning to Catahoula. First, those students enrolled at the ELC and SMP would attend schools where the Black racial identifiability is indisputably exacerbated under each of these options. Additionally, the success of these students' magnet program is jeopardized by this more significant desegregative burden. Second, the Black students rezoned to Catahoula would (1) become ineligible for the magnet program at the ELC and SMP via M-to-M transfers because they would be in the minority race at Catahoula; (2) bear a greater transportation burden; (3) attend a school further away from their homes at the earliest period in their education; and (4) attend a school where they may feel unwanted or unsafe.

The Court first details the effect of Mr. Hefner's plans on the students at the ELC and SMP. What little desegregation Mr. Hefner's plans offer at Catahoula is at the expense of exacerbating Black racial identifiability at both schools, a fact admitted in Mr. Hefner's own

---

[167] Record Document 699-1 at 6. These figures are based on residential demographics and the parties' proposed attendance zone revisions, now pending before the Court. Record Documents 697 & 699. This calculation does not consider Stephensville Elementary.

report.[168] To reopen Catahoula, his plans favor a significantly smaller number of students compared with those he disadvantages. The ELC and SMP serve significantly more PK−5 students than Catahoula in Mr. Hefner's options, as was the case just before Catahoula's 2021 closure. At that time, Catahoula served just 130 total students (73.8% White), while the ELC served 333 (66.1% Black) and SMP 441 (69.8% Black).[169] Under Option 1, Catahoula would reopen with 121 students (63.6% White), while the ELC would have 338 (69.8% Black) and SMP 410 (74.1% Black).[170] Under Option 2, Catahoula would reopen with 141 students (60.3% White), while the ELC would have 328 (70.1% Black) and SMP 400 (74.5% Black).[171] Under Option 3, Catahoula would reopen with 186 students (48.4% White), while the ELC would have 315 (70.2% Black) and SMP would have 368 (73.4% Black).[172]

Such a result is unsurprising as none of Mr. Hefner's options were designed to address desegregation at any school other than Catahoula.[173] But the consequences of Mr. Hefner's approach have districtwide implications. Mr. Cooper explained, for example, that reopening Catahoula as a PK−5 school would require rezoning over a hundred White students from St. Martinville to the Catahoula Zone.[174] Unfortunately, Mr. Hefner's efforts to adjust attendance zones to bring Catahoula closer to the desegregation standard exacerbate racial identifiability elsewhere, effectively "robbing Peter to pay Paul."[175] The United States' expert, Mr. Cropper, agreed. He said that reopening Catahoula with "more grade levels" would exacerbate racial

---

[168] Record Document 651-4.

[169] Record Document 651-11 at 3.

[170] If the Court approves the Joint Motion Regarding Attendance Zones under Option 1, the ELC would have 331 students and SMP 435. Record Document 699-1 at 6.

[171] If the Court approves the Joint Motion Regarding Attendance Zones under Option 2, the ELC would have 331 students and SMP 435. *Id.*

[172] If the Court approves the Joint Motion Regarding Attendance Zones under Option 3, the ELC would have 318 students and SMP 401. *Id.* at 7.

[173] Record Document 659 at 39, 42−43 (Hefner).

[174] Record Document 655 at 164−67 (Cooper).

[175] *Id.* at 165.

identifiability at SMP and the ELC and "does not address the high percentage of Black students . . . in St. Martinville" but compounds the problem.[176]

Dr. Frankenberg also opined on the districtwide effects of Mr. Hefner's proposals. As with the Board's plan, she explained that his options would send any desegregative progress made in the last few years "in the opposite direction."[177] At present, the ELC closely approaches the +/-15% desegregation standard at +16.8% above the districtwide percentage of Black elementary school enrollment. But if Mr. Hefner's proposed measures were adopted, a "substantial portion of the entire district" would be "even further from the desegregation standard."[178] That is because Mr. Hefner's and the District's proposals again establish two schools serving PK−5 in the St. Martinville and Catahoula attendance zones. As shown, such a configuration means several hundred more students will be relegated to racially identifiable schools until they matriculate to secondary school.[179]

Dr. Frankenberg also testified that exacerbating the Black racial identifiability at the ELC and SMP and reopening Catahoula to seven grades threatens the viability of the magnet program. It does so by moving over one hundred students from the ELC and SMP to Catahoula, thus diverting teachers and resources.[180] Such a significant movement of students and faculty could derail the magnet program in its infancy and negatively redirect the District's focus.[181] Still more concerning, as Dr. Frankenberg explained, these proposals exacerbate SMP's and the ELC's

---

[176] Record Document 656 at 38 (Cropper).
[177] Record Document 657 at 20–21 (Frankenberg).
[178] *Id.* at 21.
[179] Record Document 656 at 157 (Frankenberg).
[180] *Id.* at 158.
[181] *Id.*

racial identifiability to such an extent that it would "make it much harder to desegregate the magnet school once it's implemented."[182]

By the numbers, under current conditions with Catahoula's closure, the ELC would need ten White students, and SMP would need thirty-eight White students to bring them into compliance with the desegregation standard.[183] But under Mr. Hefner's Option 1, the ELC would require forty additional White students, and SMP would need seventy-seven more White students.[184] Under Mr. Hefner's Option 2, the ELC would need forty-one additional White students, and SMP would need seventy-eight White students.[185] Under Option 3, the ELC would need thirty-nine White students, and SMP would need sixty-five White students.[186] Because these plans eliminate the desegregation achieved by closing Catahoula Elementary, they "ask more" of the magnet school to be effective at attracting White students than any other proposal.[187]

The Court next details the disadvantages of Mr. Hefner's options to the Black students rezoned to Catahoula. It is undisputed that these rezoned Black students would be ineligible to attend the new and "robust" magnet program at the ELC or SMP. As students whose race would be in the minority at Catahoula Elementary under these plans and the Board's proposal, M-to-M transfers would be unavailable. Dr. Frankenberg described this disadvantage as a failure by the Board and Mr. Hefner to provide equal options across communities.[188] That is because Black students must go without the same choices given to their White peers: Catahoula's White

---

[182] Record Document 657 at 20–21(Frankenberg).
[183] Record Document 656 at 181 (Frankenberg).
[184] *Id.* at 178−79.
[185] *Id.* at 179.
[186] *Id.*
[187] *Id.* at 158–59. As touched upon above, these same issues apply to the Board's student assignment proposal.
[188] Record Document 657 at 30–31 (Frankenberg).

families could enroll in the magnet program through M-to-M transfers, whereas rezoned Black students at Catahoula lack a similar option, all the while living closer to the magnet school.[189]

The unequal treatment extends to transportation. Under these plans, the Government's expert, Dr. Siegel-Hawley, said rezoned Black students must travel further to earn a primary education, resulting in "an inequitable transportation burden," especially because "they may be transported into a hostile environment."[190] Mr. Hefner admitted that one of the "principles of redistricting" is reducing student travel time to the extent possible.[191] But each of his options places the greatest transportation burden on Black children. Option 2 and 3 each rezone St. Martinville students that live directly across the bayou from the ELC and SMP to Catahoula. Option 3, in particular, cuts down the middle of the St. Martinville Zone, and children living at the western end of St. Martinville's attendance boundary would cross through the new Catahoula Zone to get to the ELC or SMP. Figure C below shows the relative location of the ELC, SMP, and Catahoula, each highlighted with a red block. Mr. Hefner agreed his plans would "add some mileage," increasing the rezoned students' commute to their elementary school by about six miles.[192] But because they only worsen racial identifiability in the St. Martinville schools, neither Mr. Hefner's Option 1, 2, nor 3 offers desegregative solutions aside from transporting more Black children to Catahoula Elementary.

---

[189] Record Document 656 at 151–54, 159−60 (Frankenberg).
[190] *Id.* at 101 (Siegel-Hawley).
[191] Record Document 659 at 80 (Hefner).
[192] Record Document 658 at 286−87 (Hefner).

**Figure C**[193]



Relatedly, Mr. Hefner's options disregard the original purpose of carving an annex in the Catahoula attendance zone. When creating the 2016 Student Assignment Consent Order, the parties sought to keep the youngest students closer to their schools; they established the split zone for PK−1 students residing in the annex because these students lived closer to the ELC. Once they reached the second grade, those same students were reassigned to Catahoula, farther away, until grade five. Mr. Hefner's three options diverge from the parties' prior goal: Because Mr. Hefner's options rezone the students living in the 2021 annex to Catahoula Elementary, some of St. Martinville's youngest PK−1 children would be bused several more miles away to a school further from their residence.[194]

---

[193] Record Documents 649-7 & 649-11.
[194] Record Document 659 at 83 (Hefner).

### D.  Mr. Hefner's natural desegregation theory is flawed.

In addressing these criticisms, Mr. Hefner acknowledged that his three options would produce more racially identifiable schools at SMP and the ELC.[195] In rebuttal, he asserted at the hearing his recycled argument from a report he created in 2020: Based on 2010−2017 population numbers, the Catahoula and St. Martinville areas are "naturally desegregating"—that is, the school segregation would disappear as the result of population shifts.[196] The other expert demographers denounced that theory; they stated that no such population shift had occurred and that Mr. Hefner's conclusion was based on a flawed methodology and inaccurate population numbers. Notably, the Board did not introduce Mr. Hefner's 2020 report that contained his original theory into evidence.[197] Nevertheless, Mr. Hefner references the natural desegregation opinion in his 2023 expert reports and testimony; the District further stated that it endorsed Mr. Hefner's conclusion during the Spring 2023 hearing, though its mention is absent in the Board's post-trial brief.[198] In any event, for the reasons cited below, the Court disregards Mr. Hefner's expert opinion in this area as it results from a flawed methodology without a solid foundation and contains fatal inaccuracies.

Mr. Hefner determined in a 2020 expert report and testified at the Spring 2023 hearing that between 2010 and 2017, Catahoula's Black population increased by an average of 5.1% in two census tracts he says are assigned to Catahoula. He observed similar population trends in the St. Martinville area—the White residents' share of the population in St. Martinville grew for the same period. *Thomas I*, 544 F. Supp. 3d at 677. Based on his review, Mr. Hefner concluded that

---

[195] *Id.* at 32–35 (Hefner).
[196] Record Documents 651-4 at 6−7, 651-5 at 15−17 & 659 at 27 (Hefner).
[197] Record Document 651.
[198] Record Documents 651-4 at 6–7, 651-5 at 15–17 & 659 at 9 (John Blanchard).

these demographic trends would increase the racial diversity of the schools in St. Martinville and, at the time, Catahoula.

But the 2010−2017 numbers are stale, and his methodology was flawed. Indeed, Mr. Hefner admitted at the Spring 2023 hearing that, in re-urging his 2020 theory, he had not updated his prior report nor analyzed new population numbers.[199] More troubling was the revelation that, in reaching his conclusion, Mr. Hefner compared the official 2010 decennial census data with the 2017 "American Community Survey," or "ACS" data.[200] According to Mr. Cooper, the ACS is a "sample survey" the Census Bureau conducts yearly; it contacts one out of every forty-two households and aggregates the data over five years to arrive at estimates.[201] As Mr. Cooper explained, the ACS's purpose is not to count population but help researchers examine data like poverty rates by ethnicity, median household income, or education levels.[202] In that way, the ACS data is best used to analyze trends with a broader scope by towns, cities, and parishes.[203] Mr. Cooper stated that he would not use the ACS for redistricting voters at the national, state, or municipal level, though it may be helpful for examining "socioeconomic data."[204] In contrast, the Census Bureau recommends using the decennial census for population counting purposes, a fact even Mr. Hefner concedes.[205]

The problem with Mr. Hefner using the ACS is two-fold: For one thing, when using the data to opine on population changes within a single census tract, as Mr. Hefner attempted, "the

---

[199] Mr. Hefner testified that the ACS is a five-year average. Because there is a gap between when the ACS conducts its survey and when the results are reported, the 2017 ACS numbers Mr. Hefner relied upon are from the estimated average between 2013 and 2017 and released in 2019. Thus, the numbers that Mr. Hefner used are now six to eight years old. Record Document 659 at 29 (Hefner).

[200] *Id.*

[201] Record Documents 655 at 155 (Cooper) & 659 at 29 (Hefner).

[202] Record Document 655 at 155−156 (Cooper).

[203] *Id.* at 157.

[204] *Id.* at 158.

[205] Record Document 659 at 74–75 (Hefner).

margin of error is so large that it's basically just guesswork."[206] Making matters worse, Mr. Hefner mixed the 2010 Census numbers with the 2017 ACS population estimates. The Government's expert, Mr. Cropper, said that in doing so, Mr. Hefner did not provide an accurate "apples to apples" comparison since the data sources use different means of population measurement.[207] In sum, both experts agreed that Mr. Hefner's methodology underlying his desegregation theory was "[c]ompletely flawed."[208]

Mr. Hefner used 2017 ACS data at the time of his 2020 report because the 2020 decennial census results were not yet available. Though the 2020 Census results were accessible before the Spring 2023 hearing, it is unclear why Mr. Hefner did not update his numbers. Perhaps the reason was that the most recent census data does not support his theory. The reality is that the Catahoula area has remained steadfastly White for over ten years. Indeed, in examining Catahoula's population data from the 2020 Census, Mr. Cropper testified that Mr. Hefner's natural desegregation theory has not come to fruition. Mr. Cropper analyzed census blocks for the St. Martinville and Catahoula Zones to support his testimony rather than by census tracts as Mr. Hefner used. Census blocks are "the smallest geographic area for which the Bureau of the Census collects and tabulates decennial census data."[209] Using the relevant blocks to better reflect the 2021 Catahoula and St. Martinville actual boundaries, Mr. Cropper concluded that from 2010 through 2020, the St. Martinville Zone's White population remained constant at 54%; the former Catahoula Zone's Black population decreased from 19% to 18%.[210]

---

[206] Record Document 655 at 156 (Cooper).
[207] Record Document 656 at 17 (Cropper).
[208] Record Document 655 at 162 (Cooper); *see* Record Document 656 at 15 (Cropper) ("I believe that the basis for [Mr. Hefner's] conclusions is flawed.").
[209] U.S. CENSUS BUREAU, *Census Blocks and Block Groups* 11-1, https://www2.census.gov/geo/pdfs/reference/GARM/Ch11GARM.pdf.
[210] Record Documents 650-2 at 25 & 656 at 18–19 (Cropper).

For his part, Plaintiffs' expert, Mr. Cooper, reviewed the broader census tracts that Mr. Hefner examined in his 2020 report. Census tracts incorporate a larger geographic area than the smaller census blocks Mr. Cropper analyzed above. In 2020, Mr. Hefner claimed that the Black population in the Catahoula tracts grew by 1,056 individuals.[211] Mr. Cooper found that claim to be a "stunning mischaracterization."[212] In attempting to reconcile the numbers, Mr. Cooper explained that Mr. Hefner used two census tracts to arrive at his figure: one that incorporates the Catahoula area and one that does not. Though the latter tract Mr. Hefner used is adjacent to Catahoula, it goes "into the . . . city of St. Martinville," including portions of its downtown, and extends "south all the way to the parish line with Iberia, way south of St. Martinville."[213] This broad area is one "where a lot of black people live" and outside the boundaries "that [Mr. Hefner] included in all three of his [2023 student assignment] options."[214] Indeed, only a portion of that census tract is in the area that is in the Catahoula attendance zone under Plaintiffs' and the Board's proposals.[215]

Mr. Copper then reviewed the other tract that better represented the Catahoula area in the 2020 Census.[216] Of 1988 persons, Mr. Cooper testified that only twenty were Black.[217] Drilling down a bit further, Mr. Cooper explained that the actual town of Catahoula has 988 persons, of whom eight are Black.[218] Of these residents, he observed, there is no current census information

---

[211] U.S. CENSUS BUREAU, *Census Tracts* 3, https://www2.census.gov/geo/pdfs/education/CensusTracts.pdf.

[212] Record Document 655 at 148 (Cooper).

[213] *Id.* at 148, 151.

[214] Record Document 655 at 148−52. This is Census Tract 208, which includes 2,711 persons, 962 of whom are Black. *Id.* at 153.

[215] *Id.*

[216] *Id.* at 154.

[217] *Id.* at 149.

[218] *Id.*

breakdown as to age, meaning there is no way to know if any of these individuals have school-age children.[219]

In its June 2021 opinion, without benefiting from Mr. Cooper's or Mr. Cropper's insights, the Court rejected Mr. Hefner's "natural desegregation" theory as "weak." *Id.* at 688. The primary reason then was that Mr. Hefner considered general population trends regardless of age. As this Court observed, Mr. Hefner used residential population data that did not correlate to actual student enrollment for the 2020–2021 school year. That was notable because student enrollment data determine the District's compliance with the desegregation standard. And the Court noted that using residential figures resulted in Mr. Hefner overestimating the total number of students attending Catahoula at that time by 14%.[220] *Id.* Indeed, Mr. Hefner ignored enrollment data showing that the percentage of Black students at Catahoula fluctuated between 2016 and 2021, which undercut his theory that the Black population was steadily increasing.[221] And even if Mr. Hefner's findings proved true, the Court continued, he never explained *when* the schools in the District would "naturally" come into compliance with the desegregation standard. *Id.* at 689. For these reasons, the Court concluded in 2021 that Mr. Hefner's assumptions were based on unreliable data. *Id.* At the Spring 2023 hearing, Mr. Cropper shared the Court's prior skepticism about the accuracy of Mr. Hefner's 2021 testimony. He stated it was inappropriate to rely upon demographic trends when considering school redistricting. He opined that while "any

---

[219] *Id.* at 149–50.

[220] The Court points out there that Mr. Hefner calculated that 150 total students in PK–5 were zoned to attend Catahoula for the 2020–2021 school year. But the actual enrollment was 130 students, with only thirty Black students. Mr. Hefner could provide no explanation for this discrepancy, nor was there any other testimony at that hearing to explain the inaccuracies in his numbers. Mr. Hefner's conclusion that his then-proposed plan would increase the number of Black students at Catahoula to 37% was based on his underlying false assumption. *Thomas I*, 544 F. Supp. 3d at 686 n.26.

[221] Record Document 659 at 75–77 (Hefner).

area is subject to change over time," changing racial dynamics "takes a long time."[222] The more appropriate information for studying demographic changes in the school desegregation context is the "available [student] data."[223]

In *Borel*, 44 F.4th at 317, however, the Fifth Circuit cited Mr. Hefner's theory as a possible example of the District's "slow-but-steady" progress in removing vestiges of state-imposed segregation but stopped short of endorsing its accuracy. At the Spring 2023 hearing, the Board stated it was not abandoning Mr. Hefner's opinion on natural desegregation.[224] But the Board's failure to reference the subject in its post-trial brief suggests otherwise. This Court now has more substantial grounds to disregard Mr. Hefner's theory than it did two years ago, and its conclusions remain unchanged: Mr. Hefner's "guesswork," flawed methodology, and inaccurate population measurements cannot serve as a basis for the District's desegregation remedies.

### E. Mr. Hefner's previous 2020 proposal, addressed in *Thomas I* and *Borel*, would have an adverse effect on the District overall.

One final related point bears mentioning. In *Borel*, 44 F.4th at 317, the Fifth Circuit referenced a possible "alternative solution" this Court should have considered before ordering the "harsh" remedy of closing Catahoula Elementary: The 2020 boundary configurations proposed by Mr. Hefner. Three years ago, Mr. Hefner suggested a change in zoning between SMP and Catahoula to assist desegregation efforts. The proposed plan would have moved the border between SMP and Catahoula by approximately two miles so that more Black students attending SMP would instead enroll at Catahoula (similar to Mr. Hefner's Option 3). *Thomas I*, 544 F. Supp. 3d at 686. Based on residential data at the time, Mr. Hefner estimated that this boundary change would result in more Black students being zoned to attend Catahoula, thereby

---

[222] Record Document 656 at 31 (Cropper).
[223] *Id.*
[224] Record Document 659 at 9 (John Blanchard).

68

increasing the percentage of Black students in grades PK to five at Catahoula to approximately 37%. *Id.*

Notably, neither the Board nor Mr. Hefner put forth the 2020 proposal at the Spring 2023 hearing. Even in re-examining this plan in light of the remand, this Court does not view Mr. Hefner's 2020 proposal as an adequate remedy. During the 2021 remedial hearing, the Court found that this proposal had several flaws. One of the main issues, as noted above, was that Mr. Hefner's data had a 14% discrepancy from the Catahoula enrollment numbers at that time that went unexplained. *Id.* In other words, Mr. Hefner's calculations on what changes his plan would affect began with an inaccurate starting point. Aside from that, the Court found that this proposal offered no meaningful impact on desegregation efforts at the ELC and SMP. *Id.* at 636–87. His 2020 attendance zone modification was littered with the same problems his three options present today. Because Mr. Hefner's zone modifications would maintain Catahoula as a PK−5 school, the Court reaffirms its prior conclusion; such a configuration would be an ineffective alternative to address constitutional student assignment concerns.

### F.   Neither Mr. Hefner nor the Board presents adequate alternatives.

The experts' testimony, in the end, counsels this Court against implementing the Board's or Mr. Hefner's proposals. Reopening Catahoula as a PK−5 school is not an "effective" measure addressing this Court's student assignment concerns. Nor is it a measure that would promptly bring desegregation to the District. Reopening Catahoula as a PK−5 school under the Board's plan or Mr. Hefner's three options exacerbates the overall racial identifiability of the entire St. Martinville Zone. This backward step threatens the viability of the magnet program. These proposals also create two schools, one a majority White school and one a majority Black school, in the same zone, separately serving the same seven elementary grades. As to practicability, his

plans depend on deepening the intrusion of the Catahoula Zone into the St. Martinville Zone, imposing several burdens on the Black students who live in those expanded areas. As discussed below, other remedies look beyond a small community's interest in reopening a school, offering more "reasonable, feasible, and workable" alternatives—alternatives that better promote districtwide integration, alleviate burdens for Black children, and support the magnet school's success.

## II.     Plaintiffs and the Government offer reasonable, feasible, and workable remedies to eliminate de jure segregation, limit unequal burdens on Black families, and lessen the negative impact on the magnet school.

The Court now turns to those remaining proposals. Plaintiffs and the Government have presented three additional plans for this Court's consideration, backed by expert testimony. Each involves reopening Catahoula with a limited elementary grade band. The result is far fewer students exposed to exacerbated desegregation for much less time. Compared with the District's and Mr. Hefner's plan, Plaintiffs' and the Government's "effective alternatives" provide more favorable conditions for the magnet program to thrive. While these proposals do not bring the ELC, SMP, and Catahoula within the +/-15% goal, they certainly are closer to doing so than the Board or Mr. Hefner's proposals. Furthermore, these measures are practicable and effective; the Board has presented no evidence rebutting that conclusion. Assuming that the Fifth Circuit's remand requires this Court to reopen Catahoula Elementary in some format, the Court provides the following analysis.

### A. The Government proposes reopening Catahoula Elementary as a PK−K school, limiting young students' exposure to racially identifiable schools, and allowing St. Martinville and Catahoula students to attend the magnet school as early as possible.

The United States seeks to reopen Catahoula Elementary as a PK−K school with the 2021 geographical boundaries but with the PK−K ELC students in the annex attending Catahoula.[225] Its reason for doing so is this: The plan intentionally restricts the time the District's young students are exposed to racially identifiable schools.[226] The Government's expert, Dr. Seigel-Hawley, testified that the benefits of school desegregation extend by the number of years students are exposed to desegregation.[227] To that end, she stressed that children are best served the earlier they enter a desegregated school. And because the Government's plan implements a small grade band for Catahoula and has a limited effect on the St. Martinville zone—an area with 644 more elementary students−Dr. Siegel-Hawley endorsed the Government's proposal.[228]

Along with reopening Catahoula as a PK−K school, the Government also seeks to reconfigure the grade band at the ELC—currently a PK−1 elementary school—by moving its first grade to SMP. The ELC, as a result, would become a PK−K school like Catahoula, and SMP would serve 1–5. Consequently, under this configuration, students would attend parallel PK−K grade bands at Catahoula Elementary and the ELC; once they reach the first grade, they would all enroll together, attending SMP until they graduate into a secondary school.[229] Such an

---

[225] Record Document 655 at 228 (Cropper); *see also* Record Document 614 (Government's Proposal)

[226] In its initial proposal, the Government mentions an alternative plan that reopens Catahoula as a PK−1 school with the 2021 Catahoula attendance zones. The Government, however, did not present an argument on this proposal and, in the end, chose to endorse reopening Catahoula as a PK−K school. *See* Record Documents 614 & 684.

[227] Record Document 656 at 85−86 (Siegel-Hawley).

[228] *Id.* This figure is the difference between the PK−5 students located at the ELC and SMP and the PK−5 students residing within the Catahoula attendance boundaries defined in 2021 for grades 2−5. Record Document 651-11 at 3.

[229] Record Document 655 at 228−29 (Cropper).

outcome, Dr. Siegel-Hawley explained, would reduce the number of transitions students would make between elementary schools, offering stability in their early years of education.[230]

The Government believes a re-orientation at the ELC and SMP is practicable. In its post-trial brief, it cites the testimony of Superintendent Blanchard, who testified that moving first grade to SMP "would just basically require moving the teachers and their supplies over to the primary and . . . repainting a few classrooms"; he had no objections to doing so.[231] As for the ELC, the Government notes that the school exclusively served grades PK−K approximately ten years ago.[232] Though Superintendent Blanchard did not see the educational value in such an approach, he acknowledged the benefits of students experiencing fewer school transitions.[233]

As for demographics, the Government's plan would reopen Catahoula with thirty-three students, 33.0% of whom would be Black and 55.0% White. These numbers place Catahoula within the +/-15% desegregation standard at -14.4%. The ELC would reopen with 207 students, 68.0% of whom would be Black and 29.0% White, increasing Black racial identifiability by 3.8 percentage points, from +16.8% to +20.6%. SMP, on the other hand, would reopen with 626 students, 65.0% of whom would be Black and 33.0% White, decreasing Black racial identifiability by 2.4 percentage points from +20.0% to +17.6%.[234]

Turning to the demographic statistics submitted in the Joint Motion Regarding Attendance Zones, if Catahoula were reopened under the Government's proposal, Catahoula Elementary would serve thirty-three students, 33.0% of whom would be Black and 55.0% White.

---

[230] Record Document 656 at 85−86 (Siegel-Hawley).
[231] Record Document 658 at 177−78 (Blanchard).
[232] *See* Record Document 655 at 57−58 (Landry).
[233] Record Document 658 at 136 (Blanchard).
[234] Record Document 655 at 230 (Cropper); *see also* Record Document 650-2 at 16 (presenting these numbers in a graphic format). These are residential enrollment numbers, and they were presented to the Court in conjunction with proposed changes between the Parks and St. Martinville attendance zones. *See* Record Document 614.

The ELC would reopen with 208 students, 67.0% of whom would be Black and 30.0% White, increasing the Black student population by 5.5 percentage points. SMP would reopen with 667 students, 61.0% of whom would be Black and 36.0% White, decreasing the Black student population by 1.0 percentage points. Based on the demographic numbers in the parties' proposed order, 877 of 3,525 elementary students would be zoned to racially identifiable schools under the Government's proposal.[235]

Beyond minimizing transitions, Dr. Siegel-Hawley noted the plan's other benefits. Notably, she stressed how the Government's proposal prioritizes young students' access to a magnet school.[236] It does so, she explained, by exposing all Catahoula and St. Martinville elementary students to SMP's upcoming magnet program by the first grade.[237] Though she acknowledged that Catahoula Elementary would reopen as a small school and a majority White school, she believed that the Government's plan would be the best way to expose all students in the Catahoula and St. Martinville Zones to the magnet school as early as possible.[238]

Although this plan exposes the fewest students to racially identifiable schools among the alternatives for reopening Catahoula, it has two disadvantages. One issue is the lack of efficiency in operating a school with so few students. Still, this could be addressed by relocating the Juvenile Continuing Education Program ("JCEP") to Catahoula. The following section dealing with Plaintiffs' plan fully explores that alternative. But the second disadvantage of the Government's plan is that, by eliminating the split grade plan for the annex, it rezones the ELC

---

[235] Record Document 699-1 at 7. These figures are based on residential demographics and the parties' proposed attendance zone revisions, now pending before the Court. Record Documents 697 & 699. This calculation does not consider Stephensville Elementary.

[236] Record Document 656 at 85, 92 (Siegel-Hawley).

[237] *Id.* at 85−86.

[238] *Id.* at 89−90.

students to Catahoula and Catahoula's first graders to SMP, defeating the purpose of the former

2021 split attendance zone: allowing the youngest children to remain close to their homes.

**B.  Plaintiffs propose reopening Catahoula Elementary as a PK−1 school with a revised attendance zone, limiting the unequal burdens on Black families and supporting the magnet program.**

Plaintiffs, for their part, acknowledge that keeping Catahoula closed is the best solution

for achieving desegregation and success with the magnet program. But in keeping with the Fifth

Circuit's remand, they propose reopening Catahoula as a PK−1 elementary school under the

2021 attendance zone for those grades.[239] Because this plan eliminates grades 2–5 at Catahoula,

the proposal removes the annex, which was an awkward physical incursion into the St.

Martinville area. The annex was designed as a compromise in the 2016 Consent Order to bring

more grade 2−5 Black students into Catahoula in the hope of achieving desegregation. That goal

was not met. *Id.* at 679–83; *see also Borel*, 44 F.4th at 317 (affirming this Court's student

assignment factual findings). In putting forth this plan, Plaintiffs argue that the District would

have to bus fewer children far away from their homes while keeping more children in the ELC.

They cite community feedback for support that indicated St. Martinville residents "didn't want

their children bused to another community."[240] Plaintiffs also point to the testimony from the

ELC's principal, Ms. Jessica Landry, who reflected on the positive feedback she received from

Catahoula families attending the ELC.[241]

At the same time, like the Government's plan, reopening Catahoula under this

configuration would result in small enrollment, and the ELC would not fall within the

desegregation standard. Also concerning, Catahoula would similarly reopen as a racially

---

[239]  Record Document 657 at 495 (Frankenberg); *see also* Record Document 615 at 4 (Plaintiffs' Proposal).

[240]  Record Document 658 at 121–22 (Blanchard).

[241]  Record Document 655 at 38−39 (Landry).

identifiable school. Still, Dr. Frankenberg believed Plaintiffs' proposal would help mitigate the harmful, segregative effects of reopening Catahoula as the Board and Mr. Hefner propose.[242] Rather than seven grades of dual enrollment, Plaintiffs' proposal would bring more students together by grade two. Dr. Frankenberg said this reduces the years young students are exposed to the adverse effects of segregation.[243]

Plaintiffs' plan would reopen Catahoula with thirty-one students, 9.6% of whom would be Black and 77.4% White. These numbers place Catahoula far outside the +/-15% desegregation standard at -37.8%. The ELC would reopen with 345 students, 69.0% of whom would be Black and 28.4% White, increasing Black racial identifiability by 4.8 percentage points, from +16.8% to +21.6. SMP, on the other hand, would fare a bit better; it would reopen with 478 students, 67.4% of whom would be Black and 29.5% White, maintaining its Black racial identifiability at +20.0%.[244] In contrast, under the Board's plan, the Black racial identifiability at the ELC would increase by 4.8 percentage points and, for SMP, by 7.1 percentage points. Under Plaintiffs' proposal, at least SMP would be closer to meeting the desegregation standard than the Board's or Mr. Hefner's options.

Turning to the demographic statistics submitted in the Joint Motion Regarding Attendance Zones, if Catahoula were reopened under Plaintiffs' plan, Catahoula Elementary would serve thirty-four students, 5.9% of whom would be Black and 82.4% White. The ELC would reopen with 359 students, 66.3% of whom would be Black and 31.8% White, increasing the Black student population by 4.8 percentage points. SMP would reopen with 522 students, 61.5% of whom would be Black and 3.8% White, decreasing the Black student population by 0.5

---

[242] Record Document 656 at 190 (Frankenberg).
[243] Record Document 657 at 26−27 (Frankenberg); *See Thomas I*, 544 F. Supp. 3d at 678.
[244] Record Document 649-6 at 16 (presenting these numbers in a graphic format). These are projected actual student enrollment numbers, not residential enrollment.

percentage points. Based on the demographic numbers in the parties' proposed order, 1,062 of 3,525 elementary students would be zoned to racially identifiable schools under Plaintiffs' proposal.[245] Under the Board's plan, that number increases to 1,577 students.[246]

Because Catahoula would be limited in serving PK−1 students under Plaintiffs' plan, Dr. Frankenberg testified that the proposal would maintain current levels of integration at SMP, preserving some of the desegregation progress achieved after Catahoula's closure.[247] As a result, Dr. Frankenberg believed Plaintiffs' proposal gives SMP a better chance to desegregate once the District implements a magnet program.[248] Compared with the Board's proposal, Plaintiffs' note, SMP's magnet program would need to enroll far fewer White students to maintain integration.[249] For the ELC, Plaintiffs' proposal would require an additional thirty-six White students to come within the desegregation standard, while SMP would remain the same and require an additional thirty-eight.[250] In contrast, the Board's and Mr. Hefner's plans would require thirty-six to forty-one White student transfers for the ELC and sixty-five to seventy-eight for SMP.

All that said, Plaintiffs acknowledge that operating a school with thirty-one students on such a large campus may generate challenges. Catahoula has two separate classroom buildings, a sizable outdoor recreation space, an old but large gym, and a cafeteria.[251] The two different

---

[245] Record Document 699-1 at 8. These figures are based on residential demographics and the parties' proposed attendance zone revisions, now pending before the Court. Record Documents 697 & 699. This calculation does not consider Stephensville Elementary.
[246] Record Document 699-1 at 6.
[247] Record Document 657 at 28 (Frankenberg).
[248] *Id.* at 26.
[249] *See* Record Document 656 at 178−81 (Frankenberg).
[250] *Id.* at 181.
[251] The Court notes that at the time of its visit in May 2023, the cafeteria was not functioning. All the cooking equipment had been removed. Superintendent Wiltz did not know what had happened to it. The space was being used to store several large commercial refrigerators/freezers, which sat unplugged in the middle of the space. There were refrigerator units plugged in, but at least one needed repair. 5/22/23 Rough Tr. at 23:7−8.

classroom buildings are located on separate breezeways, which connect the classrooms to the gym and cafeteria. Each of these buildings has its own air conditioning and heating units.[252]

To manage small enrollment numbers, Plaintiffs' plan allows the Board to relocate its alternative school, JCEP, and all its operations to Catahoula's campus.[253] After doing so, Catahoula would likely enroll over seventy students.[254] Currently, JCEP is attached to the ELC's campus, separated by a fence and a gate from the ELC's PK−1 students.[255] As an alternative school, it draws students from all over the parish assigned there for varying periods. This arrangement requires children to be transported throughout the parish to one location. Plaintiffs believe the District could recreate a similar configuration at Catahoula and that such a configuration is practicable.

The physical layout of Catahoula lends itself easily to accommodate the two programs. For example, the two separate classroom buildings separated by breezeways could accommodate the two independent schools without the students encountering one another. Like Catahoula, Plaintiffs observe that JCEP's neighboring school, the ELC, only has one cafeteria. And when providing the JCEP students with lunch, the cooks prepare the food in the ELC's cafeteria, and the custodian delivers their lunch to a JCEP dining room or the classrooms.[256] Moreover, because of the separate breezeways, the JCEP students could eat in the cafeteria at different times from the PK−1 students, allowing them a "normal" school experience. Thus, like the setup

---

[252] Record Document 658 at 168 (Blanchard).
[253] Record Document 657 at 37−39 (Frankenberg); *see also* Record Document 615 at 4 (Plaintiffs' student assignment proposal).
[254] *See* Record Document 656 at 196−97 (Frankenberg).
[255] Record Documents 656 at 196 (Frankenberg) & 658 at 157−58 (Blanchard).
[256] Record Document 658 at 158 (Blanchard); *see also* Record Document 655 at 56−57 (Ms. Landry testifying that JCEP has been next door to the ELC for about five years, the ELC and JCEP buildings are separated by a cafeteria, and the ELC children do not use the cafeteria at the same time as the JCEP children).

at the ELC, Plaintiffs assert that Catahoula's PK−1 and JCEP students could use the same school campus while attending separate schools.

An additional advantage of using Catahoula for JCEP is that the Catahoula campus is a more pleasant and school-oriented physical layout than the building currently occupied by JCEP. When the Court visited the facility in May 2023, it noted that the physical school was "stark" and somber, without the decorations and bulletin boards expected in school buildings.[257] The operation of the air conditioning was also inconsistent between the warm hallways. Overall, the physical facility was dispiriting.[258]

Even without relocating JCEP to Catahoula Elementary, reopening the school under Plaintiffs' plan is practicable. Although Superintendent Blanchard had some reservations discussed below, he testified that reopening Catahoula as a PK−K school could be done. Mr. Blanchard conceded that the configuration of the ventilation systems, air conditioning, heating, plumbing, and security devices across the various buildings on the Catahoula campus allows for reopening only portions of the campus.[259]

### C. Though the Board objects to Plaintiffs' and the Government's proposals, it does not dispute their desegregative benefits or suggest any other reasonable alternative solutions.

The Board identifies several issues with Plaintiffs' and the Government's plans. Principle among them, the Board believes operating Catahoula as an elementary school with so few students and such small grade bands would be unrealistic. If reopened as a PK−K or PK−1 school, it asserts, Catahoula would be less than half of its former student population of 130 students before it closed.[260] At least in Superintendent Blanchard's view, under both

---

[257] 5/22/23 Rough Tr. at 9:8.
[258] *Id.* at 12:7−9.
[259] Record Document 658 at 167−69 (Blanchard).
[260] *Id.* at 137−38.

configurations, too many resources would be poured into a school serving so few students. He explained that operating an elementary school facility requires staff, including an administrator, a front office secretary, multiple cooks for the cafeteria, and a custodian—not to mention the several instructors needed to teach the students in the classroom.[261] Maintaining such a staff, Mr. Blanchard believed, would be cost-prohibitive in a school with under forty students.

Even though expenses are a valid concern, the District never provided the total cost required to run Catahoula before it closed. Nor did the District ever note how much it saved after closing the school.[262] Neither still, the Board did not conduct a cost analysis to understand the economic feasibility of running the school under any of the other parties' proposals—including its own.[263] So aside from conjecture, the District does not know what enrollment numbers justify the operational expenses for Catahoula Elementary.[264] By extension, the Court cannot weigh the respective financial toll each party's proposal inflicts. The Court notes that the District currently pays to maintain Catahoula despite the school sitting unoccupied. The Board runs heat and air conditioning in Catahoula's several buildings and supports the grounds with garden and lawn maintenance and the facilities with a dedicated custodian.[265] Notably, the Board recently repainted the exterior of the schoolhouse on campus and the interior of multiple classroom wings, even though the building is empty. On its May 2023 site visit, the Court stated that Catahoula "was the most recently painted of any of the places that . . . [it] observed."[266] At the

---

[261] *Id.*
[262] Record Documents 658 at 172 (Blanchard) & 659 at 149 (Vital).
[263] Record Document 658 at 171−72 (Blanchard).
[264] *Id.*
[265] *Id.* at 159, 167.
[266] 5/22/23 Rough Tr. at 23:7–8.

same time, other buildings on the ELC and SMP campuses—where children were attending classes—were not in "such good shape[]."[267]

As for small enrollment numbers, Dr. Frankenberg testified that similar early elementary schools with small enrollment sizes are used in other districts throughout Louisiana.[268] Ms. Landry, the ELC's principal, testified that grouping students within the early grades on one campus has the advantage of building an "early learning culture."[269] This culture allows for focusing on these students' needs at the early learning level and, in her view, was a massive benefit for those children.[270] It is also practicable for the District to adjust capacity by operating only some of the several classroom buildings on the Catahoula campus.[271] Indeed, other schools in the District, like SMP, have classroom buildings "not currently in use except for storage."[272]

While lamenting Catahoula's small enrollment under these proposals, the Board further rejects Plaintiffs' suggestion to mitigate those concerns. Regarding the alternative school, the Board says that this Court has found no violations regarding JCEP and that moving the school would present logistical obstacles. Among other challenges, the Board claims it would need to reinvent its transportation and shuttle system.[273] Superintendent Blanchard explained that while JCEP students living in St. Martinville ride their regular bus, all other JCEP students ride a shuttle bus starting in north St. Martin Parish at 6:30 a.m. to get students to JCEP by roughly 7:40 a.m.[274] According to the Board, restructuring that transportation system would burden the District, the bus drivers, and the JCEP students. And in the end, the Board continues, it already

---

[267] *Id.* at 4:20.
[268] Record Document 656 at 197−98 (Frankenberg).
[269] Record Document 655 at 59 (Landry).
[270] *Id.*
[271] Record Document 658 at 168−69 (Blanchard).
[272] 5/22/23 Rough Tr. at 16:11.
[273] Record Document 658 at 154−55 (Blanchard).
[274] *Id.*

has a functioning alternative school in place, so moving JCEP to Catahoula makes no practical sense.

The Court disagrees. To the extent that Catahoula's facilities exceed the space needed to serve a smaller student population, the Court finds that housing JCEP at Catahoula is at least one way to address that issue. Superintendent Blanchard agreed that it would be possible to host the JCEP at Catahoula and that it "would increase the number of students there."[275] Board member Wanda Vital similarly agreed that Catahoula could house JCEP.[276] As noted above, there are no physical impediments to operating an alternative school from Catahoula, as the District can supply several unused buildings and adequate facilities. As for transportation, *every* proposal before the Court—including the Board's—would require the District to rethink transportation to some extent. But the District has not analyzed the various options in Mr. Hefner's or its own proposal to determine their impact on students' transportation and busing.[277] So while the District's concerns in this regard may be valid, the Board is decrying the potential transportation challenges of other plans while unaware of the obstacles to its own.[278]

Ultimately, the Court understands the District's broader concerns with these proposals as both the Government's and Plaintiffs' plans come with their own set of issues. For one, they both reopen the ELC outside the desegregation standard. And though the Government's plan places the fewest students in racially identifiable schools, it requires the most reconfiguration: The plan reorients the grade bands at SMP, the ELC, and Catahoula. Plaintiffs' recommendation, on the other hand, suggests less reconfiguration and keeps students residing in the 2021 annex closer to their homes. But simultaneously, it reopens Catahoula with the highest White racial

---

[275] *Id.* at 221.
[276] Record Document 659 at 147 (Vital).
[277] Record Documents 658 at 171−73, 176 (Blanchard) & 659 at 147−48 (Vital).
[278] *See* Record Document 658 at 176 (Blanchard).

identifiability. What is more, the Government's and Plaintiffs' plans enroll less than forty students at Catahoula and use only a part of the school's campus.

Yet those concerns do not outweigh the proposals' relative desegregative benefits. The Board presents no evidence showing otherwise. Indeed, based on the testimony adduced at the hearing, the Court concludes Plaintiffs' and the Government's proposals are effective and would spur desegregation faster than reopening Catahoula to PK through five. Compared with the Board's plan, hundreds fewer students would attend racially identifiable schools, and SMP would be with the +/-15% standard at +13.7% if the Court adopts the Joint Motion Regarding Attendance Zones as the parties propose.[279]

The plans also reduce dual enrollment structures and unite all students in the area at SMP by grade two at the latest. By extension, the proposals are better at supporting the magnet program's success. Fewer students would need to move schools to desegregate SMP or the ELC, allowing more young children to attend a magnet school. For these reasons and those above, the Court finds that Plaintiffs' and the Government's plans would be (1) effective, (2) practicable, and (3) prompt at achieving desegregation; thus, each proposal is an adequate alternative "addressing [the] concern" regarding the vestiges of segregation in student assignment. *Borel*, 44 F.4th at 317.

### III. Dr. Frankenberg proposes the reasonable, feasible, and workable option of reopening Catahoula Elementary as a sixth-grade academy, avoiding the exacerbation of racial identifiability across the St. Martin Parish School District.

The final proposal comes not from the parties but from Plaintiffs' expert, Dr. Frankenberg, who proposed reopening Catahoula as a sixth-grade academy. As noted above, the

---

[279] Record Document 699-1 at 7, 8. These numbers, of course, are based on residential enrollment demographics. Though the Government's and Plaintiffs' proposals would enroll different amounts of students at SMP (522 under Plaintiffs' and 667 under the Government's) the racial demographics at the school under the Joint Motion Regarding Attendance Zones are coincidentally about the same. *Id.*

Court is not constrained to consider only the parties' three plans (and retains the broad authority to devise its own plan). *See Davis*, 721 F.2d at 1437. So, like those from Mr. Hefner, the Court will evaluate and discuss the effectiveness of Dr. Frankenberg's proposal. She makes a compelling case and offers a reasonable option for reopening Catahoula that avoids exacerbating racial identifiability across the St. Martin Parish School District.

In her report and through her live testimony, Dr. Frankenberg suggested reopening Catahoula as a "sixth grade academy"—a school that enrolls all sixth graders in the St. Martinville zone, creating two middle schools within that attendance boundary: Catahoula would house all sixth graders, while St. Martinville Junior High would house all seventh and eighth graders.[280] This plan makes no changes to current elementary school configurations, and all Catahoula area students in grades PK−5 would continue to attend the ELC and SMP.[281]

Though it may sound novel to some, Dr. Frankenberg said opening a sixth-grade academy is more common than one may believe. She stressed that other school districts nationwide, specifically in Louisiana, have operated such a school and that doing so offers education benefits.[282] Because the sixth grade is a transitional time between elementary and secondary school, Dr. Frankenberg said that serving these children in one school allows the teachers to focus on their academic and social support without older or younger students present.[283]

Dr. Frankenberg also believed this plan was best for helping the District meet its desegregation goals. She said reopening Catahoula as a sixth-grade academy would keep St.

---

[280] Record Document 649-6 at 16−17.
[281] *Id.*
[282] Record Document 656 at 185 (Frankenberg); *see also* Record Document 655 at 51−53 (Landry).
[283] Record Documents 656 at 185 (Frankenberg) & 649-6 at 17.

Martinville Junior High and Catahoula compliant with the +/-15% desegregation standard.[284] Unlike every other proposal, she continued, this plan would eliminate dual-grade structures and not exacerbate the racial identifiability at the ELC, SMP, or any other school.[285]

Dr. Frankenberg's proposal would reopen Catahoula with 115 sixth-grade students, 58.3% of whom would be Black and 39.1% White. These numbers place Catahoula within the +/-15% desegregation standard at +12.3% above the districtwide percentage of Black middle school enrollment. St. Martinville Jr. High, as a grade 7−8 school under this proposal, would reopen with 224 students, 60.2% of whom would be Black and 35.7% White. These numbers place St. Martinville Jr. High within the +/-15% desegregation standard at +14.2%.[286] The St. Martinville Elementary schools would remain the same as they are today. The ELC would reopen with 376 students, 64.1% of whom would be Black and 32.4% White, maintaining its Black racial identifiability at +16.8%. SMP would also remain the same with 478 students, 67.4% of whom would be Black and 29.5% White, maintaining Black racial identifiability at +20.0%.

Turning to the demographic statistics submitted in the Joint Motion Regarding Attendance Zones, if Catahoula were reopened as a sixth-grade academy, Catahoula Elementary would serve 134 students, 59.7% of whom would be Black and 38.8% White. St. Martinville Junior High would serve 263 7−8 grade students, 59.3% of whom would be Black and 38.0% White, decreasing the current projected Black student population by 0.1 percentage points. The ELC would reopen with 390 students, 61.5% of whom would be Black and 35.6% White, maintaining the projected Black student population. SMP would reopen with 518 students,

---

[284] Record Document 649-6 at 16.
[285] Record Document 657 at 33 (Frankenberg).
[286]. Record Document 656 at 187–88 (Frankenberg); *see also* Record Document 649-6 at 17 (presenting these numbers in a graphic format). These are projected actual student enrollment numbers, not residential enrollment.

62.0% of whom would be Black and 35.3% White, maintaining the projected Black student population. Based on the demographic numbers in the parties' proposed order, 669 of 3,525 elementary students would be zoned to racially identifiable schools under Dr. Frankenberg's proposal.[287]

All those schools would reopen within the desegregation standard, and this plan would place the fewest students in racially identifiable schools under the Joint Motion Regarding Attendance Zones. A byproduct of that reality is that the fewest students would need to M-to-M transfer to maintain desegregation at the magnet school in St. Martinville compared with every other plan.[288] Consequently, of all the options, Dr. Frankenberg opined that this configuration gives the magnet school at the ELC and SMP the best chance to succeed. Thus, this plan has long-term desegregative effects that would outlast the Court's supervision.

Though they do not officially endorse this proposal, Plaintiffs argue that opening a sixth-grade academy is practical. In supporting that argument, they point to Dr. Frankenberg's expert report explaining how a sixth-grade academy would utilize a significant amount of Catahoula's unused capacity. Dr. Frankenberg's proposal would place the largest number of students at Catahoula: It would house 115 or 134 sixth-grade students—close to the number of Catahoula students in Fall 2021 (130).[289] Plaintiffs also note that sixth-grade academies have been a feature of other school desegregation cases. *See, e.g.*, *Valley*, 646 F.2d at 940 (affirming the conversion of several one-race elementary schools into integrated zone-wide "sixth grade centers"); *Mims v.*

---

[287] Record Document 699-1 at 8. These figures are based on residential demographics and the parties' proposed attendance zone revisions, now pending before the Court. Record Documents 697 & 699. This calculation does not consider Stephensville Elementary.

[288] Record Document 656 at 98 (Siegel-Hawley) (concluding that a "sixth-grade academy would not interfere" with the students enrolled at the ELC and SMP).

[289] Record Document 649-6 at 16; *see also* Record Document 658 at 213−14 (Frankenberg).

*Duval Cnty. Sch. Bd.*, 329 F. Supp. 123, 130–31 (M.D. Fla. 1971), aff'd 447 F.2d 1330 (5th Cir. 1971)) (same).

The Board, by contrast, fails to see any "tremendous academic benefit" in adopting this plan. Though Superintendent Blanchard said this proposal was "doable," he noted that students are "going to be taught the same curriculum, just in a different facility."[290] He was also concerned about the transportation issues this proposal would create. The District, he explained, "would have to run a couple of [sic] three or four more buses, maybe more, across [its] entire geographic area and pick up just the sixth graders."[291] He alternatively suggested running "a shuttle system" wherein students are dropped off at a school, then shuttled to Catahoula. But even with shuttle service, Superintendent Blanchard said that such a system would, by its nature, increase the likelihood that some students are consistently late to school by thirty to fifty minutes a day.[292] Again, this testimony by Mr. Blanchard was not the result of any study by the District. The District also says that adopting Dr. Frankenberg's proposal is unreasonable. In its June 2021 liability ruling, this Court found that the District successfully eliminated racial identifiability at all schools serving grades six to eight. The District thus reasons that sixth graders should remain in their existing desegregated middle schools.[293]

The Court finds, however, that Dr. Frankenberg has proposed a reasonable and compelling proposal that would promptly achieve desegregation. This plan, after all, is the only proposal that does not increase racial identifiability in any school, moving the District closest to its desegregation goals.[294] Dr. Frankenberg's recommendation is also practicable. Out of

---

[290] Record Document 658 at 151−52 (Blanchard).
[291] *Id.*
[292] *Id.*
[293] *See* Record Document 651-11 at 4.
[294] Even the Government's expert, Dr. Siegel-Hawley, agreed that a sixth-grade academy would benefit students academically. *See* Record Document 656 at 98 (Siegel-Hawley).

Plaintiffs' and the Government's options, it places the largest number of students at Catahoula. Ms. Landry, the ELC's current principal, had previously suggested converting Catahoula into a districtwide middle school. And before the 2016 Consent Order, the Catahoula facilities housed middle school students. This indicates that the facility may be utilized again for middle school grades.

The Court acknowledges this plan has its disadvantages; it understands the difficulty the students living further from the school may experience commuting or participating in after-school activities. Even so, in 2022 (before the Fifth Circuit's ruling in *Borel*), the Board put forward a pairing proposal, which involved transporting all students in the St. Martinville Zone to Catahoula for some grades.[295] Apparently, at that time, the District believed transporting children across the zone was a practicable proposal. As for Dr. Frankenberg's proposal, however, no reason was given for the Board's change of heart.

After carefully considering the available data and expert opinions, the Court determines that implementing Dr. Frankenberg's proposal is preferable to implementing those from the Board and Mr. Hefner. As with Plaintiffs' and the Government's proposals, limiting Catahoula's grade band exposes fewer students to desegregation, and it does so for much less time. Dr. Frankenberg's "effective alternative" also provides more favorable conditions for the magnet program at the ELC and SMP to thrive. For those reasons and those above, this plan would be (1) effective, (2) practicable, and (3) prompt at achieving desegregation; thus, Dr. Frankenberg's is an adequate alternative "addressing [the] concern" regarding the vestiges of segregation in student assignment. *Borel*, 44 F.4th at 317.

---

[295] Record Document 658 at 206–207 (Blanchard).

### IV.    Reopening Catahoula in Fall 2023 under any grade configuration would threaten the viability of the magnet program in the St. Martinville attendance zone.

Despite the reasonableness of Plaintiffs' and the Government's proposals, reopening Catahoula for the Fall 2023 school year under these plans is premature. Though the District seeks a ruling holding otherwise, several reasons prevent the Court from doing so. [296] Of the multiple concerns, the most important is this: Reopening Catahoula in Fall 2023 would derail the ELC's and SMP's magnet program that the parties agreed by consent order to open in Fall 2024. As stated above, that program is designed to enhance the educational experience of the ELC and SMP students and serve as a desegregative tool to attract White students from Catahoula and other majority White PK−5 grades, thus lowering the racial identifiability of the ELC and SMP. Catahoula's reopening, therefore, must be tied to the magnet program's implementation.

Establishing a magnet program is two years overdue, and the responsibility for the multi-year delay falls on the Board alone. As noted above, a central feature of this Court's 2021 liability ruling was developing a magnet program to open in 2022 to serve students in the St. Martin Parish School District. In 2017, the District attempted to introduce a STEM program at SMP that included one class offering, supplemented by a robotics club, both floundering at the time of the 2021 liability hearing. In its liability opinion, however, the Court concluded that "the District failed to support and advertise [the STEM] program in such a way that it was likely to be an effective desegregation tool." *Thomas I*, 544 F. Supp. 3d at 682. The District also failed to

---

[296] This Court could not finalize this opinion until it received the parties' Joint Motion Regarding Attendance Zones as to student assignment in other areas of the St. Martinville Zone. Although the parties had discussed the possibility of such an agreement in the last days of the Spring 2023 hearing, the Court received the original proposal on June 14, 2023, with a further explanation of the demographic statistics on June 21, 2023. Record Documents 697 & 699. As previously explained, that proposal does not affect the St. Martinville/Catahoula Zone boundary lines. But it does change the number of students who would attend the ELC and SMP by expanding the St. Martinville Zone into the Parks and Breaux Bridge areas. Record Document 697.

implement the STEM program "in a way that meaningfully differentiat[ed] SMP from other schools in the District." *Id.* When "the District saw little success in attracting families to the STEM program . . . it effectively gave up" on promoting it. *Id.* To remedy those issues and the District's broader student assignment violations, the Court ordered the District to "implement a robust magnet program at SMP and [the] ELC," including a year of study "such that the [magnet] program [would] not go into effect until the 2022-2023 school year." *Id.* at 693.

The 2022−2023 school year has since ended; a magnet program has yet to be developed. False starts, obstruction, and a general lack of interest have hindered the Board's ability to realize the benefits of a robust magnet school, much less follow a court order. In Fall 2021, after the Court entered its liability ruling, the Board began conducting polls regarding magnet themes. But by the end of December 2021, plans "fizzled out" with no appreciable progress.[297] Though the Board applied for a magnet grant, it assigned Mr. Frederick Wiltz—the individual charged with consent order compliance−as the lead organizer. Mr. Wiltz had no prior experience developing a magnet school or drafting grants. Unsurprisingly, the application was never approved.[298] Then, to prepare for the Spring 2023 student assignment proceedings, the Board filed with the Court in January 2023 a one-and-a-half-page "magnet plan" where the ELC students would be exposed to "STEM/Robotics, Dance, and Visual Arts on a weekly basis."[299] Despite over eighteen months to develop a "robust" magnet program, the Board's submission contained only sixteen lines of text regarding the magnet program's contents. For SMP, the Board proposed offering students two sections of dance and one section of visual arts.[300] When questioned about these limited offerings, Superintendent Blanchard testified that he did not

---

[297] Record Document 658 at 49 (Wiltz).
[298] *Id.* at 53.
[299] Record Document 611-1 at 1.
[300] *Id.*

believe that the District could satisfy the Louisiana state curricula requirements and still incorporate a magnet theme beyond a dance PE class offered every day and other elective offerings.[301]

For two years, the District has been unable to "grasp a simple, unrefuted fact: A viable magnet program requires more than limited class offerings (even if offered to a variety of grades)."[302] Based on the testimony of Dr. Frankenberg, a true, robust, and effective magnet program is instead "apparent from entering the building" because it "incorporate[s] its theme throughout the school." *Id.* at 679. To this end, developing such a program requires "depth of implementation," showing prospective families the uniqueness of the magnet school's educational experience. Hopefully, the June 2023 Magnet Consent Order, agreed to by the parties and adopted by this Court, will help the District meet that objective.[303] Nevertheless, establishing a magnet program for St. Martinville elementary students is two years past due. And reopening Catahoula as an elementary school before a magnet is in place would be detrimental to the magnet program's success. As the experts explained, reopening Catahoula this year would compete with the St. Martinville schools, altering or delaying the planning process for the magnet program.[304] Demanding that the Board juggle both—establishing a magnet program and reopening a school—would be unprecedented for the District, which, in its past, has done neither.[305]

Aside from shifting priorities, reopening Catahoula before the magnet program's launch could discourage Catahoula parents from choosing to send their children to SMP and the ELC. If Catahoula reopens first, its rezoned families would have to decide whether to transition back to

---

[301] Record Document 658 at 108−15 (Blanchard).
[302] Record Document 696 at 3.
[303] Record Document 694.
[304] Record Document 656 at 94−98 (Seigel-Hawley), 158 (Frankenberg).
[305] *Id.* at 158 (Frankenberg).

SMP or the ELC for the magnet program one year after starting a new school.[306] According to Dr. Siegel-Hawley, the resulting "ping pong" effect could destabilize the youngest students who may wish to take advantage of the program.[307] This is largely why she believed the District should implement the magnet simultaneously with reopening Catahoula.[308] Relatedly, Catahoula area parents would lack the information to make a well-informed decision about their child's education. During her testimony, Dr. Frankenberg emphasized the importance of informing parents about the nature of the upcoming magnet program and ensuring that they fully comprehend it before expecting them to decide whether their child should enroll.[309] But, like the magnet program, such information has yet to be developed.

Another consideration counsels the Court against reopening Catahoula in Fall 2023: The overwhelming logistical obstacles for the District. Deadline extensions,[310] misrepresentations, and elongated negotiations have all delayed this Court from resolving student assignment issues. The parties submitted a briefing only a short time ago, on June 2, 2023,[311] with supplemental information filed on June 21, 2023, as to the effect of the proposed student assignment plans on this opinion.[312] During the Spring 2023 hearing, the Board said it could take steps to ready Catahoula this fall.[313] That was in March 2023. Four months later, the student assignment plan remains unresolved. Given the condensed timeframe forced upon the parties and this Court, rushing to reopen a school in early August 2023 would challenge the Board and the District's families and students, who do not yet know what to anticipate.

---

[306] *Id.* at 92, 95 & 97 (Siegel-Hawley).
[307] *Id.* at 97.
[308] *Id.* at 193 (Frankenberg).
[309] *Id.* at 193−94.
[310] Record Documents 660, 663 & 678.
[311] Record Documents 684, 686 & 687.
[312] Record Document 699.
[313] Record Document 658 at 162 (Blanchard).

The Board would also need to physically prepare Catahoula's facilities for incoming students. After a May 2023 site visit, this Court noted Catahoula's cafeteria was not "ready to go" and would require "some work to get back together again."[314] The space had "been turned into a storage area for other cafeteria equipment," with some appliances "leaking" and "no cooking equipment plugged in at all."[315] Other practical concerns, like finding faculty and administrators and developing transportation routes, would pose significant challenges on such short notice. Therefore, because of the student assignment concerns and the practical difficulties faced by the District, it will not be possible for Catahoula to reopen in Fall 2023.

## CONCLUSION & REMEDIAL ORDER

The parties' proposals aside, this Court remains convinced that keeping Catahoula closed is the best option for the District. Like Dr. Frankenberg, the Court stands by its "prior opinion that Catahoula should be closed in concert with other actions, especially implementation of a magnet school in the St. Martinville zone."[316] The desegregative improvements made since 2021 after Catahoula's closure are notable. The ELC and SMP have come closer to meeting the desegregation standard by about 4.0 percentage points, the closest to compliance since the parties entered into the 2016 Consent Order.[317] Moving forward, if the Court approves the Joint Motion Regarding Attendance Zones, with Catahoula remaining closed, demographics at the ELC and SMP would both fall within the desegregation standard, and more students than ever before would be residentially zoned to integrated schools.[318] For the ELC, it would be within the

---

[314] 5/22/23 Rough Tr. at 23:7–8, 15–16.
[315] *Id.* at 23:13–14.
[316] Record Document 649-6 at 15.
[317] Record Document 651-11 at 1−4.
[318] *See* Record Documents 651-11 at 1–4 & 699-1 at 3–4.

+/-15% desegregation standard at +14.1%, and SMP would fall within the standard at +14.6%.[319] Furthermore, Stephensville Elementary aside, all grade schools except one would fall within the +/-15% standard. That school, Cecilia Elementary, would fall outside the standard by -1.5%. Because these numbers are based on student residence, effective desegregation for all grade schools parish-wide would be both immediate and lasting.

But if this Court must choose a plan to reopen Catahoula under the terms of the remand, it chooses Plaintiffs' plan. Their proposal opens Catahoula as a PK−1 school in the 2021 attendance zone for those grade levels. This means that the annex area is eliminated. The reopening of Catahoula will not occur until the magnet program at the ELC and SMP is implemented, currently scheduled for Fall 2024. Plaintiffs' plan has several advantages over the others submitted. For one, the parties, the experts, Superintendent Blanchard, and the community feedback expressed concern about transporting young students to schools far away from home. Second, the Court believes that effectuating desegregation at an early age is essential, and this proposal allows all elementary students in the St. Martinville area to unite by the second grade. Third, unlike the Government's or Dr. Frankenberg's suggestion, this alternative will not require the Board to reconfigure the grade bands at the ELC and SMP (the Government's proposal) or St. Martinville Jr. High (Dr. Frankenberg's proposal). Finally, this plan will ensure that a robust magnet program can thrive at the ELC and SMP. The Court acknowledges that Catahoula and the ELC will reopen as racially identifiable schools. This racial identifiability will decrease if the magnet school is genuinely "robust" and successful. Nevertheless, compared with the Board's and Mr. Hefner's plan, Plaintiffs' plan exposes far fewer students to racially identifiable schools

---

[319] Record Document 699-1 at 4. These numbers, of course, are based on residential student demographics and do not account for any student transfers. The deviation from the districtwide Black elementary school percentage is based on the stipulated 47.4%.

based on the data presented at trial and the Joint Motion's proposed attendance zone modifications.

In the absence of the Board proposing no plan other than a return to the *status quo ante*, this Court reluctantly has assumed the responsibility of ordering this relief. If the Board in the future seeks to consider other reasonable and practicable alternatives to that ordered by the Court, the Board can come back to the Court and petition for a change. If the Board seeks to alter this order to that end, it must file a motion by **November 1, 2023**.[320] For example, it may consider reopening Catahoula as a parish-wide sixth-grade academy, as Dr. Frankenberg proposed. Or it might consider the Government's proposal of opening Catahoula as a PK−K school which would include the students in the annex. The Court acknowledges that the Government's plan is not only very close to Plaintiffs' plan but also, in some ways, better than Plaintiffs' plan. For example, the Government's plan places fewer children in racially identifiable schools and has a more desegregative effect on SMP. The tipping point for the Court to favor Plaintiffs' plan is that the Government's plan requires a grade reconfiguration at the ELC and SMP and buses the PK−K students from the annex further from their homes. Nevertheless, if the parties ultimately agreed on such a proposal, the Court would entertain a motion to adopt it. Throughout this litigation, the Court has encouraged the parties to come to a consensus on what is best for the parish students. Moving forward, the Court sincerely hopes that the Board prioritizes its constitutional obligations and fulfills its promises to the St. Martin Parish students by successfully desegregating the St. Martin Parish School District to the extent practicable. Only then can the Board put an end to this long-standing litigation. But in the absence of consensus and under the remand order of the Fifth Circuit, this Court must act.

---

[320] It is necessary that the Board do so by this date to permit time for discovery, expert reports, and a possible hearing.

The Fifth Circuit's remand in *Borel*, 44 F.4th at 317, commands this Court to consider "other methods of addressing [the] concern" of racial identifiability and segregation in the District's primary schools. As the evidence demonstrates, there is no plan under which reopening Catahoula contributes to desegregating the District's primary schools. Thus, if the remand means that Catahoula must be reopened, this Court must choose the lesser of several "evils." But the appellate court's opinion leaves a small window in that it states that this Court erred in closing Catahoula "at this stage in the proceedings." *Id.* at 316. If the remand means that after considering other reasonable alternatives, this Court could order the closure of Catahoula, then it would be the order of this Court to keep Catahoula closed. Indeed, this Court has considered and rejected the alternatives mentioned by *Borel*, including the consideration of different attendance zones and whether the St. Martinville and Catahoula areas were naturally desegregating. This Court would urge the Fifth Circuit to interpret the remand in that light and keep Catahoula closed. Until the Fifth Circuit gives this Court further guidance, this Court will select Plaintiffs' proposal as the plan to do the least harm to the District. As Plaintiffs propose, reopening Catahoula as a PK−1 school balances the benefits of desegregation with the Fifth Circuit's concerns about closing a local school. Therefore,

**IT IS ORDERED** that this Court's June 2021 order closing Catahoula Elementary to grades K−5 is **VACATED** to that extent only, and the order contained herein will govern the structure and timing of the school's reopening;

**IT IS FURTHER ORDERED** that the student assignment zone for Catahoula Elementary outlined in the Student Assignment Consent Order at Record Document 211 is **VACATED**;

**IT IS FURTHER ORDERED** that, subject to the other orders herein, Catahoula reopen as a PK−1 Elementary School with the PK−1 attendance zone as approved in the Student Assignment Consent Order at Record Document 211-1 at 15, referencing page 45, only for those grade levels. Grades 2−5 of the former Catahoula attendance zone are incorporated into the St. Martinville attendance zone, and the area known as the "annex" is hereby eliminated;

**IT IS FURTHER ORDERED** that Catahoula Elementary be reopened no earlier than Fall 2024 if the magnet program outlined in Record Document 694 is implemented at that time to the satisfaction of the parties and this Court.  According to the Magnet Consent Order, the program is slated to be implemented in the school year 2024−2025. If this date changes for any reason, the Court should be informed immediately. The Board may also relocate the alternative JCEP school at Catahoula at that time;

**IT IS FURTHER ORDERED** that any changes to the grade configuration at Catahoula, the prescribed zone, or the timing of the school's reopening are subject to this Court order and cannot be altered without further order of this Court;

**IT IS FURTHER ORDERED** that all students currently zoned for the ELC since the closure of Catahoula Elementary shall remain in that zone at least until the beginning of the 2024−2025 school year;

**IT IS FURTHER ORDERED** that, other than the Catahoula student attendance zone, the student attendance zones outlined in the Student Assignment Consent Order at Record Document 211 shall remain in effect parish-wide until further orders of this Court;

**IT IS FURTHER ORDERED** that all other provisions of the Student Assignment Consent Order at Record Document 211 not inconsistent with this order shall remain in effect until further orders of the Court;

**IT IS FURTHER ORDERED** that the Court will monitor the implementation of the chosen plan for at least three years after any reopening of Catahoula. *See Moore*, 921 F.3d at 547. The earliest date the Board may file a motion for unitary status will be forty-five (45) days after filing the June 30, 2027, end-of-year reports.

Finally, to implement the contents and intent of this memorandum ruling more fully,

**IT IS FURTHER ORDERED** that Plaintiffs submit to this Court a detailed order for the Court's signature by **August 8, 2023**. This order should address the practical implementation steps needed, such as a detailed geographical description of the Catahoula Elementary, the ELC, and SMP attendance zones, reporting requirements, availability of transportation, availability of transfers, etc. In the interim, this order shall remain in effect.

**THUS DONE AND SIGNED** this 31st day of July, 2023.

ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE

97